**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| RHONDA FLEMING and<br>MIRIAM CRYSTAL HERRERA, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 4:25-CV-0157-D<br>(Consolidated with |
| WARDEN T. RULE, WILLIAM K.<br>MARSHALL, III, PAMELA J. BONDI,<br>and THE UNITED STATES OF<br>AMERICA, | § § § § § § | Civil Action No. 4:25-CV-0438-D) |
| Defendants. | § | |

## PLAINTIFFS' VERIFIED AMENDED COMPLAINT

Plaintiffs Rhonda Fleming and Miriam Crystal Herrera ("Plaintiffs") file their original consolidated verified complaint, which amends their previous individual complaints, against Defendants Warden T. Rule, William K. Marshall, III, Pamela J. Bondi, and the United States of America (collectively the "Defendants"), and would show the Court the following:

## I. INTRODUCTION

This case is about protecting women's rights to safety, dignity, and bodily privacy. Plaintiffs Rhonda Fleming and Miriam Crystal Herrera are biological women incarcerated at the Federal Medical Center–Carswell ("FMC Carswell") in Fort Worth, Texas. The Bureau of Prisons' ("BOP") "inmate sex" designation for FMC Carswell is "female offenders."[1] In fact, FMC Carswell is the BOP's only medical center for female inmates. Yet the BOP endangers female inmates by housing biological men, many of whom are convicted of sexual violence against women, at FMC Carswell and other women's prisons. This unjust policy and practice must cease.

---

[1] Federal Bureau of Prisons, "FMC Carswell: An Administrative Security Medical Center with an Adjacent Minimum Security Satellite Camp," https://www.bop.gov/locations/institutions/crw/ [https://perma.cc/F2H8-WNBL].

This BOP policy violates Plaintiffs' constitutional and statutory rights to bodily privacy and the free exercise of religion. Plaintiffs, and other female inmates at FMC Carswell, are compelled to shower, undress, sleep, and use toilets in the presence of male inmates—often in open, communal spaces that offer no meaningful visual barrier and where male guards are not even permitted to access absent exigent circumstances. Female inmates are exposed to male genitalia, voyeurism, sexualized harassment, and the constant fear of sexual assault. For survivors of abuse, these conditions trigger acute anxiety, sleeplessness, and lasting psychological harm. No woman should be forced to choose between her safety and solitary confinement or suicide watch simply to avoid unwanted exposure to men in spaces reserved for female privacy.

The data emphasizes the heightened risks that the BOP policy imposes on women. Male, transgender-identifying inmates are far more likely to have been convicted of sexual crimes than female inmates. Indeed, data obtained through a Freedom of Information Act ("FOIA") request to the BOP reveals that approximately 51 percent of male, transgender-identifying inmates are incarcerated for sex offenses.[2] This percentage is nearly four times higher than the rate of sex-offense incarceration within the general BOP male population.[3] Because the BOP houses biological men in women's prisons, female inmates are unnecessarily subject to extreme and outrageous risks of sexual violence.

The BOP policy is also unlawful. Nothing in the Prison Rape Elimination Act authorizes the BOP to redefine "sex" as "gender identity" or to place men in women's facilities to "affirm" a self-reported gender identity. The BOP's current framework disregards the privacy, safety, and

---

[2] *See* Brief of *Amicus Curiae* Women's Liberation Front in Support of Appellants, filed in *Doe v. Bondi*, No. 25-5099 (D.C. Cir. Sept. 3, 2025), at 5 [Doc. #2133473]; Keep Prisons Single Sex, "News: Federal BOP Transgender Inmate Report (Jan. 2025)," available at https://usa.kpssinfo.org/federal-bop-transgender-inmate-report-january-2025/ [https://perma.cc/79UQ-GYZF].

[3] *Id.*

religious liberty of female prisoners, even though the United States Constitution protects women against routine opposite-sex exposure in showers, restrooms, and living quarters, and the Religious Freedom Restoration Act forbids the federal government from imposing substantial burdens on religious exercise absent the least restrictive means to serve a compelling interest. The BOP's approach is also arbitrary and contrary to law under the Administrative Procedure Act. And it is in direct defiance of Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, by which the President of the United States, in whom the Constitution vests all authority of the executive branch, expressly ordered that men not be housed in federal women's prisons.[4]

Plaintiffs have suffered retaliation for their attempts to vindicate their constitutional and statutory rights. BOP employees have used the disciplinary process to intimidate Ms. Fleming from filing grievances and complaints. For example, when Ms. Fleming was incarcerated at a previous BOP facility, a chaplain filed an incident report when Ms. Fleming referred to a male, transgender-identifying inmate as a man. Additionally, in July 2025, Ms. Fleming was placed in a Special Housing Unit ("SHU") after she objected to living in the same unit with male, transgender-identifying inmates. Prison officials threatened to assign Ms. Fleming to a SHU cell with a male, transgender-identifying inmate who was in the SHU for physically assaulting female inmates, and so the BOP unjustifiably forced Ms. Fleming to choose suicide watch instead of the SHU. As another example, after Ms. Herrera spoke up and joined this lawsuit, BOP officials threatened to transfer her from FMC Carswell to another facility in Alabama that is hundreds of miles from her

---

[4] *See* Exec. Order 14168, 90 F.R. 8615 (2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ [https://perma.cc/ZS9L-LF56] ("The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.").

3

Texas-based family and support network without legitimate penological justification and against BOP policy, chilling protected speech and underscoring Defendants' transparent intent to moot this litigation. These latest acts of the BOP's apparent retaliation are some of several reasons Plaintiffs filed their *Motion for Temporary Restraining Order and Preliminary and Permanent Injunction and Brief in Support* ("Motion") along with this verified complaint.

Plaintiffs seek narrowly tailored relief to vindicate women's rights in federal custody. Specifically, they request: (1) declaratory and injunctive relief prohibiting the BOP from housing male inmates—including male, transgender-identifying inmates—within women's general populations, or permitting such inmates to enter female-only privacy areas; (2) protection of Plaintiffs' religious exercise under the Religious Freedom Restoration Act; (3) setting aside of the BOP's unlawful policy under the Administrative Procedure Act; (4) an order barring the transfer of Ms. Herrera, or any other adverse change to the terms or conditions of her confinement in retaliation for her participation in this case; (5) actual damages, with post-judgment interest as permitted by law, for Ms. Fleming; and (6) an award of attorneys' fees and costs. The law, justice, and a fundamental commitment to the rights and dignity of women require no less than these requested remedies.

## II. PARTIES

1.      Plaintiff Rhonda Fleming is a 60-year-old black female, currently incarcerated at FMC Carswell in Fort Worth, Texas.

2.      Plaintiff Miriam Crystal Herrera is a 34-year-old Hispanic female also incarcerated at FMC Carswell.

3.      Defendant United States of America is the sovereign that, through the BOP, a federal agency, is in possession and control of FMC Carswell, a federal prison and medical center located in Fort Worth, Texas. The United States is responsible for creation and implementation of

4

the policies being challenged in this lawsuit, and for the incarceration of Plaintiffs and the conditions in which Plaintiffs live. The United States has waived sovereign immunity as to certain claims, including the claims set forth herein, and is liable for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, pursuant to the Federal Tort Claims Act. The United States may be served with process via certified mail delivered to the U.S. Attorney for the Northern District of Texas:

> Nancy E. Larson, Acting U.S. Attorney
> c/o Civil-Process Clerk
> U.S. Attorney's Office, Northern District of Texas
> 1100 Commerce Street, Third Floor
> Dallas, Texas 75242-1699
>
> with copy delivered via certified mail to:
>
> Pamela Bondi, U.S. Attorney General
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001
>
> and copy delivered via certified mail to:
>
> William K. Marshall, III
> Director, Federal Bureau of Prisons
> 320 First Street, NW
> Washington, D.C. 20534

4. Defendant Pamela Bondi is the Attorney General of the United States and director of the U.S. Department of Justice. Attorney General Bondi is sued in her official capacity only. Among other duties, Attorney General Bondi supervises the Department of Justice, of which one division is the BOP. Attorney General Bondi is the person responsible for the proper enforcement of BOP regulations, including regulations implementing the Prison Rape Elimination Act. Attorney General Bondi may be served with process via certified mail delivered to the U.S. Attorney for the Northern District of Texas:

Nancy E. Larson, Acting U.S. Attorney
c/o Civil-Process Clerk
U.S. Attorney's Office, Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

with copy delivered via certified mail to:

Pamela Bondi, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and copy delivered via certified mail to:

William K. Marshall, III
Director, Federal Bureau of Prisons
320 First Street, NW
Washington, D.C. 20534

5.      Defendant William K. Marshall, III is the Director of the BOP. Director Marshall is sued in his official capacity only. Among other tasks, Director Marshall is the official responsible for the creation, administration, and implementation of the policies and procedures of the BOP that are being challenged in this lawsuit. Director Marshall has appeared through counsel.

6.      Defendant Warden T. Rule is the warden of FMC Carswell. Warden Rule is sued in his official capacity only. Warden Rule is responsible for the daily administration of FMC Carswell and the enforcement of BOP policies challenged here. Warden Rule has appeared through counsel.

### III. JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court under Article III of the U.S. Constitution and 28 U.S.C. §§ 1331 and 1346 because claims in the case arise under the Constitution, laws, or treaties of the United States, including the First, Fourth, Fifth, and Eighth Amendments to the United States Constitution; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.

6

§ 2000bb, *et seq.*; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

8.      The Court has jurisdiction to issue the requested declaratory relief in accordance with 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

9.      The Court has jurisdiction to issue the requested injunctive relief in accordance with 5 U.S.C. §§ 702 and 703, 28 U.S.C. § 1343(a)(4), and Federal Rule of Civil Procedure 65.

10.      Venue is proper in the Northern District of Texas in accordance with 28 U.S.C. § 1391(e) because FMC Carswell is located in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and the policies being challenged are being implemented in the Northern District of Texas, among other locations.

## IV. <u>RELEVANT BACKGROUND FACTS</u>

### A.      *General Prison Conditions*

11.      Ms. Herrera is incarcerated and in custody of the BOP, serving a sentence of 480 months. Ms. Herrera is a non-violent, minimum-security inmate and has been housed at FMC Carswell for approximately seven years. Ms. Herrera suffers from a ruptured hard palate she has had for approximately nine years; she remains on the waiting list for corrective surgery and is still awaiting scheduling at FMC Carswell.

12.      Ms. Fleming is incarcerated and in custody of the BOP, serving a sentence of 360 months. Ms. Fleming is a non-violent, minimum-security inmate.

7

13.   FMC Carswell, which houses approximately 1,140 inmates, is designated by the BOP for "female offenders."[5] Such female facilities are not officially designated to house male inmates.[6] This means FMC Carswell should house only female offenders.

14.   Prison facilities generally house inmates 24 hours a day during their incarceration. At FMC Carswell, inmates are bunked in 4-person cells without doors and are obligated to accept cellmates as assigned by Defendants. There is effectively no privacy from one's cellmates.

15.   Inmates are under the direction, control, and supervision of BOP staff at all times while inmates eat, sleep, recreate, bathe, work, dress, and engage in other intimate activities such as using the restroom. Although shower stalls have doors at FMC Carswell, there are approximately four-inch gaps around the doors to enable female guards to see into the showers.

16.   Many of these activities are not conducted in physically separated spaces but are instead conducted in dormitory or "open" spaces visible to all other inmates and prison officials. This openness is mostly necessary to allow prison officials to keep a close eye on the activities of inmates to detect prison rule violations or harmful or harassing behavior towards other inmates or guards, thus encouraging inmates to follow the rules to avoid discipline as well as preserving the security of the facility.

---

[5] *See supra* note 1.

[6] Moreover, regardless of that "inmate sex" designation, BOP policy states: "Inmates are housed separate from the alternative sex. At various sites, female inmate units are co-located with male units. However, all housing units and activities are separate. Appropriate programs and services are provided to meet the physical, social, and psychological needs of female inmates." https://www.bop.gov/resources/pdfs/legal_guide_2025_updated.pdf [https://perma.cc/QJB3-L5KQ].

Furthermore, the BOP has recently attested in related litigation as follows: "The [Federal Bureau of Prisons ("FBOP")] believes that housing inmates according to their biological sex helps to ensure prisoner safety, security, and privacy. That is why the FBOP has always housed the vast majority of inmates with other individuals of their own biological sex. . . . It is FBOP's correctional judgment that housing inmates with inmates of their own biological sex ensures bodily privacy and safety and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships. No FBOP housing unit is co-ed. Rather, female inmates are housed separate and apart from male inmates in 29 facilities." *Second Declaration of Rick Stover, Senior Deputy Designation and Sentence Computation Center*, filed in *Jones v. Trump, et. al.* (1:25-cv-00401-RCL, (D.D.C. Mar. 1, 2025), ¶¶ 20, 23 [Dkt. 42-1].

17.    For virtually the entire history of our nation, and in most nations worldwide, male prison inmates were housed in separate facilities from female inmates.[7] There are many good reasons for this separation, including to protect the physical safety of the inmates and prison officials, bodily privacy, hygiene, and to prevent or avoid mental/sexual trauma, sexual assault, unintended pregnancies, and consensual sexual relations, which are typically prohibited by prison regulations.

18.    To preserve their bodily privacy, female inmates may not be generally or routinely subjected to observation by male guards when the inmates are disrobing, showering, or toileting. Similarly, to protect their bodily privacy, female inmates may not generally or routinely be subjected to pat searches by male guards.

B.    *Prison Regulatory Background*

19.    In 2012, the U.S. Department of Justice promulgated implementing regulations for the Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301 *et seq.*, via notice-and-comment rulemaking to effect PREA's purpose of eliminating rape in federal and federally funded prison facilities.

20.    Among other matters, these implementing regulations stated how transgender-identifying inmates would be assigned to BOP facilities. *See* 28 C.F.R. § 115.42.

21.    Subsequently, the BOP issued Program Statement number 5200.04, Transgender Offender Manual, effective January 18, 2017 ("2017 Transgender Offender Manual"), to ensure that the BOP "properly identifies, tracks, and provides services to the transgender population." 2017 Transgender Offender Manual at 1.

---

[7] *See Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989) ("Our inquiry . . . begins by noting a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender."); *see generally* Nicole Hahn Rafter, *Prisons for Women, 1790–1980*, 5 CRIME & JUST. 129 (1983), http://www.jstor.org/stable/1147471.

22.    As written, and as implemented at FMC Carswell, the 2017 Transgender Offender Manual expressly authorized Defendants to house inmates based on their self-reported gender identity.

23.    The direct consequence of housing transgender-identifying inmates based on self-reported gender identity rather than sex is that male, transgender-identifying inmates have been placed in formerly women-only prisons, including FMC Carswell.

24.    The sole dispositive criterion for such biological male inmates to be treated as if they are women is their self-report.

25.    There is no objectively discernible factor that establishes that a male inmate is a "transgender" person.[8]

26.    In contrast, sex means that one is either male or female as is determined by the union of male and female gametes at conception.

27.    Sex is immutable, binary, objectively provable, and grounded in the fact that humans reproduce sexually.[9]

28.    The physical differences between males and females are enduring.

29.    The sexes are not fungible.

30.    The subjectivity of gender is evidenced by the regulations relating to transgender-identifying inmates, who are classified as such by these self-reported criteria: "gender identity" ("a person's sense of their own gender, which is communicated to others by their gender

---

[8] *See United States v. Skrmetti*, 145 S. Ct. 1816, 1851 (2025) (Barrett, J., concurring) ("[T]ransgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex.") (internal quotations omitted).

[9] *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality op.) ("[S]ex . . . is an immutable characteristic determined solely by . . . birth.").

expression"); and "gender expression" (including "mannerisms, clothing, hair style, and choice of activities"). 2017 Transgender Offender Manual at 2.

31.    As is evident, a person's "sense of their own gender," and each of the indicia of "gender expression," are based solely on the self-reported declarations and volitional behaviors of the person himself and are not objectively verifiable as is one's sex.

32.    Additionally, the 2017 Transgender Offender Manual differentiates gender identity from sexual orientation: "sexual orientation – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related." *Id.*

33.    This differentiation means that male inmates could be heterosexual in their orientation and thus sexually attracted to women, while also claiming to be "transgender."

34.    Thus, under Defendants' policies, a male inmate with male genitalia who is sexually attracted to women may be classified as a "transgender woman" and placed among a captive female prison population. This scenario has occurred at FMC Carswell repeatedly.

35.    Intermingling men and women within a women's prison increases the risk of prison rape occurring. Regardless of sexual orientation, male inmates may use their male sexual organs to harass, threaten, or harm females.

36.    For victims of sexual abuse—as many women in prison are—exposure to male sexual organs can be even more severely mentally distressing and harmful. Similarly, being viewed by a male inmate during intimate acts such as showering, changing clothes, or going to the restroom can cause psychological distress, re-traumatization, and exacerbation of pre-existing stress conditions.

37.     Moreover, male, transgender-identifying inmates are statistically far more likely to have been convicted of sexual crimes than other federal prisoners, further heightening the serious safety risks created by Defendants' policy of housing such individuals in women's facilities. For example, as noted above, the BOP's own data, obtained through a FOIA request, confirms that approximately 51 percent of male, transgender-identifying inmates were incarcerated for sex offenses, nearly four times the rate in the general BOP male population.[10]

38.     Sexual assault in prison is a very serious national problem, which is why Congress passed PREA.

39.     28 C.F.R. § 115.42 does not mention, much less make provisions for, the protection, safety, and privacy of biological female inmates with whom biological male inmates are being housed.

40.     The 2017 Transgender Offender Manual did not mention, much less make provisions for, the protection, safety, and privacy of the female inmates with whom male inmates are being housed. For instance, the 2017 Transgender Offender Manual cites to 28 C.F.R. § 115.42(c): "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates . . . the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 2017 Transgender Offender Manual at 5. Nothing was said about the privacy, religious beliefs, health, or safety of other inmates who do not suffer from gender dysphoria.

41.     The 2017 Transgender Offender Manual elevated the concerns of male, transgender-identifying inmates, many of whom suffer multiple serious psychological disorders in addition to gender dysphoria, over and above the concerns and protection of the entire population

---

[10] *See supra* note 1.

12

of female inmates, thus shifting the burden to protect the privacy and safety of the female inmates from the BOP to the female inmates themselves.

42.     There is no penological interest being served by placing male inmates within the general populations of federal women's prisons.

43.     On May 11, 2018, the BOP issued a revised Transgender Offender Manual, No. 5200.04 CN-1.

44.     On January 13, 2022, the BOP issued a revised Transgender Offender Manual, No. 5200.08 ("2022 Transgender Offender Manual").

45.     Under the 2022 Transgender Offender Manual, Defendants retain the authority to house a male inmate in federal women's prisons.

46.     Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from placing a male inmate within a federal women's prison.

47.     Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from housing a male inmate within a SHU administrative segregation cell where one or more female inmates are housed.

48.     Nothing prohibits the Defendants from allowing a male inmate access to bathrooms and showers used by female inmates.

49.     Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from housing a male inmate within a dormitory cubicle at FMC Carswell.

50.     Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from housing a male inmate at any of the BOP's women's prisons.

51.     Non-federal prisons with similar inmate populations and inmate demographics— such as the State of Texas system—currently manage the needs of transgender-identifying

prisoners without intermingling the sexes in the general prison population, just as the federal system did prior to the adoption of gender identity theory in its regulations. Those systems demonstrate feasible, narrowly tailored alternatives that Defendants could implement.

52. Male, transgender-identifying inmates still possess the innate physical characteristics of men (even if they have had surgical removal of some or all male sexual organs), including greater average height, weight, and muscle mass than female inmates.

53. These characteristics generally make male, transgender-identifying inmates substantially larger and stronger than the average woman, thus rendering them a physical as well as sexual danger to female inmates and prison officials.[11] These risks are exacerbated by communal showers and bathrooms.

54. Data obtained through a FOIA request to the BOP demonstrates that between May 2024 and January 2025, approximately 51 percent of male, transgender-identifying inmates were incarcerated for sex offenses.[12] This percentage is nearly four times higher than the rate of sex-offense incarceration within the general BOP male population. The data confirm that male, transgender-identifying inmates are statistically far more likely to have been convicted of sexual crimes than other federal inmates.

C.    *The Conditions That Support This Lawsuit.*

1.    **Facility Layout and Privacy Deficits**

55. FMC Carswell contains multiple housing units: One North, Two North, One South, Two South, a Hospital Unit, and an Administrative Unit. Many bathrooms across the facility

---

[11] *See infra* paragraph 70.

[12] *See supra* note 1.

(including the medical services bathroom and recreation-room bathroom) lack locks, regular guard presence, or basic security, leaving women vulnerable when they use them.

56.    In the main housing units, showers have swing doors with large gaps—approximately four inches or more—deliberately designed so officers, specifically female guards, can see inside. The doors have no locks. A mirror area sits perpendicular to the showers with a direct line of sight into the stalls. Male inmates stationed near those mirrors can and do watch women while they shower.

57.    The SHU consists of small (approximately twelve feet by eight feet) lockdown cells in which prisoners eat, sleep, shower, and use the toilet in the same space with zero privacy. SHU placement may be disciplinary or administrative (including so-called "protective" custody). Any inmate can be sent to SHU at any time.

58.    Suicide watch, when imposed, houses inmates separate from the SHU in solitary-like conditions in a freezing cell while wearing a sleeveless, single-piece anti-suicide smock, which inmates refer to as a "turtle suit."

**2.    Presence and Housing of Male Inmates**

59.    As would be expected from the 2012 PREA regulations and the 2017 Transgender Offender Manual, numerous male, transgender-identifying inmates are currently housed within the general female population. Plaintiffs have been housed with male inmates.

60.    Despite President Trump signing Executive Order 14168 in January 2025, numerous male, transgender-identifying inmates have been placed into the general female populations of federal women's prisons, including FMC Carswell.

61.    These inmates include, among others:

- Jose Cruz "Katy" Bernal-Guzman (Register No. 40935-510);

15

- Gary Dean Boone (Register No. 94865-071);

- Peter Kevin Langan (Register No. 64023-061);

- Zack J. Lawrence (Register No. 26900-001);

- William McClain, also known as "July J. Shelby" (Register No. 15472-028);

- Walter John Meachum (Register No. 48556-074);

- Rafael Mercado Berrios (Register No. 23227-026);

- Michael D. Reed (Register No. 19273-045); and

- Michael "Kara" Sternquist (Register No. 44404-061).[13]

62.    Most male inmates at FMC Carswell are housed in unit One North; others are housed in Two North and other units. For example, Michael "Kara" Sternquist, Michael D. Reed, Gary Boone, and Walter John Meachum are housed in unit One North; Zack J. Lawrence is housed in Two North—the same unit as Ms. Fleming.

63.    Upon information and belief, many of these inmates have been convicted of violent or sexual offenses, including rape and murder.

- Boone was convicted in connection with the pipe bombing that resulted in the death of his wife's lover.[14]

- Langan was convicted of assaulting a federal officer and committing armed bank robbery in connection with a white-supremacist organization he co-founded called

---

[13] The presence of these male inmates in female prisons, including FMC Carswell, can be verified through a search on the BOP website. *See* Federal Bureau of Prisons, "Find an Inmate," https://www.bop.gov/inmateloc// (last accessed Nov. 3, 2025).

[14] *See United States v. Boone*, 245 F.3d 352, 356–57 (4th Cir. 2001).

the "Aryan Republican Army," whose stated goal was "overthrowing" the United States government.[15]

- Lawrence is also a sexual offender convicted of attempted enticement of a minor to engage in sexual activity and distribution of child pornography.[16]

- McClain is a repeat sexual offender whose prior victims include a nine-year-old boy and seventeen-year-old girl.[17]

- Mercado Berrios is a convicted sex offender.[18]

- Reed raped a seventy-five-year-old woman and pleaded guilty to kidnapping and indecent acts with a child.[19]

64.    Upon information and belief, the vast majority of these inmates retain their male genitalia, as well as their male physical characteristics, including height, weight, and strength. Their placement within the female population at FMC Carswell creates an ongoing and substantial risk of sexual assault, intimidation, and psychological trauma for female inmates.

### 3.    Illustrative Incidents and Patterns

65.    Female prisoners are forced to encounter these men daily in communal settings, including showers, toilets, and sleeping quarters, often without privacy barriers. For instance,

---

[15] *See United States v. Langan*, 263 F.3d 613, 615–18 (6th Cir. 2001).

[16] *See Judgment in a Criminal Case*, filed in *United States v. Lawrence* (Case No. 2:08-cr-00044-LSC-PWG, N.D. Al. July 24, 2008), at 1 [Dkt. 24].

[17] National Review, "Female Inmates Sound Alarm Over Dangers of 'Gender-Inclusive' Prison Housing," June 12, 2024, https://www.nationalreview.com/news/female-inmates-sound-alarm-over-dangers-of-gender-inclusive-prison-housing-after-ted-cruz-interrogates-biden-judicial-nominee/ (last accessed Nov. 3, 2025).

[18] *See United States v. Mercado*, 53 F.4th 1071, 1075 (7th Cir. 2022); U.S. Attorney's Office, Central District of Illinois, "Springfield Man Sentenced to Ten Years in Prison for Attempted Enticement of a Minor," Oct. 22, 2021, https://www.justice.gov/usao-cdil/pr/springfield-man-sentenced-ten-years-prison-attempted-enticement-minor [https://perma.cc/S85J-KJEX].

[19] WRAL News, "Fort Bragg Soldier Pleads Guilty to Rape, Sexual Assault," Aug. 3, 2006, https://www.wral.com/story/101441/ [https://perma.cc/4ASF-9398].

Lawrence, who is a convicted sex offender, routinely uses the women's showers and has been observed frequently engaging in sexual activity with female inmates in the showers. At one time, Lawrence was released to a halfway house, but he was soon returned to FMC Carswell for rule violations involving a cell phone. Lawrence has a girlfriend and continues to be housed in Two North with female inmates.

66.    Boone has ongoing sexual relationships with female inmates and has been observed sharing a cell naked and having sex with a woman who reportedly suffers from mental illness.

67.    Langan is, upon information and belief, the only male inmate at FMC Carswell known to have undergone genital surgery. He is also the only male inmate who regularly wears makeup and a dress.



Peter Langan

68.    McClain, who is a convicted sex offender with a history of sexual violence, has been placed in segregated housing, because, upon information and belief, he continues to sexually harass female inmates and officers.

69.    Meachum has been caught having sex with a female inmate and was transferred from Two South to One North.



Walter John Meachum

70.    Upon information and belief, at least two times in the past four months, Mercado Berrios, who is a convicted sex offender, has been placed in hospital segregation due to elevated testosterone levels. When not in hospital segregation, Mercado Berrios is known to have sex with female inmates in unit showers.



Rafael Mercado Berrios

19

71.     Sternquist has verbally assaulted women, including a five-to-seven-minute incident in which Sternquist closed distance on Ms. Fleming in a mail line, yelled that Ms. Fleming was "full of hate," and got in Ms. Fleming's face.

72.     Sternquist's assault of female inmates has also been physical and sexual. Upon information and belief, on July 19, 2025, while reportedly high on drugs, Sternquist entered the unlocked room of female inmate Tamarisk Trejo Matheos at around 2 a.m. In and of itself, this is a violation of FMC Carswell's rules. Sternquist proceeded to sexually assault Ms. Trejo Matheos, stating, "I'm not trans, I'm bisexual and everything works." Upon information and belief, despite witness statements and the existence of video evidence showing Sternquist's movement within the prison, the BOP and FMC Carswell officials have taken no meaningful action to investigate or discipline Sternquist. Instead, Ms. Trejo Matheos was eventually moved to a halfway house.

73.     Female inmates who object to being housed with men have been targeted for retaliation by both male inmates and certain BOP staff sympathetic to transgender ideology. The harassment includes physical intimidation, "accidental" unwanted bodily contact, false accusations of misconduct, and repeated verbal threats. In one instance, Boone told a sixty-year-old female inmate that if he and other men were removed from the prison, the female inmate would be "removed another way."

74.     Female inmates have also been exposed to the risk of confinement in the SHU with male inmates. The SHU consists of small lockdown cells in which prisoners eat, sleep, shower, and use the toilet in the same space, without privacy. In July 2025, in an apparent act of retaliation for protesting the BOP's transgender-identifying inmate policies and for filing this lawsuit, prison officials placed Ms. Fleming in the SHU and threatened to put her in the same cell as Bernal-

20

Guzman, who was in the SHU for physically assaulting female inmates. Fearing for her safety, Ms. Fleming requested suicide watch rather than risk placement in a cell with a man. Another female inmate who refused such housing was physically beaten.

75.     Upon information and belief, the BOP has taken no reasonable steps to protect female inmates from these dangers. Prison officials have permitted male inmates to be dispersed throughout the facility rather than confined to a separate housing unit. Warden Rule has discretion to assign all male inmates to a single unit for security and administrative reasons, but Warden Rule has declined to do so.

76.     In addition to the incidents described above, female inmates have been subjected to persistent sexual harassment and voyeurism by male inmates placed within the women's housing units. Ms. Herrera has personally experienced multiple incidents in which male prisoners observed her while she was nude or partially clothed.

77.     On one occasion, while showering early in the morning before scheduled work assignments, Ms. Herrera sensed that she was being watched. When she looked outside the shower, she observed a male inmate standing nearby and staring directly at her through the opening. The inmate was wearing makeup and pretending to groom himself in the mirror positioned so that he could watch the women shower. The shower area offers no meaningful visual barrier from the mirrors in the adjoining space, even though the prison provides a separate "hair care room" with mirrors where inmates are expected to prepare for the day.

78.     This same inmate later told Ms. Herrera that he would be waiting for her in the bathroom after lights out. In another instance, as Ms. Herrera was closing the shower door, the same inmate deliberately opened it, exposing her body and laughing about the incident.

79.     Ms. Herrera has also experienced harassment in other common areas. While she was working at her assigned duty post, one male inmate in a wheelchair made an obscene comment about how his position allowed him to have "a better view of women's private parts." On another occasion, while Ms. Herrera was sitting in the atrium watching television, a new male inmate approached her in a sexually suggestive manner, attempting to make small talk and invading her personal space as though they were in a social setting outside of prison.

80.     These repeated intrusions have severely affected Ms. Herrera's mental health and sense of safety. Having been sexually abused in the past by a person with whom she shared a living space, Ms. Herrera experiences acute anxiety when forced to shower or change clothes in view of male inmates. The lack of privacy, coupled with the frequency of such incidents, has caused lasting psychological harm and ongoing fear of sexual victimization.

81.     Despite numerous reports and complaints by Ms. Herrera and other female inmates, BOP officials have failed to take any meaningful corrective action. Male inmates continue to have unrestricted access to female housing, bathroom, and recreational areas, including locations that male guards are not permitted to access. Defendants' refusal to ensure sex-segregated housing and facilities has created conditions that are inherently unsafe and incompatible with the dignity, privacy, and security owed to female prisoners.

82.     The ongoing presence of male inmates throughout the women's prison subjects women to daily exposure to male bodies and to the constant fear of sexual assault. As a result, many female prisoners, including Plaintiffs, experience severe anxiety, sleep disruption, and psychological trauma. Defendants' continued policy of housing men, including male, transgender-identifying inmates, within the female population violates the constitutional rights of female inmates to bodily privacy, personal security, and freedom from cruel and unusual punishment.

83.     Male inmates have been known to display their male genitalia to Plaintiffs, either aggressively and intentionally as a means of intimidation or harassment, or inadvertently in the course of prison life. Many women, including Plaintiffs, have changed their behavior to dress inside the shower stalls or toilet areas, rather than in the open changing space, so to protect an ounce of their privacy from the male gaze.

84.     Whether such exposure is intentional or inadvertent, or motivated by animus or not, it is damaging to Plaintiffs and such exposure arises solely because of Defendants' policies and practices challenged herein.

85.     Plaintiffs' exposure, either intentionally or inadvertently, to these displays of male genitalia has caused them to suffer embarrassment, mental anguish, suspicion, fear of sexual assault, and other unnecessary and readily preventable mental distress.

**4.      Feasible, Sex-Segregated Housing Alternatives Within FMC Carswell**

86.     FMC Carswell has every level of security at different parts of the facility, including a Hospital Unit located upstairs. That unit is a secure medical area distinct from the SHU, with its own TV, recreation area, commissary access, on-unit laundry, and the ability to keep later hours. Inmates are regularly held there long-term, and program materials can be brought to the unit.

87.     Male inmates could be safely and humanely housed in the Hospital Unit as a distinct, secure housing area without access to female housing units and privacy spaces. Housing all male inmates there, or in an equivalently segregated setting, would substantially mitigate or eliminate the privacy and safety harms to women while preserving access to programming and services for those male inmates. Defendants have discretion to assign all male inmates to a single unit for security and administrative reasons but have declined to do so.

### 5.    Plaintiffs' Religious Beliefs

88.    Plaintiffs are people of faith. Ms. Herrera is a practicing Christian, and Ms. Fleming adheres to Messianic Judaism. Their sincerely held beliefs include that: individuals cannot choose their gender; that men cannot become women; and men and women practice modesty norms that prohibit men and women exposing or viewing one another's nudity outside of marriage. Their religion thus forbids them being seen nude by men, seeing nude men, and sharing showers, toilets, changing areas, and sleeping areas with men.

89.    Christian teachings about modesty and privacy between the sexes are among the most fundamental of Christian teachings. They are evident in Genesis, the very first book of the Bible. *See* Genesis 1:27 (New Int'l Version) ("So God created mankind in his own image, in the image of God he created them; male and female he created them.") Moreover, the New Testament imposes clear modesty norms: "I also want the women to dress modestly, with decency and propriety . . . ." 1 Timothy 2:9 (New Int'l Version).

90.    Consistent with the tenets of their faith, Plaintiffs observe certain conventions of modesty and propriety in dress and demeanor, which include not viewing nude men unnecessarily and similarly avoiding exposure of their own nudity to men outside of a marriage. Plaintiffs have changed their daily routines to preserve modesty, including changing the time that they shower or use a toilet, dressing inside the shower stalls, and avoiding open changing areas. These religious tenets and the free exercise thereof are being violated by the imposition of the subject regulations and the housing of male, transgender-identifying inmates in federal women's prisons. Defendants' placement and supervision policies force Plaintiffs to choose between violating these modesty norms or suffering punishing alternatives (such as the SHU or suicide-watch), intimidation, or discipline.

24

91.     Plaintiffs also believe they have an obligation to speak the truth about the nature of men and women, including that God created two, immutable sexes. Retaliation and threats of reprisal from prison staff have chilled Plaintiffs' ability to speak what they believe is biblical truth, under fear of punishment if they speak up.

92.     Despite being on notice through this lawsuit that their policies were violating Plaintiffs' religious freedom, Defendants' problematic policies of housing male inmates in female facilities remain in effect. Defendants have rejected Plaintiffs' requests for accommodation, and staff has discouraged and threatened the reporting of complaints, leaving Plaintiffs without any viable way to practice their faith in custody.

**6.     Executive Order 14168 and Related *Doe v. Bondi* Litigation**

93.     On January 20, 2025, President Trump issued Executive Order 14168. The Executive Order affirmed the federal government's commitment to protect women's safety, dignity, and privacy by ensuring that biological males are not housed in prison facilities designated for biological females.

94.     Executive Order 14168 directed all federal agencies, including the Department of Justice and the BOP, to align their policies with biological reality and to eliminate practices that allow males identifying as female to be placed in women's correctional institutions. Specifically, the Order directed the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers."[20]

95.     Despite the clear mandate of Executive Order 14168, the BOP has failed and refused to implement Executive Order 14168's directive at FMC Carswell. Upon information and belief, numerous male inmates who identify as female continue to be housed within the general

---

[20] *See supra* note 4.

25

population of FMC Carswell, where they share restrooms, showers, and recreational areas with female inmates.[21]

96.    In a separate case, *Doe v. Bondi*, No. 1:25-cv-286-RCL (D.D.C.), a group of anonymous male, transgender-identifying inmates challenged Executive Order 14168. On February 18, 2025, and again on February 24, 2025, the United States District Court for the District of Columbia entered preliminary injunctions enjoining enforcement of Sections 4(a) and 4(c) of Executive Order 14168 as to the anonymous plaintiffs in that case. The district court concluded that the male, transgender-identifying plaintiffs, who had previously been designated to women's facilities, were likely to succeed on their Eighth Amendment claim that summary transfer to men's prisons would subject them to a substantial risk of harm and exacerbate gender-dysphoria symptoms. The injunction currently prevents the BOP from enforcing those provisions of Executive Order 14168 against the *Doe* plaintiffs,[22] and the government's appeal of that injunction is pending before the United States Court of Appeals for the District of Columbia Circuit, *Doe v. Bondi*, No. 25-5099 (D.C. Cir.). Although the injunction purportedly does not allow the BOP to transfer the *Doe* plaintiffs to men's prisons, it does not require the BOP to house the *Doe* plaintiffs in the same housing units as females or force the BOP to allow the *Doe* plaintiffs to use the same showers and toilets that female inmates use.

---

[21] On February 21, 2025, the BOP issued a memorandum regarding compliance with Executive Order 14168 ("February 2025 Memorandum"). *See* Exhibit A to *Complaint*, filed in *Kingdom v. Trump*, Case No. 1:25-cv-00691 (D.D.C. Mar. 7, 2025), at 1–2 [Dkt. 1-1]. Although the February 2025 Memorandum purportedly represented that "BOP will comply with the executive order," it went out of its way to allege that Executive Order 14168 "does not supersede or change BOP's obligation to comply with Federal laws and regulations, including Prison Rape Elimination Act (PREA) and corresponding regulations." *Id*. at 1. As a result, the BOP has simply ignored Executive Order 14168.

[22] Although Plaintiffs suspect that one or more of the *Doe* plaintiffs may be housed at FMC Carswell, the anonymous and redacted nature of the *Doe v. Bondi* court filings makes it impossible to determine whether the preliminary injunctions in that case directly affect any inmates currently housed at FMC Carswell.

97.     While at FMC Carswell, Plaintiffs' only potential alternative to avoid exposure to male inmates would be to volunteer for protective custody. This amounts to solitary confinement in the SHU, which results in loss of paid prison work assignments, contact with other inmate friends and associates, access to recreational facilities, and other deprivations.

98.     This is backwards: it is not Plaintiffs who are intruding on the constitutional rights of other inmates in the prison, but rather it is the male inmates who necessarily violate privacy and pose other threats to legal rights and even others' safety. Every time a woman must suffer the indignity of a male inmate, whether or not he identifies as "transgender," viewing her while she showers without her consent, or her seeing a male erection in a shared restroom that she does not wish to see, that woman has been injured. It is unjust and unreasonable for Plaintiffs to be asked to "volunteer" for more punitive confinement conditions in the SHU in order to avoid the harms and threats being inflicted on them by the Defendants' policies.

99.     Plaintiffs have suffered, and continue to suffer, severe mental anguish in the form of extreme embarrassment, fear for their physical safety, anxiety, and sleeplessness as a direct result of ongoing unwanted inmate opposite-sex exposure at FMC Carswell. They are being subjected to conditions where their bodily privacy is continually at risk and frequently violated, and mental and physical safety is constantly endangered by being housed with male inmates, all under the Defendants' policies.

**7.     The Threat of Retaliatory Transfer**

100.    In October of 2025, BOP officials have threatened to transfer Ms. Herrera from FMC Carswell, located in Fort Worth, Texas, to the Federal Correctional Institution in Aliceville, Alabama ("FCI Aliceville"). This proposed transfer is in retaliation for Ms. Herrera's exercise of her constitutionally protected right to petition the government for redress of grievances through this lawsuit, as well as Ms. Herrera raising safety and privacy complaints with prison officials.

101.    The threatened transfer lacks any legitimate penological justification and contravenes the BOP's own policy guidance, which provides that inmates should ordinarily be confined within 500 miles of their home. *See* 18 U.S.C. § 3621(b). Ms. Herrera's family resides in Texas, and a transfer to Aliceville would place her more than 500 miles away from her mother and other family members who provide her with critical emotional and logistical support. By contrast, no other inmates recently designated for transfer have been assigned to facilities more than 500 miles from their homes. The claimed rationale for the transfer is therefore pretextual.

102.    Upon information and belief, Defendants selected Ms. Herrera for transfer to attempt to undermine and moot this litigation.[23] Both Ms. Herrera and Ms. Fleming have been visible advocates for restoring sex-segregated confinement within the federal prison system. Removing Ms. Herrera from FMC Carswell could effectively eliminate one of the primary witnesses challenging the BOP's current housing policies for male, transgender-identifying inmates, impair her access to counsel, and hamper her ability to observe and document ongoing harms.

103.    Federal law requires that inmate designations and transfers be based on legitimate statutory factors, including the resources of the facility, the nature of the offense, the prisoner's history and characteristics, and the sentencing court's recommendations. *Id.* None of these factors justifies removing Ms. Herrera, a first-time offender who is minimum custody and would otherwise qualify for camp or community custody, from a facility where she has maintained good behavior, stable work assignments, and access to family support. On those factors, FCI Aliceville does not advance any legitimate correctional objective.

---

[23] Even if Ms. Herrera were transferred, Plaintiffs specifically deny that any such voluntary cessation would moot Plaintiffs claims.

104.     In addition, Ms. Herrera is currently enrolled in a job-training and educational program at FMC Carswell. Transferring her to another institution would disrupt this program, impede her rehabilitation, and serve no lawful or penological purpose. Defendants' decision to single her out for transfer—while leaving other similarly situated inmates in place—demonstrates retaliatory motive rather than administrative necessity.

105.     Upon information and belief, Defendants are aware that FCI Aliceville suffers from severe staffing shortages, particularly in its medical department.[24] Assigning Ms. Herrera to such an understaffed and medically underserved facility would endanger her health and safety and further evidence the punitive nature of the proposed transfer.

106.     Defendants' retaliatory actions have caused Ms. Herrera fear, emotional distress, and ongoing uncertainty about her confinement. Their conduct would deter a person of ordinary firmness from exercising her First Amendment rights and was intended to punish Ms. Herrera for asserting constitutional claims and participating as a plaintiff in this litigation. Intimidation and deterrence, not any legitimate correctional objective, far better explains the BOP's threatened transfer of Ms. Herrera.

### 8.     Plaintiffs' Exhaustion of Administrative Remedies

107.     Plaintiffs have exhausted available administrative remedies to resolve the policy and practice of housing male inmates at FMC Carswell.

108.     Ms. Fleming repeatedly sought to initiate the BOP grievance process. She emailed her unit coordinator requesting a BP-9 grievance form but was refused or ignored. Ms. Fleming did submit an administrative claim to the BOP as a victim involving staff at FMC Carswell in the

---

[24] CBS News: 60 Minutes Overtime, "Federal Prisons, Short on Correctional Officers, Rely on Other Staff to Supervise Offenders," Jan. 28, 2024, https://www.cbsnews.com/news/federal-prison-staffing-sexual-abuse-problems-60-minutes/ [https://perma.cc/X8CM-VN7P] ("Inmates at Federal Correctional Institution, Aliceville in Alabama said the facility is short-staffed all the time.").

sum of $10,000,000.00. The BOP received Ms. Fleming's administrative claim on January 2, 2025. By July 2, 2025, six months after the BOP received Ms. Fleming's administrative claim, the BOP had neither accepted nor rejected Ms. Fleming's claim.

109.    Ms. Herrera, like other female inmates who have attempted to complain about the BOP policy and practice, was also not provided the grievance form to do so.

110.    Defendants' obstruction, intimidation, failure to respond to, or refusal to cooperate with the grievance process rendered Plaintiffs unable to seek administrative relief.

## V. STATEMENT OF APPLICABLE LAW

111.    At all relevant times, each and all of the acts alleged herein were attributed to the Defendants who acted under color of a statute, regulation, or other laws of the United States.

112.    Nothing within the text of PREA authorizes Defendants to place males into federal women's prisons. Nothing within the text of PREA authorizes Defendants to place male inmates into federal women's prisons so as to affirm a male inmate's claimed feminine gender.

113.    Nothing within the text of PREA authorizes the Defendants to redefine "sex" in federal law or regulation as meaning or including "gender identity."

114.    Nothing within the text of PREA authorizes the Defendants to redefine "sex" in federal law or regulation to be established by a person's claimed gender.

115.    Executive Order 14168 affirms the federal government's commitment to protect women's safety, dignity, and privacy by ensuring that biological males are not housed in prison facilities designated for biological females.

116.    The right to bodily privacy is protected by the Fourth, Fifth, and Eighth Amendments to the U.S. Constitution and various federal laws and regulations. This right to bodily

privacy survives incarceration and protects women from routine opposite-sex viewing while nude or engaged in intimate functions.

117.    The right to be free from a sexually hostile environment and from sexual harassment while incarcerated in a government prison is well established under federal law. The right to be free to express and enjoy religious liberty without improper governmental interference is well established in federal law, including RFRA.

118.    The rules and regulations under review in this case infringe on and disparage the federally protected rights of Plaintiffs as set forth herein.

119.    Defendants knew or should have known that the subject rules and regulations infringed on Plaintiffs' constitutional and statutory rights, but enforced and implemented those rules and regulations anyway, and continue to do so, all to the harm of Plaintiffs.

120.    The continued enforcement of the subject rules and regulations by Defendants will continue to infringe and violate Plaintiffs' constitutional and statutory rights unless this Court enjoins such action.

121.    Defendants are and have been deliberately indifferent to the constitutional and statutory violations visited upon Plaintiffs by the Defendants' policies and practices. Preserving bodily privacy—particularly in conducting personal hygiene and not suffering unconsented viewing of one's nude body—is one necessary measure of civilized life.

122.    Defendants have no legitimate penological interest in forcing female inmates to share their cells, locker areas, showers, and toilets—areas where even inmates retain a degree of constitutional protection for their bodily privacy—with male inmates.

## VI. CAUSES OF ACTION

123.    All facts set forth above are incorporated into each of the causes of action below as if fully set forth therein.

### *First Cause of Action: Violation of Bodily Privacy*
(by Plaintiffs against all Defendants)

124.    While inmates have a lessened expectation of privacy while incarcerated, all inmates, including Plaintiffs, retain a degree of constitutional protection for their bodily privacy, particularly in respect to exposure of their nude or partially unclothed bodies to the opposite sex within their cells, sleeping quarters, and in shower and restroom facilities. Plaintiffs retain constitutional bodily privacy protection rights from involuntary nudity, voyeurism, sexual intimidation, unconsented exposure to male nudity, and/or a sexually harassing environment.

125.    The separation of male and female intimate spaces, including the protection of women from compelled exposure to male bodies, is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty. From the founding era to the present, American law and social custom have strictly segregated the sexes in contexts involving nudity, bodily privacy, and personal hygiene, including bathrooms, locker rooms, and prisons. The historical record reflects a consistent understanding that forced opposite-sex exposure offends basic decency and dignity, principles that long predate the Fifth and Fourteenth Amendments and remain embedded in the common law.

126.    By intentionally placing male inmates in federal women's prisons, including FMC Carswell while Plaintiffs are incarcerated therein, Defendants have violated Plaintiffs' constitutional right to bodily privacy.

32

***Second Cause of Action: Cruel and Unusual Punishment***
(by Plaintiffs against all Defendants)

127.    Plaintiffs have the constitutional right under the Fourth, Fifth, and Eighth Amendment, even while in prison, to privacy and to be free from physical and mental harm and threats of harm imposed on them by prison officials, directly or indirectly, whether that harm is caused by implementation of rules and regulations or otherwise. Such invasions of privacy and physical and mental harm and threats of harm imposed by prison officials constitute cruel and unusual punishment under the Eighth Amendment.

128.    Plaintiffs were sentenced to serve their time in a federal women's prison. Defendants' creation and enforcement of 28 C.F.R. § 115.42 subjected Plaintiffs to cruel and unusual punishment by housing them in a facility where male inmates were intermingled in the female inmate general population, with consequent violations of their bodily privacy and religious exercise.

129.    Defendants' creation and enforcement of 28 C.F.R. § 115.42 subjected Plaintiffs to an ongoing risk of being housed with a male inmate within the general population of any of the BOP women's prison to which she may be assigned. It is cruel and unusual to subject women to indecent exposure to male genitalia, voyeurism, and sexual harassment—crimes under Texas law.

130.    The historic practice of our country, since the creation of separate correctional facilities for women, sought to protect safety, decency, and rehabilitation. The intermingling of male and female prisoners in intimate settings has no historical precedent in this Nation's penal tradition and is inconsistent with American history and tradition. Forcing female inmates to live and shower alongside men departs from the settled norms that have defined civilized confinement for centuries.

131.    Defendants therefore have subjected, and continue to subject, Plaintiffs to cruel and unusual punishment prohibited by the Eighth Amendment.

### Third Cause of Action: Violation of the RFRA
(by Plaintiffs against all Defendants)

132.    RFRA requires, among other things, that a federal statute or regulation, even if facially neutral and generally applicable, that imposes a substantial burden upon an individual's religious exercise must be narrowly tailored to serve a compelling government interest by the least restrictive means.

133.    Plaintiffs have sincere religious beliefs in the biological reality of two sexes, as presented in Scripture and explained in theology. They have sincere, biblically grounded beliefs that modesty requires avoiding exposure to or viewing of opposite-sex nudity outside of marriage. Their faith thus forbids being seen nude by men and sharing showers, toilets, changing areas, and sleeping spaces with men, as well as seeing nude men, or men in states of sexual arousal.

134.    Defendants' placement and supervision policies substantially burden Plaintiffs' religious exercise by coercing violations of modesty rules and by putting Plaintiffs to the choice of punitive or harmful alternatives.

135.    Plaintiffs also hold a religious obligation to speak truthfully about sex, sexuality, and modesty as commanded by God; retaliation and threats have chilled this religious expression, reinforcing the burden on their exercise.

136.    There is no compelling government interest in housing male inmates in federal women's prisons as a method of eliminating prison rape.

137.    There is no compelling government interest in housing male inmates in federal women's prisons so as to affirm a male inmate's self-reported feminine gender.

138. There is no compelling government interest in housing male inmates in federal women's prisons as a method of treatment or diagnosis for gender dysphoria.

139. Numerous less religiously restrictive means exist, including placing biological males in the hospital unit, or creating a separate men-only housing unit within FMC Carswell.

140. Defendants did not use the least restrictive means to attain any government interest that they may posture as "compelling."

141. Defendants have therefore violated Plaintiffs' free exercise of religion under RFRA.

### Fourth Cause of Action: Violation of the APA
(by Plaintiffs against all Defendants)

142. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" in four instances that apply to this case:

a. if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

b. if the agency action is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B);

c. if the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C); and

d. if the agency action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

143. Defendants' creation and enforcement of 28 C.F.R. § 115.42 violates Plaintiffs' statutory right to the free exercise of religion pursuant to RFRA.

144. The Defendants housed male inmates in women's prisons, purportedly as a method of eliminating prison rape pursuant to their creation and enforcement of 28 C.F.R. § 115.42.

Therefore, the Defendants acted arbitrarily, capriciously, and abused their discretion in creating and enforcing 28 C.F.R. § 115.42 in violation of 5 U.S.C. § 706(2)(A).

145. The Defendants' creation and enforcement of 28 C.F.R. § 115.42 violated Plaintiffs' constitutional right to bodily privacy.

146. The Defendants' creation and enforcement of 28 C.F.R. § 115.42 imposed unconstitutionally cruel and unusual punishment upon Plaintiffs.

147. Therefore, 28 C.F.R. § 115.42 is contrary to constitutional rights and violates 5 U.S.C. § 706(2)(B).

148. Nothing within PREA authorized Defendants to redefine sex to mean, or to at least include, gender identity.

149. Nothing within PREA authorized Defendants to house male inmates in women's prisons for the purpose of establishing zero tolerance for rape. Nothing within PREA authorized Defendants to house male inmates in women's prisons for the purpose of preventing rape.

150. Nothing within PREA authorized Defendants to house male inmates in women's prisons for the purpose of affirming a male inmate's self-reported feminine gender.

151. PREA expressly requires Defendants to protect the Eighth Amendment rights of federal prisoners, a duty in which Defendants failed with respect to Plaintiffs.

152. Therefore, 28 C.F.R. § 115.42 is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right and violates 5 U.S.C. § 706(2)(C).

### Fifth Cause of Action: First Amendment Retaliation/Chilled Speech
(by Herrera against all Defendants)

153. Ms. Herrera engaged in protected speech by filing and participating in this lawsuit and by voicing opposition to the BOP's housing practices.

36

154.    Shortly thereafter (within weeks of the undersigned counsel's appointment), BOP officials threatened to transfer Ms. Herrera to FCI Aliceville, Alabama—a move that would punish her by isolating her from her Texas-based family and support network and in violation of BOP policy. *See* 18 U.S.C. § 3621(b).

155.    The threat of transfer would chill a person of ordinary firmness from continuing to engage in that protected activity.

156.    The temporal proximity between Herrera's protected activity and the transfer threat, coupled with the absence of any legitimate penological justification, demonstrates retaliatory motive.

157.    Such retaliation violates the First Amendment and chills the exercise of protected speech by Herrera and similarly situated female federal inmates.

158.    Plaintiff therefore seeks preliminary and permanent injunctive relief prohibiting Defendants from transferring her or taking any adverse action in retaliation for her protected activity during the pendency of this case.

### *Sixth Cause of Action: Intentional Infliction of Emotional Distress (Texas)*
(by Fleming against the United States of America)

159.    In accordance with the FTCA, Ms. Fleming brings this claim for intentional infliction of emotional distress under Texas law ("IIED") against the United States based on the acts and/or omissions of the United States and Warden Rule and all BOP officers while working in their official capacities at FMC Carswell. Warden Rule and all BOP officers at FMC Carswell are employees of BOP and at all relevant times were acting within the scope of their employment as federal employees in their official uniforms during work hours.

160.    Ms. Fleming has exhausted her claims against the United States in accordance with the requirements of the FTCA.

161.     Ms. Fleming submitted an administrative claim to the BOP as a victim involving staff at FMC Carswell. The BOP received Ms. Fleming's administrative claim on January 2, 2025. By July 2, 2025, six months after the BOP received Ms. Fleming's administrative claim, the BOP had neither accepted nor rejected Ms. Fleming's claim. Pursuant to 28 U.S.C. § 2675(a), Ms. Fleming considers this failure to act as a final denial of her claim.

162.     Under Texas law, a person is liable for IIED when the defendant engages in extreme and outrageous conduct, when the defendant intended to cause plaintiff to suffer emotional distress or engaged in the conduct with reckless disregard to the probability of causing plaintiff to suffer emotional distress, the plaintiff suffered emotional distress, the outrageous conduct was a proximate cause of severe emotional distress, and no alternative cause of action would provide a remedy for the severe emotional distress caused by the defendant's conduct.

163.     The United States, individually or through its agents, servants, contractors, and/or employees, engaged in extreme and outrageous conduct by subjecting Ms. Fleming to indecent exposure to male genitalia (TEX. PENAL CODE § 21.08), voyeurism (TEX. PENAL CODE § 21.17), and sexual harassment (TEX. PENAL CODE § 42.07) while incarcerated in Defendants' custody, through the above-described acts and omissions.

164.     Ms. Fleming's injuries and damages were caused by intentional torts perpetrated by Defendants. Under 28 U.S.C. § 2680(h), the United States is liable for intentional torts perpetrated by its agents that occurred within the scope of their employment under color of federal law.

165.     At all relevant times, Defendants were acting under color of law by supervising, disciplining, overseeing, monitoring, controlling, directing, restraining, and imprisoning Ms. Fleming within the scope of their employment for the United States.

166.   Defendants used their authority as federal officers to intentionally allow Ms. Fleming to suffer indecent exposure to male genitalia, voyeurism, and sexual harassment, and as a direct and proximate cause of this conduct Ms. Fleming has suffered psychological trauma, distress, anxiety, depression, loss of quality of life and dignity, as well as economic injuries.

167.   No alternative cause of action under the FTCA other than IIED would provide a remedy for the severe emotional distress caused by Defendants.

168.   Pursuant to the FTCA, Ms. Fleming is entitled to recover damages from the United States for the wrongful acts and/or omissions of its employees.

## VII. RELIEF REQUESTED

To protect their rights to privacy, safety, and the free exercise of their faith, Plaintiffs seek the following relief:

1.   Declaratory Judgment that 28 C.F.R. § 115.42, as applied to Plaintiffs:
   i.   Violates the Fourth, Fifth, and Eighth Amendments to the U.S. Constitution, because it infringes on Plaintiffs' right to bodily privacy and subjects them to cruel and unusual punishment;
   ii.   Violates Plaintiffs' rights to freely exercise their religion under RFRA; and
   iii.   Violates the APA and should be set aside.

2.   Declaratory Judgment that the BOP's attempts to transfer Plaintiff Herrera from FMC Carswell or otherwise adversely alter the terms or conditions of her confinement in retaliation for her participation in this litigation violates the First Amendment to the U.S. Constitution, because it chills free speech.

3.   A Temporary Restraining Order ("TRO"), as argued in the Motion, immediately:
   iv.   Enjoining Defendants, their officers, employees, agents, and all persons acting in concert with them from:
      a.   housing any male inmate (meaning any person who is biologically male, regardless of gender identity) within the

general population of any housing unit where either Plaintiff is presently or will be confined during the pendency of the TRO; and

b.    permitting any male inmate to enter or remain in any female-only privacy area (including showers, restrooms, changing areas, or dormitory spaces) to which either Plaintiff has access, so that Plaintiffs are not exposed to male inmates while showering, toileting, dressing, or sleeping.

v.    Ordering that, to comply with the relief provided by the TRO, Defendants may, in their discretion:

a.    Reassign male inmates away from Plaintiffs' housing and privacy areas; or

b.    House male inmates in a secure, segregated area at FMC Carswell (including the Hospital Unit or an equivalent setting) that preserves access to programming and services while preventing access to female-only privacy areas.

vi.    Enjoining Defendants, and all persons acting in concert with them, from transferring Plaintiff Herrera or otherwise adversely altering the terms or conditions of her confinement in retaliation for her participation in this litigation during the pendency of the temporary restraining order, except where supported by a bona fide, documented penological or medical reason unrelated to this lawsuit, with at least 72 hours' written notice to Plaintiffs' counsel and the Court before any such transfer.

4.    A Preliminary Injunction and Permanent Injunction affording Plaintiffs the same protections as the TRO;

5.    Actual damages for Plaintiff Fleming for her FTCA cause of action for IIED under Texas law, plus post-judgment interest as allowed;

6.    Reasonable and necessary attorneys' fees in accordance with 28 U.S.C. § 2412, 42 U.S.C. § 1988, the Equal Access to Justice Act, and in equity; and

7.      Such other and further relief as the Court deems just and proper.


                              Respectfully submitted,

                              BROWN FOX PLLC

                              By: /s/ Cortney C. Thomas
                              Cortney C. Thomas
                                Texas Bar No. 24075153
                                cort@brownfoxlaw.com
                              C. Alan Carrillo
                                Texas Bar No. 24109693
                                alan@brownfoxlaw.com
                              Andrew C. Debter
                                Texas Bar No. 24133954
                                andrew@brownfoxlaw.com
                              8111 Preston Road, Suite 300
                              Dallas, TX 75225
                              T: 214.327.5000
                              F: 214.327.5001

                              *Attorneys for Plaintiffs Rhonda Fleming and*
                              *Miriam Crystal Herrera*

## <u>VERIFICATION</u>

My name is Rhonda Fleming. I am a Plaintiff in this lawsuit. I have personal knowledge of the facts I stated in the pleading above, and all such facts are true and correct. I hereby verify under penalty of perjury that the foregoing answers are true and correct. (28 U.S.C. § 1746).

_____
Rhonda Fleming,[25] Plaintiff

---

[25] Ms. Fleming has reviewed and approved the contents of this Amended Complaint. Because she is incarcerated, a copy will be sent to her via first-class mail. Her counsel will promptly file her executed Verification upon receipt.

**<u>VERIFICATION</u>**

My name is Miriam Crystal Herrera. I am a Plaintiff in this lawsuit. I have personal knowledge of the facts I stated in the pleading above, and all such facts are true and correct. I hereby verify under penalty of perjury that the foregoing answers are true and correct. (28 U.S.C. § 1746).

_____
Miriam Crystal Herrera,[26] Plaintiff

---

[26] Ms. Herrera has reviewed and approved the contents of this Amended Complaint. Because she is incarcerated, a copy will be sent to her via first-class mail. Her counsel will promptly file her executed Verification upon receipt.

43

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic filing system.