**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RHONDA FLEMING and** | § | |
| **MIRIAM CRYSTAL HERRERA,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-CV-0157-D** |
| | § | **(Consolidated with** |
| **WARDEN T. RULE, WILLIAM K.** | § | **Civil Action No. 4:25-CV-0438-D)** |
| **MARSHALL, III, PAMELA J. BONDI,** | § | |
| **and UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
<u>PRELIMINARY AND PERMANENT INJUNCTION AND BRIEF IN SUPPORT</u>**

BROWN FOX PLLC

Cortney C. Thomas
  Texas Bar No. 24075153
  cort@brownfoxlaw.com
C. Alan Carrillo
  Texas Bar No. 24109693
  alan@brownfoxlaw.com
Andrew C. Debter
  Texas Bar No. 24133954
  andrew@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, TX 75225
T: 214.327.5000
F: 214.327.5001

*Attorneys for Plaintiffs Rhonda Fleming and
Miriam Crystal Herrera*

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ............................................................................................... 1

II. FACTUAL BACKGROUND ............................................................................ 2

    A.    The BOP's Policy and Practice of Housing Biological Men in Women's Prison Facilities ............................................................................................. 2

    B.    The Conditions at FMC Carswell Harming Plaintiffs. ............................... 3

    C.    Housing Men in Women's Prisons Defies Executive Order 14168 and Burdens Plaintiffs' Religious Liberty. ...................................................... 6

III. LEGAL STANDARD ...................................................................................... 9

IV. ARGUMENT AND AUTHORITIES ............................................................ 10

    A.    Plaintiffs Are Likely to Succeed on the Merits .................................... 10

        1.    Plaintiffs Are Likely to Succeed on Count One Because Defendants' Policy and Practice Violates Plaintiffs' Constitutional Right to Bodily Privacy ............................................ 10

        2.    Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Eighth Amendment Claim ........................................ 13

        3.    Plaintiffs Are Likely to Succeed on Count Three Under the Religious Freedom Restoration Act ................................................ 19

            a.    Defendants substantially burden Plaintiffs' religious exercise ..... 21

            b.    Defendants have no compelling interest to justify burdening Plaintiffs' faith ............................................................................ 22

            c.    Defendants do not use the least restrictive means ....................... 23

        4.    Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Administrative Procedure Claim ................................ 24

            a.    The BOP exceeded its statutory authority under PREA .............. 25

            b.    The policy is arbitrary and capricious ......................................... 25

            c.    The policy is contrary to the Constitution .................................... 26

        5.    Plaintiff Herrera is Likely to Succeed on Her Claim for Injunctive Relief Barring Her Retaliatory Transfer in Violation of Her First Amendment Rights .................................................................... 26

B.    Plaintiffs Face Imminent and Irreparable Harm. .................................................. 28

C.    The Balance of Equities and Public Interest Favor Injunctive Relief. .................. 28

V. CONCLUSION ................................................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Adkins v. Kaspar*,
   393 F.3d 559 (5th Cir. 2004) ................................................................................ 12

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .............................................................................. 29

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) .............................................................................................. 19

*City of El Cenizo, Tex. v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ................................................................................ 9

*Cornwell v. Dahlberg*,
   963 F.2d 912 (6th Cir. 1992) ................................................................................ 10

*Cortes-Quinones v. Jimenez-Nettleship*,
   842 F.2d 556 (1st Cir. 1988) ................................................................................ 14

*De Veloz v. Miami-Dade Cnty.*,
   756 F. App'x 869 (11th Cir. 2018) .................................................................. 14, 15

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) ........................................................................................ 11, 18

*Doe v. Luzerne Cnty.*,
   660 F.3d 169 (3d Cir. 2011) ............................................................................ 10, 11

*E.T. v. Paxton*,
   No. 21-51083, 2021 WL 5629045 (5th Cir. Dec. 1, 2021) ..................................... 9

*Elrod v. Burns*,
   427 U.S. 347 (1976) .............................................................................................. 28

*Farmer v. Brennan*,
   511 U.S. 825 (1994) .................................................................................. 14, 17, 18

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .............................................................................................. 26

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .............................................................................................. 25

*Fortner v. Thomas*,
   983 F.2d 1024 (11th Cir. 1993) ............................................................................ 10

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ........................................................................... 19

*Grummett v. Rushen*,
  779 F.2d 491 (9th Cir. 1985) ............................................................ 11

*Hassani v. Napolitano*,
  2009 WL 2044596 (N.D. Tex. July 15, 2009) ................................... 9

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ........................................................................... 23

*Hostetler v. Green*,
  323 F. App'x 653 (10th Cir. 2009) .................................................... 17

*Jehovah v. Clarke*,
  798 F.3d 169 (4th Cir. 2015) ............................................................ 21

*Johnson v. Surles*,
  No. 218-cv-01449, 2019 WL 13336813 (N.D. Ala. Sept. 12, 2019) ................. 14, 15

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996) ................................................................ 28

*Jones v. Bush*,
  122 F. Supp. 2d 713 (N.D. Tex. 2000) ............................................... 9

*Kikumura v. Hurley*,
  242 F.3d 950 (10th Cir. 2001) .......................................................... 28

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014) ............................................................... 22

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ........................................................................... 25

*Lee v. Downs*,
  641 F.2d 1117 (4th Cir. 1981) ...................................................... 10, 11

*Lee v. Verizon Commc'ns, Inc.*,
  2012 WL 6089041 (N.D. Tex. Dec. 7, 2012) ..................................... 9

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) ...................................................... 22, 23

*McDonald v. Steward*,
  132 F.3d 225 (5th Cir. 1998) ............................................................ 26

iv

*Miss. Power & Light Co. v. United Gas Pipe Line*,
   760 F.2d 618 (5th Cir. 1985) ........................................................................ 9

*Moore v. Carwell*,
   168 F.3d 234 (5th Cir. 1999) ........................................................................ 10

*Morris v. Powell*,
   449 F.3d 682 (5th Cir. 2006) ........................................................................ 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................ 25

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
   703 F.3d 781 (5th Cir. 2012) ........................................................................ 19, 21

*Newton v. Joseph*,
   718 F. App'x 256 (5th Cir. 2018) ........................................................................ 10

*Nichols v. Alcatel USA, Inc.*,
   532 F.3d 364 (5th Cir. 2008) ........................................................................ 9

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................ 29

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ........................................................................ 18

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) ........................................................................ 28, 29

*Pell v. Procunier*,
   417 U.S. 817, 822 (1974) ........................................................................ 26

*Pitts v. Thornburgh*,
   866 F.2d 1450 (D.C. Cir. 1989) ........................................................................ 11

*Praylor v. Tex. Dep't of Criminal Justice*,
   430 F.3d 1208 (5th Cir. 2005) ........................................................................ 22

*Rhodes v. Chapman*,
   452 U.S. 337 (1981) ........................................................................ 14

*Texas v. United States*,
   809 F.3d 134, 187 (5th Cir. 2015) ........................................................................ 29

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017) ........................................................................ 22

*Trop v. Dulles*,
    356 U.S. 86 (1958) ........................................................................... 18

*Turner v. Safley*,
    482 U.S. 78 (1987) ........................................................................... 12

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ......................................................................... 23

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ......................................................................... 11

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ......................................................................... 14

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ......................................................................... 22

*Woods v. Smith*,
    60 F.3d 1161 (5th Cir. 1995) ............................................................ 26

*York v. Story*,
    324 F.2d 450 (9th Cir. 1963) ..................................................... 10, 11

## Statutes

5 U.S.C. § 706(2)(A)–(C) ........................................................................ 24
5 U.S.C. § 706(2)(B) ............................................................................... 26
5 U.S.C. § 706(2)(C) ............................................................................... 25
5 U.S.C. §§ 701–706 .............................................................................. 22
18 U.S.C. § 1836(b)(3)(A) ........................................................................ 9
18 U.S.C. § 3621(b) ................................................................................. 8
34 U.S.C. § 30301 .................................................................................. 25
34 U.S.C. § 30302 .................................................................................... 3
34 U.S.C. § 30307(a) .............................................................................. 25
42 U.S.C. § 2000bb-1(a) ........................................................................... 7
42 U.S.C. § 2000bb-1(a)–(b) ................................................................... 18
42 U.S.C. § 2000cc-1(a) .......................................................................... 18
42 U.S.C. § 2000cc-2(b) .......................................................................... 18
42 U.S.C. § 2000cc-5(7)(A) ..................................................................... 18
42 U.S.C. § 15602(1)–(2) ........................................................................ 12

## Rules

Fed. R. Civ. P. 65 ..................................................................................... 9

**Regulations**

28 C.F.R. § 115.15 (d) ........................................................................................ 10
28 C.F.R. § 115.15(a) .......................................................................................... 10
28 C.F.R. § 115.42 ......................................................................................... 2, 26
28 C.F.R. § 115.6 ................................................................................................ 16
28 C.F.R. § 541.3 ............................................................................................... 16

**Other Authorities**

Executive Order 14168, 90 F.R. 8615 ................................................................. 6

Plaintiffs Rhonda Fleming and Miriam Crystal Herrera ("Plaintiffs") hereby move the Court for a temporary restraining order and preliminary and permanent injunctive relief against Defendants and in support thereof would show the Court the following.[1]

## I. <u>INTRODUCTION</u>

This case challenges the Bureau of Prisons' ("BOP") policy of housing biological males in federal women's prisons—a policy that violates female inmates' rights to bodily privacy, security, and religious exercise. Ms. Fleming and Ms. Herrera are confined at FMC Carswell, a federal women's medical center where at least a dozen biological men now live, shower, and undress alongside female prisoners. The consequences are precisely what common sense would predict: women suffer sexual harassment, voyeurism, and fear. Plaintiffs seek injunctive relief to halt these ongoing violations of their constitutional rights to bodily privacy and personal security, as well as violations of their statutory rights under the Religious Freedom Restoration Act and the Administrative Procedure Act.

After Plaintiffs filed suit to protect their constitutional rights, the BOP threatened to transfer Ms. Herrera to FCI Aliceville in Alabama—hundreds of miles from her family and the medical care she needs—in apparent retaliation for her participation in this litigation. Unless the Court intervenes, Plaintiffs will continue to suffer irreparable harm: daily unwanted exposure to men in showers, restrooms, and sleeping quarters, and, for Ms. Herrera, the threat of retaliatory transfer for having sought judicial protection. Immediate injunctive relief is necessary to preserve the status quo, prevent irreparable harm, and protect Plaintiffs' constitutional rights while this case proceeds.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in Plaintiffs' Amended Complaint.

## II. <u>FACTUAL BACKGROUND</u>

**A.**    **The BOP's Policy and Practice of Housing Biological Men in Women's Prison Facilities.**

1.    For virtually all of American history, male and female inmates have been housed separately for obvious reasons of safety, privacy, and sexual integrity. BOP regulations once reflected that reality. That changed in 2012 when, under color of the Prison Rape Elimination Act ("PREA"), the BOP promulgated 28 C.F.R. § 115.42,[2] effectively authorizing officials to assign inmates based not on sex but on gender identity ideology. The BOP followed with its 2017 Transgender Offender Manual (together with subsequent revised versions, the "Manual"), which directed that an inmate's self-reported "gender identity"—not biological sex—could control housing determinations.[3] *See* Ex. A-1, Manual (APP004-051).

2.    Under this policy, biological males claiming to identify as women may be (and indeed have been) placed in federal women's prisons. Ex. B, Declaration of Rhonda Fleming dated November 3, 2025 ("Fleming Decl.") ¶ 4 (APP100-101). The BOP policy requires no objective proof of transition or medical treatment, but only their own self-report.[4] Consequently, male inmates with intact male genitalia and histories of sexual violence have gained access to women's dormitories, showers, and restrooms. Fleming Decl. ¶¶ 4–5 (APP100-101).

---

[2] The regulation provides, in relevant part: "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c). "A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration." *Id.* at § 115.42(e).

[3] The Manual consists of three versions: (1) Program Statement number 5200.04, effective January 18, 2017; (2) Program Statement number 5200.04 CN-1, effective May 11, 2018; and (3) Program Statement number 5200.08, January 13, 2022.

[4] *See* Ex. A-1 (APP004-051) (defining "transgender" for purposes of BOP regulations as "the state of one's gender identity not matching one's biological sex").

3.      This policy is contrary to the very purpose of PREA, which was enacted to prevent sexual assault in confinement. *See* 34 U.S.C. § 30302. By replacing sex-based segregation with gender-based placement, the BOP has created the very conditions PREA was designed to avert. Fleming Decl. ¶¶ 5–7 (APP101); Ex. C, Declaration of Miriam Herrera dated November 3, 2025 ("Herrera Decl.") ¶¶ 4–5 (APP109-110). Female inmates, including many victims of sexual abuse, are now forced into involuntary cohabitation with biological males, exposing them to profound psychological trauma and the ever-present threat of assault. Herrera Decl. ¶¶ 5–7 (APP110).

4.      Data obtained through a Freedom of Information Act ("FOIA") request underscore the danger. Approximately 51 percent of male, transgender-identifying inmates were incarcerated for sex offenses—nearly four times the rate of sex-offense incarceration among the general BOP male population.[5] These inmates are thus statistically far more likely to have committed sexual offenses, yet they are now granted access to the very population most at risk: confined women, many of whom are survivors of sexual trauma. *Id.* Herrera Decl. ¶ 6 (APP110).

5.      In January 2022, the BOP briefly updated the Manual to re-emphasize case-by-case review, but in practice the agency continued to defer to inmate self-identification rather than biological criteria. *See* Ex. A-1 (APP004-051). That practice persists to this day at the BOP's female penal institutions nationwide.

**B.      The Conditions at FMC Carswell Harming Plaintiffs.**

6.      FMC Carswell is a federal medical center designated for "female offenders."[6] Its population of approximately 1,140 women lives in four-person cells (without doors) and

---

[5] *See* Ex. A-2, Brief of Amicus Curiae Women's Liberation Front in Support of Appellants at 5, *Doe v. Bondi*, Nos. 25-5099 (D.C. Cir. filed Sept. 3, 2025) ("Information obtained through a FOIA request shows that between May 2024 and January 2025, 51 percent of men identifying as 'transgender' were incarcerated for sex offenses. This number is almost four times as high as the number in the general Federal Bureau of Prisons population.") (APP052-081).

[6] Federal Bureau of Prisons, "FMC Carswell: An Administrative Security Medical Center with an Adjacent Minimum Security Satellite Camp," https://www.bop.gov/locations/institutions/crw/ [https://perma.cc/F2H8-WNBL].

communal units with relatively open showers and limited privacy. Amended Complaint ("Am. Compl."), Dkt. 56-1, ¶¶ 14–15; Fleming Decl. ¶ 3 (APP100). Inmates sleep, bathe, and change clothes within constant view of one another. Am. Compl., Dkt. 56-1, ¶¶ 14–16; Fleming Decl. ¶¶ 3–4 (APP100-101); Herrera Decl. ¶¶ 3–5 (APP109-110). In this environment, the introduction of biological males obliterates any sense of security or modesty. Fleming Decl. ¶ 6 (APP101); Herrera Decl. ¶¶ 3–7 (APP109-110).

7.      Into this environment, the BOP has placed at least a dozen biological males claiming to identify as "women." Fleming Decl. ¶ 4 (APP100-101); Herrera Decl. ¶ 3 (APP109). Many retain male genitalia and possess the height, weight, and strength typical of male physiology. Fleming Decl. ¶ 5 (APP101). Some have been convicted of sexual or violent offenses. *Id.*; Am. Compl., Dkt. 56-1 ¶ 63.

8.      Ms. Fleming and Ms. Herrera must now live, shower, and change clothes in the presence of these men. Fleming Decl. ¶¶ 3–4 (APP100-101); Herrera Decl. ¶ 3 (APP109). Plaintiffs report constant fear, humiliation, and anxiety. Fleming Decl. ¶ 5 (APP101); Herrera Decl. ¶ 7 (APP110). They have witnessed male inmates exposing themselves, watching women shower, and making lewd remarks, and are aware of some of these male inmates engaging in sex or sexually assaulting female inmates. Fleming Decl. ¶¶ 6–7 (APP101); Herrera Decl. ¶ 5 (APP110).

9.      Ms. Herrera was watched by a male inmate wearing makeup while she showered. Herrera Decl. ¶ 4 (APP109-110). The inmate used a mirror positioned to see into the stall and told her afterward that he would be waiting for her in the bathroom after lights out. *Id.* When she tried to close the door, he reopened it, laughing. *Id.*

4

10.     Ms. Fleming has consistently objected to being housed in such conditions and filed multiple grievances. Fleming Decl. ¶¶ 11, 17 (APP102-103). On one occasion, officials told Fleming she could be assigned a male cellmate in the Special Housing Unit ("SHU"), where she would be forced to use the toilet and shower in the same room where she and the male cellmate would sleep. Fleming Decl. ¶¶ 12–13 (APP102-103). Fearing assault, she requested suicide watch rather than endure that placement. *Id.* ¶ 13 (APP102-103).

11.     Female inmates have also reported male prisoners entering restrooms while women were using them, frequently engaging in sexual activity with female inmates, and boasting about sexual access to women. Fleming Decl. ¶¶ 6–7 (APP101); Herrera Decl. ¶ 5 (APP110). Female inmates at FMC Carswell have also reported at least one incident of a male inmate sexually assaulting a female inmate in July 2025. Fleming Decl. ¶ 7 (APP101). Despite eyewitness accounts, officials imposed no meaningful discipline. *Id.* ¶¶ 7, 11 (APP101-102).

12.     These conditions devastate women's sense of safety and modesty. Many Carswell inmates, including Ms. Herrera, are survivors of prior sexual abuse. Herrera Decl. ¶ 6 (APP110). Exposure to male nudity or harassment re-traumatizes them daily. Fleming Decl. ¶¶ 5–6, 14–16 (APP101, 103); Herrera Decl. ¶¶ 6–7 (APP110).

13.     Ms. Fleming and Ms. Herrera's complaints have been ignored. Fleming Decl. ¶¶ 11, 17 (APP102-103); Herrera Decl. ¶ 10 (APP111). Rather than removing the men or providing accommodations, prison officials have required Plaintiffs to "adjust," warning that continued complaints could lead to discipline or transfer. Fleming Decl. ¶ 11 (APP102); Herrera Decl. ¶ 10 (APP111). These conditions inflict a constant, involuntary assault on bodily privacy and personal dignity. Fleming Decl. ¶¶ 5–6, 14–16 (APP101, 103); Herrera Decl. ¶¶ 6–9 (APP110-111).

## C.    Housing Men in Women's Prisons Defies Executive Order 14168 and Burdens Plaintiffs' Religious Liberty.

14.    On January 20, 2025, the President issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*.[7] Ex. A-3, Executive Order 14168 (APP082-088).  Executive Order 14168 reaffirmed that federal agencies must base sex-specific policies on biological sex, not gender identity. *See id.* at § 4(a). Directly contravening that order, the BOP continues to enforce the Manual and Section 115.42, perpetuating the very "gender ideology" Executive Order 14168 rescinds.[8]

15.    For Plaintiffs, this defiance of federal policy carries grave spiritual consequences. Both women hold sincere religious beliefs that modesty before men outside of marriage is a moral obligation. Fleming Decl. ¶¶ 8–10 (APP101-102); Herrera Decl. ¶ 8 (APP110). Their faith forbids them from undressing, showering, or using toilet facilities in the presence of men. Fleming Decl. ¶¶ 8–10 (APP101-102); Herrera Decl. ¶ 8 (APP110). By compelling them to do so under threat of discipline, Defendants substantially burden their exercise of religion within the meaning of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a).  No compelling governmental

---

[7] *See* Exec. Order 14168, 90 F.R. 8615 (2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ [https://perma.cc/ZS9L-LF56].

[8] In a separate case, *Doe v. Bondi*, No. 1:25-cv-286-RCL (D.D.C.), a group of anonymous male, transgender-identifying inmates challenged Executive Order 14168. On February 18, 2025, and again on February 24, 2025, the United States District Court for the District of Columbia entered preliminary injunctions enjoining enforcement of Sections 4(a) and 4(c) of Executive Order 14168 as to the anonymous plaintiffs in that case. The injunction currently prevents the BOP from enforcing those provisions of Executive Order 14168 against the *Doe* plaintiffs. Although the injunction purportedly does not allow the BOP to transfer the *Doe* plaintiffs to men's prisons, it does not require the BOP to house the *Doe* plaintiffs in the same housing units as females or force the BOP to allow the *Doe* plaintiffs to use the same showers and toilets that female inmates use. Although Plaintiffs suspect that one or more of the *Doe* plaintiffs may be housed at FMC Carswell, the anonymous and redacted nature of the *Doe v. Bondi* court filings makes it impossible to determine whether the preliminary injunctions in that case directly affect any inmates currently housed at FMC Carswell. The government's appeal of that injunction is pending before the United States Court of Appeals for the District of Columbia Circuit, *Doe v. Bondi*, No. 25-5099 (D.C. Cir.).

interest justifies such coercion, particularly where sex-based housing has always provided a less restrictive alternative.

**D.    The Threat of Imminent Retaliatory Transfer Against Ms. Herrera.**

16.    In early October 2025, shortly after the Court appointed undersigned counsel and Defendants Rule and Marshall were served, BOP officials informed Ms. Herrera that she would soon be transferred from FMC Carswell to FCI Aliceville in Alabama—hundreds of miles from her family in Texas. Herrera Decl. ¶ 11 (APP111). The stated reason was "institutional need," but in an October 9, 2025 email, Defendants' counsel revealed that Ms. Herrera had been "scheduled for transfer, along with multiple other inmates, as part of a broader effort to lessen FMC Carswell's population." *Id.* ¶ 11 (APP111); Exhibit A-4 (October 9, 2025 email from L. Hasday) (APP087-090). Only after Ms. Herrera's counsel intervened did the BOP "remove her from the transfer list" because of an upcoming oral surgery. Herrera Decl. ¶ 11 (APP111). Even then, Defendants' counsel made clear that "afterward, it is possible she will be transferred to a different institution." Exhibit A-4 (October 9, 2025 email from L. Hasday) (APP087-090). After Plaintiffs' counsel followed up to confer about whether the BOP would agree to keep Ms. Herrera at FMC Carswell for the duration of this litigation, Defendants' counsel responded on October 31, 2025 that it would not, reiterating that the BOP "has authority to decide where to place inmates" and confirming that it would oppose any request to limit that discretion. Exhibit A-5 (October 31, 2025 email from L. Hasday) (APP091-098). Plaintiffs reasonably believe that Ms. Herrera's inclusion on the transfer list (and the BOP's continued refusal to commit to keeping her at FMC Carswell) was not coincidental, but retaliatory, timed directly to her participation in this litigation. Herrera Decl. ¶¶ 11, 13 (APP111).

17.     In an October 31, 2025 email, Defendants' counsel confirmed that "FMC Carswell is the BOP's *only* medical center for female inmates, and it must prioritize placing inmates there who require its medical services." Ex. A-5 (APP091-098). Yet Defendants' counsel had previously described Carswell as overcrowded and explained that BOP was moving women out to "lessen" that population. Ex. A-4 (APP087-090). The inescapable conclusion is this: the BOP prioritizes housing male, transgender-identifying inmates at a female prison at the expense of female inmates.

18.     FCI Aliceville is known for chronic staffing shortages and inadequate medical services, particularly in its medical department.[9] Herrera Decl. ¶ 12 (APP111). The transfer would separate Ms. Herrera from her support network, place her in a facility under significantly poorer conditions, and chill her exercise of protected rights. Herrera Decl. ¶¶ 12–13 (APP111). Indeed, the BOP may transfer Ms. Herrera, who requires medical services, in violation of its own policy guidance, which provides that inmates should ordinarily be confined within 500 miles of their home.[10]

19.     The timing and context make clear that the transfer threat is retaliatory. The threatened transfer chills not only her exercise of First Amendment rights but also that of other inmates who might otherwise come forward.

20.     Unless enjoined, Defendants may carry out the transfer at any time, inflicting irreparable harm before this Court can adjudicate the underlying claims.

---

[9] *See* CBS News: 60 Minutes Overtime, "Federal Prisons, Short on Correctional Officers, Rely on Other Staff to Supervise Offenders," Jan. 28, 2024, https://www.cbsnews.com/news/federal-prison-staffing-sexual-abuse-problems-60-minutes/ [https://perma.cc/X8CM-VN7P] ("Inmates at Federal Correctional Institution, Aliceville in Alabama said the facility is short-staffed all the time.").

[10] *See* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to [various factors], place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence.").

## III. <u>LEGAL STANDARD</u>

In accordance with Federal Rule of Civil Procedure 65, Plaintiffs seek a temporary restraining order and preliminary and permanent injunctions to enjoin Defendants' policy and practice of housing male inmates in female prison facilities. A TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief," and requires the party seeking such relief to establish the same four elements for obtaining a preliminary injunction. *Lee v. Verizon Commc'ns, Inc.*, 2012 WL 6089041, at *1 n.2 (N.D. Tex. Dec. 7, 2012) (Fitzwater, C.J.) (quoting *Hassani v. Napolitano*, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) (Fitzwater, C.J.)). The Court may issue a temporary restraining order and a preliminary injunction if the plaintiff establishes:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the . . . injunction will not disserve the public interest.

*City of El Cenizo, Tex. v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018); *see also Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.) (addressing preliminary injunction standard). "The first two factors, the likelihood of success on the merits and a showing of irreparable injury absent a stay, are the most critical." *E.T. v. Paxton*, No. 21-51083, 2021 WL 5629045, at *2 (5th Cir. Dec. 1, 2021) (internal quotations omitted).

Both temporary restraining orders and preliminary injunctions are extraordinary remedies and will be granted only if the plaintiff carries its burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

## IV. <u>ARGUMENT AND AUTHORITIES</u>

**A.    Plaintiffs Are Likely to Succeed on the Merits.**

**1.    Plaintiffs Are Likely to Succeed on Count One Because Defendants' Policy and Practice Violates Plaintiffs' Constitutional Right to Bodily Privacy**

Under the Fourth Amendment, "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex . . . ." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992). The Fifth Circuit agrees, as it recognizes that non-emergent, cross-sex strip searches raise a valid Fourth Amendment privacy claim. *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999); *Newton v. Joseph*, 718 F. App'x 256, 258 (5th Cir. 2018). BOP regulations also forbid such searches. *See* 28 C.F.R. § 115.15(a) ("The facility shall not conduct cross-gender strip searches or cross-gender visual body cavity searches . . . except in exigent circumstances or when performed by medical practitioners."). Indeed, FMC Carswell adheres to this regulation, and it does not even permit male guards to access certain female-only intimate spaces outside of exigent circumstances.[11]

Moreover, the Fifth Amendment's Due Process Clause protects the fundamental right to bodily privacy and personal security. *See York v. Story*, 324 F.2d 450, 456 (9th Cir. 1963); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). Courts have consistently held that female inmates possess a constitutional right not to be observed by male officers or inmates while nude. *See Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176–

---

[11] Federal Bureau of Prisons, Prison Rape Elimination Act Audit Report: Federal Medical Center, Carswell, p. 33 (Sept. 10, 2025), https://www.bop.gov/locations/institutions/crw/crw_prea.pdf?v=1.0.1 [https://perma.cc/GYU9-PC2E] (finding that FMC Carswell has policies and procedures "that enable[] inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks" and that FMC Carswell "require[s] staff of the opposite gender to announce their presence when entering an inmate housing unit"); *see* 28 C.F.R. § 115.15 (d).

77 (3d Cir. 2011) (recognizing that an individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"). As these courts have recognized, "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" *Fortner*, 983 F.2d at 1030 (quoting *Lee*, 641 F.2d at 1119) (reversing lower court's dismissal of claim seeking an injunction prohibiting female guards viewing male inmates when nude in living quarters, showering, and when toileting). The Ninth Circuit put it plainly: "We could not 'conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.'" *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir. 1985) (quoting *York*, 324 F.2d at 455).

The right to bodily privacy in intimate spaces is one that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (stating that the Due Process clause "has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition" and 'implicit in the concept of ordered liberty.'") (quoting *Glucksberg*, 521 U.S. at 721). From the inception of women's penal institutions, the American tradition has recognized and enforced sex segregation. *See Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989) (noting "a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender"). The BOP's policy discards that heritage, replacing a system consistent with centuries of law and custom with one that erases the boundary between the sexes. Such a break from historical

11

practice confirms the absence of any legitimate governmental interest sufficient to overcome Plaintiffs' liberty interests.

Here, Defendants' policy obliterates that fundamental right. By housing biological males in communal living and bathing areas with women, the BOP compels female inmates, including Plaintiffs, to expose their naked bodies to men, violating the core privacy interests the Constitution protects. It undermines institutional safety and inflicts psychological trauma on those the government is bound to protect.

Because the right to privacy is well established and Defendants' policy infringes it, the BOP policy cannot stand unless Defendants show it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Fifth Circuit evaluates the reasonableness of a prison regulation by analyzing four factors:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.

*Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 89–90). Intermingling the sexes in women's prisons fails every prong of this test: it is not rationally related to any legitimate security interest, no alternative means exist for Plaintiffs to preserve privacy, and obvious alternatives—sex-based housing assignments—are available at minimal cost.

*First*, there is no rational connection between intermixing the sexes and any legitimate safety interest. Congress enacted the Prison Rape Elimination Act to achieve "zero tolerance" for prison rape and to make its prevention a "top priority." 42 U.S.C. § 15602(1)–(2). Yet the BOP's policy does the opposite: it places men—including those sexually attracted to women and

convicted of sexual crimes against women—into the female inmate population, creating a risk of harassment, abuse, and rape that did not previously exist.

*Second*, Plaintiffs have no alternative means to safeguard their privacy. Administrative channels have proven futile. Segregation in the SHU is no solution—it strips inmates of privileges enjoyed in general population and still fails to ensure sex-segregated housing. The SHU's limited capacity only underscores the impossibility of securing privacy for all women.

*Third*, returning female facilities to female-only status would impose minimal administrative burden. It simply restores the longstanding and effective practice that governed federal prisons for decades. The BOP need only revise internal placement policies. Transgender-identifying inmates would continue to receive medical care and protection, just as other vulnerable inmates do today. Far from straining resources, the change would advance PREA's objectives and reduce the risk of sexual trauma and associated health costs.

*Fourth*, obvious and less-restrictive alternatives exist. For decades, the BOP maintained sex-specific facilities that respected privacy and safety. That model remains readily available. Other options include dedicated housing or private quarters for transgender-identifying inmates— approaches that preserve security and dignity for all. The availability of these alternatives confirms the unreasonableness of the challenged policy.

Because Defendants cannot show that forcing women to cohabit with men is reasonably related to any legitimate penological objective, the BOP policy cannot stand. Plaintiffs are therefore likely to succeed on their constitutional claim protecting bodily privacy.

### 2.    Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Eighth Amendment Claim

Plaintiffs have a strong likelihood of success on the merits of their Eighth Amendment claim that Defendants are failing to protect them from a serious risk of bodily harm by housing

them with male, transgender-identifying inmates. The Eighth Amendment forbids prison officials from acting with deliberate indifference to a substantial risk of serious harm to those in their custody. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). That duty includes protecting inmates "from violence at the hands of other prisoners." *Id.* (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).

Defendants have done the opposite. Their policy of housing biological males within the general population of a federal women's prison exposes Plaintiffs to ongoing threats of physical and sexual violence, voyeurism, and psychological trauma. Fleming Decl. ¶¶ 5–7, 14–16 (APP101, 103); Herrera Decl. ¶¶ 4–7 (APP109-110). By compelling female prisoners to share intimate living spaces with men—many of whom retain male genitalia and have histories of sexual or violent crimes—Defendants have created conditions that are dangerous on their face. Fleming Decl. ¶¶ 5–6 (APP101); Herrera Decl. ¶ 3 (APP109).

Plaintiffs' failure-to-protect claim requires them to establish both an objective and a subjective element. The objective element requires showing incarceration "under conditions posing a substantial risk of serious harm." *Id.* at 833. The threatened harm must be "objectively, 'sufficiently serious.'" *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Without question, physical and sexual violence constitute objectively serious deprivations. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Here, Plaintiffs face clear risks of violence, voyeurism, rape, and sexual assault and harassment if they are housed with men. *See De Veloz v. Miami-Dade Cnty.*, 756 F. App'x 869, 877 (11th Cir. 2018) ("Housing a biological female alongside . . . male inmates poses an outrageous risk that she will be harassed, assaulted, raped, or even murdered."); *cf. Johnson v. Surles*, No.

218-cv-01449, 2019 WL 13336813, at *5 (N.D. Ala. Sept. 12, 2019), *report and recommendation adopted*, No. 4:18-CV-1449, 2020 WL 13750675 (N.D. Ala. Jan. 2, 2020) ("Placing a female detainee in a male detention facility creates a substantial risk of serious harm to the female detainee's health and safety.") (collecting cases). The risk of sexual assault and psychological trauma inherent in housing males with females is obvious and well documented. As the Eleventh Circuit explained, "female and male inmates are not housed together in prisons because this risk is not only self-evident, but serious and real." *De Veloz*, 756 F. App'x at 877. Defendants' own data confirm the danger: male inmates commit sexual assaults at vastly higher rates than females.[12] And male, transgender-identifying inmates are statistically far more likely than the general BOP male inmate population to be incarcerated for sexual offenses.[13]

The risk here is not hypothetical. FMC Carswell's population includes at least a dozen male, transgender-identifying inmates, many convicted of violent or sexual crimes. Fleming Decl. ¶¶ 4–5 (APP100-101); *see* Am. Compl., Dkt. 56-1 ¶ 63. Nearly all of these inmates retain their male genitalia and possess the physical characteristics of men, including superior height, weight, and strength. *See* Fleming Decl. ¶ 5 (APP101); Herrera Decl. ¶ 3 (APP109); Am. Compl., Dkt. 56-1 ¶¶ 64, 67. Their placement among women creates a daily threat of physical domination, intimidation, and sexual abuse. Fleming Decl. ¶¶ 5–7, 14–16 (APP101, 103); Herrera Decl. ¶¶ 4–7 (APP109-110).

---

[12] *See* U.S. Dep't of Just., Bureau of Just. Stat., *Sexual Victimization Reported by Adult Correctional Authorities, 2019–2020 – Statistical Tables*, p. 11 (Emily D. Buehler & Shelby Kottke-Weaver eds., July 2024) (NCJ 308553) https://bjs.ojp.gov/document/svraca1920st.pdf [https://perma.cc/3MUT-JGXX]. ("In substantiated inmate-perpetrated incidents, males accounted for 81% of nonconsensual sexual acts perpetrators, 78% of sexual harassment perpetrators, and 67% of abusive sexual contact perpetrators.").

[13] *See* Brief of Amicus Curiae Women's Liberation Front in Support of Appellants at 5, *Doe v. Bondi*, Nos. 25-5099 (D.C. Cir. filed Sept. 3, 2025) ("Information obtained through a FOIA request shows that between May 2024 and January 2025, 51 percent of men identifying as 'transgender' were incarcerated for sex offenses. This number is almost four times as high as the number in the general Federal Bureau of Prisons population.").

That threat has already materialized. Male inmates at FMC Carswell have repeatedly engaged in voyeurism, harassment, and assault of, and sex with, female inmates. Fleming Decl. ¶¶ 6–7 (APP101); Herrera Decl. ¶ 5 (APP110). Ms. Herrera has been watched by male prisoners while nude or showering; one inmate stood in front of a mirror positioned to view the showers and stared at her as she bathed. Herrera Decl. ¶ 4 (APP109-110). On another occasion, he opened her shower door, exposing her body while laughing telling her he would be waiting for her in the bathroom after lights out. *Id.* Male inmates have also made lewd remarks—one boasting that his wheelchair gave him a better view of women's "private parts." Herrera Decl. ¶ 5 (APP110). Others have entered restrooms while women were using them and have been observed having sexual relations with female inmates in cells and showers. Fleming Decl. ¶ 6 (APP101); Herrera Decl. ¶ 5 (APP110). In July 2025, one male inmate physically assaulted a female prisoner in her room after declaring, "I'm not trans, I'm bisexual and everything works." Fleming Decl. ¶ 7 (APP101). Despite evidence and witness statements, prison officials took no meaningful disciplinary action. Fleming Decl. ¶¶ 7, 11 (APP101-102). These episodes confirm that the risk of assault is not speculative; it is an ongoing and documented reality.

Federal regulations recognize that unconsented exposure to another inmate's genitalia is, by definition, sexual harassment, 28 C.F.R. § 115.6, and sexual propositions, stalking, and indecent exposure likewise violate BOP regulations, 28 C.F.R. § 541.3. But rather than prevent and punish that behavior as those regulations would require, Defendants maintain a penal environment in which the female inmates are regularly exposed to male genitalia in the prison common areas as well as showers, restrooms, cells, and even the SHU. Such exposure humiliates and degrades not only the Plaintiffs, but also other female inmates throughout the prison.

These conditions inflict humiliation, fear, and psychological harm for female inmates like Plaintiffs, many of whom are survivors of sexual trauma. Herrera Decl. ¶ 6 (APP110). Plaintiffs suffer sleeplessness, anxiety, and ongoing mental distress because their bodily privacy and physical security are continually at risk. Fleming Decl. ¶ 16 (APP103); Herrera Decl. ¶ 7 (APP110). Such conditions easily satisfy the objective component of an Eighth Amendment violation.

The subjective element requires showing officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Courts have consistently found this element satisfied when officials knowingly house women with male inmates. *See De Veloz v. Miami-Dade Cnty.*, 756 F. App'x 869, 878 (11th Cir. 2018) (concluding that evidence showing prison officials had "actual, subjective knowledge that [the prisoner] was a female" when they nevertheless reclassified her as male to house her among men "amounts to deliberate indifference under *Farmer*"); *Hostetler v. Green*, 323 F. App'x 653, 657–58 (10th Cir. 2009) (Gorsuch, J.) (concluding that prison officials' violation of a policy barring male inmates from entering female housing units, combined with their awareness of the BOP policy's safety rationale, supported a finding of deliberate indifference based on subjective knowledge of the risk in allowing a male inmate to remain unsupervised in a female's cell).

The BOP has received repeated complaints, grievances, and lawsuits (including this action) detailing harassment, sexual misconduct, and voyeurism by male inmates at FMC Carswell. Fleming Decl. ¶¶ 11, 17 (APP102-103); Herrera Decl. ¶ 10 (APP111). Ms. Fleming herself was placed in the SHU after objecting to such conditions and was told she could be assigned a male cellmate; fearing for her safety, she requested suicide watch rather than risk assault. Fleming Decl. ¶¶ 12–13 (APP102-103). The BOP is thus on direct notice from Ms. Fleming's prior grievances

and litigation raising identical safety concerns, yet it has ignored those warnings and continues to house biological males among women. Fleming Decl. ¶¶ 11–13, 17 (APP102-103); Herrera Decl. ¶ 10 (APP111). Its persistent refusal to segregate male inmates or modify housing assignments reflects not confusion, but a conscious disregard for safety that constitutes deliberate indifference within the meaning of *Farmer*.

Moreover, Defendants' placement of biological males into female inmates' intimate spaces itself constitutes cruel and unusual punishment. Whether "informed by the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101 (1958), or based in our nation's history and tradition,[14] those standards include and have always included the principle that women are not confined with men, a norm universally observed in civilized nations. By compelling women to bathe, change clothes, and use restroom facilities in the presence of male inmates, Defendants have crossed a constitutional line that our Nation's history and tradition have never tolerated. In doing so, Defendants have inflicted cruel and unusual punishment upon the female prisoners of FMC Carswell.

The Eighth Amendment requires prisons to take reasonable measures to guarantee the safety of inmates. *Farmer*, 511 U.S. at 832. Defendants' deliberate choice to disregard the known and serious risks of housing men in women's facilities violates that mandate. Plaintiffs have shown both an objectively substantial risk of serious harm and the Defendants' subjective awareness of and indifference to that danger. Accordingly, Plaintiffs have demonstrated a strong likelihood of success on the merits of their Eighth Amendment claim.

---

[14] *See Dobbs*, 597 U.S. at 231; *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 22 (2022).

3.    **Plaintiffs Are Likely to Succeed on Count Three Under the Religious Freedom Restoration Act**

The Religious Freedom Restoration Act ("RFRA") provides that the government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except where the government "demonstrates that application of the burden … (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). Once a plaintiff gives prima facie evidence of a substantial burden on her sincere belief, the burden shifts to the government to prove that it acts on a compelling interest via the most narrowly tailored means. 42 U.S.C. § 2000cc-2(b).[15]

Religious exercise under RFRA "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). It includes "belief and profession" and performing—or abstaining from—physical acts that are engaged in for religious reasons. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014). The claimant's religious belief must be sincere, but federal courts may not question the truth of the belief. *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 790 (5th Cir. 2012). "We limit ourselves to 'almost exclusively a credibility assessment' when determining sincerity. To examine religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Id.* at 792. The belief does not need to be central to the faith system, but need only be important to the claimant's free exercise of religion. *Id.* at 790. And

---

[15] Sections 42 U.S.C. § 2000cc-2(b) is a provision of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). While RLUIPA is a separate statute from RFRA, the two are substantially similar, and RLUIPA's institutionalized-persons provision, 42 U.S.C. § 2000cc-1(a), has been held to allow prisoners "to seek religious accommodations pursuant to the same standard as set forth in RFRA." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

sincerity "does not require perfect adherence to beliefs expressed by the inmate, and even the most sincere practitioner may stray from time to time." *Id.* at 791.

Plaintiffs are women of faith whose religious convictions forbid exposure to or viewing of the opposite sex in states of undress. Fleming Decl. ¶¶ 8–10 (APP101-102); Herrera Decl. ¶ 8 (APP110). Ms. Fleming is a Messianic Jew who grounds her modesty convictions in the Word of God as revealed in Scripture. Fleming Decl. ¶¶ 8–10 (APP101-102). From Genesis to the New Testament, Scripture affirms the dignity, modesty, and protection of the human body, especially within the sexes created by God. From the very beginning, "God created man in His own image . . . male and female He created them." *Genesis* 1:27 (New International Version). Ms. Herrera is a practicing Christian whose faith teaches that men and women should not see one another naked or share intimate spaces outside of marriage. Herrera Decl. ¶ 8 (APP110). Both Plaintiffs follow biblical instructions on modesty. *See 1 Timothy* 2:9 (New International Version) ("I also want the women to dress modestly, with decency and propriety . . . ."). Plaintiffs strive to live in accordance with these principles even while incarcerated. Fleming Decl. ¶¶ 8–10 (APP101-102); Herrera Decl. ¶ 9 (APP111). For these Christian women, being required to shower or sleep in close quarters with a biological male directly conflicts with these biblical principles and their Spirit-led convictions to live modestly, honorably, and in accordance with God's design.

These beliefs are neither novel nor contrived; they reflect millennia of Judeo-Christian teaching on sexual modesty and the sanctity of the body.[16] The sincerity of these convictions

---

[16] *See, e.g.*, Protocatechesis 14, NPNF 2:7 (quoting Cyril of Jerusalem, who instructed "Let men be with men, and women with women . . . let there be a separation, men with men, and women with women, lest the pretext of salvation become an occasion of destruction."); Cyprian of Carthage, *De habitu virginum* [*The Dress of Virgins*] ch. 19, in The Fathers of the Church: St. Cyprian—Treatises (Roy J. Deferrari trans., Catholic Univ. of Am. Press 1958) (condemning, in the mid-third century A.D. and on Christian grounds, the common Roman practice of mixed-sex bathing), https://www.ewtn.com/catholicism/library/dress-of-virgins-12507 [https://perma.cc/9ZDL-FVYC].

should not be disputed. Under settled precedent, this Court's inquiry regarding those beliefs ends there.

### a.    Defendants substantially burden Plaintiffs' religious exercise

The "effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates [her] religious beliefs, or (2) forces the adherent to choose between . . . enjoying some generally available, non-trivial benefit, and . . . following [her] religious beliefs." *Moussazadeh*, 703 F.3d at 793.

That is precisely what Defendants have done. By housing male inmates within the women's general population at FMC Carswell, Defendants have compelled Plaintiffs either to (1) live in daily violation of their faith-based convictions on modesty and sexual propriety, or (2) enter punitive solitary confinement under the guise of "protective custody" to avoid such exposure.

Both Plaintiffs have endured repeated exposure to male genitalia and sexual harassment from male inmates placed in their housing units. Fleming Decl. ¶¶ 6, 12 (APP101-102); Herrera Decl. ¶¶ 4–5 (APP109-110). Ms. Herrera was watched while showering by a male inmate wearing makeup who later told her he would be waiting for her after lights out. Herrera Decl. ¶ 4 (APP109-110). When she closed the shower door, he deliberately opened it, laughing. *Id.* Ms. Fleming was threatened with being assigned a male cellmate in the SHU, forcing her to request suicide watch rather than risk being confined with a man. Fleming Decl. ¶ 13 (APP102-103).

These experiences are incompatible with Plaintiffs' religious duty to preserve bodily modesty and avoid viewing or being viewed nude by men. Under any reasonable measure, forcing a believer to endure daily exposure to male nudity in showers, restrooms, and living quarters constitutes a "substantial burden" on religious exercise. *See Jehovah v. Clarke*, 798 F.3d 169, 180 (4th Cir. 2015) (reversing dismissal of the Christian prisoner's RFRA claim objecting to being

housed with non-Christian cellmates who subjected him to anti-Christian rhetoric because that rhetoric plausibly chilled the plaintiff's religious practices).

### b.    Defendants have no compelling interest to justify burdening Plaintiffs' faith

RFRA only allows burdens on religious exercise that are in service of compelling interests, i.e., "only those interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (defining compelling interests in the context of RFRA). Defendants cannot meet that standard here.

Defendants may assert an interest in reducing sexual assault or in affirming the self-identified "gender identity" of male inmates. But neither justifies forcing religious women to cohabit with men. The first rationale is self-defeating: placing biological males in women's prisons increases, not reduces, the risk of sexual assault. The BOP's own data—obtained through FOIA— show that approximately 51 percent of male, transgender-identifying inmates were incarcerated for sex offenses, nearly four times the rate in the general BOP male population. The BOP policy of housing male inmates in women's facilities endangers women by exposing them to sexual assault and abuse, thereby undermining the very rationale PREA was enacted to protect.

The second potential rationale fares no better. The Fifth Circuit has squarely rejected any constitutional right to gender-affirming treatments, much less cross-sex housing. *Praylor v. Tex. Dep't of Criminal Justice*, 430 F.3d 1208, 1209 (5th Cir. 2005) (no constitutional right to hormone treatment). *See also Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2014) (no constitutional right to sex-reassignment surgery). Even if some limited medical treatment for gender dysphoria may be warranted, it does not follow that men must be housed with women as part of that care. Such a potential asserted interest is therefore neither compelling nor coherent.

### c.    Defendants do not use the least restrictive means

Even assuming Defendants could articulate a compelling interest, they must still show that "it lacks other means of achieving its desired goal without imposing a substantial burden" on Plaintiffs' faith. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). That is an "exceptionally demanding" standard. *Id.* If a less restrictive means is available to satisfy the government interest, "the Government must use it." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000); *accord McAllen*, 764 F.3d at 475 ("The burden on the government in demonstrating the least restrictive means test is a heavy burden.").

Defendants cannot carry that burden. FMC Carswell itself contains a secure Hospital Unit—a distinct, medically equipped area separate from the women's general population—where male inmates could be securely housed without access to female privacy spaces while retaining essential services. Non-federal systems, including the Texas Department of Criminal Justice, already manage transgender-identifying inmates without intermingling the sexes. And even in the federal prison system, the vast majority (98.5%) of male, transgender-identifying inmates (1466 out of 1488 total, as of February 2025) in federal custody are housed in male prisons.[17] It is simply implausible that the BOP can safely house the other 99% in a facility that matches their sex but cannot do so for the male inmates currently housed at FMC Carswell. In fact, the BOP has recently attested in a sworn declaration that it "believes that all 22 biological male inmates [who are currently housed in women's facilities] can be safely housed in low security men's facilities."[18] Defendants must also explain why a host of other protective measures, such as door locks or

---

[17] *Jones v. Trump, et. al.*, 1:25-cv-00401-RCL, Dkt. 24-1, ¶ 5 (D.D.C.) ("As of February 20, 2025, there are 2,198 inmates housed in FBOP facilities and halfway houses that identify as the opposite biological sex. There are 1,488 biological male inmates who identify as female and 710 biological female inmates who identify as male. The FBOP currently has 22 biological male inmates living in female institutions.").

[18] *Jones v. Trump, et. al.*, 1:25-cv-00401-RCL, Dkt. 42-1, ¶ 24 (D.D.C.).

separate showers, would not be sufficient to safely house male, transgender-identifying inmates in male facilities. Those existing alternatives show that Defendants' policy is not the least restrictive means but the most invasive.

Instead of implementing any of these existing reasonable alternatives, the BOP has prioritized housing male, transgender-identifying inmates in women's prisons at the expense of female inmates. Indeed, the BOP threatens to transfer Ms. Herrera out of FMC Carswell without justification, and it has forced Ms. Fleming to choose suicide watch instead of the SHU. This is backwards: it is not Plaintiffs who are intruding on the constitutional rights of other inmates in the prison, but rather it is the male inmates who necessarily violate privacy and pose other threats to legal rights and even others' safety.

In the end, Defendants' policy burdens Plaintiffs' faith for no legitimate penological reason. RFRA forbids that result. The statute requires not indifference but accommodation, especially where, as here, obvious and less restrictive solutions lie close at hand.

### 4. Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their Administrative Procedure Claim

Plaintiffs are also likely to prevail on their claim that Defendants' policy and practice of housing biological males in women's prisons violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right, power, privilege, or immunity," or that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A)–(C). Defendants' policy fails on each of these grounds.

### a.    The BOP exceeded its statutory authority under PREA

The Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. § 30301 *et seq.*, directed the Attorney General to issue national standards "for the detection, prevention, reduction, and punishment of prison rape." *Id.* § 30307(a). Nothing in PREA authorizes the BOP to redefine "sex" to mean "gender identity" or to house male inmates in female institutions. Congress enacted PREA to reduce sexual violence in custody, not to compel or permit cross-sex housing that predictably increases the risk of assault and trauma.

An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). Here, the BOP has assumed a legislative power Congress never delegated. By construing PREA to mandate or permit cross-sex placement, the BOP has acted "in excess of statutory jurisdiction [and] authority." 5 U.S.C. § 706(2)(C). An agency "has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986). The BOP's gender-identity regime lacks that statutory foundation.

### b.    The policy is arbitrary and capricious

Even if some authority existed to consider gender identity, the BOP's decision to house males with females is arbitrary and capricious under Section 706(2)(A). An agency acts arbitrarily when it "entirely fail[s] to consider an important aspect of the problem" or offers explanations "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, the BOP ignored the safety, privacy, and religious-liberty interests of female prisoners. It offered no reasoned basis for abandoning sex-segregated confinement that had safeguarded women for generations, and it disregarded readily available alternatives such as assigning male inmates to separate units within existing facilities. That unexplained reversal from

25

prior policy, which for decades respected biological sex as the governing classification, violates the APA's core requirement of reasoned decisionmaking. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### c.   The policy is contrary to the Constitution

Agency action is unlawful if it is "contrary to constitutional . . . right." 5 U.S.C. § 706(2)(B). By enforcing a policy that forces women to expose themselves to male inmates in showers, toilets, and sleeping quarters, the BOP has violated Plaintiffs' constitutional rights to bodily privacy and freedom from cruel and unusual punishment. And by compelling exposure that contravenes Plaintiffs' sincere religious convictions, the BOP has simultaneously violated RFRA. An agency cannot enforce a rule that is unconstitutional on its face or as applied.

In sum, the BOP's continued enforcement of 28 C.F.R. § 115.42 and its implementing guidance cannot be squared with the APA. The rule exceeds statutory authority, disregards mandatory procedures, conflicts with the Constitution, and defies a presidential directive. Plaintiffs are therefore substantially likely to prevail on the merits of their APA claim, and the unlawful policy should be set aside.

### 5.   Plaintiff Herrera is Likely to Succeed on Her Claim for Injunctive Relief Barring Her Retaliatory Transfer in Violation of Her First Amendment Rights

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). In particular, "prison officials may not retaliate against an inmate because that inmate exercised his right of access to the courts." *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998) (citing *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995)). "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a

retaliatory adverse act, and (4) causation." *McDonald*, 132 F.3d at 231. "Causation requires a showing that but for the retaliatory motive the complained of incident . . . would not have occurred." *Id.* (internal quotations marks omitted). The retaliatory adverse act must be more than *de minimis* such that it is "capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) (considering First Amendment retaliation claim regarding an inmate's grievances).

Here, Defendants threatened to transfer Ms. Herrera to FCI Aliceville after she joined this case and within weeks of the Court's appointment of the undersigned counsel. Herrera Decl. ¶ 11 (APP111). The stated justification is pretextual,[19] and the timing—mere weeks after Defendants Rule and Marshall were served—shows retaliatory motive. Such a threatened transfer to an inferior facility is well more than a *de minimis* harm that serves to chill not only Ms. Herrera's exercise of constitutional rights but that of any other female inmate who might dare to speak out against Defendants' unlawful policies. *See Morris*, 449 F.3d at 687 (stating that transfer to an inferior prison facility is a "much more serious retaliatory act than what has been considered *de minimis* in other circuits" and holding that the plaintiff's "prison transfer claim meets the *de minimis* threshold"). The First Amendment forbids the government from punishing individuals for petitioning the courts for redress. The Court should accordingly enjoin Defendants from the threatened retaliatory transfer of Ms. Herrera pending the resolution of this litigation.

---

[19] In an October 9, 2025 email, Defendants' counsel explained that Ms. Herrera had been "scheduled for transfer, along with multiple other inmates, as part of a broader effort to lessen FMC Carswell's population," but was "removed from the transfer list" only because of her pending oral surgery. Herrera Decl. ¶ 11 (APP111); Exhibit A-4 (October 9, 2025 email from L. Hasday) (APP087-090). Then, in an October 31 email, Defendants' counsel confirmed that FMC Carswell "is the BOP's *only* medical center for female inmates" and that the BOP "must prioritize placing inmates there who require its medical services." Ex. A-5 (APP091-098). Those two admissions cannot be reconciled with the BOP's decision to move *women*, including a female inmate requiring medical attention, out of the only women's medical facility while allowing male, transgender-identifying inmates to remain there. The BOP's insistence that it "has authority to decide where to place inmates" and its refusal to agree not to transfer Ms. Herrera show not operational necessity, but rather a deliberate choice to preserve discretion that works to the detriment of women.

**B.    Plaintiffs Face Imminent and Irreparable Harm.**

It is well established that alleging the deprivation of a constitutional right "unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs,* 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That principle applies with equal force to RFRA, as "courts have recognized that this same principle applies." *Id.* (citing *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA."). The Plaintiffs have alleged and demonstrated violations of their constitutional rights, as well as rights under RFRA, and have therefore established irreparable harm as a matter of law. *See Elrod v. Burns*, 427 U.S. at 373. Moreover, Plaintiffs have alleged ongoing physical consequences from the current and prospective privacy violations, Fleming Decl. ¶ 16 (APP103); Herrera Decl. ¶¶ 6–7 (APP110), which also constitutes irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Every day Plaintiffs are compelled to be housed among men, undress in their presence, and fear assault inflicts irreparable injury to bodily privacy, psychological well-being, and religious conscience.

Ms. Herrera's threatened transfer likewise poses additional irreparable harm—separation from family support, loss of counsel access, and chilling of protected rights. Once executed, the harms of such transfer cannot be fully remedied. Courts routinely enjoin retaliatory transfers to prevent such harm.

**C.    The Balance of Equities and Public Interest Favor Injunctive Relief.**

The equities here are one-sided in Plaintiffs' favor. Granting relief imposes minimal burden on Defendants—they need only revert to the longstanding practice of housing male and female inmates separately and refrain from retaliatory transfers. Denying relief, by contrast, perpetuates the following threatened—and actual—injury to the Plaintiffs: ongoing violation of their constitutional right to bodily privacy; the substantial burdening of their religious exercise; the

28

reality of sexual harassment and abuse, and the elevated risk of rape; retaliation when they seek relief through complaints and litigation; and the consequent mental and physiological impacts from these harms. The constitutional and RFRA violations are irreparable harms, and impact not only the two Plaintiffs, but every female inmate at FMC Carswell. Against this, the burden on Defendants is simple adjustment of administrative procedures and some redirection of existing resources to assign inmate housing based on sex rather than self-perceived, inmate-authorized gender identity. But "such inconveniences are common incidental effects of injunctions" and not sufficient reason in themselves to foreclose issuing an injunction. *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015).

The public interest always favors enforcement of constitutional guarantees. *Nken v. Holder*, 556 U.S. 418, 436 (2009); *see also Opulent Life Church*, 697 F.3d at 298. It also favors prison policies that protect women from sexual victimization and respect religious conscience under RFRA. *See Opulent Life Church*, 697 F.3d at 298; *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."). Congress enacted PREA to prevent sexual abuse, not to enable it. Enjoining BOP's unlawful practice promotes both institutional safety and the rule of law.

## V. <u>CONCLUSION</u>

Defendants' policy of housing biological males in women's prisons defies the Constitution, federal statute, and common sense. It endangers female inmates, violates their bodily privacy, and accordingly burdens the exercise of their faith. And Defendants' threat of retaliatory transfer chills their right to petition the courts. Plaintiffs therefore respectfully request that this Court grant their

Motion for Temporary Restraining Order and Preliminary and Permanent Injunction and enjoin Defendants as follows:

    (a) Enter a temporary restraining order immediately enjoining Defendants, their officers, employees, agents, and all persons acting in concert with them from:

        (1) housing any male inmate (meaning any person who is biologically male, regardless of gender identity) within the general population of any housing unit where either Plaintiff is presently or will be confined during the pendency of this Order; and

        (2) permitting any male inmate to enter or remain in any female-only privacy area (including showers, restrooms, changing areas, or dormitory spaces) to which either Plaintiff has access, so that Plaintiffs are not exposed to male inmates while showering, toileting, dressing, or sleeping.

    (b) Order that, to comply with the foregoing relief, Defendants may, in their discretion, (1) reassign male inmates away from Plaintiffs' housing and privacy areas or (2) house such inmates in a secure, segregated area at FMC Carswell (including the Hospital Unit or an equivalent setting) that preserves access to programming and services while preventing access to female-only privacy areas.

    (c) Temporarily enjoin Defendants, and all persons acting in concert with them, from transferring Plaintiff Herrera or otherwise adversely altering the terms or conditions of her confinement in retaliation for her participation in this litigation during the pendency of the temporary restraining order, except where supported by a bona fide, documented penological or medical reason unrelated to this lawsuit, with at least 72 hours' written notice to Plaintiffs' counsel and the Court before any such transfer.

    (d) Set the matter for expedited hearing and, after hearing, convert the temporary restraining order into a preliminary and permanent injunction affording the same protections for the duration of this litigation.

    (e) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

BROWN FOX PLLC

By: */s/ Cortney C. Thomas*
Cortney C. Thomas
  Texas Bar No. 24075153
  cort@brownfoxlaw.com
C. Alan Carrillo
  Texas Bar No. 24109693
  alan@brownfoxlaw.com
Andrew C. Debter
  Texas Bar No. 24133954
  andrew@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, TX 75225
T: 214.327.5000
F: 214.327.5001

*Attorneys for Plaintiffs Rhonda Fleming and Miriam Crystal Herrera*

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for the Plaintiffs conferred with counsel for Defendants via email on October 28, 2025 and November 2, 2025. Counsel for Defendants indicated that they opposed the relief requested herein.

*/s/ Cortney C. Thomas*
Cortney C. Thomas

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic filing system.