**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RHONDA FLEMING** and **MIRIAM CRYSTAL HERRERA,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Civil Action No. 4:25-CV-0157-D (Consolidated with** |
| **WARDEN T. RULE, WILLIAM K. MARSHALL, III, PAMELA J. BONDI,** and **UNITED STATES OF AMERICA,** | § § § § | **Civil Action No. 4:25-CV-0438-D)** |
| **Defendants.** | § § | |

**APPENDIX IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY AND PERMANENT INJUNCTION AND BRIEF IN SUPPORT**

Respectfully submitted,

By: _/s/ Cortney C. Thomas_
    Cortney C. Thomas
     Texas Bar No. 24075153
     cort@brownfoxlaw.com
    C. Alan Carrillo
     Texas Bar No. 24109693
     alan@brownfoxlaw.com
    Andrew C. Debter
     Texas Bar No. 24133954
     andrew@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    T: 214.327.5000
    F: 214.327.5001

    *Attorneys for Plaintiffs Rhonda Fleming and
    Miriam Crystal Herrera*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

| Tab | Exhibit | APP #s |
|:---:|---|---|
| A | Declaration of Cortney C. Thomas | APP001 – 098 |
| B | Declaration of Rhonda Fleming | APP099 – 107 |
| C | Declaration of Miriam Herrera | APP108 – 112 |

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RHONDA FLEMING and** | § | |
| **MIRIAM CRYSTAL HERRERA,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-CV-0157-D** |
| | § | **(Consolidated with** |
| **WARDEN T. RULE, FBOP DIRECTOR** | § | **Civil Action No. 4:25-CV-0438-D)** |
| **WILLIAM MARSHALL, II, UNKNOWN** | § | |
| **AUTHOR OF BOP TRANSGENDER** | § | |
| **POLICY, UNITED STATES OF** | § | |
| **AMERICA,** | § | |
| | § | |
| **Defendants.** | § | |

## DECLARATION OF CORTNEY C. THOMAS

1.      My name is Cortney C. Thomas.  I have personal knowledge of the matters set forth in this Declaration.  I am of sound mind, and I am otherwise competent to testify to the facts set forth below.

2.      I am an attorney at the law firm of Brown Fox PLLC ("Brown Fox"), licensed to practice law in the State of Texas.

3.      My firm represents Plaintiff Rhonda Fleming and Miriam Crystal Herrera.  I make this Declaration based on my personal knowledge acquired by virtue of my involvement as counsel in this matter.

4.      Fair and accurate copies of the following exhibits referenced in Plaintiffs' Motion for Temporary Restraining Order and Preliminary and Permanent Injunction and Brief in Support in this action are attached to this Declaration as follows:

**Exhibit A-1** – The Bureau of Prisons' Transgender Offender Manual and its subsequent revisions: (1) Program Statement number 5200.04, effective January 18, 2017; (2) Program

Statement number 5200.04 CN-1, effective May 11, 2018; and (3) Program Statement number 5200.08, effective January 13, 2022;

**Exhibit A-2** – Brief of Amicus Curiae Women's Liberation Front, *Doe v. Bondi*, No. 25-5099 (D.C. Cir. filed Sept. 3, 2025);

**Exhibit A-3** – Executive Order 14168, 90 F.R. 8615, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*;

**Exhibit A-4** – October 9, 2025 email from L. Hasday; and

**Exhibit A-5** – October 31, 2025 email from L. Hasday.

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 3, 2025.

*/s/ Cortney C. Thomas*
CORTNEY C. THOMAS

# EXHIBIT A-1

 **U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:          RSD/FOB
NUMBER:   5200.04
DATE:        January 18, 2017

# Transgender Offender Manual

/s/
*Approved*: Thomas R. Kane
Acting Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population.

**a. Program Objectives.**  Expected results of this program are:

- This policy is meant to provide guidance to staff in dealing with the unique issues that arise when working with transgender inmates.
- Institutions ensure transgender inmates can access programs and services that meet their needs as appropriate, and prepare them to return to the community.
- Sufficient resources will be allocated to deliver appropriate services to transgender inmates.
- Staff will be offered training, enabling them to work effectively with transgender inmates.
- To support staff's understanding of the increased risk of suicide, mental health issues and victimization of transgender inmates.

**b. Institution Supplement.**  None required.  Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 2. DEFINITIONS

*Gender* – a construct used to classify a person as male, female, both, or neither.  Gender encompasses aspects of social identity, psychological identity, and human behavior.

*Gender identity* – a person's sense of their own gender, which is communicated to others by their gender expression.

*Gender expression* – includes mannerisms, clothing, hair style, and choice of activities.

*Gender nonconforming* – a person whose appearance or manner does not conform to traditional societal gender expectations.

*Transgender* – the state of one's gender identity not matching one's biological sex. For the purposes of this policy, a transgender inmate is one who has met with a Bureau of Prisons psychologist and signed the form indicating consent to be identified within the agency as transgender. This step allows for accommodations to be considered.

*Cisgender* – the state of one's gender identity matching one's biological sex.

*Sexual orientation* – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related.

*Gender Dysphoria* (GD) – a mental health diagnosis currently defined by DSM-5 as, "A strong and persistent cross-gender identification. It is manifested by a stated desire to be the opposite sex and persistent discomfort with his or her biologically assigned sex." Not all transgender inmates will have a diagnosis of GD, and a diagnosis of GD is not required for an individual to be provided services.

*Intersex* – a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical biological definitions of male or female. Not all intersex people identify as transgender; unless otherwise specified, this policy does not apply to intersex people who do not identify as transgender.

*Transition* – measures that change one's gender expression or body to better reflect a person's gender identity.

3. **STAFF RESPONSIBILITIES**

The following Bureau components are responsible for ensuring consistent establishment of the programs, services, and resource allocations necessary for transgender offenders.

APP006

a. **Central Office**

(1) The **Female Offender Branch** is the agency's primary source and point of contact on classification, management, and intervention programs and practices for transgender inmates in Bureau custody. The Branch is responsible for the following functions as they relate to transgender inmates:

- Engaging stakeholders, including serving as the primary point of contact on issues affecting transgender inmates with judges, political figures, and advocacy groups.
- Ensuring the Bureau offers appropriate services to transgender inmates.
- Preparing budgetary requests to deliver national and pilot programs or services affecting transgender inmates.
- Providing guidance and direction to Regional staff and institution leadership on transgender issues.
- Developing and implementing staff training on transgender issues.
- Building a research-based foundation for the Bureau's work with transgender inmates.
- Presenting at internal and external conferences/events regarding the agency's transgender inmates' practices.
- Developing and monitoring monthly reports on the transgender population and institutional programs.
- Issuing an annual report on the state of transgender offenders in the Bureau that will be made available to all staff and stakeholders.
- Advising agency leadership on transgender inmate needs.
- Conducting an annual survey of transgender inmates in the Bureau and sharing results with internal and external stakeholders.
- Providing national oversight of pilot programs and initiatives serving transgender offenders.

(2) The **Health Services Division** oversees all medical and psychiatric activity as it applies to transgender inmates. Guidance on the most current research-driven clinical medical and psychiatric care of transgender inmates will be provided by the Medical Director.

The Health Services Division also has oversight of a Transgender Clinical Care Team (TCCT). This team will be comprised of Physicians, Pharmacists, and Psychiatrists. Social Workers, Psychologists, and other clinical providers can also be included when appropriate. The TCCT will offer advice and guidance to health services staff on the medical treatment of transgender inmates and/or inmates with GD. Medical staff can raise issues to the TCCT through the Health Services Division.

(3) The **Psychology Services Branch** oversees all psychological mental health programs and services as they apply to transgender inmates, to include providing advice and guidance on

identification and evaluation of transgender inmates, and making recommendations for treatment needs of transgender inmates and/or inmates with GD.

(4) **Central Office Branches/Divisions** of Correctional Services, Psychology Services, Education, Correctional Programs, Reentry Affairs, Residential Reentry Management, Health Services, Health Programs, Social Work, Office of General Counsel, and Trust Fund meet annually with the Female Offender Branch to discuss transgender population needs and evaluate current gender-responsive services. The National Union and the Central Office LGBT Special Emphasis Program Manager will be invited to attend these meetings.

(5) The **Transgender Executive Council (TEC)** will consist of staff members from the Health Services Division, the Female Offender Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC), and the Office of General Counsel. The TEC will meet a minimum of quarterly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with GD, including designation issues. Institution staff and DSCC staff may raise issues on specific inmates to the TEC through the Female Offender Branch. The National PREA Coordinator is consulted as needed.

b. **Regional Offices**

■ Provide oversight to institutions regarding services and other relevant trends managing transgender inmates.
■ Assign transgender responsibilities to the Regional Female Offender/Transgender Coordinator Collateral Duty Assignment. This individual meets quarterly with the Female Offender Branch to discuss staffing and programming needs.

c. **Institutions**

The institution CEO will establish a multi-disciplinary approach to the management of transgender inmates; specifically:
■ Ensure transgender inmates have access to services.
■ Enter tracking information for self-identified transgender inmates by updating SENTRY and other databases (e.g., PDS), as appropriate.
■ Provide appropriate reentry resources that may be specific to the population.
■ Advise the Local Union of transgender inmate management issues, as appropriate.

4. **STAFF TRAINING**

Staff will be provided specialized training in working with unique issues when managing transgender inmates, with refresher training at annual training. Institutions housing known transgender inmates should provide additional training, if needed.

The Female Offender Branch will be responsible for developing training materials and current information on the management of transgender inmates. This information will be made available to staff on the Female Offender Branch Sallyport page.

In addition, the Prison Rape Elimination Act (PREA) regulations incorporated into the BOP Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** have training requirements concerning pat searches and communication skills for transgender inmates. See 28 C.F.R. § 115.15(f) and 115.31 (a) (9). Please refer to this Program Statement regarding implementation of those training requirements.

Staff will be provided adequate time to complete these trainings during duty hours.

5. **INITIAL DESIGNATIONS**

The PREA regulations, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**, state in section 28 C.F.R. § 115.42 (c):

> **"In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates…the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."**

Upon receipt of information from a Pre-Sentence Report, court order, U.S. Attorney's Office, defense counsel, the offender, or other source that an individual entering BOP custody is transgender, designations staff will refer the matter to the TEC for advice and guidance on designation.

Institution staff managing pretrial or holdover offenders may also refer cases to the TEC for review. Any TEC recommendations concerning pretrial inmates will be coordinated with the appropriate United States Marshal's Office.

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing

**APP009**

patterns, and physical layouts (e.g., types of showers available). The TEC will recommend housing by gender identity when appropriate.

**6. INTAKE SCREENING**

The PREA regulations in 28 C.F.R. part 115, Subpart A, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** and the Program Statement **Intake Screening,** address intake screening. Screening of transgender inmates will be conducted in accordance with these policies and all other applicable policies and procedures.

7. **HOUSING AND PROGRAMMING ASSIGNMENTS**

During Initial classification and Program Reviews, Unit Management staff will twice-yearly review the inmate(s) current housing unit status and programming available for transgender inmates; this review will be documented by Unit Management.

The reviews will consider on a case-by-case basis that the inmate placement does not jeopardize the inmate's health and safety and does not present management or security concerns.

In making housing unit and programming assignments, a transgender or intersex inmate's own views with respect to his/her own safety must be given serious consideration.

Transgender inmates shall be given the opportunity to shower separate from other inmates.

The agency shall not place transgender or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree , legal settlement, or legal judgment for the purpose of protecting such inmates.

In order for an inmate to be considered for transfer to another location, including a facility housing individuals of the inmate's identified gender, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

8. **DOCUMENTATION AND SENTRY ASSIGNMENTS**

a. **Medical and Mental Health Information**. Medical and mental health information for transgender inmates will be maintained in the current electronic recordkeeping system in accordance with the Program Statement **Health Information Management**. Medical and mental health information is considered confidential, and may only be released in accordance with appropriate laws, rules, and regulations.

**APP010**

b. **Initial Screening**.  For initial designations, designations staff will assign Case Management Activity (CMA) SENTRY assignments if information in the PSR or other documentation indicates a likely transgender identity.  The screening codes will be:

> SCRN M2F – inmate should be screened for male to female.
> SCRN F2M – inmate should be screened for female to male.

Any inmate arriving at the designated institution with a screening code is to be referred to the Chief Psychologist or designee for review within 14 days.  If the code was assigned in error, the screening code will be removed by the psychologist.  If the inmate identifies as transgender, the psychologist will replace the screening code with an identifying code, as indicated below. Holdover facilities will be exempt from this initial screening requirement, as limited available records and brevity of stay do not allow for a comprehensive screening.

Any inmate who arrives without a screening code but identifies as transgender during intake, or at any time during the incarceration period, is referred to the Chief Psychologist or designee and interviewed within 14 days of the inmate notification.  Inmates in pretrial status at Bureau facilities may also receive a SENTRY code.

c. **Notification to Staff and Tracking**.  After consultation with Psychology Services, and if the inmate affirms his/her transgender identity, the screening code will be updated to a permanent assignment by a psychologist:

> TRN M2F – inmate is male to female transgender (transgender female).
> TRN F2M – inmate is a female to male transgender (transgender male).

The inmate must request to Psychology Services staff that the CMA assignment be entered, and the inmate consents that all staff will therefore be notified that the individual is transgender.  The inmate's request will be documented on BP-A1110, Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates (included as Attachment A to this policy).  Psychology Services will maintain the form in the electronic mental health record and forward a copy of the form to the Unit Team.  The Unit Team will maintain the form in the FOI Exempt section of the Central File.

Staff should consult the CMA assignment when interacting with the inmate; e.g., use of pronouns, searches, commissary items, etc., as indicated below.

APP011

If there are questions about the need to continue a CMA assignment, the Warden should contact the Female Offender Branch. Should the CMA assignment change, staff members will not be disciplined for the continued provision of accommodations or use of pronouns.

## 9. HORMONE AND MEDICAL TREATMENT

Hormone or other medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff. Medical staff should request consultation from Psychology Services regarding the mental health benefits of hormone or other medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT.

In the event this treatment changes the inmate's appearance to the extent a new identification card is needed, the inmate will not be charged for the identification card.

## 10. INSTITUTION PSYCHOLOGY SERVICES

Bureau psychologists are available to provide assessment and treatment services for transgender inmates, if appropriate. Guidance on assessment procedures will be provided by the Psychology Services Branch.

If an inmate identifies as transgender, the psychologist will provide the inmate with information regarding the range of treatment options available in the Bureau and their implications. In addition, based upon the psychologist's preliminary assessment and the inmate's expressed interest, a referral to the Clinical Director and/or Chief Psychiatrist may be generated. While the initial interview must be scheduled within 14 days, an assessment may take longer in some instances.

In addition to a referral to medical services, a transgender inmate may be offered individual psychotherapy. Individual psychotherapy goals might include: (1) helping the inmate to live more comfortably within a gender identity and deal effectively with non-gender issues; (2) emphasizing the need to set realistic life goals related to daily living, work, and relationships, including family of origin; (3) seeking to define and address issues that may have undermined a stable lifestyle, such as substance abuse and/or criminality; and (4) addressing any co-occurring mental health issues. Mood disorders, anxiety disorders, substance use disorders, and personality disorders, etc., may also be present; any effective treatment plan will fully address these symptoms.

If an institution has multiple transgender inmates, a support group facilitated by a mental health provider may also be a component of the treatment plan. Common concerns of transgender inmates, which may be addressed effectively in a group setting, include self-esteem issues and relationship issues.

Psychologists who provide mental health treatment for transgender inmates address all mental health needs, including suicide risk, if present.

Psychologists working with transgender inmates are encouraged to consult the Reentry Services Division in Central Office for additional resources.

## 11. PRONOUNS AND NAMES

Staff interacting with inmates who have a CMA assignment of transgender can use the authorized gender-neutral communication with inmates (e.g., by the legal last name or "Inmate" last name). Transgender inmates often prefer to be called by pronouns of their identified gender identity. Staff may choose to use these gender-specific pronouns or salutations per the inmate's request, and will not be disciplined for doing so.

An official committed name change while in BOP custody must be done consistent with the Program Statement **Correctional Systems Manual**, Chapter 4. The name entered on the inmate's Judgement and Commitment Order will remain the official committed name for all Bureau records (incident reports, progress reviews, sentence calculations, etc.). However, any additional names or aliases can be entered into SENTRY as appropriate.

## 12. PAT SEARCHES

Pat searches of transgender inmates will be conducted in accordance with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**. The policy language, included here as a reference, states:

"Transgender Inmates – For purposes of pat searching, inmates will be pat-searched in accordance with the gender of the institution, or housing assignment, in which they are assigned. Transgender inmates may request an exception. The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services. Exceptions must be specifically described (e.g., "pat search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database; e.g., posted picture file). Inmates should be provided a personal identifier (e.g., notation on commissary card, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to pat searches."

It is recommended the inmate request the exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden. The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office.

Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated institution rules concerning contraband.

In exigent circumstances, any staff member may conduct a pat search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

13. **VISUAL SEARCHES**

For purposes of a visual search, inmates will be searched in accordance with the gender of the institution, or housing assignment, to which they are assigned. The visual search shall be made in a manner designed to ensure as much privacy to the inmate as practicable. Staff should consider the physical layout of the institution, and the characteristics of an inmate with a transgender CMA assignment, to adjust conditions of the visual search as needed for the inmate's privacy.

Transgender inmates may also request an exception to be visually searched by a staff member of the inmate's identified gender. The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services. Exceptions must be specifically described (e.g., "visual search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database; e.g., posted picture file). Inmates should be provided a personal identifier (e.g., notation on commissary card, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to visual searches.

It is recommended the inmate request the exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden. The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office.

Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated institution rules concerning contraband.

Transgender inmates placed at an institution or in a housing unit that does not correspond with their identified gender, and who are granted an exemption as indicated above, will be searched by: bargaining unit staff of the inmate's identified gender who consent to participate in the search; management staff of the inmate's identified gender who consent to participate in the search; or available Health Services clinical staff.

**APP014**

Transgender inmates placed at an institution or in a housing unit of their identified gender will be searched by bargaining unit staff of the inmate's identified gender who consent to participate in the search; management staff of the inmate's identified gender; or available medical staff.

Institutions should consider using available body scanning technology in lieu of visual searches of transgender inmates.

In exigent circumstances, any staff member may conduct a visual search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

14. **CLOTHING AND COMMISSARY ITEMS**

Consistent with safety and security concerns, inmates with the CMA assignment of transgender will have the opportunity to have undergarments of their identified gender even if they are not housed with inmates of the identified gender. Institutional laundry will have available institutional undergarments that fulfill the needs of transgender inmates. Undergarments will not have metal components.

Standardized lists of Commissary items for transgender inmates are available in accordance with the Program Statement **Trust Fund/Deposit Manual**.

Additional items based on an individualized assessment of the transgender inmate may be approved by the Warden. Additional items may be provided by the institution or purchased by the inmate, as appropriate.

Inmates who purchase and/or are provided items under this section will be subject to disciplinary sanctions, including the removal of these items, if they are found to have violated institution rules relating to the possession of these items.

15. **REENTRY NEEDS**

In accordance with the Program Statement **Release Preparation Program**, institution staff should assist transgender inmates in addressing these issues prior to release or placement in a Residential Reentry Center/Home Confinement.

During initial classifications and Program Reviews, Unit Management will formulate a pre-release plan that will assist transgender inmates in obtaining appropriate identification, finding housing and employment, and providing community resources to reintegrate into the community.

**APP015**

The Reentry Affairs Coordinator may assist staff with identifying these resources. Institution and/or Regional Social Workers should be contacted concerning the continuity of medical care.

The Female Offender Branch and/or Social Workers can be contacted to provide guidance and resources for reentry needs of transgender inmates.

### 16. ADMINISTRATIVE REMEDIES

Inmates may use the procedures of the Program Statement **Administrative Remedy Program** concerning any issues relating to this policy.

**APP016**

**REFERENCES**

*Program Statements*
P1330.18    Administrative Remedy Program (1/6/14)
P4500.11    Trust Fund/Deposit Fund Manual (4/9/15)
P5100.08    Security Designation and Custody Classification Manual (9/12/06)
P5290.15    Intake Screening (3/30/09)
P5310.12    Psychology Services Manual (03/07/95)
P5310.16    Treatment and Care of Inmates with Mental Illness (5/1/14)
P5322.13    Inmate Classification and Program Review (5/16/14)
P5324.08    Suicide Prevention (4/5/07)
P5324.12    Sexually Abusive Behavior Prevention and Intervention Program (6/4/15)
P5325.07    Release Preparation Program (12/31/07)
P5521.06    Searches of Housing Units, Inmates, and Inmate Work Areas (6/4/15)
P5800.15    Correctional Systems Manual (9/23/16)
P6031.04    Patient Care (6/3/14)
P6090.04    Health Information Management (3/2/15)

*Federal Regulations*
28 CFR part 115

*Additional Resources For Clinicians*
Diagnostic and Statistical Manual of Mental Disorders (DSM), most current version.
World Professional Association for Transgender Health (WPATH) standards.

*BOP Forms*
BP-A0148    Inmate Request to Staff
BP-A1110    Case Management Activity (CMA) SENTRY Assignment Consent Form for
            Transgender Inmates

*ACA Standards (see Program Statement, **Directives Management Manual**, sections 2.5 and
10.3)*

■  American Correctional Association Standards for Adult Correctional Institutions, 4th
   Edition: 4-4056M, 4-4084M, 4-4084.1M, 4-4133M, 4-4180M, 4-4194M, 4-4278M, 4-
   4281.1M, 4-4281.2M, 4-4281.3M, 4-4281.4M, 4-4281.5M, 4-4281.6M, 4-4281.7M, 4-
   4281.8M, 4-4362M, 4-4371M, 4-4406M.
■  American Correctional Association Performance Based Standards for Adult Local Detention
   Facilities, 4th Edition:  4-ALDF-2A-29, 4-ALDF-2A-32, 4-ALDF-2A-34, 4-ALDF-6B-03,
   4-ALDF-2C-03, 4-ALDF-4C-22M, 4-ALDF-4C-30M, 4-ALDF-4D-22, 4-ALDF-4D-22-1, 4-

**APP017**

ALDF-4D-22-2, 4-ALDF-4D-22-3, 4-ALDF-4D-22-4, 4-ALDF-4D-22-5, 4-ALDF-4D-22-6M, 4-ALDF-4D-22-7, 4-ALDF-4D-22-8, 4-ALDF-7B-08, 4-ALDF-7B-10, 4-ALDF-7B-10-1.

■ American Correctional Association Standards for Administration of Correctional Agencies, 2nd Edition:  None.

■ American Correctional Association Standards for Correctional Training Academies:  None.

*Records Retention*

Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

APP018

**Attachment A.    Case Management Activity (CMA) SENTRY Assignment
Consent Form for Transgender Inmates (BP-A1110)**

I agree that Bureau of Prisons staff may enter a CMA assignment on SENTRY concerning my gender identity.

I understand that this CMA assignment will identify me as transgender to all staff members.

I understand that the purpose of the CMA assignment is to assist staff members in providing programs and taking measures as described in the Program Statement **Transgender Offender Manual**.

I understand that specific medical and mental health information will not be disclosed to all staff using the CMA assignment; specific medical and mental health information is maintained separately.

Inmate Name:

Register Number:

Signature:

Date:

**APP019**



**U.S. Department of Justice**
Federal Bureau of Prisons

C H A N G E   N O T I C E
OPI:         RSD/WSP
NUMBER:   5200.04 CN-1
DATE:        May 11, 2018

# Transgender Offender Manual

*Approved*:  Mark S. Inch
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5200.04, **Transgender Offender Manual**, dated January 18, 2017.  The purpose of the Change Notice is to ensure that the Transgender Executive Council (TEC) considers issues related to prison management and security in determining appropriate housing of transgender inmates, including risks posed to staff, other inmates, and members of the public.  The clarifications to policy will establish appropriate expectations for the inmate population concerning designations.

The changes are marked with a <mark>highlight</mark> and inserted into the policy.  Deleted text is struck through.  In addition, the branch name has been changed from Female Offender Branch to Women and Special Populations Branch.

1.  **PURPOSE AND SCOPE**

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population, <mark>consistent with maintaining security and good order in Federal prisons.</mark>

4.  **STAFF TRAINING**

The **Women and Special Populations Branch** will be responsible for developing training materials and current information on the management of transgender inmates.  <mark>Training will include information concerning best practices for maintaining the safety of transgender inmates, while also ensuring security and good order in Federal prisons and the safety of staff, inmates, and the public.</mark> This information will be made available to staff on the <mark>Women and Special Populations Branch</mark> Sallyport page.

5. **INITIAL DESIGNATIONS**

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). ~~The TEC will recommend housing by gender identity when appropriate.~~

In deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis:

- ■  The TEC will use biological sex as the initial determination for designation;
- ■  The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;
- ■  The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and
- ■  The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

7. **HOUSING AND PROGRAMMING ASSIGNMENTS**

In order for an inmate to be considered for transfer to another institution of the same sex as the inmate's current facility ~~location, including a facility housing individuals of the inmate's identified gender~~, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

In addition, the Warden may make a recommendation to the TEC to transfer a transgender or intersex inmate based on an inmate's identified gender.

In considering such recommendations, the TEC will apply all criteria of Section 5, above, and make the following assessments concerning the recommendation:

■ The TEC will use biological sex as the initial determination for designation;
■ The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;
■ The TEC will also consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and
■ The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 9. HORMONE AND NECESSARY MEDICAL TREATMENT

Hormone or other necessary medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff.  Medical staff should request consultation from Psychology Services regarding the mental health benefits of hormone or other necessary medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT.



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:           RSD/FOB
NUMBER:   5200.04
DATE:         January 18, 2017

# Transgender Offender Manual

        /s/
*Approved*:  Thomas R. Kane
Acting Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population, ==consistent with maintaining security and good order in Federal prisons.==

a**. Program Objectives**.  Expected results of this program are:

- This policy is meant to provide guidance to staff in dealing with the unique issues that arise when working with transgender inmates.
- Institutions ensure transgender inmates can access programs and services that meet their needs as appropriate, and prepare them to return to the community.
- Sufficient resources will be allocated to deliver appropriate services to transgender inmates.
- Staff will be offered training, enabling them to work effectively with transgender inmates.
- To support staff's understanding of the increased risk of suicide, mental health issues and victimization of transgender inmates.

b. **Institution Supplement**.  None required.  Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

2. **DEFINITIONS**

*Gender* – a construct used to classify a person as male, female, both, or neither.  Gender encompasses aspects of social identity, psychological identity, and human behavior.

*Gender identity* – a person's sense of their own gender, which is communicated to others by their gender expression.

*Gender expression* – includes mannerisms, clothing, hair style, and choice of activities.

*Gender nonconforming* – a person whose appearance or manner does not conform to traditional societal gender expectations.

*Transgender* – the state of one's gender identity not matching one's biological sex. For the purposes of this policy, a transgender inmate is one who has met with a Bureau of Prisons psychologist and signed the form indicating consent to be identified within the agency as transgender. This step allows for accommodations to be considered.

*Cisgender* – the state of one's gender identity matching one's biological sex.

*Sexual orientation* – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related.

*Gender Dysphoria* (GD) – a mental health diagnosis currently defined by DSM-5 as, "A strong and persistent cross-gender identification. It is manifested by a stated desire to be the opposite sex and persistent discomfort with his or her biologically assigned sex." Not all transgender inmates will have a diagnosis of GD, and a diagnosis of GD is not required for an individual to be provided services.

*Intersex* – a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical biological definitions of male or female. Not all intersex people identify as transgender; unless otherwise specified, this policy does not apply to intersex people who do not identify as transgender.

*Transition* – measures that change one's gender expression or body to better reflect a person's gender identity.

3. **STAFF RESPONSIBILITIES**

The following Bureau components are responsible for ensuring consistent establishment of the programs, services, and resource allocations necessary for transgender offenders.

**APP024**

a. **Central Office**

(1) The <mark>**Women and Special Populations Branch**</mark> is the agency's primary source and point of contact on classification, management, and intervention programs and practices for transgender inmates in Bureau custody. The Branch is responsible for the following functions as they relate to transgender inmates:

- Engaging stakeholders, including serving as the primary point of contact on issues affecting transgender inmates with judges, political figures, and advocacy groups.
- Ensuring the Bureau offers appropriate services to transgender inmates.
- Preparing budgetary requests to deliver national and pilot programs or services affecting transgender inmates.
- Providing guidance and direction to Regional staff and institution leadership on transgender issues.
- Developing and implementing staff training on transgender issues.
- Building a research-based foundation for the Bureau's work with transgender inmates.
- Presenting at internal and external conferences/events regarding the agency's transgender inmates' practices.
- Developing and monitoring monthly reports on the transgender population and institutional programs.
- Issuing an annual report on the state of transgender offenders in the Bureau that will be made available to all staff and stakeholders.
- Advising agency leadership on transgender inmate needs.
- Conducting an annual survey of transgender inmates in the Bureau and sharing results with internal and external stakeholders.
- Providing national oversight of pilot programs and initiatives serving transgender offenders.

(2) The **Health Services Division** oversees all medical and psychiatric activity as it applies to transgender inmates. Guidance on the most current research-driven clinical medical and psychiatric care of transgender inmates will be provided by the Medical Director.

The Health Services Division also has oversight of a Transgender Clinical Care Team (TCCT). This team will be comprised of Physicians, Pharmacists, and Psychiatrists. Social Workers, Psychologists, and other clinical providers can also be included when appropriate. The TCCT will offer advice and guidance to health services staff on the medical treatment of transgender inmates and/or inmates with GD. Medical staff can raise issues to the TCCT through the Health Services Division.

(3) The **Psychology Services Branch** oversees all psychological mental health programs and services as they apply to transgender inmates, to include providing advice and guidance on

identification and evaluation of transgender inmates, and making recommendations for treatment needs of transgender inmates and/or inmates with GD.

(4)  **Central Office Branches/Divisions** of Correctional Services, Psychology Services, Education, Correctional Programs, Reentry Affairs, Residential Reentry Management, Health Services, Health Programs, Social Work, Office of General Counsel, and Trust Fund meet annually with the Women and Special Populations Branch to discuss transgender population needs and evaluate current gender-responsive services.  The National Union and the Central Office LGBT Special Emphasis Program Manager will be invited to attend these meetings.

(5)  The **Transgender Executive Council (TEC)** will consist of staff members from the Health Services Division, the Women and Special Populations Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC), and the Office of General Counsel.  The TEC will meet a minimum of quarterly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with GD, including designation issues.  Institution staff and DSCC staff may raise issues on specific inmates to the TEC through the Women and Special Populations Branch.  The National PREA Coordinator is consulted as needed.

b.  **Regional Offices**

- Provide oversight to institutions regarding services and other relevant trends managing transgender inmates.
- Assign transgender responsibilities to the Regional Female Offender/Transgender Coordinator Collateral Duty Assignment.  This individual meets quarterly with the Women and Special Populations Branch to discuss staffing and programming needs.

c.  **Institutions**

The institution CEO will establish a multi-disciplinary approach to the management of transgender inmates; specifically:
- Ensure transgender inmates have access to services.
- Enter tracking information for self-identified transgender inmates by updating SENTRY and other databases (e.g., PDS), as appropriate.
- Provide appropriate reentry resources that may be specific to the population.
- Advise the Local Union of transgender inmate management issues, as appropriate.

**APP026**

4. **STAFF TRAINING**

Staff will be provided specialized training in working with unique issues when managing transgender inmates, with refresher training at annual training.  Institutions housing known transgender inmates should provide additional training, if needed.

The Women and Special Populations Branch will be responsible for developing training materials and current information on the management of transgender inmates.  Training will include information concerning best practices for maintaining the safety of transgender inmates, while also ensuring security and good order in Federal prisons and the safety of staff, inmates, and the public.  This information will be made available to staff on the Women and Special Populations Branch Sallyport page.

In addition, the Prison Rape Elimination Act (PREA) regulations incorporated into the BOP Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** have training requirements concerning pat searches and communication skills for transgender inmates. See 28 C.F.R. § 115.15(f) and 115.31 (a) (9).  Please refer to this Program Statement regarding implementation of those training requirements.

Staff will be provided adequate time to complete these trainings during duty hours.

5. **INITIAL DESIGNATIONS**

The PREA regulations, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**, state in section 28 C.F.R. § 115.42 (c):

> **"In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates…the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."**

Upon receipt of information from a Pre-Sentence Report, court order, U.S. Attorney's Office, defense counsel, the offender, or other source that an individual entering BOP custody is transgender, designations staff will refer the matter to the TEC for advice and guidance on designation.

Institution staff managing pretrial or holdover offenders may also refer cases to the TEC for review.  Any TEC recommendations concerning pretrial inmates will be coordinated with the appropriate United States Marshal's Office.

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). ~~The TEC will recommend housing by gender identity when appropriate.~~

In deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;
- The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 6.  INTAKE SCREENING

The PREA regulations in 28 C.F.R. part 115, Subpart A, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** and the Program Statement **Intake Screening,** address intake screening.  Screening of transgender inmates will be conducted in accordance with these policies and all other applicable policies and procedures.

## 7.  HOUSING AND PROGRAMMING ASSIGNMENTS

During Initial classification and Program Reviews, Unit Management staff will twice-yearly review the inmate(s) current housing unit status and programming available for transgender inmates; this review will be documented by Unit Management.

The reviews will consider on a case-by-case basis that the inmate placement does not jeopardize the inmate's health and safety and does not present management or security concerns.

In making housing unit and programming assignments, a transgender or intersex inmate's own views with respect to his/her own safety must be given serious consideration.

Transgender inmates shall be given the opportunity to shower separate from other inmates.

The agency shall not place transgender or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree , legal settlement, or legal judgment for the purpose of protecting such inmates.

In order for an inmate to be considered for transfer to another institution of the same sex as the inmate's current facility location, including a facility housing individuals of the inmate's identified gender, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

In addition, the Warden may make a recommendation to the TEC to transfer a transgender or intersex inmate based on an inmate's identified gender.

In considering such recommendations, the TEC will apply all criteria of Section 5, above, and make the following assessments concerning the recommendation:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;
- The TEC will also consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress

towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 8. DOCUMENTATION AND SENTRY ASSIGNMENTS

a. **Medical and Mental Health Information**.  Medical and mental health information for transgender inmates will be maintained in the current electronic recordkeeping system in accordance with the Program Statement **Health Information Management**.  Medical and mental health information is considered confidential, and may only be released in accordance with appropriate laws, rules, and regulations.

b. **Initial Screening**.  For initial designations, designations staff will assign Case Management Activity (CMA) SENTRY assignments if information in the PSR or other documentation indicates a likely transgender identity.  The screening codes will be:

> SCRN M2F – inmate should be screened for male to female.
> SCRN F2M – inmate should be screened for female to male.

Any inmate arriving at the designated institution with a screening code is to be referred to the Chief Psychologist or designee for review within 14 days.  If the code was assigned in error, the screening code will be removed by the psychologist.  If the inmate identifies as transgender, the psychologist will replace the screening code with an identifying code, as indicated below.  Holdover facilities will be exempt from this initial screening requirement, as limited available records and brevity of stay do not allow for a comprehensive screening.

Any inmate who arrives without a screening code but identifies as transgender during intake, or at any time during the incarceration period, is referred to the Chief Psychologist or designee and interviewed within 14 days of the inmate notification.  Inmates in pretrial status at Bureau facilities may also receive a SENTRY code.

c. **Notification to Staff and Tracking**.  After consultation with Psychology Services, and if the inmate affirms his/her transgender identity, the screening code will be updated to a permanent assignment by a psychologist:

> TRN M2F – inmate is male to female transgender (transgender female).
> TRN F2M – inmate is a female to male transgender (transgender male).

The inmate must request to Psychology Services staff that the CMA assignment be entered, and the inmate consents that all staff will therefore be notified that the individual is transgender. The inmate's request will be documented on BP-A1110, Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates (included as Attachment A to this policy). Psychology Services will maintain the form in the electronic mental health record and forward a copy of the form to the Unit Team. The Unit Team will maintain the form in the FOI Exempt section of the Central File.

Staff should consult the CMA assignment when interacting with the inmate; e.g., use of pronouns, searches, commissary items, etc., as indicated below.

If there are questions about the need to continue a CMA assignment, the Warden should contact the Women and Special Populations Branch. Should the CMA assignment change, staff members will not be disciplined for the continued provision of accommodations or use of pronouns.

## 9.  HORMONE AND NECESSARY MEDICAL TREATMENT

Hormone or other necessary medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff. Medical staff should request consultation from Psychology Services regarding the mental health benefits of hormone or other necessary medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT.

In the event this treatment changes the inmate's appearance to the extent a new identification card is needed, the inmate will not be charged for the identification card.

## 10.  INSTITUTION PSYCHOLOGY SERVICES

Bureau psychologists are available to provide assessment and treatment services for transgender inmates, if appropriate. Guidance on assessment procedures will be provided by the Psychology Services Branch.

If an inmate identifies as transgender, the psychologist will provide the inmate with information regarding the range of treatment options available in the Bureau and their implications. In addition, based upon the psychologist's preliminary assessment and the inmate's expressed interest, a referral to the Clinical Director and/or Chief Psychiatrist may be generated. While the initial interview must be scheduled within 14 days, an assessment may take longer in some instances.

**APP031**

In addition to a referral to medical services, a transgender inmate may be offered individual psychotherapy. Individual psychotherapy goals might include: (1) helping the inmate to live more comfortably within a gender identity and deal effectively with non-gender issues; (2) emphasizing the need to set realistic life goals related to daily living, work, and relationships, including family of origin; (3) seeking to define and address issues that may have undermined a stable lifestyle, such as substance abuse and/or criminality; and (4) addressing any co-occurring mental health issues. Mood disorders, anxiety disorders, substance use disorders, and personality disorders, etc., may also be present; any effective treatment plan will fully address these symptoms.

If an institution has multiple transgender inmates, a support group facilitated by a mental health provider may also be a component of the treatment plan. Common concerns of transgender inmates, which may be addressed effectively in a group setting, include self-esteem issues and relationship issues.

Psychologists who provide mental health treatment for transgender inmates address all mental health needs, including suicide risk, if present.

Psychologists working with transgender inmates are encouraged to consult the Reentry Services Division in Central Office for additional resources.

## 11. PRONOUNS AND NAMES

Staff interacting with inmates who have a CMA assignment of transgender can use the authorized gender-neutral communication with inmates (e.g., by the legal last name or "Inmate" last name). Transgender inmates often prefer to be called by pronouns of their identified gender identity. Staff may choose to use these gender-specific pronouns or salutations per the inmate's request, and will not be disciplined for doing so.

An official committed name change while in BOP custody must be done consistent with the Program Statement **Correctional Systems Manual**, Chapter 4. The name entered on the inmate's Judgement and Commitment Order will remain the official committed name for all Bureau records (incident reports, progress reviews, sentence calculations, etc.). However, any additional names or aliases can be entered into SENTRY as appropriate.

**APP032**

12. **PAT SEARCHES**

Pat searches of transgender inmates will be conducted in accordance with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.  The policy language, included here as a reference, states:

"Transgender Inmates – For purposes of pat searching, inmates will be pat-searched in accordance with the gender of the institution, or housing assignment, in which they are assigned. Transgender inmates may request an exception.  The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services.  Exceptions must be specifically described (e.g., "pat search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database; e.g., posted picture file).  Inmates should be provided a personal identifier (e.g., notation on commissary card, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to pat searches."

It is recommended the inmate request the exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden. The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office.

Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated institution rules concerning contraband.

In exigent circumstances, any staff member may conduct a pat search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

13. **VISUAL SEARCHES**

For purposes of a visual search, inmates will be searched in accordance with the gender of the institution, or housing assignment, to which they are assigned.  The visual search shall be made in a manner designed to ensure as much privacy to the inmate as practicable.  Staff should consider the physical layout of the institution, and the characteristics of an inmate with a transgender CMA assignment, to adjust conditions of the visual search as needed for the inmate's privacy.

Transgender inmates may also request an exception to be visually searched by a staff member of the inmate's identified gender.  The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services.  Exceptions must be specifically described (e.g., "visual search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database; e.g., posted picture file).  Inmates should be provided a

**APP033**

personal identifier (e.g., notation on commissary card, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to visual searches.

It is recommended the inmate request the exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden.  The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office.

Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated institution rules concerning contraband.

Transgender inmates placed at an institution or in a housing unit that does not correspond with their identified gender, and who are granted an exemption as indicated above, will be searched by: bargaining unit staff of the inmate's identified gender who consent to participate in the search; management staff of the inmate's identified gender who consent to participate in the search; or available Health Services clinical staff.

Transgender inmates placed at an institution or in a housing unit of their identified gender will be searched by bargaining unit staff of the inmate's identified gender who consent to participate in the search; management staff of the inmate's identified gender; or available medical staff.

Institutions should consider using available body scanning technology in lieu of visual searches of transgender inmates.

In exigent circumstances, any staff member may conduct a visual search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

## 14.  CLOTHING AND COMMISSARY ITEMS

Consistent with safety and security concerns, inmates with the CMA assignment of transgender will have the opportunity to have undergarments of their identified gender even if they are not housed with inmates of the identified gender.  Institutional laundry will have available institutional undergarments that fulfill the needs of transgender inmates.  Undergarments will not have metal components.

Standardized lists of Commissary items for transgender inmates are available in accordance with the Program Statement **Trust Fund/Deposit Manual**.

Additional items based on an individualized assessment of the transgender inmate may be approved by the Warden.  Additional items may be provided by the institution or purchased by the inmate, as appropriate.

Inmates who purchase and/or are provided items under this section will be subject to disciplinary sanctions, including the removal of these items, if they are found to have violated institution rules relating to the possession of these items.

## 15. REENTRY NEEDS

In accordance with the Program Statement **Release Preparation Program**, institution staff should assist transgender inmates in addressing these issues prior to release or placement in a Residential Reentry Center/Home Confinement.

During initial classifications and Program Reviews, Unit Management will formulate a pre-release plan that will assist transgender inmates in obtaining appropriate identification, finding housing and employment, and providing community resources to reintegrate into the community.

The Reentry Affairs Coordinator may assist staff with identifying these resources. Institution and/or Regional Social Workers should be contacted concerning the continuity of medical care.

The Women and Special Populations Branch and/or Social Workers can be contacted to provide guidance and resources for reentry needs of transgender inmates.

## 16. ADMINISTRATIVE REMEDIES

Inmates may use the procedures of the Program Statement **Administrative Remedy Program** concerning any issues relating to this policy.

## REFERENCES

*Program Statements*

P1330.18    Administrative Remedy Program (1/6/14)
P4500.11    Trust Fund/Deposit Fund Manual (4/9/15)
P5100.08    Security Designation and Custody Classification Manual (9/12/06)
P5290.15    Intake Screening (3/30/09)
P5310.12    Psychology Services Manual (03/07/95)
P5310.16    Treatment and Care of Inmates with Mental Illness (5/1/14)
P5322.13    Inmate Classification and Program Review (5/16/14)
P5324.08    Suicide Prevention (4/5/07)
P5324.12    Sexually Abusive Behavior Prevention and Intervention Program (6/4/15)
P5325.07    Release Preparation Program (12/31/07)
P5521.06    Searches of Housing Units, Inmates, and Inmate Work Areas (6/4/15)
P5800.15    Correctional Systems Manual (9/23/16)

**APP035**

P6031.04       Patient Care (6/3/14)

P6090.04       Health Information Management (3/2/15)

*Federal Regulations*
28 CFR part 115

*Additional Resources For Clinicians*
Diagnostic and Statistical Manual of Mental Disorders (DSM), most current version.
World Professional Association for Transgender Health (WPATH) standards.

*BOP Forms*
BP-A0148      Inmate Request to Staff

BP-A1110      Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates

*ACA Standards (see Program Statement, **Directives Management Manual**, sections 2.5 and 10.3)*

- American Correctional Association Standards for Adult Correctional Institutions, 4th Edition: 4-4056M, 4-4084M, 4-4084.1M, 4-4133M, 4-4180M, 4-4194M, 4-4278M, 4-4281.1M, 4-4281.2M, 4-4281.3M, 4-4281.4M, 4-4281.5M, 4-4281.6M, 4-4281.7M, 4-4281.8M, 4-4362M, 4-4371M, 4-4406M.
- American Correctional Association Performance Based Standards for Adult Local Detention Facilities, 4th Edition: 4-ALDF-2A-29, 4-ALDF-2A-32, 4-ALDF-2A-34, 4-ALDF-6B-03, 4-ALDF-2C-03, 4-ALDF-4C-22M, 4-ALDF-4C-30M, 4-ALDF-4D-22, 4-ALDF-4D-22-1, 4-ALDF-4D-22-2, 4-ALDF-4D-22-3, 4-ALDF-4D-22-4, 4-ALDF-4D-22-5, 4-ALDF-4D-22-6M, 4-ALDF-4D-22-7, 4-ALDF-4D-22-8, 4-ALDF-7B-08, 4-ALDF-7B-10, 4-ALDF-7B-10-1.
- American Correctional Association Standards for Administration of Correctional Agencies, 2nd Edition:  None.
- American Correctional Association Standards for Correctional Training Academies:  None.

*Records Retention*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

APP036

**Attachment A.    Case Management Activity (CMA) SENTRY Assignment
Consent Form for Transgender Inmates (BP-A1110)**

I agree that Bureau of Prisons staff may enter a CMA assignment on SENTRY concerning my gender identity.

I understand that this CMA assignment will identify me as transgender to all staff members.

I understand that the purpose of the CMA assignment is to assist staff members in providing programs and taking measures as described in the Program Statement **Transgender Offender Manual**.

I understand that specific medical and mental health information will not be disclosed to all staff using the CMA assignment; specific medical and mental health information is maintained separately.

Inmate Name:

Register Number:

Signature:

Date:

**APP037**



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T

OPI:              RSD/WASPB
NUMBER:     5200.08
DATE:             January 13, 2022

# Transgender Offender Manual

/s/
*Approved*:  M.D.  Carvajal
Director, Federal Bureau of Prisons

## 1.  PURPOSE AND SCOPE

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population.

**a.  Program Objectives**.  Expected results of this program are:

- This policy provides guidance to staff in dealing with the unique issues that arise when working with transgender inmates.
- Institutions ensure transgender inmates can access programs and services that meet their needs as appropriate, and prepare them to return to the community.
- Sufficient resources will be allocated to deliver appropriate services to transgender inmates.
- Staff will complete training, enabling them to work effectively with transgender inmates.
- To enhance staff's understanding of the increased risk of suicide, mental health issues and victimization of transgender inmates.

**b.  Summary of Changes**

Rescinded P5200.04 CN-1 Transgender Offender Manual (5/11/2018)

This reissuance incorporates the following modifications:

- Clarified duties and responsibilities of various staff.
- Added an institution requirement for maintaining a copy of the Case Management Activity (CMA) Assignment form BP-A1110, Consent Form for Transgender Inmates.  Inmates can no longer request to have a CMA assignment removed, and then re-added at a later date.
- Clarified transfer, consultation, and program requirements.

- Updated guidance regarding initial designation and redesignation procedures for transgender offenders.
- Added information about gender affirming surgery.

c. **Institution Supplement**. None required. Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 2. DEFINITIONS

*Gender* – a construct used to classify a person as male, female, both, or neither. Gender encompasses aspects of social identity, psychological identity, and human behavior.

*Gender identity* – a person's sense of their own gender, which is communicated to others by their gender expression.

*Gender expression* – includes mannerisms, clothing, hairstyle, and choice of activities.

*Gender nonconforming* – a person whose appearance or manner does not conform to traditional societal gender expectations.

*Transgender* – the state of one's gender identity not matching one's sex assigned at birth. For the purposes of this policy, a transgender inmate is one who has met with a Bureau Psychologist and signed the form indicating consent to be identified within the agency as transgender. This step allows accommodations to be considered.

*Cisgender* – the state of one's gender identity matching one's sex assigned at birth.

*Sexual orientation* – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related.

*Gender Dysphoria* (GD) – a mental health diagnosis currently defined by DSM-5 as, "A strong and persistent cross-gender identification. It is manifested by a stated desire to be the opposite sex and persistent discomfort with his or her biologically assigned sex." Not all transgender inmates will have a diagnosis of GD, and a diagnosis of GD is not required for an individual to be provided services.

*Intersex* – a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical physiological definitions of male or female.  Not all intersex people identify as

P5200.08    1/13/2022    Federal Regulations from 28 CFR: this type. Implementing instructions: this type.                    2

APP039

transgender; unless otherwise specified, this policy does not apply to intersex people who do not identify as transgender.

*Transition* – measures that change one's gender expression or body to better reflect a person's gender identity.

*Gender Affirming* – describes behaviors or interventions that support the gender identity of a person.

## 3.  STAFF RESPONSIBILITIES

The following Bureau components are responsible for ensuring consistent establishment of the programs, services, and resource allocations necessary for transgender offenders.

### a.  Central Office

(1) The **Women and Special Populations Branch (WASPB)** is the agency's primary source and point of contact on accommodation/transition, classification, management, and intervention/treatment programs and practices for transgender inmates in Bureau custody. The Branch is responsible for the following functions as they relate to transgender inmates:

- Engaging stakeholders, including serving as the primary point of contact on issues affecting transgender inmates with external entities including judges, congress, and advocacy groups.
- Ensuring the Bureau offers appropriate services to transgender inmates.
- Preparing budget requests to deliver national and pilot programs or services affecting transgender inmates.
- Providing guidance and direction to staff and institution, region, and agency leadership on transgender issues.
- Developing and implementing staff training on transgender issues.
- Building a research-based foundation for the Bureau's work with transgender inmates, including implementation support and intervention services.
- Presenting at internal and external conferences/events regarding the agency's transgender inmates' practices.
- Developing and monitoring monthly reports on the transgender population and institutional programs.
- Conducting an annual survey of transgender inmates in the Bureau and sharing results with internal and external stakeholders.
- Providing national oversight of pilot programs and initiatives serving transgender offenders.
- Overseeing the Transgender Executive Council (TEC).
- Ensure that a National Program and Policy Coordinator is assigned to each Region who will meet quarterly to discuss staffing and programming needs of transgender inmates.

**APP040**

(2) The **Health Services Division** oversees all medical and psychiatric guidance and treatment as it applies to transgender inmates. Clinical guidance on the most current research-driven clinical medical and psychiatric care of transgender inmates will be provided at the direction of the Medical Director. The Medical Director only receives referrals from the TEC and determines whether gender affirming surgery requests will be referred to a surgeon.

(3) The **Psychology Services Branch** oversees all mental health programs and services as they apply to transgender inmates, to include providing advice and guidance on identification and evaluation of transgender inmates, and making recommendations for treatment needs of transgender inmates and/or inmates with GD.

(4) **Central Office Branches** of Correctional Services, Psychology Services, Education, Correctional Programs, Reentry Affairs, Residential Reentry Management, Health Programs, Litigation, Chaplaincy Services, Intelligence and Counter Terrorism Branch, and Trust Fund meet annually with the Women and Special Populations Branch to discuss transgender population needs and evaluate current gender-responsive services. The National Union and the Central Office LGBT Special Emphasis Program Manager will be invited to attend these meetings.

(5) The **Transgender Executive Council (TEC)** will consist of senior level staff members (GS-14 and above) from the Women and Special Populations Branch, the Psychology Services Branch, Health Services Division, and the Designation and Sentence Computation Center (DSCC). The team is led by the Senior Deputy Assistant Director, Reentry Services and also includes the Senior Deputy Assistant Director, Correctional Programs Division (DSCC), and the Senior Deputy Assistant Director, Health Services. The TEC is the agency's official decision-making body on all issues affecting the transgender population. It will meet a minimum of monthly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with GD, including training, designation issues, and reviewing all transfers for approval. Staff or inmates may raise issues on specific inmates to the TEC through the Women and Special Populations Branch. The Office of General Counsel is consulted as needed.

**b.  Regional Offices**

■  Provide oversight to institutions regarding services and other relevant trends managing transgender inmates.

**c.  Institutions**

The Warden will establish a multi-disciplinary approach to the management of transgender inmates. The Associate Warden of Programs is the primary point of contact in the institution for transgender issues and will consult as needed with the Chief Psychologist, Captain, Clinical

**APP041**

Director, Unit Manager, or other individuals as appropriate; and specifically to:

- Ensure transgender inmates have access to services.
- Enter tracking information for self-identified transgender inmates by updating SENTRY CMA assignments and other databases (e.g., PDS).
- Maintain a copy of the Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates (BP-A1110) in the Central File and Psychology Data System (PDS).
- Provide appropriate reentry resources that may be specific to the population.
- Advise the Local Union of transgender inmate management issues.
- Consult and refer transgender inmates to the TEC.
- Provide programming developed by the Reentry Services Division for transgender inmates.

## 4. STAFF TRAINING

Staff are provided specialized training in working with unique issues when managing transgender inmates as part of annual training. Institutions housing transgender inmates should provide additional training.

The Women and Special Populations Branch is responsible for developing training materials and current information on the management of transgender inmates. This information will be made available to staff via the Bureau's intranet.

In addition, the Prison Rape Elimination Act (PREA) regulations incorporated into the BOP Program Statement, **Sexually Abusive Behavior Prevention and Intervention Program** have training requirements concerning pat searches and communication skills for transgender inmates. See 28 C.F.R. § 115.15(f) and 115.31 (a) (9). Please refer to this Program Statement regarding implementation of those training requirements.

Staff will be provided adequate time to complete these trainings during duty hours. Staff will be provided proper relief to complete the training.

## 5. INITIAL DESIGNATIONS

The PREA regulations (section 28 C.F.R. § 115.42 (c)), incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**, state:

**"In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates…the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."**

Upon receipt of information from a Pre-Sentence Report, court order, U.S. Attorney's Office, defense counsel, the offender, or other source that an individual entering BOP custody is

**APP042**

transgender or intersex, designations staff will refer the matter to the TEC.

Institution staff managing pretrial or holdover offenders must also refer cases to the TEC for review. Any TEC recommendations concerning pretrial inmates will be coordinated with the appropriate United States Marshals Service District Office.

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). The TEC will consider the wellbeing of all inmates while exploring appropriate options available to assist with mitigating risk to the inmate, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, and security of the institution.

It will be documented on all SENTRY designation notes for transgender inmates that the TEC reviewed the inmate for appropriate institution designation.

## 6.  HOUSING AND PROGRAMMING ASSIGNMENTS

During Initial Classification and subsequent Program Reviews, unit management staff will review the inmate's current housing unit status and programming available for transgender inmates. This review will be documented by Unit Management staff in the inmate central file and for holdovers in the holdover file, with institution oversight by the Associate Warden.

The reviews will consider on a case-by-case basis that the inmate placement does not jeopardize the inmate's wellbeing and does not present management or security concerns.

In making housing unit and programming assignments, a transgender or intersex inmate's own views with respect to his/her own safety must be given serious consideration.

Transgender inmates shall be given the opportunity to shower separate from other inmates when individual shower stalls are unavailable.

The agency shall not place transgender or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status.  The only exception is if such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

Wardens will consult with WASPB prior to submitting a designation request to the DSCC for the redesignation of transgender inmates when the designation is related to the individual's

P5200.08    1/13/2022    Federal Regulations from 28 CFR: this type. Implementing instructions: this type.    6

**APP043**

transition.  The DSCC and Office of Medical Designations will consult with WASPB prior to the designation or redesignation of all transgender inmates.

In situations where the transfer request is related to progressing the individual inmate's transition (i.e., transfer to a different sex facility) the TEC will consider the case. Prior to considering the case, the Warden will submit documentation to the TEC showing the inmate has met the minimum standards of compliance with programs, medications and mental health treatment, and meeting hormone goal levels.  Ordinarily, inmates will not be submitted to the TEC for consideration until they have maintained one year clear conduct for 100 and 200 series incident report sanctions, though they may be considered for submission on a case-by-case basis by the Warden, as appropriate.

It will be noted in all SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 7.  DOCUMENTATION AND SENTRY ASSIGNMENTS

The PREA regulations in 28 C.F.R. part 115, Subpart A, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** and the Program Statement **Intake Screening,** address intake screening. Screening of transgender inmates will be conducted in accordance with these policies and all other applicable policies and procedures.

**a.  Medical and Mental Health Information**. Medical and mental health information for transgender inmates will be maintained in the current electronic recordkeeping system or health record system in accordance with the Program Statements **Health Information Management and Psychology Services Manual**. Medical and mental health information is considered confidential, and may only be released in accordance with appropriate laws, rules, and regulations.

**b.  Initial Screening**. For initial designations, staff will assign Case Management Activity (CMA) SENTRY assignments if information in the PSR or other documentation indicates a likely transgender identity.  The screening codes are:

SCRN M2F – inmate should be screened for male to female transgender identification.
SCRN F2M – inmate should be screened for female to male transgender identification.

Any inmate arriving at the designated institution with a screening code is to be referred to the Chief Psychologist or designee for review within 14 days. If the code was assigned in error, the screening code will be removed by the Psychologist. If the inmate identifies as transgender, the psychologist will replace the screening code with an identifying code, as indicated below. Holdover facilities are exempt from this initial screening requirement, as limited available

records and brevity of stay do not typically allow for a comprehensive screening.

Any inmate who arrives without a screening code but identifies as transgender during intake, or at any time during the incarceration period, is referred to the Chief Psychologist or designee and interviewed within 14 days of the inmate notification. Inmates in pretrial status at Bureau facilities may also receive a transgender screening CMA SENTRY assignment.

**c. Notification to Staff and Tracking**. After consultation with Psychology Services, and if the inmate affirms his/her transgender identity, the screening code will be updated to a permanent assignment by a Psychologist:

TRN M2F – inmate identifies as male to female transgender (transgender female).
TRN F2M – inmate identifies as female to male transgender (transgender male).

The inmate must request to Psychology Services staff that the Case Management Activity (CMA) assignment be entered, and the inmate consents that all staff will therefore be notified that the individual is transgender. The inmate's request will be documented on a Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates (BP-A1110). Psychology Services shall maintain the form in the electronic mental health record.

Staff should consult the transgender CMA assignment when interacting with the inmate; e.g., use of pronouns and access to accommodations. All inmates have access to transgender treatment, regardless of assignment.

If there are questions about the need to continue a CMA assignment, the Warden will contact the WASPB. Inmates may request in writing to have CMA assignments removed. If this occurs, ordinarily the assignment will not be re-added at a later date.

## 8. HORMONE THERAPY AND MEDICAL TREATMENT

Hormone therapy or other medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff. Medical staff will request consultation from Psychology Services regarding the mental health benefits of hormone or other medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant Clinical Guidance.  Questions concerning hormone treatment may be referred to the WASPB or the Health Services Division.

In the event this treatment changes the inmate's appearance to the extent a new identification card is needed, the inmate will not be charged for the identification card as is standard practice.

P5200.08    1/13/2022    Federal Regulations from 28 CFR: this type. Implementing instructions: this type.    8

**APP045**

## 9.  SURGERY

While not all inmates who identify as transgender may be interested in seeking surgical intervention, such a decision does not preclude them from obtaining other accommodations as described in this Program Statement. For transgender inmates in Bureau custody, surgery may be the final stage in the transition process and is generally considered only after one year of clear conduct and compliance with mental health, medical, and programming services at the gender affirming facility. Once that period elapses, an inmate may submit a request to his or her Warden requesting surgical consideration. The Warden will forward the request to the TEC. The TEC is the sole body who may determine that all milestones and individual goals for surgical consideration have been met. When this occurs, the case is referred to the agency's Medical Director for medical consideration. He or she may review existing records and/or interview the inmate, institution staff, and members of the TEC. After this individualized assessment, the Medical Director will determine if the surgery is medically appropriate for referral to a gender affirming surgeon.

## 10. OTHER MENTAL HEALTH SERVICES

Bureau Psychologists provide assessment and treatment services for transgender inmates, as appropriate. Guidance on assessment procedures is available on the Psychology Services intranet page.

If an inmate identifies as transgender, the Psychologist will provide the inmate with information regarding the range of treatment options available in the Bureau and their implications. In addition, based upon the Psychologist's preliminary assessment and the inmate's expressed interest, a referral to the Clinical Director and/or Chief Psychiatrist may be generated. While the initial interview must be scheduled within 14 days, an assessment may take longer in some instances.

In addition to a referral for medical services, a transgender inmate may be offered individual psychotherapy.  Individual psychotherapy goals might include: (1) helping the inmate to live more comfortably within a gender identity and deal effectively with non-gender issues; (2) emphasizing the need to set realistic life goals related to daily living, work, and relationships, including family of origin; (3) seeking to define and address issues that may have undermined a stable lifestyle, such as substance abuse and/or criminality; and (4) addressing any co-occurring mental health issues. Mood disorders, anxiety disorders, substance use disorders, and personality disorders, etc., may also be present; any effective treatment plan will fully address these symptoms. Group treatment may also be recommended.

Common concerns of transgender inmates, which can be addressed effectively in a group setting, include self-esteem issues and relationship issues.

Psychologists who provide mental health treatment for transgender inmates address all mental health needs, including suicide risk, if present. If an inmate who identifies as a transgender harms, attempts to remove, or removes his or her genitalia or other gender-specific anatomy, a suicide risk assessment is conducted consistent with the Program Statement, Suicide Prevention Program. In addition, the treating psychologist notifies the Chief Psychologist who in turn notifies the Regional Psychology Services Administrator and the Psychology Services Branch.

Psychologists working with transgender inmates are encouraged to consult the Reentry Services Division in Central Office for additional resources.

## 11. SPECIAL POPULATIONS SERVICES

Some facilities have Special Populations Coordinators on staff. These individuals are responsible for delivering First Step Act and other programs, which includes programs developed specifically for inmates who identify as transgender. In the absence of such staff, the Warden will seek consultation from WASPB regarding the delivery of group interventions and services.

## 12. PRONOUNS AND NAMES

Staff interacting with inmates who have a CMA assignment of transgender, shall either use the authorized gender-neutral communication with inmates (e.g., by the legal last name or "Inmate" last name) or the pronouns associated with the inmate's identified gender. Deliberately and repeatedly mis-gendering an inmate is not permitted.

The name entered on the inmate's Judgment and Commitment Order is the official committed name for all Bureau records (incident reports, progress reviews, sentence calculations, etc.). An official committed name change while in BOP custody must be done consistent with the Program Statement **Correctional Systems Manual.** Any additional names or aliases should be entered into SENTRY, as appropriate.

## 13. PAT SEARCH ACCOMMODATIONS

Pat searches of transgender inmates will be conducted in accordance with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

Pat search information refers only to individuals at male facilities who identify as female. The Bureau does not offer "male only" pat searches.

Unless there is a history of inappropriate sexual behavior suggesting approval poses risks to staff, requests are ordinarily approved by the Warden's Office. Inmates may request denials be reviewed by the TEC through the Administrative Remedy Program. Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated

institution rules concerning contraband.

In exigent circumstances, any staff member may conduct a pat search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

## 14. VISUAL SEARCHES

For purposes of a visual search, inmates will be searched in accordance with the gender of the institution, or housing assignment, to which they are assigned.  The visual search shall be made in a manner designed to ensure as much privacy to the inmate as practicable. Staff should consider the physical layout of the institution, and the characteristics of an inmate with a transgender CMA assignment, to adjust conditions of the visual search as needed for the inmate's privacy.

Transgender inmates may also request an exception to be visually searched by a staff member of the inmate's identified gender. The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services. Exceptions must be specifically described (e.g., "visual search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database). Inmates should be provided a personal identifier (e.g., notation on identification, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to visual searches.

Inmates request an exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden.  The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office. Inmates may request denials be reviewed by the TEC through the Administrative Remedy Program.  Inmates who are granted this exception may have it reversed by the Warden if found to have violated institution rules concerning contraband.

Transgender inmates placed at an institution or in a housing unit that does not correspond with their identified gender, and who are granted an exemption as indicated above, will be searched by staff of the inmate's identified gender who consent to participate in the search, or Health Services clinical staff.

Transgender inmates placed at an institution or in a housing unit of their identified gender will be searched by staff of the inmate's identified gender who consent to participate in the search or medical staff.

Institutions should consider using available body scanning technology in lieu of visual searches of transgender inmates.

In exigent circumstances, any staff member may conduct a visual search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

## 15. CLOTHING, COMMISSARY ITEMS, AND OTHER ACCOMMODATIONS

Consistent with safety and security concerns, inmates with the CMA assignment of transgender will have the opportunity to have undergarments of their identified gender even if they are not housed with inmates of the identified gender. Institutional laundry will have available institutional undergarments that fulfill the needs of transgender inmates. Undergarments will not have metal components.

Standardized lists of Commissary items for transgender inmates are available in accordance with the Program Statement **Trust Fund/Deposit Manual** and the information on the RSD intranet page.

Additional items based on an individualized assessment of the transgender inmate population may be approved by the Warden. Additional items may be provided by the institution or purchased by the inmate, as appropriate. Any concerns regarding such items are directed to the WASPB.

Inmates who purchase and/or are provided items under this section will be subject to disciplinary sanctions, including the removal of these items, if they are found to have violated institution rules relating to the possession of these items.

Any other accommodation requests are discussed with the TEC through the WASPB.

## 16. REENTRY NEEDS

In accordance with the Program Statement **Release Preparation Program**, institution staff assist transgender inmates in addressing reentry issues prior to release or placement in a Residential Reentry Center/Home Confinement.

During Initial Classification and Program Reviews, unit management formulates a pre-release plan that assists transgender inmates in obtaining identification, finding housing and employment, and providing community resources to assist with reintegration into the community.

The Reentry Affairs Coordinator will assist staff with identifying these resources. Community Treatment Services staff or Institution and/or Regional Social Workers may be contacted concerning the continuity of medical care.

The WASPB can be contacted to provide guidance and resources for any additional reentry

needs of transgender inmates. All accommodation and treatment decisions for inmates in community custody are made by the Residential Reentry Management Branch in consultation with the TEC.

## 17. ADMINISTRATIVE REMEDIES

Inmates who wish to seek formal review of any issue relating to this policy may use the procedures in the Program Statement **Administrative Remedy Program**.

## REFERENCES

*Program Statements*

| | |
|---|---|
| P1330.18 | Administrative Remedy Program (1/6/14) |
| P4500.12 | Trust Fund/Deposit Fund Manual (3/15/18) |
| P5100.08 | Security Designation and Custody Classification Manual (9/4/19) |
| P5290.15 | Intake Screening (3/30/09) |
| P5310.17 | Psychology Services Manual (08/25/16) |
| P5310.16 | Treatment and Care of Inmates with Mental Illness (5/1/14) |
| P5322.13 | Inmate Classification and Program Review (5/16/14) |
| P5324.08 | Suicide Prevention (4/5/07) |
| P5324.12 | Sexually Abusive Behavior Prevention and Intervention Program (6/4/15) |
| P5325.07 | Release Preparation Program (8/15/19) |
| P5521.06 | Searches of Housing Units, Inmates, and Inmate Work Areas (6/4/15) |
| P5800.15 | Correctional Systems Manual (9/23/16) |
| P6031.04 | Patient Care (6/3/14) |
| P6090.04 | Health Information Management (3/2/15) |

*Federal Regulations*
28 CFR part 115

*Additional Resources For Clinicians*
Diagnostic and Statistical Manual of Mental Disorders (DSM), most current version. World Professional Association for Transgender Health (WPATH) standards.

*ACA Standards*

■   American Correctional Association Standards for Adult Correctional Institutions, 5th Edition: 5-ACI-1C-09, 5-ACI-1D-12, 5-ACI-1D-13, 5-ACI-2C-02, 5-ACI-1D-08, 5-ACI-3D-05, 5-ACI-3D-08(M), 5-ACI-3D-09, 5-ACI-3D-10, 5-ACI-3D-11, 5-ACI-3D-12, 5-ACI-3D-13, 5-ACI-3D-14, 5-ACI-3D-15, 5-ACI-3D-16, 5-ACI-6A-21(M), 5-ACI-6A-32(M), 5-ACI-6C-14(M)

■   American Correctional Association Performance Based Standards for Adult Local Detention Facilities, 4th Edition:  4-ALDF-2A-29, 4-ALDF-2A-32, 4-ALDF-2A-34, 4-ALDF-6B-03, 4-ALDF-2C-03, 4-ALDF-4C-22M, 4-ALDF-4C-30M, 4-ALDF-4D-22, 4-ALDF-4D-22-1, 4-

**APP050**

ALDF-4D-22-2, 4-ALDF-4D-22-3, 4-ALDF-4D-22-4, 4-ALDF-4D-22-5, 4-ALDF-4D-22-6M, 4-ALDF-4D-22-7, 4-ALDF-4D-22-8, 4-ALDF-7B-08, 4-ALDF-7B-10, 4-ALDF-7B-10-1.

■    American Correctional Association Standards for Administration of Correctional Agencies, 2nd Edition:  None.

■    American Correctional Association Standards for Correctional Training Academies:  None.

*Records Retention*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

P5200.08    1/13/2022    Federal Regulations from 28 CFR: this type. Implementing instructions: this type.    14

**APP051**

# EXHIBIT A-2

APP052

**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 5, 2025**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 25-5099

(Consolidated with 25-5101, 25-5108, 25-5210, 25-5213, 25-5215)

JANE DOE; MARY DOE; SARA DOE,

*Plaintiffs-Appellees,*

*v.*

PAMELA BONDI, in her official capacity as Attorney General of the United States; WILLIAM K. MARSHALL, III, in his official capacity as Director of the Federal Bureau of Prisons,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Columbia*

## BRIEF OF *AMICUS CURIAE* WOMEN'S LIBERATION FRONT IN SUPPORT OF APPELLANTS

NANCY STADE
WOMEN'S LIBERATION FRONT
1802 Vernon Street NW, Suite 2036
Washington, DC 20009
(202) 507-9475
boardtreasurer@womensliberationfront.org

*Counsel for Amicus Curiae*

September 3, 2025



## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

In Jones v. Bondi, plaintiffs in district court, and appellees here, are five inmates in the custody of the Federal Bureau of Prisons (BOP). With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. Jones, Dkts. 14, 47. Their pseudonyms are Jane Jones, Amy Jones, Barbara Jones, Carla Jones, and Donna Jones. In Doe v. Bondi, plaintiffs in district court, and appellees here, are 14 inmates in the custody of BOP. With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. Doe, Dkt. 7. Their pseudonyms are Jane Doe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sophia Doe, Sally Doe, Wendy Doe, Rachel Doe, and Ellen Doe. In Moe v. Trump, plaintiff in district court, and appellee here, is an inmate in the custody of BOP. With the permission of the district court, plaintiff is proceeding pseudonymously in this litigation. Moe, Dkts. 7, 67. The pseudonym

APP054

being used is Maria Moe. In all three consolidated cases, defendants in district court, and appellants here, are Pamela Bondi, in her official capacity as Attorney General of the United States; and William K. Marshall, III, in his official capacity as Director of BOP.1 In Moe v. Trump, defendants in district court, and appellants here, also include Donald J. Trump, in his official capacity as President of the United States. In Jones v. Bondi, plaintiffs' original complaint also listed Donald J. Trump, in his official capacity as President of the United States, as a defendant. The Jones plaintiffs later omitted President Trump as a defendant in filing their Amended Complaint, and the President is thus no longer a party in that case. See JA341. There were no additional parties and no amici curiae in district court.

**Related Cases**

This case has not previously been before this Court. We are aware of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C): Kingdom v. Trump, No. 1:25-cv-691 (D.D.C.)

## Rulings Under Review

The rulings under review are the February 24, 2025, and March 3, 2025

Orders in Jones (Dkts. 28, 46); the March 10, 2025 Order in Moe (Dkt. 1

These actions were originally brought against defendant James R.

McHenry, III, in his official capacity as Acting Attorney General of the

United States, and defendant William Lothrop, in his official capacity as

Acting Director of BOP. Attorney General Bondi was automatically

substituted as a party under Federal Rule of Civil Procedure 25(d).

Director Marshall was automatically substituted as a party under

Federal Rule of Appellate Procedure 43(c)(2)); and the February 18, 2025,

February 24, 2025, and March 19, 2025 Orders in Doe (Dkts. 44, 55, 68),

entered by the Honorable Royce C. Lamberth, granting plaintiffs'

motions for preliminary injunctions. Some of the orders are available at

Doe v. Bondi, No. 1:25-cv-286, 2025 WL 596653 (D.D.C. Feb. 24, 2025);

Doe v. McHenry, No. 1:25-cv-286, 2025 WL 596651 (D.D.C. Feb. 18,

2025); Jones v. Bondi, No. 1:25-cv-401, 2025 WL 923117 (D.D.C. Feb. 24,

2025); and Jones v. Bondi, No. 1:25-cv-401, 2025 WL 923755 (D.D.C. Mar.

3, 2025). The orders are located in the Joint Appendix at JA168-69 (Doe

February 18 Order), JA185-88 (Doe February 24 Order), JA240-43 (Doe

March 19 Order), JA333-34 (Jones February 24 Order), JA445-49 (Jones

March 3 Order), and JA569-71 (Moe March 10 Order).

**APP057**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae states it is a non-profit 501(c)(3) organization. Amicus curiae has no corporate parent and is not owned in whole or in part by any publicly-held corporation

**APP058**

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ......................................................i

CORPORATE DISCLOSURE STATEMENT ............................................v

TABLE OF AUTHORITIES ......................................................vii

ISSUE PRESENTED ......................................................viii

Interest of Amici Women's Liberation Front (WoLF) ..................viii

SUMMARY OF THE ARGUMENT ........................................... 1

ARGUMENT .................................................... 4

    I.    When The Balance of the Equities Includes the Effect
on Women. Plaintiffs Have Not Shown, and Cannot
Show, A Likelihood Of Success On The Merits ..................... 4

    II.    The Judge Abused His Discretion by Issuing the
Preliminary Injunctions........................................... 8

    III.    Some of the Harms That Women Have Suffered By
Being Confined With Men Have Been Publicized, But
Ignored............................................... 11

CONCLUSION ................................................... 13

APP059

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes & Other Authorities:**

Exec. Order No. 14168,
    Defending Women From Gender Ideology Extremism and
    Restoring Biological Truth to the Federal Government,
    90 Fed. Reg. 8615 (Jan. 30, 2025) ........................................ 3, 11, 13

Langevin, R., Lang, R.A., Wright, P. et al., Identifying violence-
    proneness in sex offenders. Annals of Sex Research (1989) ............ 6

Long-Term Follow-Up of Transsexual Persons Undergoing Sex
    Reassignment Surgery: Cohort Study in Sweden, Dhejne
    C, Lichtenstein P, Boman M, Johansson ALV, Långström
    N, et al. (2011) 22;6(2):e16885. ........................................ 7

Nolan IT, Kuhner CJ, Dy GW. Demographic and temporal
    trends in transgender identities and gender confirming
    surgery. .............................................................. 7

Steiner, Benjamin, et al., "The Impact of Inmate and Prison
    Characteristics on Prisoner Victimization." Trauma,
    Violence & Abuse, vol. 18, no. 1, 2017 .............................. 5

Stoller, Robert J., Presentations of Gender,
    1985 Yale University Press ............................................ 6

**APP060**

## ISSUE PRESENTED

Whether the district court abused its discretion in granting preliminary injunctions blocking the transfer of male trans-identifying inmates to male facilities, on the ground that any such transfer violates the Eighth Amendment.

## Interest of Amici Women's Liberation Front (WoLF)

Amici are Women's Liberation Front (hereinafter WoLF) staff, members, and volunteers. WoLF is a non-profit feminist organization dedicated to the liberation of women, ending the corrosive effects of gender identity on women,  ending the exploitation of women, and promoting freedom by fighting coercive control, dehumanization, and violence. WoLF's supporters include over 400 "sisters in action" who advocate for its mission and attend school, work in education, and live across the U.S. WoLF's interest in this case stems from its interest in empowering and protecting the rights of women.  Among WoLF's core tenets is that women and men are biologically and materially different and women have a right to and need sex-segregated spaces.   WoLF

**APP061**

submits this brief to advance and defend that principle, most especially

in prison where the women have no choice but to remain.

**APP062**

## SUMMARY OF THE ARGUMENT

Plaintiffs cannot demonstrate a likelihood of success in their legal challenge because housing transgender-identifying male inmates in female prisons poses significant risks to women and lacks sufficient justification. Data shows that most trans-identifying male inmates choose to remain in male facilities, where sexual assault rates are often lower than in female prisons. In female facilities, these individuals have been documented assaulting women, who are then punished for reporting. Over half of trans-identifying male inmates were incarcerated for sex offenses—nearly four times the rate of the general prison population—and a disproportionate number are classified as high-security risks. Historical studies link gender dysphoria and cross-dressing with violent sexual crimes, and research suggests that transitioning does not reduce male-pattern criminality. Many trans-identifying inmates retain male anatomy and discontinue hormone therapy after transfer to female prisons. Additionally, they receive preferential treatment, including special housing, cosmetics, and surgeries, which female inmates do not receive. WoLF concludes that

these policies prioritize the rights of trans-identifying males over the safety and dignity of incarcerated women.

The rights and safety of female prisoners have been systematically neglected, even by prominent civil rights and women's organizations such as the ACLU, NOW, and the National Women's Law Center, which prioritize gender identity over women's concerns. Women who speak out—whether inside or outside prison—face silencing, professional retaliation, or disciplinary punishment. The judge's opinion in the referenced case is either uninformed or biased, favoring the emotional discomfort of transgender-identifying male plaintiffs over the tangible harms experienced by incarcerated women. The judge acknowledged that trans-identifying men may suffer psychological distress from being housed in male prisons or referred to as male, but he dismissed the documented trauma women endure from sharing intimate spaces with biologically male inmates. The ruling minimizes the impact on women by citing the small number of trans-identifying males in female facilities, despite evidence that even one male inmate can cause significant harm to a larger number of women. Many of these individuals are statistically more likely to have committed sexual offenses and a majority report

sexual attraction to women. The current approach undervalues women's suffering and undermines their safety and rehabilitation.

The persistent neglect of incarcerated women's safety, despite public exposure of the harms they endure when housed with men, have led to the complete avoidance of the issues women face in prison. The United Nations' position that imprisoning women alongside men constitutes a human rights violation, yet only with Executive Order 14168 in 2025 did efforts begin to formally separate them in custody. Empirical evidence underscores women's heightened vulnerability to abuse during arrest and imprisonment, including sexual violence, invasive searches, and degrading treatment. Once incarcerated, women may face rape, forced prostitution, and constant surveillance in intimate settings. Women's needs in detention are distinct from those of men, including trans-identifying males, international standards—such as the Bangkok Rules and the Geneva Convention— explicitly advocate for gender-specific protections and housing. Systemic failure to uphold these standards continues to expose female prisoners to preventable harm.

APP065

## ARGUMENT

I.    **When The Balance of the Equities Includes the Effect on Women. Plaintiffs Have Not Shown, and Cannot Show, A Likelihood Of Success On The Merits.**

First, it is necessary to dispose of the argument that men identifying as women are at risk in men's prisons. As explained in the government's brief, 99% of male inmates identifying as transgender chose to remain in the male prisons.  [Govt. Br. 2-3]. And, rates of sexual assaults in male prisons are generally low, sometimes less than the rates of assault in female prisons.[1]  [Govt. Br. 2-3]. It is noteworthy that in the female facilities that house males identifying as transgender, the male inmates are known to assault the female inmates.[2]  And women are punished for reporting the assault.  See  e.g., https://genevievegluck.substack.com/p/exclusive-trans-identified-male-

---

[1] This is not surprising considering that female prisoners are more likely than male prisoners to be sexually assaulted and less able to defend themselves from male prisoners.
[2] Women have reported to WoLF that they often are discouraged from reporting these assaults, receive disciplinary action or further harassment if they file a complaint, and that the typical response of the prison, if there is one, is to place the male in a segregated housing unit (SHU) for a few days and then return him to the general population of women.  Thus the number of assaults on women is underreported.

**APP066**

held. Accessed 8/27/25.   Protecting the men is valued over protecting the women.

Second, the men who identify as women in prison are dangerous to women. Information obtained through a FOIA request shows that between May 2024 and January 2025, 51 percent of men identifying as "transgender" were incarcerated for sex offenses. https://usa.kpssinfo.org/federal-bop-transgender-inmate-report-january-2025/ Visited 8/26/25.  This number is almost four times as high as the number in the general Federal Bureau of Prisons population. Id.  This statistic supports the argument that factors other than the fact that a male prisoner identifies as transgender, such as sexual offenses against women and children,  are what place these men at risk. Steiner, Benjamin, et al. "The Impact of Inmate and Prison Characteristics on Prisoner Victimization." Trauma, Violence & Abuse, vol. 18, no. 1, 2017, pp. 17–36.  JSTOR,  https://www.jstor.org/stable/26638159.  Accessed 8/27/25.

Third, men identifying as transgender are statistically higher security risks compared to men who do not identify as transgender. 33% of men who say they are 'trans' are designated as high security risks, but

only 11% of the general population holds this classification.

https://roarwomennyc.com/2025/07/18/myth-vs-fact-men-in-womens-prisons/#myth2 Visited 8/26/25.

Fourth, a fact that had been known for years in law enforcement is now ignored. Sexual homicide perpetrators have been found to have a high occurrence of genital and gender dysphoria. Stoller, Robert J., Presentations of Gender, 1985 Yale University Press. In a 1988 study of sexual homicide killers, 54% were cross-dressers or transvestites. Today, these men would be called "transwomen." Langevin, R., Lang, R.A., Wright, P. et al. Identifying violence-proneness in sex offenders. Annals of Sex Research 2, 49–66 (1989). https://doi.org/10.1007/BF00850679 Visited 8/26/25. Davis killer in grisly 2013 slayings will stay in prison after judges reject appeal attempt, https://www.sacbee.com/news/local/article254085413.html

Fifth, men who identify as women, regardless of hormone therapy, lowered testosterone, or surgery, maintain male levels of criminality. https://murrayblackburnmackenzie.org/wp-content/uploads/2021/04/mbm-briefing-on-dhjene-et-al.-april-2021-1.pdf Accessed 8/28/25

APP068

Additionally, some trans-identifying men discontinue hormone treatment upon transferring to women's prisons to be able to have erections. Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden, Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, et al. (2011) 22;6(2):e16885. doi:10.1371/journal.pone.0016885 Fewer than 15% of trans-identifying males have undergone genital surgery. Nolan IT, Kuhner CJ, Dy GW. Demographic and temporal trends in transgender identities and gender confirming surgery. Transl Androl Urol. 2019 Jun;8(3):184-190. doi: 10.21037/tau.2019.04.09. PMID: 31380225; PMCID: PMC6626314.; https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0016885 Accessed 8/26/25.

Sixth, the men identifying as women receive better treatment and amenities. A woman in Central California Women's Facility reported that "these men or transgender persons get to decide where they want to live; prison and/or room. If women object to them getting moved into a room, the women will be moved to accommodate the transgender person. Essentially, the men or transgender has more rights than a woman in a women's prison." No other group of prisoners gets this special treatment.

APP069

https://roarwomennyc.com/2025/07/18/myth-vs-fact-men-in-womens-prisons/#myth1 Visited 8/26/25.  Moreover, such men may obtain special clothes, cosmetics, cosmetic surgery, including breast implants and facial feminization. Needless to say, women do not get these benefits to enhance their feeling of "femininity." https://roarwomennyc.com/2025/07/18/myth-vs-fact-men-in-womens-prisons/#myth1  Visited 8/26/25.

## II.    The Judge Abused His Discretion by Issuing the Preliminary Injunctions.

The interests of female prisoners have consistently been ignored. Civil rights organizations and women's organizations, such as the ACLU, NOW, and even the National Women's Law Center, have abandoned women in favor of supporting gender identity.  When women have attempted to be heard they have found that they are ignored, silenced, fired, or shunned. And, if they are in prison and complain, they are subjected to disciplinary measures.

The judge's opinion reflects either the absence of briefing on behalf of women in prison, or an innate bias which presumes that male suffering of any degree outweighs female suffering of any degree. The judge seemingly agrees that, for the men, mere "placement in a male penitentiary by itself will exacerbate the symptoms of their gender

APP070

dysphoria, even if they are not subject to physical or sexual violence in their new facility." The judge includes in the harms claimed by Plaintiffs that they would be, "made to shower in the company of men" and that "simply because the mere homogenous presence of men will cause uncomfortable dissonance." There has been no similar relief for incarcerated women subjected to the presence of men in their showers, toilets, and sleeping quarters, and no concern for the heterogeneous presence that causes actual harm to women and undermines their rehabilitation. https://usa.kpssinfo.org/eo-litigation-does-versus-trump-tro/ Visited 8/26/25.

The judge also included as a harm that men in a men's prison would be "referred to as men." Yet, the actual harms to women are minimized or ignored. In this case, in the underlying order granting the temporary restraining order the judge dismissed the harms to women, writing "[e]ven if the Court credits the Executive Order's representation that housing biological males in female penitentiaries has some deleterious effect on privacy and security, … there are only about sixteen male-to-female transgender women housed in female penitentiaries." Thus,

9

according to the judge "the balance of the equities and the public interest favor the plaintiffs."

Not only is this a blatant over-valuing of the intangible concerns of men who claim to identify as women, it completely ignores, devalues, and underestimates the concerns of and harms to women when incarcerated with men who are statistically more likely than not to have been convicted of sexual offenses. Moreover, just one male in a female prison can cause incalculable harm to the women in the unit, regardless of how many women are in the unit. "Female prisoners are routinely harassed, attacked, and sexually assaulted by the men they are forced to share cells, showers, and toilets with. In some prisons, women take turns staying awake to safeguard each other against attacks by men in the night."    https://roarwomennyc.com/2025/07/18/myth-vs-fact-men-in-womens-prisons/#myth1    In fact 60% of trans-identified males say they are        sexually        attracted        to        women. https://roarwomennyc.com/2025/07/18/myth-vs-fact-men-in-womens-prisons/#myth1    Visited 8/26/25.

III.    **Some of the Harms That Women Have Suffered By Being Confined With Men Have Been Publicized, But Ignored.**

Perhaps it is because they are women and prisoners, but some of the harms suffered by women in prison with men have been made public, but nothing has changed for them. See Appendix. Despite the fact that the United Nations has stated that imprisoning women with men is a human rights violation, not until the BOP attempted to implement Executive Order 14168 did anyone attempt to insure that women are separated from men when in custody. Exec. Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,90 Fed. Reg. 8615 (Jan. 30, 2025). Furthermore,

> "[e]mpirical evidence shows that women have a heightened vulnerability to mental and physical abuse during arrest, questioning and in prison. Many women detainees face inhuman and degrading treatment during arrest, interrogation and in custody including stripped naked, threats of rape, touching, "virginity testing", invasive body searches, insults and humiliations of a sexual nature or even rape. Once imprisoned, women may be subjected to several forms of violence such as rape by other inmates and guards, forced into prostitution, touched in a sexual manner during frisks, watched while showering or using toilets and required to wear revealing prison uniforms."
> https://www.ohchr.org/sites/default/files/Documents/Issues/Women/WRGS/OnePagers/Women_and_Detention.pdf

**APP073**

The needs of incarcerated women are substantially different from those of men, including men identifying as women.  The Twelfth United Nations Congress on Crime Prevention and Criminal Justice,  known as "the Bangkok Rules" specifically recognized these needs and clearly stated that women should not be housed with men. https://www.ohchr.org/sites/default/files/Documents/ProfessionalInterest/BangkokRules.pdf   The Geneva Convention is consistent with this position. https://ihl-databases.icrc.org/en/customary-ihl/v1/rule119

APP074

## CONCLUSION

In light of the information provided above, the court should vacate

the preliminary injunctions, permit the Bureau of Prisons to implement

Executive Order Number 14168, and remand these matters for trial.


/s/ Nancy Stade
Nancy Stade
Women's Liberation Front
1802 Vernon Street NW #2036 Washington, DC 20009
(202) 507-9475
BoardTreasurer@womensliberationfront.org
*Counsel for Amicus Curiae*

APP075

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(d), because this brief contains 2,189 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.


Dated:  September 3, 2025          /s/ Nancy Stade
                                   Nancy Stade

APP076

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system on September 3, 2025, which will send notice of such filing to all counsel who are CM/ECF registered users.

Dated:  September 3, 2025                /s/ Nancy Stade
                                        Nancy Stade

APP077

# APPENDIX

Examples of Male Inmates Who Harmed Incarcerated Women

| | |
|---|---|
| Justin "Justine" Randall-Pizzaro | While housed in a women's prison in New York, Randall-Pizzaro attacked a female inmate by punching her and stomping on her head and hands. |
| Ramel "Diamond" Blount | Blount raped a female inmate while housed in a women's prison in New York. He attacked the victim just after she finished showering. |
| Christopher Williams | Williams was convicted of a sex offence and originally incarcerated in a men's facility, where he assaulted a corrections officer. Once transferred to a women's prison in Washington, Williams harassed and sexually abused his cellmate, including while she slept. |
| Richard Masbruch ("Sherri Lashure") | Masbruch was incarcerated for crimes including rape, kidnapping, and torture. While housed in a men's prison, he amputated his own penis. He was transferred to a California women's prison, where he raped and sodomized multiple female inmates. |
| Rodney James ("Shiloh Heavenly Quine") | James was incarcerated for crimes including kidnapping and murder. While housed in a women's prison in California, he sexually harassed and threatened multiple female inmates. |

A1

| | |
|---|---|
| Andre Patterson ("Janiah Monroe") | Patterson, who is over six feet tall, strangled his cellmate in a men's prison with his bare hands. After being moved to an Illinois women's prison, he raped a female inmate and sexually assaulted multiple others. |
| Michael "Michelle" Cole | Cole raped his female cellmate in a county jail in Ohio. |
| Brian "Linda Patricia" Thompson | On at least two occasions, Thompson robbed banks with the stated goal of returning to prison. When he was housed in a women's facility in Oregon, he harassed and threatened to rape female inmates. |
| Hobbie Bingham ("Princess Zoee Andromeda-Love") | Andromeda-Love is a registered sex offender who sexually assaulted a 12 year-old girl. In a Washington women's prison, he groomed and raped a woman with a developmental disability, who prison records say had the "disposition of a young child." |
| Jovanie Saldana | Saldana was housed in a Pennsylvania women's prison for over a year. He sexually harassed multiple female inmates, and was only transferred out of the facility after he reported being the victim of an assault. |

A2

| | |
|---|---|
| Tremaine Deon Carroll | Carroll raped multiple female inmates while housed at a women's prison in California. His first cellmate became pregnant. During subsequent criminal proceedings against Carroll for forcible rape, a judge ordered that Carroll be referred to using she/her pronouns. |
| Demetrius "Demi" Minor | Minor sexually assaulted a female inmate on multiple occasions while housed in a women's prison in New Jersey. |
| Nathan Goninan ("Nonnie Marcella Lotusflower") | Lotusflower was placed in a women's prison in Washington after sexually assaulting and raping a teen girl. While there, he assaulted a female correctional officer, sexually assaulted a female inmate, and punched another inmate in the face. He has repeatedly threatened female inmates and staff during violent outbursts. |
| Jermaine "Cyntara" Gibson | While housed in a women's prison in New Jersey, Gibson sexually harassed a female inmate and purposely exposed his genitals. After the woman refused to have sex with Gibson, he repeatedly punched her in the head. |
| Jonathan Robertson ("Siyaah Skylit") | Robertson was incarcerated in a women's prison in California, where he raped a female inmate until she was unconscious and needed emergency |

A3

|  | medical care. He also spit on and threatened to rape female inmates. |
|--|--|

A4

# EXHIBIT A-3

APP082

# Presidential Documents

Executive Order 14168 of January 20, 2025

### Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2.** *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) ''Gender identity'' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3**. *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms ''sex'', ''male'', ''female'', ''men'', ''women'', ''boys'' and ''girls'' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term ''sex'' and not ''gender'' in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4**. *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5.** *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6.** *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7.** *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students";

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021);

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

**APP086**

# EXHIBIT A-4

APP087

**Cort Thomas**

| | |
|---|---|
| **From:** | Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov> |
| **Sent:** | Thursday, October 9, 2025 2:03 PM |
| **To:** | Cort Thomas |
| **Cc:** | Andrew Debter; Alan Carrillo; Paulette Miniter |
| **Subject:** | RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.) |

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Cort,

Thanks again for your patience. Here is the information I have:

Ms. Fleming is *not* scheduled for transfer.

Ms. Herrera was scheduled for transfer, along with multiple other inmates, as part of a broader effort to lessen FMC Carswell's population. Yesterday, however, the BOP removed her from the transfer list because she has an upcoming oral surgery with an outside provider. She will stay at FMC Carswell for at least the next couple of weeks to complete the surgery and any follow-up care. Afterward, it is possible she will be transferred to a different institution.

If you have any questions or would like to discuss, please let me know.

Thanks,
Lisa

*********************************************************************
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Hasday, Lisa (USATXN)
**Sent:** Thursday, October 9, 2025 10:35 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Cort,

Thanks for your patience on my response. As I think I may have mentioned during our call, yesterday was a furlough day for me. This morning, I contacted the BOP about this. I'll get back to you as soon as possible.

Lisa

*********************************************************************
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas

1

Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Wednesday, October 8, 2025 9:17 AM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Good morning, Lisa. Thank you for your time yesterday. I received notice that the BOP is trying to move both Ms. Fleming and Ms. Herrera out of Carswell. Ms. Herrera's family is in Dallas and there is no reason to transfer her. Timing-wise, this feels like it is retaliation for her lawsuit. Can you please work with BOP to ensure that she is not moved? Otherwise, we will need to get this in front of Judge Fitzwater to prevent her from being moved.

Please give me a call today if you can to discuss.

Best,

Cort



**Cort Thomas**
**Direct** 214.367.6094
**Main** 214.327.5000

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Friday, October 3, 2025 10:58 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>; Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Yes, I'm available that afternoon and will be at my office number (below). Just let me know if you plan to call at 2 or later.

Thanks,
Lisa

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

2

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Friday, October 3, 2025 10:52 AM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>; Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Good morning, Lisa.  Yes, we are happy to coordinate scheduling.   Do you have any availability for a call on Tuesday afternoon after 2 pm?  Thanks!

Cort



**Cort Thomas**
**Direct** 214.367.6094
**Main**  214.327.5000

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Friday, October 3, 2025 10:31 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>; Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Hello counsel,

I hope you are doing well.  I was recently assigned to represent the defendants in the above-referenced lawsuit.  I understand that the court has appointed you as counsel for the plaintiffs.  I thought it made sense to touch base.  Do you plan on amending the complaint?  If so, perhaps we could agree on a schedule for the amended complaint and a response thereto.

I look forward to hearing from you.

Thanks,
Lisa

**************************************************************************
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

# EXHIBIT A-5

## Cort Thomas

| | |
|---|---|
| **From:** | Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov> |
| **Sent:** | Friday, October 31, 2025 3:28 PM |
| **To:** | Cort Thomas |
| **Cc:** | Andrew Debter; Alan Carrillo |
| **Subject:** | RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.) |

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Cort,

The BOP has confirmed that it would oppose the planned TRO motion. As an initial matter, a motion for emergency relief is inappropriate because the BOP has no immediate plans to transfer Ms. Herrera. Due to Ms. Herrera's to-be-scheduled surgery, there is still a medical hold in place preventing any transfer. In any event, the BOP has authority to decide where to place inmates and those decisions are not subject to judicial review. FMC Carswell is the BOP's *only* medical center for female inmates, and it must prioritize placing inmates there who require its medical services.

That said, if your client chooses to proceed with a TRO motion, I appreciate your offer to agree on a briefing schedule, especially since I am not in the office every day due to the shutdown. If you proceed with the TRO motion, when would you likely file it?

I appreciate our communication about this case, and I look forward to continuing to work with you.

Lisa

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Hasday, Lisa (USATXN)
**Sent:** Wednesday, October 29, 2025 10:55 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Thank you, Cort. I'm conferring with the BOP about your planned TRO motion and hope to respond about that soon, either today or Friday. I will be out on furlough tomorrow.

I'm planning to file today the motion to reset the response deadline with your revisions incorporated, which seems to me to be a separate matter from the planned TRO.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

1

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Tuesday, October 28, 2025 3:39 PM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Good afternoon, Lisa. The 60 days for the motion to dismiss works in general. See attached limited proposed markup. We are not opposed to sixty days to file a motion to dismiss or answer to the amended complaint. The trick is that we also intend to seek injunctive relief. More specifically, Mimi Herrera has asked us to seek a TRO preventing her from being moved out of Carswell during the pendency of this litigation. Based on our email traffic, I am assuming (perhaps wrongly?) that BOP will be opposed to this relief. If BOP is opposed, then we will have to seek a TRO and cannot wait until 60 days for a response. Can you please let us know if BOP is opposed/unopposed to this requested relief? And if it is, do you want to try to reach an agreed briefing schedule, or would you prefer that the judge just set it after receipt of the request?

We are also going to seek a preliminary injunction, but we can likely figure out for the timing of that briefing later on.

Happy to jump on the phone if that would be helpful.

Cort



**Cort Thomas**
**Direct** 214.367.6094
**Main** 214.327.5000

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Tuesday, October 28, 2025 9:47 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Cort,

Hope all is well. I'm checking in and seeking your position on the attached motion to reset the defendants' response deadline to 60 days after the forthcoming filing of the plaintiffs' amended complaint. Based on our discussions, I've indicated in the draft motion that it is unopposed.

I look forward to hearing from you.

Thanks,
Lisa

*************************************************************************

2

**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Hasday, Lisa (USATXN)
**Sent:** Tuesday, October 21, 2025 3:01 PM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Thank you, Cort.  Please let me know if you have any issues regarding meeting with your clients.  Let's plan to check in no later than early next week to see where we are.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Monday, October 20, 2025 9:58 AM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Good morning, Lisa.  Apologies for the delay. BOP has pushed our meeting with clients a couple of times, but we are hopeful to finally meet with them this week.  At this point, I can confirm that we should be in position to file our amended complaint on or before your November 3 deadline.  I anticipate that we will be unopposed to 60 days for a motion to dismiss, but I won't know until after our in-person meeting this week (again hopefully; because we've been pushed a couple of times before, I am a little gun shy).

If you want more finality, I guess we could file an agreed motion as to a deadline for us to file the amended complaint, and then a second motion after we have confirmation from clients?  Or if you are good to wait until after our meeting this week, that would work too.

Cort



**Cort Thomas**
**Direct**  214.367.6094
**Main**  214.327.5000

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Thursday, October 16, 2025 10:23 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

No problem, Cort. Is there any update regarding the scheduling matters that we discussed?

*************************************************************************

**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Thursday, October 9, 2025 4:57 PM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Got it. Thanks, Lisa. We will circle back if need by after visiting with our clients. Appreciate it!

Cort



**Cort Thomas**
**Direct**  214.367.6094
**Main**   214.327.5000

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Thursday, October 9, 2025 2:03 PM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Cort,

Thanks again for your patience. Here is the information I have:

Ms. Fleming is *not* scheduled for transfer.

4

Ms. Herrera was scheduled for transfer, along with multiple other inmates, as part of a broader effort to lessen FMC Carswell's population. Yesterday, however, the BOP removed her from the transfer list because she has an upcoming oral surgery with an outside provider. She will stay at FMC Carswell for at least the next couple of weeks to complete the surgery and any follow-up care. Afterward, it is possible she will be transferred to a different institution.

If you have any questions or would like to discuss, please let me know.

Thanks,
Lisa

**********************************************************************
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Hasday, Lisa (USATXN)
**Sent:** Thursday, October 9, 2025 10:35 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Cort,

Thanks for your patience on my response. As I think I may have mentioned during our call, yesterday was a furlough day for me. This morning, I contacted the BOP about this. I'll get back to you as soon as possible.

Lisa

**********************************************************************
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Wednesday, October 8, 2025 9:17 AM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Cc:** Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Good morning, Lisa. Thank you for your time yesterday. I received notice that the BOP is trying to move both Ms. Fleming and Ms. Herrera out of Carswell. Ms. Herrera's family is in Dallas and there is no reason to transfer her. Timing-wise, this feels like it is retaliation for her lawsuit. Can you please work with BOP to ensure that she is not moved? Otherwise, we will need to get this in front of Judge Fitzwater to prevent her from being moved.

Please give me a call today if you can to discuss.

5

Best,

Cort



**Cort Thomas**
**Direct**  214.367.6094
**Main**   214.327.5000

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Friday, October 3, 2025 10:58 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>; Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Yes, I'm available that afternoon and will be at my office number (below).  Just let me know if you plan to call at 2 or later.

Thanks,
Lisa

*************************************************************************

**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

**From:** Cort Thomas <cort@brownfoxlaw.com>
**Sent:** Friday, October 3, 2025 10:52 AM
**To:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>; Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** [EXTERNAL] RE: Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

Good morning, Lisa.  Yes, we are happy to coordinate scheduling.   Do you have any availability for a call on Tuesday afternoon after 2 pm?  Thanks!

Cort



**Cort Thomas**
**Direct**  214.367.6094
**Main**   214.327.5000

6

**From:** Hasday, Lisa (USATXN) <Lisa.Hasday@usdoj.gov>
**Sent:** Friday, October 3, 2025 10:31 AM
**To:** Cort Thomas <cort@brownfoxlaw.com>; Andrew Debter <andrew@brownfoxlaw.com>; Alan Carrillo <alan@brownfoxlaw.com>; Paulette Miniter <paulette@brownfoxlaw.com>
**Subject:** Fleming, et al. v. Rule, et al., No. 4:25-cv-157 (N.D. Tex.)

[EXTERNAL EMAIL] Do not open links or attachments if you cannot verify the sender.

Hello counsel,

I hope you are doing well.  I was recently assigned to represent the defendants in the above-referenced lawsuit.  I understand that the court has appointed you as counsel for the plaintiffs.  I thought it made sense to touch base.  Do you plan on amending the complaint?  If so, perhaps we could agree on a schedule for the amended complaint and a response thereto.

I look forward to hearing from you.

Thanks,
Lisa

**************************************************************************
**Lisa R. Hasday**
Assistant U.S. Attorney
U.S. Department of Justice | U.S. Attorney's Office for the Northern District of Texas
Email Address: lisa.hasday@usdoj.gov
Phone: (214) 659-8737

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **RHONDA FLEMING and** | § | |
| **MIRIAM CRYSTAL HERRERA,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-CV-0157-D** |
| | § | **(Consolidated with** |
| **WARDEN T. RULE, WILLIAM K.** | § | **Civil Action No. 4:25-CV-0438-D)** |
| **MARSHALL, III, PAMELA J. BONDI,** | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |

## DECLARATION OF RHONDA FLEMING

I, Rhonda Fleming, declare:

1.      My name is Rhonda Fleming. I am over the age of eighteen and competent to make this declaration. I make this declaration based on my personal knowledge of the matters set forth herein.

2.      I am currently incarcerated in the Bureau of Prisons at FMC Carswell in Fort Worth, Texas.

3.      The living arrangements at FMC Carswell provide very little privacy. Inmates must sleep, change clothes, and bathe in full view of one another. Showers and restrooms are communal, and there are no private facilities available to inmates within the general population.

4.      Despite being designated a women's facility, FMC Carswell now houses at least a dozen biological male inmates who claim to identify as women. These male inmates are placed in the same housing units as female inmates, use the same showers and restrooms, and move freely about the compound.  Within units at Carswell, four inmates typically will share a cell, and the

cells do not have doors, let alone locks.  While shower stalls have doors, there are approximately 4-inch gaps around the doors to enable female guards to see the shower.

5.      Many of these male inmates retain male genitalia and possess the physical characteristics and strength of men. Several are known to have been convicted of violent or sexual offenses. Their presence in the general population has created an environment of constant fear, anxiety, and humiliation for me and other women incarcerated here.

6.      I have personally witnessed male inmates undressing and showering alongside women. I have also observed male inmates entering restrooms while women were using them and staring at female inmates while they were naked or changing clothes. These events are deeply distressing and violate my most basic sense of modesty and dignity.

7.      In July 2025, a male inmate physically assaulted a female prisoner in her room after saying, "I'm not trans, I'm bisexual and everything works." Even after that assault, prison officials took no meaningful action to remove male inmates from our housing units.

8.      I practice Messianic Judaism. A central tenet of my faith is modesty: I may not expose my unclothed body to men who are not my husband, nor may I view the nude body of men who are not my husband. For me, undressing or showering in the presence of men is a grave sin and an affront to my faith.

9.      My faith also teaches me to avoid "sitting with the wicked" and to worship with God's people. I have a strong fear of God and believe He punishes disobedience to His commandments. I cannot in good conscience participate in worship services that include men pretending to be women. This has denied me the ability to worship as commanded. More specifically, I have been denied access to Jewish services with the Rabbi because a male inmate has been present for Passover and other important Jewish Holy Days.

10.     The BOP's policy of housing biological males in women's facilities forces me to violate these religious convictions. I am compelled either to expose my body in front of men or to refrain from bathing or using the restroom. As a result, I live in a constant state of moral conflict and spiritual distress.

11.     I have filed complaints and grievances about these conditions, but they have been ignored or dismissed. Rather than addressing my concerns, prison staff have warned me that continued complaints could result in disciplinary action or transfer. Indeed, prison staff have repeatedly retaliated against me due to my firm resolve that the BOP Transgender Policy violates my religious and bodily privacy rights.  The FBOP employees have used the disciplinary process to intimidate me and stop the filing of grievances and complaints.  At the same time that the BOP disregards the safety of biological women, it simultaneously demonstrates a clear bias towards the male inmates.  By way of example, in the past I was housed at Federal Prison Camp-Bryan, a lower security facility in Texas.  During a chapel service, I made a comment about "the other man in the room," who was a large, young man who identified was a woman.  He complained that I referred to him as a man, I was written up for "abusive/obscene language," and soon thereafter I was moved out of the camp and back to prison.

12.     FMC Carswell has, at times, placed biological male inmates not only in general-population housing but also in the Special Housing Unit ("SHU"). In that setting, women can be locked inside a cell with a man and forced to shower and use the toilet—without a partition—in front of a man.

13.     On or about July 19, 2025, I was placed in the SHU after objecting to the presence of male inmates in my housing unit. Prison officials threatened to assign me to a cell with a biological male inmate (Katy Bernal Guzman) who was in the SHU for physical assaulting female

prisoners. I was terrified at the thought of being confined in a cell with this man and requested suicide watch rather than risk being assaulted in the cell. This experience caused severe distress and reinforced my belief that FMC Carswell officials are indifferent to my safety and religious conscience.

14.    The conditions at FMC Carswell subject me to daily fear, humiliation, and anxiety. I am constantly on guard, uncertain whether I will be exposed or harassed. Many women here have similar experiences but are too afraid to report them because of retaliation or disbelief.

15.    The policy of housing men in women's facilities contradicts common sense and undermines the safety and dignity of women. It forces me to expose my body to men, violates my religious beliefs, and subjects me to a substantial risk of sexual harassment and assault.

16.    As a result of these unlawful policies and the constant fear and humiliation they cause, I have suffered serious physical and emotional harm. I live with a reasonable and ongoing fear of sexual assault by male inmates, which has caused chronic anxiety, sleeplessness, and recurring headaches. The stress has also resulted in stomach pain, loss of appetite, and other physical symptoms. I have experienced what I believe to be sexual harassment and intimidation, and I suffer continual fear of rape and bodily harm each day I remain housed under these conditions. These harms are not merely emotional but manifest in physical pain and deterioration of my health and well-being.

17.    I have exhausted, or attempted in good faith to exhaust, all available administrative remedies. I repeatedly requested administrative remedy forms from prison staff to grieve the BOP's policy of housing biological males in women's facilities, but those forms were never provided. On January 31, 2025, I submitted a written message to the Grievance Coordinator specifically requesting access to the grievance process and forms related to this issue, but my

DECLARATION OF RHONDA FLEMING

request went unanswered. A true and correct copy of the message requesting a grievance form is attached as **<u>Exhibit B-1</u>**. Despite these efforts, no administrative remedy process was made available to me.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

November 3, 2025.

_____
Rhonda Fleming

# EXHIBIT B-1

APP106

TRULINCS  20446009 - FLEMING, RHONDA ANN - Unit: CRW-I-N

--------------------------------------------------------------------------------------------------

FROM: 20446009
TO: Administrative Remedies
SUBJECT: ***Request to Staff*** FLEMING, RHONDA, Reg# 20446009, CRW-I-N
DATE: 01/31/2025 03:32:02 PM

To: Grievance Coordinator
Inmate Work Assignment: na

I need access to the grievance process.  I am requesting forms for the issue sent to the Special Monitor, as written below.
Thank you
-----FLEMING, RHONDA ANN on 1/31/2025 3:30 PM wrote:

> *No response ever provided.*

*EX-A-2*

**APP107**

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| RHONDA FLEMING and<br>MIRIAM CRYSTAL HERRERA,<br><br>　　　Plaintiffs,<br><br>v.<br><br>WARDEN T. RULE, WILLIAM K.<br>MARSHALL, III, PAMELA J. BONDI,<br>UNITED STATES OF AMERICA,<br><br>　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:25-CV-0157-D<br>(Consolidated with<br>Civil Action No. 4:25-CV-0438-D) |

## DECLARATION OF MIRIAM HERRERA

I, Miriam Herrera, declare:

1.　　　My name is Miriam "Mimi" Crystal Herrera. I am over eighteen years of age, of sound mind, and competent to testify. I make this declaration based on my personal knowledge.

2.　　　I am currently incarcerated in the Bureau of Prisons at FMC Carswell in Fort Worth, Texas.

3.　　　Despite its designation as a women's prison, FMC Carswell houses biological male inmates who claim to identify as women within the general female population. These male inmates retain male genitalia, share our living quarters, and use the same bathrooms, showers, and recreation areas as women. Within the Units at Carswell, four inmates typically will share a cell, and the cells do not have doors, let alone locks.  While shower stalls have doors, there are approximately 4-inch gaps around the doors to enable female guards to see into the shower.

4.　　　I have personally witnessed and experienced repeated incidents of harassment and voyeurism by these male inmates. On one occasion, while I was showering, Peter Langan, a male

inmate wearing makeup positioned himself in front of a mirror that reflected directly into the shower area and stared at me while I bathed. When I closed the shower door, he deliberately opened it, laughed, and told me he would be waiting for me in the bathroom after lights out. I was terrified.

5.      On other occasions, male inmates have entered the restrooms while women were using them and have made lewd comments about our bodies. One male inmate in a wheelchair bragged that his position gave him "a better view of women's private parts." I have also observed male inmates having sexual relations with female prisoners in cells and showers.

6.      These repeated intrusions have taken a serious toll on me. I was sexually abused in the past by someone I lived with, and being forced to shower or change clothes where men can see me brings all of that trauma back. I feel sick with fear and anxiety whenever I have to go into the bathroom or shower area. It feels like I'm never safe. The lack of privacy, coupled with the frequency of such incidents, has caused lasting psychological harm and ongoing fear of sexual victimization.

7.      These experiences have caused me severe fear, humiliation, and anxiety. I often have difficulty sleeping and live in constant apprehension of being watched, harassed, or assaulted. Many women here have similar fears but are too afraid to complain because they worry about retaliation.

8.      My Christian faith teaches that men and women should not see one another naked or share intimate spaces outside of marriage. I believe that modesty before men is a moral duty. Being forced to undress, shower, or use the restroom in the presence of men violates my religious convictions and my conscience.

9.      Because of these conditions, I am continually forced to choose between following my faith and performing basic daily functions such as bathing or using the restroom. The emotional and spiritual toll of this dilemma has been overwhelming.

10.     When I and others complained about these conditions, officials at FMC Carswell ignored our grievances and warned that further complaints could result in disciplinary action or transfer. Instead of protecting women, staff have told us we must "adjust" to the presence of men.

11.     After this lawsuit was filed, I was informed by staff that I would soon be transferred from FMC Carswell to FCI Aliceville in Alabama. The stated reason was "institutional need," but staff indicated the transfer was related to my participation in this case. The timing and context made it clear that the transfer was retaliatory.

12.     A transfer to FCI Aliceville would be devastating. It is hundreds of miles from my family in Texas, and I depend on their support. Aliceville is known to have chronic staffing shortages and inadequate medical care. Moving me there would isolate me from my family and counsel and worsen my conditions of confinement.

13.     The mere threat of transfer has already caused me stress and fear. I understand that prison officials may retaliate against inmates who seek legal redress, and the threat to move me confirms that risk. I fear that without court intervention, I could be transferred at any time in retaliation for asserting my rights.

14.     The conditions I have described are real, ongoing, and dangerous. They endanger my physical safety and burden my exercise of religion.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

November 3, 2025.

_____
Miriam Herrera