**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **RHONDA FLEMING** and<br>**MIRIAM CRYSTAL HERRERA,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:25-CV-0157-D** |
| | § | **(Consolidated with** |
| **WARDEN T. RULE, WILLIAM K.** | § | **Civil Action No. 4:25-CV-0438-D)** |
| **MARSHALL, III, PAMELA J. BONDI,** | § | |
| **and THE UNITED STATES OF** | § | |
| **AMERICA,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| **ELIZABETH ANN HARDIN** and | § | |
| **BRENDA LEIGH KIRK** | § | |
| | § | |
| **[Proposed] Intervenor-Plaintiffs** | § | |
| | § | |

**PROPOSED COMPLAINT-IN-INTERVENTION OF INTERVENOR-PLAINTIFFS**
**ELIZABETH ANN HARDIN AND BRENDA LEIGH KIRK**

Proposed Intervenor-Plaintiffs Elizabeth Ann Hardin and Brenda Leigh Kirk ("Intervenor-Plaintiffs") file their original Complaint-in-Intervention, seeking to join the verified amended complaint of Rhonda Fleming and Miriam Crystal Herrera, Docket No. 61, in *Fleming et al. v. Rule et al.*, Case No. 4:25-cv-0157-D (consolidated with No. 4:25-cv-0438-D), against Defendants Warden T. Rule, William K. Marshall, III, Pamela J. Bondi, and the United States of America (collectively, the "Defendants"), and would show the Court the following:

## I. INTRODUCTION

This case is about protecting women's rights to safety, dignity, and bodily privacy. Intervenor-Plaintiffs Elizabeth Ann Hardin and Brenda Leigh Kirk are biological women incarcerated at the Federal Medical Center–Carswell ("FMC Carswell") in Fort Worth, Texas. The

Bureau of Prisons' ("BOP") "inmate sex" designation for FMC Carswell is "female offenders."[1] In fact, FMC Carswell is the BOP's only medical center for female inmates. Yet the BOP endangers female inmates by housing biological men, many of whom are convicted of sexual violence against women, at FMC Carswell and other women's prisons. This unjust policy and practice must cease.

This BOP policy violates Intervenor-Plaintiffs' constitutional and statutory rights to bodily privacy and to be free from cruel and unusual punishment. Intervenor-Plaintiffs, and other female inmates at FMC Carswell, are compelled to shower, undress, sleep, and use toilets in the presence of male inmates—often in open, communal spaces that offer no meaningful visual barrier and where male guards are not even permitted to access such spaces absent exigent circumstances. Female inmates are exposed to male genitalia, voyeurism, sexualized harassment, and the constant fear of sexual assault. For survivors of abuse, these conditions trigger acute anxiety, sleeplessness, and lasting psychological harm. No woman should be forced to choose between her safety and solitary confinement or suicide watch simply to avoid unwanted exposure to men in spaces reserved for female privacy.

The data emphasizes the heightened risks that the BOP policy imposes on women. Male, transgender-identifying inmates are far more likely to have been convicted of sexual crimes than female inmates. Indeed, data obtained through a Freedom of Information Act ("FOIA") request to the BOP reveals that approximately 51 percent of male, transgender-identifying inmates are incarcerated for sex offenses.[2] This percentage is nearly four times higher than the rate of sex-

---

[1] Federal Bureau of Prisons, "FMC Carswell: An Administrative Security Medical Center with an Adjacent Minimum Security Satellite Camp," https://www.bop.gov/locations/institutions/crw/ [https://perma.cc/F2H8-WNBL].

[2] *See* Brief of *Amicus Curiae* Women's Liberation Front in Support of Appellants, filed in *Doe v. Bondi*, No. 25-5099 (D.C. Cir. Sept. 3, 2025), at 5 [Doc. #2133473]; Keep Prisons Single Sex,

offense incarceration within the general BOP male population.[3] Because the BOP houses biological men in women's prisons, female inmates are unnecessarily subject to extreme and outrageous risks of sexual violence.

The BOP policy is also unlawful. Nothing in the Prison Rape Elimination Act authorizes the BOP to redefine "sex" as "gender identity" or to place men in women's facilities to "affirm" a self-reported gender identity. Indeed, federal law protects women against cross-gender strip searches, pat-downs, and males "viewing their breasts, buttocks, or genitalia" while showering. *See* 28 C.F.R. §115.15(a) (strip searches and visual body cavity searches); § 115.15(d) (showers). The BOP's current framework disregards the privacy, safety, and dignity of female prisoners, even though the United States Constitution protects women against routine opposite-sex exposure in showers, restrooms, and living quarters. The BOP's approach is also arbitrary and contrary to law under the Administrative Procedure Act. And it directly defies Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, by which the President of the United States, in whom the Constitution vests all authority of the executive branch, expressly ordered that men not be housed in federal women's prisons.[4]

---

"News: Federal BOP Transgender Inmate Report (Jan. 2025)," available at https://usa.kpssinfo.org/federal-bop-transgender-inmate-report-january-2025/ [https://perma.cc/79UQ-GYZF].

[3] *Id.*

[4] *See* Exec. Order 14168, 90 F.R. 8615 (2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ [https://perma.cc/ZS9L-LF56] ("The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.").

Intervenor-Plaintiffs seek narrowly tailored relief to vindicate women's rights in federal custody. Specifically, they request: (1) declaratory and injunctive relief prohibiting the BOP from housing male inmates—including male, transgender-identifying inmates—within women's general populations, or permitting such inmates to enter female-only privacy areas; (2) setting aside of the BOP's unlawful policy under the Administrative Procedure Act; (3) an injunction against Defendants ordering them to cease their *ultra vires* acts; and (4) an award of attorneys' fees and costs. The law, justice, and a fundamental commitment to the rights and dignity of women require no less than these requested remedies.

## II. **PARTIES**

1.      Plaintiff Elizabeth Ann Hardin, Register No. 20280-078, is a 67-year-old black female, currently incarcerated at FMC Carswell in Fort Worth, Texas.

2.      Plaintiff Brenda Leigh Kirk, Register No. 09978-180, is a 52-year-old white female also incarcerated at FMC Carswell.

3.      Defendant United States of America is the sovereign that, through the BOP, a federal agency, is in possession and control of FMC Carswell, a federal prison and medical center located in Fort Worth, Texas. The United States is responsible for creation and implementation of the policies being challenged in this lawsuit, and for the incarceration of Intervenor-Plaintiffs and the conditions in which Intervenor-Plaintiffs live. The United States has waived sovereign immunity as to certain claims, including the claims set forth herein, and is liable for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel. The United States may be served with process via certified mail delivered to the U.S. Attorney for the Northern District of Texas:

Nancy E. Larson, Acting U.S. Attorney
c/o Civil-Process Clerk
U.S. Attorney's Office, Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

with copy delivered via certified mail to:

Pamela Bondi, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and copy delivered via certified mail to:

William K. Marshall, III
Director, Federal Bureau of Prisons
320 First Street, NW
Washington, D.C. 20534

4.      Defendant Pamela Bondi is the Attorney General of the United States and director

of the U.S. Department of Justice. Attorney General Bondi is sued in her official capacity only.

Among other duties, Attorney General Bondi supervises the Department of Justice, of which one

division is the BOP. Attorney General Bondi is the person responsible for the proper enforcement

of BOP regulations, including regulations implementing the Prison Rape Elimination Act.

Attorney General Bondi may be served with process via certified mail delivered to the U.S.

Attorney for the Northern District of Texas:

Nancy E. Larson, Acting U.S. Attorney
c/o Civil-Process Clerk
U.S. Attorney's Office, Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

with copy delivered via certified mail to:

Pamela Bondi, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and copy delivered via certified mail to:

William K. Marshall, III
Director, Federal Bureau of Prisons
320 First Street, NW
Washington, D.C. 20534

5.      Defendant William K. Marshall, III is the Director of the BOP. Director Marshall

is sued in his official capacity only. Among other tasks, Director Marshall is the official

responsible for the creation, administration, and implementation of the policies and procedures of

the BOP that are being challenged in this lawsuit. Director Marshall has appeared through counsel.

6.      Defendant Warden T. Rule is the warden of FMC Carswell. Warden Rule is sued

in his official capacity only. Warden Rule is responsible for the daily administration of FMC

Carswell and the enforcement of BOP policies challenged here. Warden Rule has appeared through

counsel.

### III. <u>JURISDICTION AND VENUE</u>

7.      Jurisdiction is proper in this Court under Article III of the U.S. Constitution and

28 U.S.C. §§ 1331 and 1346 because claims in the case arise under the Constitution, laws, or

treaties of the United States, including the First, Fourth, Fifth, and Eighth Amendments to the

United States Constitution; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

8.      The Court has jurisdiction to issue the requested declaratory relief in accordance

with 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

9.      The Court has jurisdiction to issue the requested injunctive relief in accordance

with 5 U.S.C. §§ 702 and 703, 28 U.S.C. § 1343(a)(4), and Federal Rule of Civil Procedure 65.

10.     Venue is proper in the Northern District of Texas in accordance with 28 U.S.C.

§ 1391(e) because FMC Carswell is located in this district, a substantial part of the events or

omissions giving rise to the claims occurred in this district, and the policies being challenged are being implemented in the Northern District of Texas, among other locations.

## IV. RELEVANT BACKGROUND FACTS

**A.    *General Prison Conditions***

11.    Ms. Hardin is incarcerated and in custody of the BOP, with an expected release date of 2029. Ms. Hardin is housed in the Two North unit of Carswell.

12.    Ms. Kirk is incarcerated and in custody of the BOP, with an expected release date of 2038. Ms. Kirk is housed in the Two North unit, where she serves as head orderly lead.

13.    FMC Carswell, which houses approximately 1,140 inmates, is designated by the BOP for "female offenders."[5] Such female facilities are not officially designated to house male inmates.[6] This means FMC Carswell should house only female offenders.

---

[5] *See supra* note 1.

[6] Moreover, regardless of that "inmate sex" designation, BOP policy states: "Inmates are housed separate from the alternative sex. At various sites, female inmate units are co-located with male units. However, all housing units and activities are separate. Appropriate programs and services are provided to meet the physical, social, and psychological needs of female inmates." https://www.bop.gov/resources/pdfs/legal_guide_2025_updated.pdf [https://perma.cc/QJB3-L5KQ].

Furthermore, the BOP has recently attested in related litigation as follows: "The [Federal Bureau of Prisons ("FBOP")] believes that housing inmates according to their biological sex helps to ensure prisoner safety, security, and privacy. That is why the FBOP has always housed the vast majority of inmates with other individuals of their own biological sex. . . . It is FBOP's correctional judgment that housing inmates with inmates of their own biological sex ensures bodily privacy and safety and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships. No FBOP housing unit is co-ed. Rather, female inmates are housed separate and apart from male inmates in 29 facilities." *Second Declaration of Rick Stover, Senior Deputy Designation and Sentence Computation Center*, filed in *Jones v. Trump et. al.* (1:25-cv-00401-RCL, (D.D.C. Mar. 1, 2025), ¶¶ 20, 23 [Dkt. 42-1].

14. Prison facilities generally house inmates 24 hours a day during their incarceration. At FMC Carswell, inmates are bunked in 4-person cells without doors and are obligated to accept cellmates as assigned by Defendants. There is effectively no privacy from one's cellmates.

15. Inmates are under the direction, control, and supervision of BOP staff at all times while inmates eat, sleep, recreate, bathe, work, dress, and engage in other intimate activities such as using the restroom. Although shower stalls have doors at FMC Carswell, there are approximately four-inch gaps around the doors to enable female guards to see into the showers. Similarly, the toilets have individual stalls, but women using them can be viewed through a gap in the door by those passing by or attempting to look in.

16. Many of these activities are not conducted in physically separated spaces but are instead conducted in dormitory or "open" spaces visible to all other inmates and prison officials. This openness is mostly necessary to allow prison officials to keep a close eye on the activities of inmates to detect prison rule violations or harmful or harassing behavior towards other inmates or guards, thus encouraging inmates to follow the rules to avoid discipline as well as preserving the security of the facility.

17. For virtually the entire history of our nation, and in most nations worldwide, male prison inmates were housed in separate facilities from female inmates.[7] There are many good reasons for this separation, including to protect the physical safety of the inmates and prison officials, bodily privacy, hygiene, and to prevent or avoid mental and sexual trauma, sexual assault,

---

[7] *See Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989) ("Our inquiry . . . begins by noting a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender."); *see generally* Nicole Hahn Rafter, *Prisons for Women, 1790–1980*, 5 CRIME & JUST. 129 (1983), http://www.jstor.org/stable/1147471.

unintended pregnancies, and consensual sexual relations, which are typically prohibited by prison regulations.

18.    To preserve their bodily privacy, female inmates may not be generally or routinely subjected to observation by male guards when the inmates are disrobing, showering, or toileting. Similarly, to protect their bodily privacy, female inmates may not generally or routinely be subjected to pat searches by male guards.

**B.    *Prison Regulatory Background***

19.    In 2012, the U.S. Department of Justice promulgated implementing regulations for the Prison Rape Elimination Act ("PREA"), 34 U.S.C. § 30301 *et seq.*, via notice-and-comment rulemaking to effect PREA's purpose of eliminating rape in federal and federally funded prison facilities.

20.    Among other matters, these implementing regulations stated how transgender-identifying inmates would be assigned to BOP facilities. *See* 28 C.F.R. § 115.42.

21.    Subsequently, the BOP issued Program Statement number 5200.04, Transgender Offender Manual, effective January 18, 2017 ("2017 Transgender Offender Manual"), to ensure that the BOP "properly identifies, tracks, and provides services to the transgender population." 2017 Transgender Offender Manual at 1.

22.    As written and as implemented at FMC Carswell, the 2017 Transgender Offender Manual expressly authorized Defendants to house inmates based on their self-reported gender identity.

23.    The direct consequence of housing transgender-identifying inmates based on self-reported gender identity rather than sex is that male, transgender-identifying inmates have been placed in formerly women-only prisons, including FMC Carswell.

24.    The sole dispositive criterion for such biological male inmates to be treated as if they are women is their self-report.

25.    There is no objectively discernible factor that establishes that a male inmate is a "transgender" person.[8]

26.    In contrast, sex means that one is either male or female as is determined by the union of male and female gametes at conception.

27.    Sex is "a historical fact." *Trump v. Orr*, No. 25A319, 607 U.S. -- (2025). It is immutable, binary, objectively provable, and grounded in the fact that humans reproduce sexually.[9]

28.    The physical differences between males and females are enduring.

29.    The sexes are not fungible.

30.    The subjectivity of gender is evidenced by the regulations relating to transgender-identifying inmates, who are classified as such by these self-reported criteria: "gender identity" ("a person's sense of their own gender, which is communicated to others by their gender expression"); and "gender expression" (including "mannerisms, clothing, hair style, and choice of activities"). 2017 Transgender Offender Manual at 2.

---

[8] *See United States v. Skrmetti*, 145 S. Ct. 1816, 1851 (2025) (Barrett, J., concurring) ("[T]ransgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex.") (internal quotations omitted).

[9] *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality op.) ("[S]ex . . . is an immutable characteristic determined solely by . . . birth.").

31.    As is evident, a person's "sense of their own gender," and each of the indicia of "gender expression," are based solely on the self-reported declarations and volitional behaviors of the person himself and are not objectively verifiable as is one's sex.[10]

32.    Additionally, the 2017 Transgender Offender Manual differentiates gender identity from sexual orientation: "sexual orientation – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related." *Id.*

33.    This differentiation means that male inmates could be heterosexual in their orientation and thus sexually attracted to women, while also claiming to be "transgender."

34.    Thus, under Defendants' policies, a male inmate with male genitalia who is sexually attracted to women may be classified as a "transgender woman" and placed among a captive female prison population. This scenario has occurred at FMC Carswell repeatedly.

35.    Intermingling men and women within a women's prison increases the risk of prison rape occurring. Regardless of gender identification, male inmates may use their male sexual organs to harass, threaten, or harm females.

36.    For victims of sexual abuse—as many women in prison are—exposure to male sexual organs can be even more severely mentally distressing and harmful. Similarly, being viewed by a male inmate during intimate acts such as showering, changing clothes, or going to the restroom can cause psychological distress, re-traumatization, and exacerbation of preexisting stress conditions.

---

[10] *Cf. Skrmetti*, 145 S. Ct. at 1852 (Barrett, J., concurring) ("The boundaries of the group, in other words, are not defined by an easily ascertainable characteristic that is fixed and consistent across the group.").

37.    Being exposed to males in intimate spaces is especially traumatic for Ms. Kirk, who has been the victim of sexual and intimate violence. She has been raped, molested as a child, and kidnapped and placed in the trunk of a car. Today, she regularly has severe trauma responses, and requires accommodations for that trauma, such as open MRIs.

38.    Moreover, male, transgender-identifying inmates are statistically far more likely to have been convicted of sexual crimes than other federal prisoners, further heightening the serious safety risks created by Defendants' policy of housing such individuals in women's facilities. For example, as noted above, the BOP's own data, obtained through a FOIA request, confirms that approximately 51 percent of male, transgender-identifying inmates were incarcerated for sex offenses, nearly four times the rate in the general BOP male population.[11]

39.    Sexual assault in prison is a very serious national problem, which is why Congress passed PREA.

40.    28 C.F.R. § 115.42 does not mention, much less make provisions for, the protection, safety, and privacy of biological female inmates with whom biological male inmates are being housed. The PREA regulations enable inmates to shower, perform bodily functions, and change clothing without "cross-gender" viewing, but by defining gender through mere self-identification, Defendants fail to honor those safeguards. *See* 28 C.F.R. § 115.15.

41.    The 2017 Transgender Offender Manual did not mention, much less make provisions for, the protection, safety, and privacy of the female inmates with whom male inmates are being housed. For instance, the 2017 Transgender Offender Manual cites to 28 C.F.R. § 115.42(c): "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates . . . the agency shall consider on a case-by-case basis whether a placement would

---

[11] *See supra* note 1.

ensure the inmate's health and safety, and whether the placement would present management or security problems." 2017 Transgender Offender Manual at 5. Nothing was said about the privacy, religious beliefs, health, or safety of other inmates who do not suffer from gender dysphoria.

42.    The 2017 Transgender Offender Manual elevated the concerns of male, transgender-identifying inmates, many of whom suffer multiple serious psychological disorders in addition to gender dysphoria, over and above the concerns and protection of the entire population of female inmates, thus shifting the burden to protect the privacy and safety of the female inmates from the BOP to the female inmates themselves.

43.    There is no penological interest being served by placing male inmates within the general populations of federal women's prisons.

44.    On May 11, 2018, the BOP issued a revised Transgender Offender Manual, No. 5200.04 CN-1.

45.    On January 13, 2022, the BOP issued a revised Transgender Offender Manual, No. 5200.08 ("2022 Transgender Offender Manual").

46.    Under the 2022 Transgender Offender Manual, Defendants claim authority to house a male inmate in federal women's prisons.

47.    Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from placing a male inmate within a federal women's prison.

48.    Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from housing a male inmate within a SHU ("Special Housing Unit") administrative segregation cell where one or more female inmates are housed.

49.    Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from allowing a male inmate access to bathrooms and showers used by female inmates.

50.     Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from housing a male inmate within a dormitory cubicle at FMC Carswell.

51.     Nothing within the 2022 Transgender Offender Manual prohibits the Defendants from housing a male inmate at any of the BOP's women's prisons.

52.     Non-federal prisons with similar inmate populations and inmate demographics—such as the State of Texas system—currently manage the needs of transgender-identifying prisoners without intermingling the sexes in the general prison population, just as the federal system did before the adoption of gender identity theory in its regulations. Those systems demonstrate feasible, narrowly tailored alternatives that Defendants could implement.

53.     Male, transgender-identifying inmates still possess the innate physical characteristics of men (even if they have had surgical removal of some or all male sexual organs), including greater average height, weight, and muscle mass than female inmates.

54.     These characteristics generally make male, transgender-identifying inmates substantially larger and stronger than the average woman, thus rendering them a physical and sexual danger to female inmates and prison officials.[12] These risks are exacerbated by communal showers and bathrooms. And regardless of the male, transgender-identifying inmates' physical characteristics, such inmates are male and thus violate the privacy of the female inmates.

55.     Data obtained through a FOIA request to the BOP demonstrates that between May 2024 and January 2025, approximately 51 percent of male, transgender-identifying inmates were incarcerated for sex offenses.[13] This percentage is nearly four times higher than the rate of sex-offense incarceration within the general BOP male population. The data confirm that male,

---

[12] *See infra* paragraph 70.

[13] *See supra* note 1.

transgender-identifying inmates are statistically far more likely to have been convicted of sexual crimes than other federal inmates.

**C.    *The Conditions That Support This Lawsuit.***

      **1.    Facility Layout and Privacy Deficits**

56.    FMC Carswell contains multiple housing units: One North, Two North, One South, Two South, a Hospital Unit, and an Administrative Unit. Many bathrooms across the facility (including the medical-services bathroom and recreation-room bathroom) lack locks, regular guard presence, or basic security, leaving women vulnerable when they use them.

57.    In the main housing units, showers have swing doors with large gaps— approximately four inches or more—deliberately designed so officers, specifically female guards, can see inside. The doors have no locks. A mirror area sits perpendicular to the showers with a direct line of sight into the stalls. Male inmates stationed near those mirrors can and do watch women while they shower.

58.    The SHU consists of small (approximately twelve feet by eight feet) lockdown cells in which prisoners eat, sleep, shower, and use the toilet in the same space with zero privacy. SHU placement may be disciplinary or administrative (including so-called "protective" custody). Any inmate can be sent to the SHU at any time.

59.    When imposed, inmates on suicide watch are housed separate from the SHU, in solitary-like conditions in a freezing cell, wearing a sleeveless, single-piece anti-suicide smock, which inmates refer to as a "turtle suit."

      **2.    Presence and Housing of Male Inmates**

60.    As would be expected from the 2012 PREA regulations and the 2017 Transgender Offender Manual, numerous male, transgender-identifying inmates are currently housed within the general female population. Intervenor-Plaintiffs have been housed with male inmates.

61.    Despite President Trump signing Executive Order 14168 in January 2025, numerous male, transgender-identifying inmates have been placed into the general female populations of federal women's prisons, including FMC Carswell.

62.    These inmates include, among others:

- Jose Cruz "Katy" Bernal-Guzman (Register No. 40935-510);

- Gary Dean Boone (Register No. 94865-071);

- Peter Kevin Langan (Register No. 64023-061);

- Zack J. Lawrence (Register No. 26900-001);

- William McClain, also known as "July J. Shelby" (Register No. 15472-028);

- Walter John Meachum III (Register No. 48556-074);

- Rafael Mercado Berrios (Register No. 23227-026);

- Michael D. Reed (Register No. 19273-045); and

- Michael "Kara" Sternquist (Register No. 44404-061).[14]

63.    Most male inmates at FMC Carswell are housed in unit One North; others are housed in Two North and other units. For example, Michael "Kara" Sternquist, Michael D. Reed, Gary Boone, and Walter John Meachum are housed in unit One North; Zack J. Lawrence is housed in Two North—the same unit as Ms. Hardin and Ms. Kirk.

64.    Many of these male inmates, who still have intact male genitalia, engage in sexual intercourse with female inmates. Ms. Kirk has personally observed Zack Lawrence having sex

---

[14] The presence of these male inmates in female prisons, including FMC Carswell, can be verified through a search on the BOP website. *See* Federal Bureau of Prisons, "Find an Inmate," https://www.bop.gov/inmateloc// (last accessed Nov. 3, 2025).

with a female inmate in Two North. Walter Meachum has also been having sex with a female inmate.

65.    During a single round, an officer caught two female-female couples and the male-female couple having sex and wrote them all disciplinary shots. A lieutenant then came to the unit, read the shots, and moved Meachum the same night. The lieutenant dropped the disciplinary shots so that there would be no paper trail of the male inmates having sex with women. After Meachum was moved, he engaged in sex with a different female inmate.

66.    This is further evidence that male inmates are given preferential treatment at FMC Carswell. When a male is caught engaging in sex with a woman, he is typically only moved units. When two women are caught together, they are sent to the SHU.

67.    Upon information and belief, many of these inmates have been convicted of violent or sexual offenses, including rape and murder.

- Reed raped a seventy-five-year-old woman and pleaded guilty to kidnapping and indecent acts with a child.[15]

- Lawrence is also a sexual offender convicted of attempted enticement of a minor to engage in sexual activity and distribution of child pornography.[16]

- McClain is a repeat sexual offender whose prior victims include a nine-year-old boy and seventeen-year-old girl.[17]

---

[15] WRAL News, "Fort Bragg Soldier Pleads Guilty to Rape, Sexual Assault," Aug. 3, 2006, https://www.wral.com/story/101441/ [https://perma.cc/4ASF-9398].

[16] *See Judgment in a Criminal Case*, filed in *United States v. Lawrence* (Case No. 2:08-cr-00044-LSC-PWG, N.D. Ala. July 24, 2008), at 1 [Dkt. 24].

[17] National Review, "Female Inmates Sound Alarm Over Dangers of 'Gender-Inclusive' Prison Housing," June 12, 2024, https://www.nationalreview.com/news/female-inmates-sound-alarm-over-dangers-of-gender-inclusive-prison-housing-after-ted-cruz-interrogates-biden-judicial-nominee/ (last accessed Nov. 3, 2025).

- Mercado Berrios is a convicted sex offender.[18]

- Boone was convicted in connection with the pipe bombing that resulted in the death of his wife's lover.[19]

- Langan was convicted of assaulting a federal officer and committing armed bank robbery in connection with a white-supremacist organization he co-founded called the "Aryan Republican Army," whose stated goal was "overthrowing" the United States government.[20]

68.    Upon information and belief, almost all of these inmates retain their male genitalia, as well as their male physical characteristics, including height, weight, and strength. Their placement within the female population at FMC Carswell creates an ongoing and substantial risk of sexual assault, intimidation, and psychological trauma for female inmates.

### 3.    Illustrative Incidents and Patterns

69.    Female prisoners are forced to encounter these men daily in communal settings, including showers, toilets, and sleeping quarters, often without privacy barriers. For instance, Lawrence, who is a convicted sex offender, routinely uses the women's showers and has often been observed engaging in sexual activity with female inmates in the showers. At one time, Lawrence was released to a halfway house, but he was soon returned to FMC Carswell for rule violations involving a cell phone. Lawrence has a girlfriend and continues to be housed in Two North with female inmates.

---

[18] *See United States v. Mercado*, 53 F.4th 1071, 1075 (7th Cir. 2022); U.S. Attorney's Office, Central District of Illinois, "Springfield Man Sentenced to Ten Years in Prison for Attempted Enticement of a Minor," Oct. 22, 2021, https://www.justice.gov/usao-cdil/pr/springfield-man-sentenced-ten-years-prison-attempted-enticement-minor [https://perma.cc/S85J-KJEX].

[19] *See United States v. Boone*, 245 F.3d 352, 356–57 (4th Cir. 2001).

[20] *See United States v. Langan*, 263 F.3d 613, 615–18 (6th Cir. 2001).

70.    Boone has ongoing sexual relationships with female inmates and has been observed sharing a cell naked and having sex with a woman who reportedly suffers from mental illness.

71.    Langan is, upon information and belief, the only male inmate at FMC Carswell known to have undergone genital surgery. He is also the only male inmate who regularly wears makeup and a dress.


Peter Langan

72.    McClain, who is a convicted sex offender with a history of sexual violence, has been placed in segregated housing because, upon information and belief, he continues to sexually harass female inmates and officers.

73.    Meachum has been caught having sex with a female inmate and was transferred from Two South to One North.



Walter John Meachum

74.     Upon information and belief, at least two times in the past four months, Mercado Berrios, who is a convicted sex offender, has been placed in hospital segregation due to elevated testosterone levels. When not in hospital segregation, Mercado Berrios is known to have sex with female inmates in unit showers.



Rafael Mercado Berrios

75.    Sternquist's assault of female inmates has also been physical and sexual. Upon information and belief, on July 19, 2025, while reportedly high on drugs, Sternquist entered the unlocked room of female inmate Tamarisk Trejo Matheos at around 2 a.m. In and of itself, this violates FMC Carswell's rules. Sternquist proceeded to sexually assault Ms. Trejo Matheos, stating, "I'm not trans, I'm bisexual and everything works." Upon information and belief, despite witness statements and the existence of video evidence showing Sternquist's movement within the prison, the BOP and FMC Carswell officials have taken no meaningful action to investigate or discipline Sternquist. Instead, Ms. Trejo Matheos was eventually moved to a halfway house.

76.    Ms. Kirk has seen Sternquist walking around with a visible erection and "rubbing" on women in the medical area against their consent.

77.    Female inmates who object to being housed with men have been targeted for retaliation by both male inmates and certain BOP staff sympathetic to transgender ideology. The harassment includes physical intimidation, "accidental" unwanted bodily contact, false accusations of misconduct, repeated verbal threats, and statements that the women should not report the biological males because doing so would "make things worse" for those who report it.

78.    In one instance, Boone told a sixty-year-old female inmate that if he and other men were removed from the prison, the female inmate would be "removed another way."

79.    Female inmates have also been exposed to the risk of confinement in the SHU with male inmates. The SHU consists of small lockdown cells in which prisoners eat, sleep, shower, and use the toilet in the same space, without privacy. In July 2025, in an apparent act of retaliation for protesting the BOP's transgender-identifying inmate policies and for filing this lawsuit, prison officials placed a female inmate (Ms. Rhonda Fleming) in the SHU and threatened to put her in the same cell as Bernal-Guzman, who was in the SHU for physically assaulting female inmates.

Fearing for her safety, Ms. Fleming requested suicide watch rather than risk placement in a cell with a man. Another female inmate who refused such housing was physically beaten.

80.     Upon information and belief, the BOP has taken no reasonable steps to protect female inmates from these dangers. Prison officials have permitted male inmates to be dispersed throughout the facility rather than confined to a separate housing unit. Warden Rule has discretion to assign all male inmates to a single unit for security and administrative reasons, but Warden Rule has declined to do so.

81.     In addition to the incidents described above, female inmates have been subjected to persistent sexual harassment and voyeurism by male inmates placed within the women's housing units.

82.     The shower area offers no meaningful visual barrier from the mirrors in the adjoining space, even though the prison provides a separate "hair care room" with mirrors where inmates are expected to prepare for the day. Male inmates position themselves so they can view female inmates showering.

83.     Intervenor-Plaintiffs have personally witnessed and experienced transgender-identifying male inmates peeking into the showers. This has contributed to Intervenor-Plaintiffs' sense of insecurity and has been experienced as a humiliating indignity.

84.     The ongoing presence of male inmates throughout the women's prison subjects women to daily exposure to male bodies and to the constant fear of sexual assault. As a result, many female prisoners, including Intervenor-Plaintiffs, experience severe anxiety, sleep disruption, and psychological trauma. Defendants' continued policy of housing men, including male, transgender-identifying inmates, within the female population violates the constitutional

rights of female inmates to bodily privacy, personal security, and freedom from cruel and unusual punishment.

85.     Male inmates have been known to display their male genitalia to Intervenor-Plaintiffs, either aggressively and intentionally as a means of intimidation or harassment, or inadvertently in the course of prison life. Many women, including Intervenor-Plaintiffs, have changed their behavior to dress inside the shower stalls or toilet areas, rather than in the open changing space, to protect an ounce of their privacy from the male gaze. Intervenor-Plaintiffs have observed males standing at the sink areas with visible erections while shaving or grooming, a sight females cannot avoid as they enter or exit the area.

86.     Intervenor-Plaintiffs have changed their daily routines because of the presence of males. For instance, because of the presence of men in the shower area, Ms. Hardin no longer exits the shower in a towel; instead she gets fully dressed inside the shower to avoid being seen.  She has also ceased changing shirts openly in the bathroom, and now avoids stalls with broken or non-locking doors.

87.     Whether such exposure is intentional or inadvertent, or motivated by animus or not, it is damaging to Intervenor-Plaintiffs and such exposure arises only because of Defendants' policies and practices challenged herein.

88.     Intervenor-Plaintiffs' exposure, either intentionally or inadvertently, to these displays of male genitalia has caused them to suffer embarrassment, mental anguish, suspicion, fear of sexual assault, and other unnecessary and readily preventable mental distress.

**4.     Feasible, Sex-Segregated Housing Alternatives Within FMC Carswell**

89.     FMC Carswell has every level of security at different parts of the facility, including a Hospital Unit located upstairs. That unit is a secure medical area distinct from the SHU, with its

own TV, recreation area, commissary access, on-unit laundry, and the ability to keep later hours. Inmates are regularly held there long-term, and program materials can be brought to the unit.

90.     Male inmates could be safely and humanely housed in the Hospital Unit as a distinct, secure housing area without access to female housing units and privacy spaces. Housing all male inmates there, or in an equivalently segregated setting, would substantially mitigate or eliminate the privacy and safety harms to women while preserving access to programming and services for those male inmates. Defendants have discretion to assign all male inmates to a single unit for security and administrative reasons but have declined to do so.

91.     Indeed, the placement of transgender-identifying males in women's housing units is the unfortunate result of activist lawyering that favored ideology over the needs of real people. *The New Yorker* has reported that a working group of attorneys studying transgender-identifying prisoners during the term of President Obama "asked [trans] people in prison what they needed, and they all said that they wanted a trans unit." Yet the attorneys ignored prisoners' desires, because the activist attorneys "believed that L.G.B.T. units were stigmatizing, and only served to perpetuate the prison system." One of the lead attorneys for that working group came to "regret[] the outcome" because the group "acted as though the real stakeholders were the law professors." *See* Masha Gessen, *Chase Strangio's Victories for Transgender Rights*, The New Yorker (Oct. 12, 2020), https://www.newyorker.com/magazine/2020/10/19/chase-strangios-victories-for-transgender-rights.

92.     Ms. Hardin has personally witnessed separate spaces as a workable alternative. While incarcerated in the Texas Department of Criminal Justice system, she experienced that officials stopped allowing men and women to co-shower and separated male inmates to a different dorm.

5.     **Executive Order No. 14168 and Related *Doe v. Bondi* Litigation**

93.     On January 20, 2025, President Trump issued Executive Order No. 14168. The Executive Order affirmed the federal government's commitment to protect women's safety, dignity, and privacy by ensuring that biological males are not housed in prison facilities designated for biological females.

94.     Executive Order No. 14168 directed all federal agencies, including the Department of Justice and the BOP, to align their policies with biological reality and to eliminate practices that allow males identifying as female to be placed in women's correctional institutions. Specifically, the Order directed the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers."[21]

95.     Despite the clear mandate of Executive Order No. 14168, the BOP has failed and refused to implement Executive Order No. 14168's directive at FMC Carswell. Upon information and belief, numerous male inmates who identify as female continue to be housed within the general population of FMC Carswell, where they share restrooms, showers, and recreational areas with female inmates. In a separate case, *Doe v. Bondi*, No. 1:25-cv-286-RCL (D.D.C.), a group of anonymous male, transgender-identifying inmates challenged Executive Order No. 14168. On February 18, 2025, and again on February 24, 2025, the United States District Court for the District of Columbia entered preliminary injunctions enjoining enforcement of Sections 4(a) and 4(c) of Executive Order No. 14168 as to the anonymous plaintiffs in that case. The district court concluded that the male, transgender-identifying plaintiffs, who had previously been designated to women's facilities, were likely to succeed on their Eighth Amendment claim that summary transfer to men's prisons would subject them to a substantial risk of harm and exacerbate gender-dysphoria

---

[21] *See supra* note 4.

symptoms. The injunction currently prevents the BOP from enforcing those provisions of Executive Order No. 14168 against the *Doe* plaintiffs,[22] and the government's appeal of that injunction is pending before the United States Court of Appeals for the District of Columbia Circuit, *Doe v. Bondi*, No. 25-5099 (D.C. Cir.). Although the injunction purportedly does not allow the BOP to transfer the *Doe* plaintiffs to men's prisons, it does not require the BOP to house the *Doe* plaintiffs in the same housing units as females or force the BOP to allow the *Doe* plaintiffs to use the same showers and toilets that female inmates use.

96.    On February 21, 2025, the Federal Bureau of Prisons issued an agency-wide memorandum titled Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." The memorandum, which acknowledged the initial injunction in *Doe v. Bondi*, directed all wardens and Chief Executive Officers to bring institutional practices into conformity with Executive Order No. 14168, except where a nationwide restraining order temporarily bars implementation of certain provisions.[23]

97.    The memorandum mandates that staff policies and institutional programs conform to the executive order's recognition of biological sex. It requires staff to address inmates only by their legal names and pronouns corresponding to their biological sex (a provision Defendants are currently not enforcing), prohibits the use of appropriated funds to purchase items associated with transgender ideology (which Intervenor-Plaintiffs believe Defendants are not enforcing), and suspends clothing accommodations that deviate from an inmate's biological sex (which

---

[22] Although Plaintiffs suspect that one or more of the *Doe* plaintiffs may be housed at FMC Carswell, the anonymous and redacted nature of the *Doe v. Bondi* court filings makes it impossible to determine whether the preliminary injunctions in that case directly affect any inmates currently housed at FMC Carswell.

[23] *See* Exhibit A to *Complaint*, filed in *Kingdom v. Trump*, Case No. 1:25-cv-00691 (D.D.C. Mar. 7, 2025), at 1–2 [Dkt. 1-1].

Defendants are not enforcing). It further orders the halt of all transgender-specific programming and rescinds pat-search accommodations that previously allowed male inmates to be searched by female officers. Defendants currently continue to allow male inmates to be searched by female officers, in violation of the memorandum. Collectively, the memorandum reflects the Bureau's initial steps to enforce Executive Order No. 14168 by realigning policy and terminology to biological sex across all federal correctional facilities to the fullest extent possible, while still acknowledging the (wrongfully issued) injunction in *Doe v. Bondi*. Defendants have almost entirely refused to implement this memorandum.

98.    Leadership and staff at FMC Carswell refuse to implement the February 21 memo. For instance, staff continue to use female names and pronouns for male inmates. They call Peter Langan "Donna" instead of Peter, and they call Michael Sternquist "Kara" instead of Michael. Intervenor-Plaintiffs have witnessed Warden Rule referring to these biological men as women.

99.    Carswell also supplies male inmates with women's garments and uniforms, including panties and bras, in violation of the BOP memorandum.

100.    Female prison staff conduct pat-downs of male inmates, in violation of the BOP memorandum.

101.    So long as Defendants continue to defy EO 14168 and the February 21 implementing memorandum at FMC Carswell, Intervenor-Plaintiffs' only potential alternative to avoid exposure to male inmates would be to volunteer for protective custody. This amounts to solitary confinement in the SHU, which results in loss of paid prison work assignments, contact with other inmate friends and associates, access to recreational facilities, and other deprivations.

102.    This is backward: it is not Intervenor-Plaintiffs who are intruding on the constitutional rights of other inmates in the prison—it is the male inmates who necessarily violate

privacy and pose other threats to legal rights and even others' safety. Every time a woman must suffer the indignity of a male inmate's viewing her while she showers, or she sees a male erection in a shared restroom, that woman has been injured. It is unjust and unreasonable for Intervenor-Plaintiffs to be asked to "volunteer" for more punitive confinement conditions in the SHU in order to avoid the harms and threats being inflicted on them by the Defendants' policies.

103.    Intervenor-Plaintiffs have suffered, and continue to suffer, severe mental anguish in the form of extreme embarrassment, fear for their physical safety, anxiety, and sleeplessness as a direct result of ongoing unwanted inmate opposite-sex exposure at FMC Carswell. They are being subjected to conditions where their bodily privacy is continually at risk and often violated, and mental and physical safety is constantly endangered by being housed with male inmates, all under the Defendants' policies.

**6.    Intervenor-Plaintiffs' Exhaustion of Administrative Remedies**

104.    Intervenor-Plaintiffs have exhausted available administrative remedies to resolve the policy and practice of housing male inmates at FMC Carswell.

105.    Prison staff told Ms. Kirk that complaining would be futile and that she would be punished if she tried to vindicate her rights. When Ms. Kirk attempted to raised a complaint, a lieutenant called her to the bench and told here to "let all this stuff drop" because "these women are not bothering you," referring to the transgender-identifying male inmates. Ms. Kirk objected, saying "they're men," explaining that she does not want to be exposed to male genitals in bathrooms and showers, and describing her past trauma including being the victim of sexual assault and rape. The staff made clear that Ms. Kirk would face retaliation if she continued to challenge the prison policy.

106.    Ms. Kirk prepared papers for grievances and for women to send to outside authorities and advocates concerning men being in the prison. As head orderly lead, she announced

that the female inmates in the unit could come get copies. Special Investigative Services (SIS), the prison's internal disciplinary arm, then confiscated her papers and told her she could not distribute them because the male inmates did not like it.

107.    Ms. Hardin witnessed that women who attempted to complain about the presence or conduct of male inmates were ignored or threatened, and staff refused to acknowledge that such complaints could be grieved. Ms. Hardin personally witnessed male inmates violating PREA rules—including entering women's restrooms and exposing themselves—without any disciplinary response. She also witnessed prison staff violating federal policy, such as by referring to transgender-identifying males as "she" and providing them female garments, in violation of the February 21, 2025, BOP memorandum. Combined with the threats of retaliation from staff, she knew that filing a grievance would be futile and invite retaliation.

108.    Defendants' obstruction, intimidation, failure to respond to, or refusal to cooperate with the grievance process rendered those remedies unavailable.

## V. <u>STATEMENT OF APPLICABLE LAW</u>

109.    At all relevant times, each and every act alleged herein was attributed to the Defendants who acted under color of a statute, regulation, or other law of the United States.

110.    Nothing within the text of PREA authorizes Defendants to place males into federal women's prisons.

111.    Nothing within the text of PREA authorizes Defendants to place male inmates into federal women's prisons to affirm a male inmate's claimed feminine gender.

112.    Nothing within the text of PREA authorizes the Defendants to redefine "sex" in federal law or regulation as meaning or including "gender identity."

113.    Nothing within the text of PREA authorizes the Defendants to redefine "sex" in federal law or regulation to be established by a person's claimed gender identity.

114.    Executive Order No. 14168 affirms the federal government's commitment to protect women's safety, dignity, and privacy by ensuring that biological males are not housed in prison facilities designated for biological females.

115.    On February 21, 2025, the BOP issued an agency-wide memorandum to implement Executive Order No. 14168, reiterating that biological males should not be housed in the same units as females, should not be referred to by biologically inaccurate pronouns or names, and should not be provided with female clothing.

116.    The right to bodily privacy is protected by the Fourth, Fifth, and Eighth Amendments to the U.S. Constitution and various federal laws and regulations. This right to bodily privacy survives incarceration and protects women from routine opposite-sex viewing while nude or engaged in intimate functions.

117.    The right to be free from a sexually hostile environment and from sexual harassment while incarcerated in a government prison is well established under federal law.

118.    The rules and regulations under review here infringe on and disparage the federally protected rights of Intervenor-Plaintiffs as set forth here.

119.    Defendants knew or should have known that the subject rules and regulations infringed on Intervenor-Plaintiffs' constitutional and statutory rights, but enforced and implemented those rules and regulations anyway, and continue to do so, all to the harm of Intervenor-Plaintiffs.

120.    The continued enforcement of the subject rules and regulations by Defendants will continue to infringe and violate Intervenor-Plaintiffs' constitutional and statutory rights unless this Court enjoins such action.

121.    Defendants are and have been deliberately indifferent to the constitutional and statutory violations visited upon Intervenor-Plaintiffs by the Defendants' policies and practices. Preserving bodily privacy—particularly in conducting personal hygiene and not suffering unconsented viewing of one's nude body—is one necessary measure of civilized life.

122.    Defendants have no legitimate penological interest in forcing female inmates to share their cells, locker areas, showers, and toilets—areas where even inmates retain a degree of constitutional protection for their bodily privacy—with male inmates.

## VI. <u>CAUSES OF ACTION</u>

123.    All facts set forth above are incorporated into each of the causes of action below as if fully set forth therein.

### *First Cause of Action: Violation of Bodily Privacy*
(by Intervenor-Plaintiffs against all Defendants)

124.    While inmates have a lessened expectation of privacy while incarcerated, all inmates, including Intervenor-Plaintiffs, retain a degree of constitutional protection for their bodily privacy, particularly with respect to exposure of their nude or partially unclothed bodies to the opposite sex within their cells, sleeping quarters, and in shower and restroom facilities. Intervenor-Plaintiffs retain constitutional bodily privacy protection rights from involuntary nudity, voyeurism, sexual intimidation, unconsented exposure to male nudity, and/or a sexually harassing environment.

125.    The separation of male and female intimate spaces, including the protection of women from compelled exposure to male bodies, is deeply rooted in this Nation's history and

tradition and implicit in the concept of ordered liberty. From the founding era to the present, American law and social custom have strictly segregated the sexes in contexts involving nudity, bodily privacy, and personal hygiene, including bathrooms, locker rooms, and prisons. The historical record reflects a consistent understanding that forced opposite-sex exposure offends basic decency and dignity, principles that long predate the Fifth and Fourteenth Amendments and remain embedded in the common law.

126.    By intentionally placing male inmates in federal women's prisons, including FMC Carswell while Intervenor-Plaintiffs are incarcerated therein, Defendants have violated Intervenor-Plaintiffs' constitutional right to bodily privacy.

### Second Cause of Action: Cruel and Unusual Punishment
(by Intervenor-Plaintiffs against all Defendants)

127.    Intervenor-Plaintiffs have the constitutional right under the Fourth, Fifth, and Eighth Amendments, even while in prison, to privacy and to be free from physical and mental harm and threats of harm imposed on them by prison officials, directly or indirectly, whether that harm is caused by implementation of rules and regulations or otherwise. Such invasions of privacy and physical and mental harm and threats of harm imposed by prison officials constitute cruel and unusual punishment under the Eighth Amendment.

128.    Intervenor-Plaintiffs were sentenced to serve their time in a federal women's prison. Defendants' creation and enforcement of 28 C.F.R. § 115.42 subjected Intervenor-Plaintiffs to cruel and unusual punishment by housing them in a facility where male inmates were intermingled in the female inmate general population, with consequent violations of their bodily privacy.

129.    Defendants' creation and enforcement of 28 C.F.R. § 115.42 subjected Intervenor-Plaintiffs to an ongoing risk of being housed with a male inmate within the general population of

any of the BOP women's prisons to which they may be assigned. It is cruel and unusual to subject women to indecent exposure to male genitalia, voyeurism, and sexual harassment—crimes under Texas law.

130.    The historic practice of our country, since the creation of separate correctional facilities for women, sought to protect safety, decency, and rehabilitation. The intermingling of male and female prisoners in intimate settings has no historical precedent in this Nation's penal tradition and is inconsistent with American history and tradition. Forcing female inmates to live and shower alongside men departs from the settled norms that have defined civilized confinement for centuries.

131.    Defendants therefore have subjected, and continue to subject, Intervenor-Plaintiffs to cruel and unusual punishment prohibited by the Eighth Amendment.

### *Third Cause of Action: Violation of the APA*
(by Intervenor-Plaintiffs against all Defendants)

132.    Under the APA, a reviewing Court must "hold unlawful and set aside agency action" in four instances that apply to this case:

a.    if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

b.    if the agency action is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B);

c.    if the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C); and

d.    if the agency action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

133.     The Defendants housed male inmates in women's prisons, purportedly as a method of eliminating prison rape by their creation and enforcement of 28 C.F.R. § 115.42. Therefore, the Defendants acted arbitrarily, capriciously, and abused their discretion in creating and enforcing 28 C.F.R. § 115.42 in violation of 5 U.S.C. § 706(2)(A).

134.     The Defendants' creation and enforcement of 28 C.F.R. § 115.42 violated Intervenor-Plaintiffs' constitutional right to bodily privacy.

135.     The Defendants' creation and enforcement of 28 C.F.R. § 115.42 imposed unconstitutionally cruel and unusual punishment upon Intervenor-Plaintiffs.

136.     Therefore, 28 C.F.R. § 115.42 is contrary to constitutional rights and violates 5 U.S.C. § 706(2)(B).

137.     Nothing within PREA authorized Defendants to redefine sex to mean, or to at least include, gender identity.

138.     Nothing within PREA authorized Defendants to house male inmates in women's prisons for the purpose of establishing zero tolerance for rape. Nothing within PREA authorized Defendants to house male inmates in women's prisons for the purpose of preventing rape.

139.     Nothing within PREA authorized Defendants to house male inmates in women's prisons for the purpose of affirming a male inmate's self-reported feminine gender.

140.     PREA expressly requires Defendants to protect the Eighth Amendment rights of federal prisoners, a duty in which Defendants failed with respect to Intervenor-Plaintiffs.

141.     Therefore, 28 C.F.R. § 115.42 is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right and violates 5 U.S.C. § 706(2)(C).

*Fourth Cause of Action: Ultra Vires*

142.     Intervenor-Plaintiffs may seek prospective equitable relief to restrain unlawful acts that exceed statutory limits or contravene the Constitution.

143.     An ultra vires claim is appropriate when a plaintiff alleges that an officer acted without any authority whatever or without any colorable basis for the exercise of authority. Intervenor-Plaintiffs meet that standard here because PREA provides no authority for BOP to redefine "sex," integrate male and female housing, or disregard mandatory privacy safeguards protecting against cross-sex voyeurism, exposure, or sexual intimidation. Nothing in PREA's operative language authorizes housing biological males in women's facilities, and policy goals cannot override statutory limits.

144.     Defendants' actions further contravene Executive Order No. 14168 and the February 21, 2025, BOP Memorandum, which direct the Bureau to align its practices with biological sex and protect incarcerated women from being subjected to biological males in intimate spaces. Continued defiance of those directives demonstrates that Defendants are acting without any lawful authority.

145.     Enjoining Defendants would compel them to comply with constitutional minima, including the Fifth and Eighth Amendments, PREA's statutory mandates, and regulatory commands from the President, and would restrain ongoing ultra vires action at FMC Carswell.

## VII. <u>RELIEF REQUESTED</u>

To protect their rights to privacy, safety, and the free exercise of their faith, Intervenor-Plaintiffs seek the following relief:

1.     Declaratory Judgment that 28 C.F.R. § 115.42, as applied to Intervenor-Plaintiffs:

      i.        Violates the Fourth, Fifth, and Eighth Amendments to the U.S. Constitution, because it infringes on Intervenor-Plaintiffs' right to bodily privacy and subjects them to cruel and unusual punishment;

     ii.        Violates the APA and should be set aside.

2.    A Temporary Restraining Order ("TRO"), as argued in the original Plaintiffs' Motion, ECF No. 58, immediately:

      i.        Enjoining Defendants, their officers, employees, agents, and all persons acting in concert with them from:

          a.      housing any male inmate (meaning any person who is biologically male, regardless of gender identity) within the general population of any housing unit where either Intervenor-Plaintiff is presently or will be confined during the pendency of the TRO; and

          b.      permitting any male inmate to enter or remain in any female-only privacy area (including showers, restrooms, changing areas, or dormitory spaces) to which either Intervenor-Plaintiff has access, so that Intervenor-Plaintiffs are not exposed to male inmates while showering, toileting, dressing, or sleeping.

     ii.        Ordering that, to comply with the relief provided by the TRO, Defendants may, in their discretion:

          a.      Reassign male inmates away from Intervenor-Plaintiffs' housing and privacy areas; or

          b.      House male inmates in a secure, segregated area at FMC Carswell (including the Hospital Unit or an equivalent setting) that preserves access to programming and services while preventing access to female-only privacy areas.

3.    A Preliminary Injunction and Permanent Injunction affording Intervenor-Plaintiffs the same protections as the TRO;

4.    Reasonable and necessary attorneys' fees in accordance with 28 U.S.C. § 2412, 42 U.S.C. § 1988, the Equal Access to Justice Act, and in equity; and

5.    Such other and further relief as the Court deems just and proper.


Dated: November 10, 2025                              Respectfully submitted,

                                                     */s/ John Greil*
                                                     John Greil
                                                       Tex. Bar No. 24110856
                                                     Brian J. Field*
                                                       D.C. Bar No. 985577
                                                     Justin A. Miller
                                                       Tex. Bar No. 24116768
                                                     SCHAERR | JAFFE LLP
                                                     1717 K Street NW, Suite 900
                                                     Washington, DC 20006
                                                     (202) 787-1060
                                                     jgreil@schaerr-jaffe.com
                                                     bfield@schaerr-jaffe.com
                                                     jmiller@schaerr-jaffe.com

                                                     *Motion for pro hac vice forthcoming*

                                                     *Attorneys for Intervenor-Plaintiffs Elizabeth Ann Hardin and Brenda Leigh Kirk*