# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| RHONDA FLEMING and<br>MIRIAM CRYSTAL HERRERA,<br><br>   **Plaintiffs,**<br><br>v.<br><br>WARDEN T. RULE, WILLIAM K.<br>MARSHALL, III, PAMELA J. BONDI,<br>and THE UNITED STATES OF AMERICA,<br><br>   **Defendants.** | § § § § § § § § § § § § | |
| ELIZABETH ANN HARDIN,<br>BRENDA LEIGH KIRK, JASMINE<br>MEABON, JESSICA CLEMENCIO<br>MORAIS, and KEISHA WILLIAMS<br><br>   **Intervenor-Plaintiffs,**<br><br>v.<br><br>WARDEN T. RULE, WILLIAM K.<br>MARSHALL, III, PAMELA J. BONDI,<br>and THE UNITED STATES OF AMERICA,<br><br>   **Defendants.** | § § § § § § § § § § § § § § | **Civil Action No. 4:25-CV-0157-D**<br>**(Consolidated with**<br>**Civil Action No. 4:25-CV-0438-D)** |

## INTERVENOR-PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION AND BRIEF IN SUPPORT

SCHAERR | JAFFE LLP

John Greil
 Texas Bar No. 24110856
jgreil@schaerr-jaffe.com
Brian Field (*pro hac vice*)
bfield@schaerr-jaffe.com
Justin A. Miller
 Texas Bar No. 24116768
jmiller@schaerr-jaffe.com
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060

*Attorneys for Intervenor-Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

MOTION AND BRIEF IN SUPPORT ...................................................................... 1

I.  INTRODUCTION ......................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................... 3

    A.  The BOP's Policy and Practice of Housing Biological Men in Women's Prison Facilities. .......................................................................... 3

    B.  The Conditions at FMC Carswell Harm Female Inmates. ............................... 3

    C.  The Narrower Relief This Court Provided to Plaintiffs Fleming and Herrera Did Not Remedy the Injuries That Have Occurred, and Are Occurring, to Intervenor-Plaintiffs. ......................................................... 4

    D.  Intervenor-Plaintiffs Are Suffering Ongoing Injuries, As They Are Subjected to Male Inmates In Shared Spaces and Ongoing Retaliation by Prisoners and Staff. ...................................................................... 5

    E.  Housing Men in Women's Prisons Defies Executive Order 14168 and Implementing DOJ Memoranda. ...................................................... 7

III.  LEGAL STANDARD .................................................................................... 8

IV.  ARGUMENT AND AUTHORITIES ............................................................... 9

    A.  The Court Can Grant the Requested Relief; *Doe* Does Not Bar Sex-Segregated Housing at Carswell, and These Injuries are Traceable and Redressable to Defendants' Choices. ................................................... 9

    B.  Intervenor-Plaintiffs Are Likely to Succeed on the Merits. ............................ 11

        1.  Intervenor-Plaintiffs are likely to succeed on Count One because Defendants' policy and practice violates their constitutional right to bodily privacy .................................................. 11

        2.  Intervenor-Plaintiffs have a substantial likelihood of success on the merits of their Eighth Amendment claim .................................... 15

        3.  Intervenor-Plaintiffs have a substantial likelihood of success on the merits of their Administrative Procedure claim ........................... 21

            a.  The BOP exceeded its statutory authority under PREA ......... 21

            b.  The policy is arbitrary and capricious .................................... 22

            c.  The policy is contrary to the Constitution ............................. 23

        4.  Intervenor-Plaintiffs are likely to succeed on their *ultra vires* claim .................................................................................. 23

C.    Intervenor-Plaintiffs Face Imminent and Irreparable Harm. .......................... 24

D.    The Balance of Equities and Public Interest Favor Injunctive Relief............. 26

V.    REMEDY........................................................................................................ 26

VI.    CONCLUSION................................................................................................ 27

CERTIFICATE OF CONFERENCE.................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adkins v. Kaspar*,
   393 F.3d 559 (5th Cir. 2004) ................................................................... 13

*Apter v. Dep't of Health & Hum. Servs.*,
   80 F.4th 579 (5th Cir. 2023) ................................................................... 23

*Ayala Chapa v. Bondi*,
   132 F.4th 796 (5th Cir. 2025) ................................................................. 24

*Bucklew v. Precythe*,
   587 U.S. 119 (2019) ................................................................................ 20

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ..................................................................... 8

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
   603 U.S. 799 (2024) ................................................................................ 27

*Cornwell v. Dahlberg*,
   963 F.2d 912 (6th Cir. 1992) ................................................................... 11

*Cortes-Quinones v. Jimenez-Nettleship*,
   842 F.2d 556 (1st Cir. 1988) ................................................................... 15

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ................................................................... 27

*De Veloz v. Miami-Dade County*,
   756 F. App'x 869 (11th Cir. 2018) ..................................................... 16, 19

*Doe v. Bondi*,
   No. 1:25-cv-286-RCL (D.D.C. 2025) ........................................................ 7

*Doe v. Bondi*,
   No. 25-5099 (D.C. Cir. docketed Apr. 2, 2025) ......................................... 8

*Doe v. Luzerne County*,
   660 F.3d 169 (3d Cir. 2011) .................................................................... 11

*Doe v. McHenry*,
   763 F. Supp. 3d 81 (D.D.C. 2025) ............................................................. 9

*E.T. v. Paxton*,
   19 F.4th 760 (5th Cir. 2021) ..................................................................... 9

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................ 24

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ......................................................................... *passim*

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..................................................................................................... 23

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)..................................................................................................... 22

*Fortner v. Thomas*,
   983 F.2d 1024 (11th Cir. 1993) ................................................................................... 11

*Hostetler v. Green*,
   323 F. App'x 653 (10th Cir. 2009) .............................................................................. 19

*In re Envirodyne Indus., Inc.*,
   29 F.3d 301 (7th Cir. 1994) ......................................................................................... 26

*Inst. for Free Speech v. Johnson*,
   148 F.4th 318 (5th Cir. 2025) ........................................................................................ 9

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977)..................................................................................................... 26

*Johnson v. Surles*,
   No. 2:18-cv-01449-MHH-HNJ, 2019 WL 13336813 (N.D. Ala. Sep. 12, 2019) .................... 16

*Jones v. Bush*,
   122 F. Supp. 2d 713 (N.D. Tex. 2000) ........................................................................... 8

*K.P. v. LeBlanc*,
   627 F.3d 115 (5th Cir. 2010) ......................................................................................... 9

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)..................................................................................................... 22

*Lee v. Downs*,
   641 F.2d 1117 (4th Cir. 1981) ............................................................................... 11, 12

*Moore v. Carwell*,
   168 F.3d 234 (5th Cir. 1999) ....................................................................................... 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)....................................................................................................... 22

*Newton v. Joseph*,
   718 F. App'x 256 (5th Cir. 2018) ................................................................................ 11

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................................... 26

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) ................................................................................. 24, 26

*Pitts v. Thornburgh*,
   866 F.2d 1450 (D.C. Cir. 1989)................................................................................... 12

*Reed v. Goertz*,
  598 U.S. 230 (2023) ................................................................................... 10

*Rhodes v. Chapman*,
  452 U.S. 337 (1981) ................................................................................... 16

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..................................................................... 26

*Trop v. Dulles*,
  356 U.S. 86 (1958) ..................................................................................... 20

*Turner v. Safley*,
  482 U.S. 78 (1987) ..................................................................................... 13

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ................................................................................... 12

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ................................................................................... 16

*York v. Story*,
  324 F.2d 450 (9th Cir. 1963) ..................................................................... 11

**Constitutional Provisions**

U.S. Const. amend. IV ................................................................................... 11

U.S. Const. amend. V ............................................................................... 11, 20

U.S. Const. amend. VIII ...................................................................... 15, 20, 21

U.S. Const. art. III ........................................................................................... 9

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706 .................................... 21

5 U.S.C. § 706 ............................................................................... 21, 22, 23, 27

Prison Rape Elimination Act of 2003, 34 U.S.C. § 30301 *et seq.* .................. 8

34 U.S.C. § 30302 .......................................................................................... 14

34 U.S.C. § 30307 .......................................................................................... 21

Mich. Comp. Laws § 801.104 (1986) ........................................................... 12

Mich. Rev. Stat. ch. 148, § 4 (1846) ............................................................. 13

Prisons (Ireland) Act 1826, 7 Geo. 4, c. 74, § 6 (UK) .................................. 12

**Regulations**

28 C.F.R. § 115.42 ..................................................................................... 3, 23

28 C.F.R. § 541.3 ........................................................................................... 18

**Rules**

Fed. R. Civ. P. 65 .............................................................................................................. 8

Local Rule 7.2(f) ............................................................................................................... 1

**Other Authorities**

Emily D. Buehler & Shelby Kottke-Weaver, Bureau of Just. Stat., U.S. Dep't of Just.,
     NJC 308553, Sexual Victimization Reported by Adult Correctional
     Authorities, 2019-2020–Statistical Tables (2024) ..................................................... 16

Bureau of Prisons,
     Transgender Offender Manual (2017, 2018, 2022) ..................................................... 3

Exec. Order 14168,
     Defending Women from Gender Ideology Extremism and Restoring
     Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (2025).................................. 7

Masha Gessen,
     *Chase Strangio's Victories for Transgender Rights*, The New Yorker
     (Oct. 12, 2020) ......................................................................................................... 22

*Locations, FMC Carswell*,
     Fed. Bureau Prisons ................................................................................................. 3

Memorandum, Compliance with Executive Order 'Defending Women
     from Gender Ideology Extremism and Restoring Biological Truth
     to the Federal Government' (Feb. 21, 2025), Compl. Ex. A,
     *Kingdom v. Trump*, No. 1:25-cv-00691-RCL
     (D.D.C. Mar. 7, 2025), ECF No. 1-1 .......................................................... 8, 21, 24

**MOTION AND BRIEF IN SUPPORT**[1]

Intervenor-Plaintiffs Elizabeth Ann Hardin, Brenda Leigh Kirk, Jasmine Meabon, Jessica Clemencio Morais, and Keisha Williams move for preliminary and permanent injunctive relief to protect themselves from unconstitutionally being imprisoned with men.

## I.    INTRODUCTION

This case challenges the Bureau of Prisons' ("BOP") policy of housing biological males in federal women's prisons—a policy that violates female inmates' rights to bodily privacy and security and their rights against cruel and unusual punishment. This Court has already recognized that the Bureau of Prisons' policy of housing male inmates in women's prisons violates the rights of women incarcerated at FMC Carswell. *See* Stip. Order of Permanent Inj. & Final J. (ECF No. 137).

In response to that order, Defendants did not solve the underlying problem. Instead, they chose to play a shell game, shifting the injury onto different women, without ending the injury. Today, men continue to be housed with women, continue to share showers and housing units, and continue to threaten and intimidate women. The Constitution does not permit Defendants to cure a violation by shifting it onto different women, and no court order compels Defendants to choose that path.

This record shows why plaintiff-specific shuffling is not enough. Elizabeth Ann Hardin personally saw a male inmate shaving in a women's bathroom with a visible erection. As a result of joining this litigation, Defendants sent her to Minnesota, against her will, instead of Bryan, Texas, where she could have been close to her family. Brenda Leigh Kirk still encounters male

---

[1] **Use of Generative Artificial Intelligence.** This brief was prepared using generative artificial intelligence; any language drafted by generative artificial intelligence was checked for accuracy, using print reporters or traditional legal databases, by a human being. *See* L.R. 7.2(f).

inmates daily in the elevator and food service; one of them has become loud, hostile, and threatening, while another inmate began targeting Kirk after learning of her role in this case. Jasmine Meabon was sexually threatened in a restroom stall by Gary Boone after this court ordered injunctive relief; she continues seeing him in shared spaces and reasonably fears retaliation if she complains. Jessica Clemencio Morais saw and reported Boone's misconduct, then faced humiliating, retaliatory treatment from staff over her clothing because of this lawsuit. Keisha Williams was moved to the camp at FMC Carswell, but even she could not escape male inmates, still encountering men in common areas like the mailroom.

The declarations[2] submitted by each Intervenor-Plaintiff establish three propositions that matter here.

First, the injury is not limited to dormitory sleeping assignments. The problem follows women into elevators, dining lines, recreation areas, medical treatment, restrooms, and mailrooms.

Second, it is not enough to move women. The Constitution does not require the victims of the violation to be the ones displaced, isolated, routed around, or driven into protective custody.

Third, it is not enough to move men from one women's hallway to another. That merely changes which women are exposed while preserving the same daily intermingling, intimidation, stalking, voyeurism, and retaliation.

The preliminary injunction should therefore do four things: (1) bar Defendants from housing any male inmate within the general population of any housing unit where biological females are present or will be confined; (2) bar Defendants from allowing male inmates into any area where women are present, including elevators, dining areas, recreation areas, medical or

---

[2] Each Intervenor-Plaintiff reviewed and approved the contents of her declaration and have been sent a copy by U.S. mail for execution. Counsel will promptly file the executed declarations upon receipt.

hospital areas, mailrooms, showers, restrooms, changing areas, and dormitory spaces; (3) require Defendants to house male inmates in a secure, segregated unit at FMC Carswell—such as the Hospital Unit or an equivalent setting—that preserves access to programming and services without exposing women to them; and (4) prohibit retaliation against Intervenor-Plaintiffs.

Intervenor-Plaintiffs will show why the law entitles them to this relief.

## II.    FACTUAL BACKGROUND

### A.    The BOP's Policy and Practice of Housing Biological Men in Women's Prison Facilities.

1.    As Plaintiffs Fleming and Herrera explained in detail, the Bureau of Prisons formalized its policy of allowing biological men to be placed in female prisons in 2012 when it promulgated 28 C.F.R. § 115.42. The BOP followed with its 2017 Transgender Offender Manual (together with subsequent revised versions, the "Manual" (ECF No. 59 at APP004–051)), which directed that an inmate's self-reported "gender identity"—not biological sex—could control housing determinations. *See id.* at APP009–010.[3]

2.    In January 2022, the BOP briefly updated the Manual to re-emphasize case-by-case review, but in practice the agency continued to defer to inmate self-identification rather than biological criteria. *See* ECF No. 59 at APP042, APP045. That practice persists to this day at the BOP's female penal institutions nationwide.

### B.    The Conditions at FMC Carswell Harm Female Inmates.

3.    FMC Carswell is a federal medical center designated for "female offenders."[4] Its population of approximately 1,140 women lives in four-person cells (without doors) and

---

[3] Intervenor-Plaintiffs agree with the background provided by Plaintiffs Fleming and Herrera, and will not burden the court with repeating that here. *See* Pls.' Mot. TRO & Prelim. & Perm. Inj. at 2–5, §§ 2.A & 2.B (ECF No. 58).

[4] *See Locations, FMC Carswell*, Fed. Bureau Prisons, https://www.bop.gov/locations/institutions/crw/ (last visited Mar. 28, 2026).

communal units with relatively open showers and limited privacy. Intervenor-Pls.' 1st Am. Compl. ¶¶ 19–20, ECF No. 125 ("Am. Compl."); Fleming Decl. ¶ 3 (ECF No. 59 at APP100). Inmates sleep, bathe, and change clothes within constant view of one another. Am. Compl. ¶¶ 22–23; Fleming Decl. ¶¶ 3–4 (ECF No. 59 at APP100–101); Herrera Decl. ¶¶ 3–5 (ECF No. 59 at APP109–110). In this environment, the introduction of biological males obliterates any sense of security or modesty. Fleming Decl. ¶ 6 (ECF No. 59 at APP101); Herrera Decl. ¶¶ 3–7 (ECF No. 59 at APP109–110).

4.     Into this environment, the BOP has placed at least a dozen biological males claiming to identify as "women." Fleming Decl. ¶ 4 (ECF No. 59 at APP100–101); Herrera Decl. ¶ 3 (ECF No. 59 at APP109). Many retain male genitalia and possess the height, weight, and strength typical of male physiology. Fleming Decl. ¶ 5 (ECF No. 59 at APP101). Some have been convicted of sexual or violent offenses. *Id.*; Am. Compl. ¶ 75.

**C.     The Narrower Relief This Court Provided to Plaintiffs Fleming and Herrera Did Not Remedy the Injuries That Have Occurred, and Are Occurring, to Intervenor-Plaintiffs.**

5.     On February 2, 2026, this Court entered a stipulated permanent injunction in favor of Plaintiffs Fleming and Herrera. ECF No. 137. That order applies only to those two Plaintiffs. It bars Defendants from housing male inmates within the general female population *in any housing unit in which Fleming or Herrera is housed*, and from allowing male inmates into privacy areas *to which those two Plaintiffs have access.* It permits compliance either by moving men away from those two Plaintiffs or by housing men in a secure segregated area.[5]

---

[5] "To comply with this order, defendants may, in their discretion, (a) reassign male inmates away from Plaintiffs' housing and privacy areas; or (b) house such inmates in a secure, segregated area at FMC Carswell (including the Hospital Unit or a comparable setting) that preserves access to programming and services while preventing access to female-only privacy areas." ECF No. 137 ¶ D.

6.      That order proved three things. First, Defendants have imposed cognizable legal injuries on women at FMC Carswell. Second, relief for those injuries is feasible. Third, narrower plaintiff-specific relief is inadequate for these Intervenor-Plaintiffs.

7.      As the Intervenor Complaint alleges, after the Court's earlier relief protecting women in Two North, Defendants simply moved at least one male inmate into One North, injuring different women there. Am. Compl. ¶¶ 71, 118. Today, men continue to be housed in general housing at Carswell, sharing showering and living spaces with women and encountering women in shared spaces, including the elevator, food service, recreation, and the mail room. Kirk Decl. ¶ 3 (App.4); Williams Decl. ¶¶ 3, 6 (App.14).

**D.      Intervenor-Plaintiffs Are Suffering Ongoing Injuries, As They Are Subjected to Male Inmates In Shared Spaces and Ongoing Retaliation by Prisoners and Staff.**

8.      **Elizabeth Ann Hardin.** Until February 2026, Hardin was housed in Two North at Carswell. Hardin Decl. ¶ 2 (App.1). She personally saw Sean Patrick O'Brien in the women's bathroom around 4:00 a.m. while she was getting ready for work; he was shaving there with a visible erection. *Id.* ¶ 3 (App.2). Even after this court's injunction, Hardin was subjected to male inmates in common areas, including elevators. *Id.* ¶¶ 5–6 (App.2). That included Peter Langan giving her weird and threatening looks when Hardin attempted to use the shared elevator, making her feel unsafe and uncomfortable. *Id.* ¶ 6 (App.2).

9.      **Brenda Leigh Kirk**. Kirk remained housed in Two North in December 2025 and March 2026. Kirk Decl. ¶ 2 (App.3). She has experienced that shifting the men around does not solve her problem, because to leave her unit she must take the elevator down through One North, where male inmates are housed; she sees male inmates in the elevator and in food service every day, often several times a day. *Id.* ¶ 3 (App.4). One of those men, Michael Sternquist, became loud, hostile, and threatening to her; in shared spaces, including the elevator, he blamed women

5

for restrictions placed on him and muttered violent things, causing Kirk to fear he might snap and hurt someone. *Id.* ¶ 4 (App.4).

10.   **Jasmine Meabon.** Meabon was housed in Two South in late 2025 and early 2026. Meabon Decl. ¶ 2 (App.7). On or about November 10, 2025, while she was using the restroom on the recreation yard, Gary Boone entered while she was in a stall, looked over the stall, and asked whether she needed help wiping her vagina. *Id.* ¶ 3 (App.8). Even after a male inmate was moved from her housing unit, Meabon still saw Boone in shared spaces, including outside and in main line, and by March 2026 she still encounters him. *Id.* ¶ 6 (App.8).

11.   **Jessica Clemencio Morais.** Morais was housed in One North in late 2025 and early 2026, and by March 2026 had been moved to Two South. Morais Decl. ¶ 2 (App.10). In One North, she regularly saw male inmates in the unit; men winked at women, blew kisses, came too close in phone and computer lines, and positioned themselves where they could see women in the showers. *Id.* ¶ 3 (App.11). She personally had problems with Gary Boone. She saw Boone enter the restroom while Meabon was inside, and after he came out he asked Morais a sexual question about sex in exchange for commissary. *Id.* ¶ 4 (App.11). On another occasion, he made another sexually suggestive comment to her. *Id.* By March 2026, even after her move to Two South, she still had to see Boone in shared spaces, especially recreation, where he sought her out, stood behind her, stared at her, and listened to her conversation. *Id.* ¶ 9 (App.11).

12.   **Keisha Williams**. Williams was housed in One North in December 2025 and then moved to the camp at FMC Carswell in early March 2026. Williams Decl. ¶ 2 (App.14). Williams also reported threatening conduct by a male inmate, including threats to harm people and to "blow up the place" when he left. *Id.* ¶ 5 (App.14). Moving Williams to the camp did not solve the problem because she still encounters male inmates in common areas, including the mail room. *Id.*

¶ 6 (App.14). She believes she has received inadequate medical care as retaliation for her participation in this lawsuit. *Id.* ¶¶ 8–15 (App.14–15).

13.     These declarations all point in the same direction. The relevant injury is not merely that a male inmate might sleep in the next bunk or shower with a woman. It is that Defendants have chosen a regime in which women in a federal women's prison are daily compelled to overlap with men in places where prison life forces them to travel, eat, toilet, seek medical care, recreate, and protect their basic privacy and safety. When women object, the record reflects a pattern of retaliation, indifference, intimidation, and redistribution of the same men into different women's spaces.

**E.     Housing Men in Women's Prisons Defies Executive Order 14168 and Implementing DOJ Memoranda.**

14.     On January 20, 2025, the President issued Executive Order ("EO") 14168 entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." EO 14168, 90 Fed. Reg. 8615 (2025) (ECF No. 59 at APP083–086). EO 14168 reaffirmed that federal agencies must base sex-specific policies on biological sex, not gender identity. *See id.* § 4(a) (ECF No. 59 at APP084). Directly contravening that order, the BOP continues to enforce the Manual and Section 115.42, perpetuating the very "gender ideology" EO 14168 rescinds.[6]

---

[6] In a separate case, *Doe v. Bondi*, No. 1:25-cv-286-RCL (D.D.C.), a group of anonymous male, transgender-identifying inmates challenged EO 14168. On February 18, 2025, and again on February 24, 2025, the U.S. District Court for the District of Columbia entered preliminary injunctions enjoining enforcement of Sections 4(a) and 4(c) of EO 14168 as to the anonymous plaintiffs in that case. The injunction currently prevents the BOP from enforcing those provisions of EO 14168 against the *Doe* plaintiffs. Although the injunction purportedly does not allow the BOP to transfer the *Doe* plaintiffs to men's prisons, it does not require the BOP to house the *Doe* plaintiffs in the same housing units as females or force the BOP to allow the *Doe* plaintiffs to use the same showers and toilets that female inmates use. Although Intervenor-Plaintiffs suspect that one or more of the *Doe* plaintiffs may be housed at FMC Carswell, the anonymous and redacted nature of the *Doe v. Bondi* court filings makes it impossible to determine whether the preliminary

15.    The *Doe v. Bondi* injunction bars transfer of certain male plaintiffs to men's prisons, but does not require BOP to house those men in the same units as women or to let them use the same showers and toilets. Am. Compl. ¶ 109. Further, on February 21, 2025, BOP issued agency-wide guidance directing wardens to bring institutional practices into conformity with EO 14168 to the fullest extent possible, while still complying with the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. § 30301 *et seq.,* and court orders. *See* Memorandum, Compliance with Executive Order 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government' (Feb. 21, 2025), Compl. Ex. A, *Kingdom v. Trump*, No. 1:25-cv-00691-RCL (D.D.C. Mar. 7, 2025), ECF No. 1-1 ["Compliance Memo"]; Am. Compl. ¶¶ 110 & n.23, 111. The Complaint alleges Carswell staff have largely refused to implement even that memorandum's directives. Am. Compl. ¶¶ 112–114.

## III.    LEGAL STANDARD

In accordance with Federal Rule of Civil Procedure 65, Intervenor-Plaintiffs seek preliminary and permanent injunctions to enjoin Defendants' policy and practice of housing male inmates in female prison facilities. The Court may issue a preliminary injunction if the plaintiff establishes:

> (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the … injunction will not disserve the public interest.

*City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (citation omitted); *see also Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.) (addressing preliminary injunction standard), *aff'd,* 244 F.3d 134 (5th Cir. 2000) (per curiam). "The first two factors, the likelihood

injunctions in that case directly affect any inmates currently housed at FMC Carswell. The government's appeal of that injunction is pending before the U.S. Court of Appeals for the District of Columbia Circuit, *Doe v. Bondi*, No. 25-5099 (D.C. Cir. docketed Apr. 2, 2025).

of success on the merits and a showing of irreparable injury absent a stay, are the most critical."

*E.T. v. Paxton*, 19 F.4th 760, 764 (5th Cir. 2021) (cleaned up).

## IV.     ARGUMENT AND AUTHORITIES

### A.     The Court Can Grant the Requested Relief; *Doe* Does Not Bar Sex-Segregated Housing at Carswell, and These Injuries are Traceable and Redressable to Defendants' Choices.

Defendants' standing and redressability objection fails for the reasons Intervenor-Plaintiffs

explain fully in their opposition to Defendants' motion to dismiss (ECF No. 147). Article III

requires a concrete injury that is fairly traceable to the defendants' conduct and redressable by a

favorable order. *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 327, 330 (5th Cir. 2025). Those

elements are satisfied here because the complaint and declarations challenge Defendants' current

choices inside Carswell. The Complaint alleges that Warden Rule controls housing assignments

and transfers, has discretion to assign all male inmates to a single secure unit, and chooses instead

to keep them dispersed through women's housing and shared areas. Am. Compl. ¶¶ 21, 94, 103–

104. That is enough to make the injuries traceable to Defendants' own conduct. *See K.P. v.

LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010).

The contrary theory that Defendants assert misreads the district court order in *Doe v. Bondi*.

*See Doe v. McHenry*, 763 F. Supp. 3d 81 (D.D.C. 2025). That order addressed transfer of certain

male inmates to male prisons. It did not purport to freeze those inmates in a particular bed, cell,

wing, or unit inside FMC Carswell. The D.D.C. order says "the defendants shall maintain and

continue plaintiffs['] … housing status in women's facilities and shall continue to provide their

gender dysphoria treatment as it existed immediately prior to January 20, 2025." *See* ECF No. 147

at 3 (quoting ECF No. 148 at App.108). Grammatically, that language contains two commands.

Under the rule of the last antecedent, the time qualifier modifies only the second command—

gender-dysphoria treatment—not the first. The singular pronoun "it" makes the point clearer still:

if the date qualifier were meant to modify both housing status and treatment, the order would have used a plural referent. So the order preserves the status category of "housed in a women's facility"; it does not require the exact same bed, cell, hallway, or integrated housing arrangement forever.

Any other reading would be absurd. It would mean the BOP could not move a *Doe* plaintiff to an adjacent room, change a roommate, make a routine security adjustment, or use a segregated unit within Carswell. The D.D.C. order does not say that. Nor did Judge Lamberth's reasoning. As Intervenor-Plaintiffs explain, *Doe*'s theory of harm was "imminent transfer to a male penitentiary," not relocation within a women's prison. Intervenor-Pls.' Opp'n to Mot. to Dismiss at 6–9 (filed concurrently) ("MTD Opp'n). This Court should reject Defendants' attempt to transform a transfer order into an order dictating the internal layout of FMC Carswell.

That matters because the requested injunction here does not require transfer to a men's prison (although that is part of the ultimate relief Intervenor-Plaintiffs seek). It requires precisely the narrower middle path that *Doe* leaves open: segregated housing within Carswell, coupled with rules preventing overlap between men and women in housing and shared spaces. The Complaint alleges that the Hospital Unit is inside Carswell, secure, distinct from the SHU, and capable of preserving programming and services. Am. Compl. ¶¶ 103–104. Using it, or an equivalent secure unit, would not violate *Doe*'s concern about transfer to a male penitentiary. It would instead vindicate the rights of the women in this case.

Redressability is equally clear. A favorable injunction would stop Defendants from housing men in women's general-population units, stop overlap in the shared spaces where these women continue to suffer injury, and stop retaliation. Even partial relief is enough for standing so long as it relieves a discrete injury. *Reed v. Goertz*, 598 U.S. 230, 234 (2023). Here, relief would do far

more than that. It would directly address the exposure, fear, humiliation, and retaliation that define this case.

Intervenor-Plaintiffs have standing to seek the requested relief, and nothing bars this court from ordering Defendants to place the male inmates in a segregated unit within Carswell. [7]

### B.    Intervenor-Plaintiffs Are Likely to Succeed on the Merits.

#### 1.    Intervenor-Plaintiffs are likely to succeed on Count One because Defendants' policy and practice violates their constitutional right to bodily privacy

Under the Fourth Amendment, "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex[.]" *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *accord Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999); *Newton v. Joseph*, 718 F. App'x 256, 258 (5th Cir. 2018).

Moreover, the Fifth Amendment's Due Process Clause protects the fundamental right to bodily privacy and personal security. *See York v. Story*, 324 F.2d 450, 456 (9th Cir. 1963); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). Courts have consistently held that female inmates possess a constitutional right not to be observed by male officers or inmates while nude. *See Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *Doe v. Luzerne County*, 660 F.3d 169, 176–77 (3d Cir. 2011). As these courts have recognized, "most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" *Fortner*, 983 F.2d at 1030 (quoting *Lee*, 641

---

[7] Hardin's transfer does not change the result. Four Intervenor-Plaintiffs remain at Carswell, so the Court plainly has a live controversy over current Carswell conditions. Hardin independently seeks protection against retaliation, *see* Hardin Decl. ¶¶ 7–8 (App.2), and her transfer itself is powerful evidence of why anti-retaliation relief is needed now. The Court need not allow Defendants to defeat equitable review by shipping a plaintiff far from home after she joins a case challenging prison conditions.

F.2d at 1119) (reversing lower court's dismissal of claim seeking an injunction prohibiting female guards viewing male inmates when nude in living quarters, showering, and when toileting).

The right to bodily privacy in intimate spaces is one that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (cleaned up). From the inception of women's penal institutions, the American tradition has recognized and enforced sex segregation. *See Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989) (noting "a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender"). The BOP's policy discards that heritage, replacing a system consistent with centuries of law and custom with one that erases the boundary between the sexes. Such a break from historical practice confirms the absence of any legitimate governmental interest sufficient to overcome Intervenor-Plaintiffs' liberty interests.

This point is implicit in the concept of ordered liberty, as evidenced by the practice across the Anglo-American legal tradition. Anglo-American custody rules long treated sex separation in confinement as a structural safeguard, not an optional management preference. Early prison law required male and female prisoners to be housed in separate parts of a prison, with separate common halls, yards, and privies designed to prevent contact between the sexes. *See* Prisons (Ireland) Act 1826, 7 Geo. 4, c. 74, § 6 (UK) (requiring "two separate parts, one for male and one for female prisoners, with a complete division between them, so as to prevent any intercourse," and providing that "it shall be considered as a primary and invariable rule that the male prisoners shall in all cases be separated from the female"), https://tinyurl.com/yc7x7ury; *see also* Mich. Comp. Laws § 801.104 (1986) ("Male and female prisoners, unless they are husband and wife, shall not be put, kept, or confined in the same room in any jail, lock-up, holding center, or holding

12

cell.").[8] That history confirms that forcing women in a federal women's prison to share living and common spaces with male inmates is a sharp break from a settled and widespread legal practice.

Here, Defendants' policy obliterates this fundamental right. By housing biological males in women's general-population units and permitting them to overlap with women in showers, restrooms, dormitory areas, elevators, dining areas, recreation areas, medical areas, and other shared spaces, the BOP compels female inmates, including Intervenor-Plaintiffs, to endure intimate exposure to men and constant threats of physical and verbal harm in the ordinary course of prison life. It undermines institutional safety and inflicts serious psychological trauma on those the government is bound to protect.

Because the right to privacy is well established and Defendants' policy infringes it, the BOP policy cannot stand unless Defendants show it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Fifth Circuit evaluates the reasonableness of a prison regulation by analyzing four factors:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.

*Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (quoting *Turner*, 482 U.S. at 89–90).

Intermingling the sexes in women's prisons fails every prong of this test: it is not rationally related

---

[8] The Michigan history is especially telling: that provision was enacted in 1846 (*see* Mich. Rev. Stat. ch. 148, § 4 (1846)), has been carried forward through successive over 150 years of codifications of Michigan law (viz. the compiled laws of 1857, 1871, 1897, 1915, 1929, 1948, and 1970), was revised in 1986 to redefine the relevant houses of correction, and remains in effect today.

13

to any legitimate security interest, no alternative means exist for Intervenor-Plaintiffs to preserve privacy, and obvious alternatives—sex-based housing assignments—are available at minimal cost.

*First*, there is no rational connection between intermixing the sexes and any legitimate safety interest. Congress enacted the Prison Rape Elimination Act to achieve "zero-tolerance" for prison rape and to make its prevention a "top priority." 42 U.S.C. § 15602(1)–(2) (current version at 34 U.S.C. § 30302). Yet the BOP's policy does the opposite: it places men—including those sexually attracted to women and convicted of sexual crimes against women—into the female inmate population, creating a risk of harassment, abuse, and rape that did not previously exist.

*Second*, Plaintiffs have no alternative means to safeguard their privacy. Administrative channels have proven futile. Segregation in the SHU is no solution—it strips inmates of privileges enjoyed in general population and still fails to ensure sex-segregated housing. The SHU's limited capacity only underscores the impossibility of securing privacy for all women.

*Third*, returning female facilities to female-only status would impose minimal administrative burden. It simply restores the longstanding and effective practice that governed federal prisons for decades. The BOP need only revise internal placement policies. Transgender-identifying inmates would continue to receive medical care and protection, just as other vulnerable inmates do today. Far from straining resources, the change would advance PREA's objectives and reduce the risk of sexual trauma and associated health costs.

*Fourth*, obvious and less-restrictive alternatives exist. For decades, the BOP maintained sex-specific facilities that respected privacy and safety. That model remains readily available. Other options include dedicated housing or private quarters for transgender-identifying inmates—approaches that preserve security and dignity for all. The availability of these alternatives confirms the unreasonableness of the challenged policy.

Because Defendants cannot show that forcing women to cohabit with men is reasonably related to any legitimate penological objective, the BOP policy cannot stand. Intervenor-Plaintiffs are therefore likely to succeed on their constitutional claim protecting bodily privacy.

### 2. Intervenor-Plaintiffs have a substantial likelihood of success on the merits of their Eighth Amendment claim

Plaintiffs have a strong likelihood of success on the merits of their Eighth Amendment claim that Defendants are failing to protect them from a serious risk of bodily harm by housing them with male, transgender-identifying inmates. The Eighth Amendment forbids prison officials from acting with deliberate indifference to a substantial risk of serious harm to those in their custody. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). That duty includes protecting inmates "from violence at the hands of other prisoners." *Id.* (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).

Defendants have done the opposite. Their policy of housing biological males within the general population of a federal women's prison exposes Intervenor-Plaintiffs to ongoing threats of physical and sexual intimidation, voyeurism, retaliation, and psychological trauma. Hardin Decl. ¶¶ 3–6 (App.2); Kirk Decl. ¶¶ 3–8, 10, 12 (App.4–5); Meabon Decl. ¶¶ 3–9, 12 (App.8–9); Morais Decl. ¶¶ 3–11, 13 (App.11–12); Williams Decl. ¶¶ 3–7, 9–13 (App.14–15). By compelling female prisoners to share intimate living spaces with men—and to continue encountering those same men in elevators, food service, recreation, and other shared spaces—Defendants have created conditions that are dangerous on their face. Williams Decl. ¶¶ 3, 6, 12 (App.14–15); Hardin Decl. ¶¶ 3–6 (App.2); Kirk Decl. ¶¶ 3–4, 10 (App.4–5); Meabon Decl. ¶¶ 3, 6, 9 (App.8); Morais Decl. ¶¶ 3–4, 6, 9–11 (App.11–12).

Intervenor-Plaintiffs' failure-to-protect claim requires them to establish both an objective and a subjective element. The objective element requires showing incarceration "under conditions

15

posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. The threatened harm must be "objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Without question, physical and sexual violence constitute objectively serious deprivations. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

Here, Intervenor-Plaintiffs face clear risks of violence, voyeurism, rape, and sexual assault and harassment if they are housed with men. *See De Veloz v. Miami-Dade County*, 756 F. App'x 869, 877 (11th Cir. 2018) ("[H]ousing a biological female alongside … male inmates poses an outrageous risk that she will be harassed, assaulted, raped, or even murdered."); *cf. Johnson v. Surles*, No. 2:18-cv-01449-MHH-HNJ, 2019 WL 13336813, at *5 (N.D. Ala. Sep. 12, 2019) ("Placing a female detainee in a male detention facility creates a substantial risk of serious harm to the female detainee's health and safety." (collecting cases)), *report and recommendation adopted*, 2020 WL 13750675 (N.D. Ala. Jan. 2, 2020); Hardin Decl. ¶¶ 3–6 (App.2); Kirk Decl. ¶¶ 3–4 (App.4); Meabon Decl. ¶¶ 3–6, 9 (App.8); Morais Decl. ¶¶ 3–5, 9–11 (App.11–12); Williams Decl. ¶¶ 3–7, 12 (App.14–15). The risk of sexual assault and psychological trauma inherent in housing males with females is obvious and well documented. As the Eleventh Circuit explained, "female and male inmates are not housed together in prisons because this risk is not only self-evident, but serious and real." *De Veloz*, 756 F. App'x at 877. Defendants' own data confirm the danger: male inmates commit sexual assaults at vastly higher rates than females.[9] And

---

[9] *See* Emily D. Buehler & Shelby Kottke-Weaver, Bureau of Just. Stat., U.S. Dep't of Just., NJC 308553, Sexual Victimization Reported by Adult Correctional Authorities, 2019-2020– Statistical Tables 11 (2024) ("In substantiated inmate-perpetrated incidents, males accounted for 81% of nonconsensual sexual acts perpetrators, 78% of sexual harassment perpetrators, and 67% of abusive sexual contact perpetrators."), https://perma.cc/3MUT-JGXX.

male, transgender-identifying inmates are statistically far more likely than the general BOP male inmate population to be incarcerated for sexual offenses.[10]

The risk here is real. FMC Carswell continues to house male inmates within the general female population, and Intervenor-Plaintiffs personally describe male inmates being housed in One North, Two North, and Two South, with continuing overlap in shared elevators, food service, recreation, restrooms, main line, and the mail room. *See* Am. Compl. ¶¶ 67–70; Hardin Decl. ¶¶ 3– 6 (App.2); Kirk Decl. ¶¶ 3–4, 10 (App.4–5); Meabon Decl. ¶¶ 2–3, 6, 9 (App.7–8); Morais Decl. ¶¶ 3–4, 9–11 (App.11–12); Williams Decl. ¶¶ 3–7, 12 (App.14–15). Their placement among women creates a daily threat of intimidation, voyeurism, sexual misconduct, retaliation, physical domination, and verbal harassment.

That threat has already materialized. Hardin personally saw Sean Patrick O'Brien shaving in the women's bathroom with a visible erection. Hardin Decl. ¶ 3 (App.2). Meabon states that Gary Boone entered the recreation-yard restroom while she was in a stall, looked over the stall, and asked whether she needed help wiping her vagina. Meabon Decl. ¶ 3 (App.8). Morais witnessed that incident and describes Boone's subsequent sexual comments toward her, along with male inmates winking at women, blowing kisses, crowding women in lines, and positioning themselves where they could see women in the showers. Morais Decl. ¶¶ 3–4 (App.11). Williams states that male inmates in One North shared the same showers, restrooms, and living areas with women; that there was no meaningful separation; that men could see into the showers and bathrooms; and that Gary Boone watched her and later acted aggressively toward her in common areas. Williams Decl. ¶¶ 3–4 (App.14). Williams also reported that Michael Sternquist threatened

---

[10] *See* Brief of *Amicus Curiae* Women's Liberation Front in Support of Appellants at 5, *Doe v. Bondi*, No. 25-5099 (D.C. Cir. filed Sep. 3, 2025, rejected Sep. 4, 2025) (ECF No. 59 at APP067).

17

to blow up the prison and to harm people he had conflicts with while at Carswell. *Id.* ¶ 5 (App.14). Kirk states that Zack Lawrence became loud, hostile, and threatening in shared spaces, including the elevator, and that his behavior made her fear he might snap and hurt someone. Kirk Decl. ¶ 4 (App.4). These episodes confirm that the risk of assault, intimidation, and sexualized misconduct is an ongoing and documented reality at Carswell.

Sexual propositions, stalking, and indecent exposure violate BOP regulations. 28 C.F.R. § 541.3. But rather than prevent and punish that behavior as that regulation would require, Defendants maintain a penal environment in which female inmates are regularly exposed to male inmates in showers, restrooms, living areas, elevators, food service, recreation, main line, and other common spaces. Hardin Decl. ¶¶ 3–6 (App.2); Kirk Decl. ¶¶ 3–4, 10 (App.4–5); Meabon Decl. ¶¶ 3, 6, 9 (App.8); Morais Decl. ¶¶ 3–4, 9–11 (App.11–12); Williams Decl. ¶¶ 3–6, 12 (App.14–15). Such exposure humiliates and degrades the Intervenor-Plaintiffs and other female inmates throughout the prison.

These conditions inflict humiliation, fear, and psychological harm on female inmates like Intervenor-Plaintiffs. Meabon states that Boone's restroom intrusion caused flashbacks because she previously had been raped. Meabon Decl. ¶¶ 3–5 (App.8). Hardin explains that she changed her daily routine to protect her privacy; Morais describes fear, humiliation, and a mental breakdown; Kirk describes fear from hostile male inmates and retaliation; and Williams describes ongoing fear and retaliation after she complained. Hardin Decl. ¶¶ 4, 6 (App.2); Morais Decl. ¶¶ 8–10 (App.11); Kirk Decl. ¶¶ 4, 7–8, 12 (App.4–5); Williams Decl. ¶¶ 4–7, 9–14 (App.14–15). Such conditions easily satisfy the objective component of an Eighth Amendment violation.

The subjective element requires showing officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Courts have consistently found this

18

element satisfied when officials knowingly house women with male inmates. *See De Veloz*, 756 F. App'x at 878 (concluding that evidence showing prison officials had "actual, subjective knowledge that [the prisoner] was a female" when they nevertheless reclassified her as male to house her among men "amounts to deliberate indifference under *Farmer*" (citing 511 U.S. at 843 n.8)); *Hostetler v. Green*, 323 F. App'x 653, 657–58 (10th Cir. 2009) (Gorsuch, J.) (concluding that prison officials' violation of a policy barring male inmates from entering female housing units, combined with their awareness of the BOP policy's safety rationale, supported a finding of deliberate indifference based on subjective knowledge of the risk in allowing a male inmate to remain unsupervised in a female's cell).

The BOP has received repeated complaints, grievances, and reports from Intervenor-Plaintiffs detailing harassment, sexual misconduct, threats, voyeurism, and retaliation by male inmates at FMC Carswell. Meabon reported Boone's restroom misconduct to Lieutenant Recorder and SIS staff member Freeze, but does not believe staff took the matter seriously. Meabon Decl. ¶¶ 4, 7, 10 (App.8). Morais reported the same incident to staff, asked that camera footage be preserved, and emailed the warden and psychology staff, but says staff did not meaningfully protect her. Morais Decl. ¶ 5 (App.11). Williams reported Boone's aggressive conduct and Sternquist's threats, yet saw no meaningful action. Williams Decl. ¶¶ 4–5 (App.14). Kirk reported harassment tied to this case, but Lieutenant Garcia brushed her off and focused instead on her job. Kirk Decl. ¶¶ 6–7 (App.4). The BOP is thus on direct notice from Intervenor-Plaintiffs' complaints and this litigation that housing biological males among women at Carswell creates serious safety, privacy, and retaliation concerns. Its persistent refusal to segregate male inmates or prevent overlap in shared spaces reflects not confusion, but a conscious disregard for safety that constitutes deliberate indifference within the meaning of *Farmer*.

19

Defendants' deliberate indifference is especially clear because even after this Court's prior order for Fleming and Herrera, the problem persisted for these Intervenor-Plaintiffs. Hardin still faced male inmates in shared elevators and other common areas; Kirk still had to pass through One North and encounter male inmates in the elevator and food service every day; Meabon still saw Boone in shared spaces; Morais was not moved until March 2026 and still had to encounter Boone in recreation after being moved; and Williams still encountered male inmates in common areas at the camp, including the mail room. Hardin Decl. ¶ 6 (App.2); Kirk Decl. ¶¶ 3, 10 (App.4–5); Meabon Decl. ¶¶ 6, 9 (App.8); Morais Decl. ¶¶ 9–11 (App.11–12); Williams Decl. ¶¶ 6, 12 (App.14–15).

Moreover, Defendants' placement of biological males into female inmates' intimate and common spaces itself constitutes cruel and unusual punishment. The Eighth Amendment does not permit the government to "superadd" terror, pain, or disgrace to an otherwise lawful sentence. *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019) (citation omitted). That is what Defendants are doing here. By compelling women in a federal women's prison to bathe, change clothes, use restroom facilities, and navigate daily prison life in the presence of male inmates, Defendants impose a form of confinement that is not merely restrictive, but degrading, terrorizing, and sexualized. And whether viewed through the Nation's evolving standards of decency, *see Trop v. Dulles*, 356 U.S. 86, 101 (1958), or through its history and tradition, the law has long treated sex-separated confinement as the baseline rule, not an optional preference. Defendants have thus crossed a constitutional line that our law has never tolerated, inflicting cruel and unusual punishment on the female prisoners of FMC Carswell.[11]

---

[11] The history discussed *supra*, regarding the Fifth Amendment, reinforces the same conclusion.

The Eighth Amendment requires prisons to take reasonable measures to guarantee the safety of inmates. *Farmer*, 511 U.S. at 832–33 (collecting cases). Defendants' deliberate choice to disregard the known and serious risks of housing men in women's housing units and shared spaces violates that mandate. Intervenor-Plaintiffs have demonstrated a strong likelihood of success on the merits of their Eighth Amendment claim.

### 3. Intervenor-Plaintiffs have a substantial likelihood of success on the merits of their Administrative Procedure claim

Intervenor-Plaintiffs are also likely to prevail on their claim that Defendants' policy and practice of housing biological males in women's prisons violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right, power, privilege, or immunity," or that is "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. §§ 706(2)(A)–(C). Defendants' policy fails on each of these grounds.

### a. The BOP exceeded its statutory authority under PREA

PREA directed the Attorney General to issue national standards "for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30307(a)(1). Nothing in PREA authorizes the BOP to redefine "sex" to mean "gender identity" or to house male inmates in female institutions. Congress enacted PREA to reduce sexual violence in custody, not to compel or permit cross-sex housing that predictably increases the risk of assault and trauma. Defendants' own February 21, 2025 guidance underscores the point, because it contemplates housing decisions based on biological sex to the fullest extent consistent with court orders and PREA, rather than any blanket requirement that biological males be housed in women's general population. *See* Compliance Memo, *supra*.

An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 125 (2000) (cleaned up). Here, the BOP has assumed a legislative power Congress never delegated. By construing PREA to authorize or require cross-sex placement in women's prisons, the BOP has acted "in excess of statutory jurisdiction [and] authority." 5 U.S.C. § 706(2)(C). An agency "has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The BOP's gender-identity-based housing regime lacks that statutory foundation.

### b.      The policy is arbitrary and capricious

Even if some statutory authority existed to consider gender identity, the BOP's decision to house biological males in women's prisons and women's general-population units is arbitrary and capricious under Section 706(2)(A). An agency acts arbitrarily when it "entirely fail[s] to consider an important aspect of the problem" or offers explanations "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, the BOP ignored the safety and privacy interests of female prisoners. It offered no reasoned basis for abandoning sex-segregated confinement that had safeguarded women for generations, and it disregarded readily available alternatives such as assigning male inmates to secure, separate units within existing facilities and preventing overlap in shared spaces through separate movement, routing, or scheduling. Contemporary reporting on the development of transgender-prisoner policy confirms that segregated transgender housing was a known and requested alternative, but was rejected by advocates on ideological grounds rather than because it was unworkable. *See* Masha Gessen, *Chase Strangio's Victories for Transgender Rights*, The New Yorker (Oct. 12, 2020), https://tinyurl.com/mvmuedcn. Defendants' unexplained reversal from the

longstanding practice of sex-separated confinement, which for decades treated biological sex as the governing classification for prison housing and ordinary prison life, violates the APA's core requirement of reasoned decisionmaking. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

### c.     The policy is contrary to the Constitution

Agency action is unlawful if it is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). By enforcing a policy that forces women to expose themselves to male inmates in showers, toilets, and sleeping quarters, and subjects them to physical and verbal threats in shared spaces, the BOP has violated Intervenor-Plaintiffs' constitutional rights to bodily privacy and freedom from cruel and unusual punishment. An agency cannot enforce a rule that is unconstitutional on its face or as applied.

In sum, the BOP's continued enforcement of its policy and practice of housing biological males in women's prisons—including its application of 28 C.F.R. § 115.42 and related implementing guidance—cannot be squared with the APA. That policy exceeds statutory authority, conflicts with the Constitution, and is arbitrary and capricious. Intervenor-Plaintiffs are therefore substantially likely to prevail on the merits of their APA claim, and the unlawful policy should be set aside.

### 4.     Intervenor-Plaintiffs are likely to succeed on their *ultra vires* claim

Intervenor-Plaintiffs are also likely to succeed on their *ultra vires* claim, seeking prospective equitable relief against federal officials acting beyond statutory limits and without colorable authority. The Fifth Circuit has described *ultra vires* action as action taken "without any authority whatever" or without a "colorable basis for the exercise of authority." *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 587–88 (5th Cir. 2023) (cleaned up). And it has explained

that an "agency acts *ultra vires* when it 'go[es] beyond what Congress has permitted it to do.'"

*Ayala Chapa v. Bondi*, 132 F.4th 796, 799 (5th Cir. 2025) (citation omitted).

Defendants' conduct here exceeds the bounds of any statute. PREA gives no colorable authority to redefine sex, to integrate male inmates into the general female population of a women's prison, or to force women to accept opposite-sex exposure in showers, restrooms, dormitory areas, and the shared spaces that structure daily prison life. The February 21, 2025 BOP Compliance Memorandum only underscores the point. It preserved compliance with PREA and court orders, required staff to conform certain institutional practices to biological sex, and contemplated individualized housing determinations. *See* Compliance Memo, *supra*. Yet the Complaint alleges Carswell officials continue to disregard even that internal directive. Am. Compl. ¶¶ 110–114, 164. Defendants' conduct is action beyond statutory bounds and without a lawful basis. Intervenor-Plaintiffs are likely to succeed on their *ultra vires* claim.

### C.    Intervenor-Plaintiffs Face Imminent and Irreparable Harm.

The deprivation of a constitutional right "unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Intervenor-Plaintiffs have demonstrated ongoing violations of their constitutional rights to bodily privacy and freedom from cruel and unusual punishment, and have established irreparable harm as a matter of law. *See id.* Every day women at Carswell are compelled to encounter male inmates in housing units and shared spaces, to guard against unwanted exposure in showers and restrooms, and to live under the continuing threat of sexual intimidation, retaliation, and assault. Those injuries inflict irreparable harm to bodily privacy, psychological well-being, and personal security.

The record shows that those harms are real. Hardin changed how she dressed and used the shower because male inmates were present in women's bathroom and shower areas, and even after

24

this Court's prior order she continued to face male inmates in shared elevators and other common spaces; today, she is placed in Minnesota, far from her family in Texas, as retaliation for this lawsuit. Hardin Decl. ¶¶ 3–8 (App.2). Kirk still has to encounter male inmates in the elevator and food service every day, and she has also faced harassment and retaliation tied to her participation in this case, lost the job she was working in prison, and was excluded from a training program. Kirk Decl. ¶¶ 3–8, 10, 12 (App.4–5). Meabon suffered flashbacks from Boone's restroom intrusion because she is a rape survivor, still sees him in shared spaces, and fears retaliation if she complains. Meabon Decl. ¶¶ 3–8 (App.8). Morais suffered humiliation, fear, and a mental breakdown after continued exposure to Boone and retaliatory treatment by staff, and even after being moved she still had to encounter him in shared recreation space. Morais Decl. ¶¶ 4–10, 13 (App.11–12). Williams likewise continues to encounter male inmates in common areas even after being moved to the camp. Williams Decl. ¶¶ 3–6 (App.14). These are ongoing, present-tense injuries, not compensable after the fact.

Retaliation is itself part of the irreparable harm and further shows why narrower relief will fail. Hardin was transferred to Minnesota rather than FPC Bryan (Southern Texas), farther from her family, in circumstances she reasonably believes may have been retaliatory. Hardin Decl. ¶¶ 7–8 (App.2). Kirk was harassed by another inmate because of this litigation, brushed off by staff when she reported it, and inexplicably denied the job training program to which she had already been accepted. Kirk Decl. ¶¶ 5–7, 10 (App.4–5). Meabon fears retaliatory searches, aggressive treatment, or SHU placement if she complains. Meabon Decl. ¶ 8 (App.8). Morais states that Boone circulated papers from this case in her housing unit, that other inmates began whispering and watching her, and that staff later targeted and humiliated her. Morais Decl. ¶¶ 6, 8, 10, 13 (App.11–12). Without an injunction that both separates the male inmates and prohibits retaliation,

Defendants can continue inflicting the same harms through intimidation, transfers, and administrative reshuffling.

        **D.**     **The Balance of Equities and Public Interest Favor Injunctive Relief.**

The balance of equities and the public interest strongly favor relief. An injunction would impose only modest administrative burdens on Defendants by requiring them to restore sex-separated housing and prevent retaliation, while denying relief would perpetuate ongoing constitutional violations, sexual harassment and abuse, retaliation, and the resulting mental and physical harm to Intervenor-Plaintiffs and other female inmates at FMC Carswell. Such administrative inconvenience is not enough to outweigh these injuries. *See Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd mem.,* 579 U.S. 547 (2016) (per curiam). And because the public always has an interest in the vindication of constitutional rights and in prison policies that protect women from sexual victimization, the public interest likewise favors an injunction. *See Nken v. Holder*, 556 U.S. 418, 436 (2009); *cf. Opulent Life*, 697 F.3d at 298.

## V.    <u>REMEDY</u>

This court should not grant a remedy that shifts a constitutional injury from one woman onto another woman. "Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must look to the practical realities and necessities inescapably involved in reconciling competing interests, in order to determine the special blend of what is necessary, what is fair, and what is workable." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 375 (1977) (cleaned up). It is an "age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties." *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (Posner, C.J.).

As long as there are men in the women's housing units at FMC Carswell (which is permitted under the current injunction rendered to Plaintiffs Fleming and Herrera), this Court's

order causes injuries to "innocent third parties." The current injunction thus does not eliminate the underlying injury; it allows Defendants to relocate male inmates into other women's units, thereby shifting the same privacy, safety, and dignity harms from some female inmates to others who are equally innocent. Moving the men at Carswell to a separate unit will prevent the Court's order from injuring innocent third parties.

Finally, the Court should find the challenged policy unlawful under the APA, and set the policy aside, not merely enjoin its application to a handful of inmates or units. "The default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022); *accord Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring) ("By similarly authorizing courts to 'set aside' agency actions, the APA likewise authorized vacatur." (quoting 5 U.S.C. § 706(2))). If the Court finds the BOP's policy unlawful, the proper remedy is to "set aside" and vacate that rule, with universal application.

## VI.    CONCLUSION

Defendants' policy of housing biological males in women's prison units and permitting them to overlap with women in the ordinary spaces of prison life violates the Constitution, exceeds Defendants' lawful authority, and inflicts ongoing and irreparable harm. It strips female prisoners of bodily privacy, subjects them to humiliation, intimidation, and heightened risk of sexual misconduct, and then leaves them vulnerable to retaliation when they seek relief. Nor can Defendants cure those violations by shuffling women to different units, moving male inmates from one women's hallway to another, or otherwise forcing the victims of the policy to bear its burdens. Intervenor-Plaintiffs therefore respectfully request that this Court grant their Motion for Preliminary and Permanent Injunction and enter an order:

(a) Preliminarily enjoining Defendants, their officers, employees, agents, and all persons acting in concert with them from:

    (1) housing any male inmate (meaning any person who is biologically male, regardless of gender identity) within the general population of any housing unit at FMC Carswell where biological females are present or will be confined during the pendency of this case; and

    (2) permitting any male inmate to enter or remain in any space where biological female inmates are present, including but not limited to showers, restrooms, changing areas, dormitory spaces, elevators, dining areas, recreation areas, medical or hospital areas, the mailroom, and other shared prison spaces, so that Intervenor-Plaintiffs and other female inmates are not forced to encounter male inmates while showering, toileting, dressing, sleeping, eating, seeking medical care, recreating, receiving mail, or otherwise navigating daily prison life;

(b) Ordering that, to comply with the foregoing relief, Defendants shall house male inmates in a secure, segregated area at FMC Carswell—including the Hospital Unit or an equivalent setting—and shall use such separate movement, routing, scheduling, or other measures as necessary to prevent overlap between male inmates and female inmates in housing and shared spaces;

(c) Providing that Defendants may not comply with this Order by transferring, isolating, or otherwise burdening Intervenor-Plaintiffs or other female inmates, rather than separating the male inmates, except at the request of the affected female inmate or for a bona fide, documented penological or medical reason unrelated to this litigation;

(d) Preliminarily enjoining Defendants, and all persons acting in concert with them, from retaliating against Intervenor-Plaintiffs in any manner because of their participation in this litigation or their complaints about male inmates being housed with women, including through retaliatory transfer, reclassification, housing changes, SHU placement, loss of work or programming, loss of privileges, adverse medical treatment, disclosure of grievances or litigation materials, or permitting staff or inmate harassment; and requiring at least 72 hours' written notice to Intervenor-Plaintiffs' counsel and the Court before any transfer or materially adverse change in the conditions of confinement of any Intervenor-Plaintiff, unless exigent circumstances make advance notice impossible;

(e) Ordering Defendants to file a status report setting for the steps taken to comply;

(f) Waiving the security bond requirement under Fed. R. Civ. P. 65(c);

(g) If the Court deems it necessary, setting the matter for expedited hearing where Defendants shall appear and show cause why a preliminary injunction should not issue for the duration of this litigation; and

(h) Granting such other and further relief as the Court deems just and proper.

Dated: March 30, 2026

Respectfully submitted,

SCHAERR | JAFFE LLP

By: */s/ John Greil*
John Greil
  Texas Bar No. 24110856
jgreil@schaerr-jaffe.com
Brian Field (*pro hac vice*)
bfield@schaerr-jaffe.com
Justin A. Miller
  Texas Bar No. 24116768
jmiller@schaerr-jaffe.com
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060

*Attorneys for Intervenor-Plaintiffs*

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for the Intervenor-Plaintiffs conferred with counsel for Defendants via videoconference on March 6, 2026, and with counsel for Plaintiffs via email on March 30, 2026. Counsel for Defendants indicated that they opposed the relief requested herein. Counsel for Plaintiffs does not oppose the relief requested herein.

*/s/ John Greil*
John Greil

29