IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

| | |
|---|---|
| RHONDA FLEMING and MIRIAM CRYSTAL HERRERA,<br><br>        Plaintiffs,<br><br>v.<br><br>WARDEN T. RULE, et al.,<br><br>        Defendants. | Civil Action No. 4:25-CV-157-D<br>(consolidated with No. 4:25-CV-438-D) |

## APPENDIX TO DEFENDANTS' RESPONSE TO INTERVENOR PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

RYAN RAYBOULD
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants United States
and the Attorney General, the Director of
the Federal Bureau of Prisons, and the
Warden of FMC Carswell (in their
official capacities)

Contents

Page Number
<u>(in lower right corner)</u>

1.   Docket,
     *Doe v. Blanche*, No. 25-5099 (D.C. Cir.) .................................................... App. 001

2.   Consolidated Brief for Appellants,
     *Doe v. Bondi*, No. 25-5099 (D.C. Cir.) ....................................................... App. 024

3.   Order Granting Preliminary Injunction,
     *Doe v. Bondi*, No. 1:25-CV-286-RCL (D.D.C.) ......................................... App. 109

4.   Opinion,
     *Doe v. Blanche*, No. 25-5099 (D.C. Cir.) .................................................... App. 112

5.   Order (to Withhold the Mandate)
     *Doe v. Blanche*, No. 25-5099 (D.C. Cir.) .................................................... App. 164

6.   Declaration of Malissa Mark ...................................................................... App. 165

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:  214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants United States
and the Attorney General, the Director of
the Federal Bureau of Prisons, and the
Warden of FMC Carswell (in their
official capacities)

<u>Certificate of Service</u>

On April 20, 2026, I electronically submitted the foregoing document with the

clerk of court for the U.S. District Court, Northern District of Texas, using the electronic

case filing system of the court.  I hereby certify that I have served all parties

electronically or by another manner authorized by Federal Rule of Civil Procedure

5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

**General Docket**
**United States Court of Appeals for District of Columbia Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 25-5099 | **Docketed:** 04/02/2025 |
| **Nature of Suit:** 2550 Prisoner-Civil Rights | **Termed:** 04/17/2026 |
| Jane Doe, et al v. Todd Blanche, et al | |
| **Appeal From:** United States District Court for the District of Columbia | |
| **Fee Status:** Fee Waived | |

**Case Type Information:**
  **1)** Civil US
  **2)** United States
  **3)**

**Originating Court Information:**
  **District:** 0090-1 : 1:25-cv-00286-RCL                                      **Lead:** 1:25-cv-00286-RCL
  **Motions Judge:** Royce C. Lamberth, U.S. Senior District Judge
  **Date Filed:** 01/30/2025
  **Date Order/Judgment:**                          **Date NOA Filed:**
  03/19/2025                                          04/02/2025

**Prior Cases:**
  None

**Current Cases:**

| | Lead | Member | Start | End |
|---|---|---|---|---|
| Consolidation | | | | |
| | 25-5099 | 25-5101 | 04/30/2025 | |
| | 25-5099 | 25-5108 | 04/30/2025 | |
| | 25-5099 | 25-5210 | 06/12/2025 | |
| | 25-5099 | 25-5213 | 06/12/2025 | |
| | 25-5099 | 25-5215 | 06/12/2025 | |
| | 25-5099 | 25-5304 | 09/03/2025 | |
| | 25-5099 | 25-5305 | 09/03/2025 | |
| | 25-5099 | 25-5306 | 09/03/2025 | |
| | 25-5099 | 25-5419 | 01/07/2026 | |
| | 25-5099 | 25-5420 | 01/07/2026 | |
| | 25-5099 | 25-5427 | 01/07/2026 | |
| | 25-5099 | 26-5066 | 03/10/2026 | |
| | 25-5099 | 26-5067 | 03/10/2026 | |
| | 25-5099 | 26-5069 | 03/10/2026 | |

**Panel Assignment:**
  **Panel:** SS    CTLP    ARR
  **Date of Hearing:** 09/05/2025    **Date of Decision:** 04/17/2026    **Date Completed:** 04/17/2026

---

| | |
|---|---|
| Jane Doe | Eve L. Hill |
|     Plaintiff - Appellee | Email: ehill@browngold.com |
| | [COR LD NTC Retained] |
| | Brown, Goldstein & Levy, LLP |
| | Firm: 410-962-1030 |
| | 120 East Baltimore Street |
| | Suite 2500 |
| | Baltimore, MD 21202 |
| | |
| | Kara Jane Janssen, Esquire |
| | Direct: 415-433-6830 |
| | Email: kjanssen@rbgg.com |
| | Fax: 415-488-7104 |
| | [COR LD NTC Retained] |
| | Rosen Bien Galvan & Grunfeld LLP |
| | 101 Mission Street, 6th Floor |
| | San Francisco, CA 94105 |
| | |
| | Jennifer Levi |
| | Email: jlevi@gladlaw.org |
| | [COR LD NTC Retained] |
| | GLBTQ Advocates & Defenders |
| | 18 Tremont Street |

App. 001

Suite 950
Boston, MA 02108

Christopher Stoll
Email: cstoll@nclrights.org
[COR LD NTC Retained]
National Center for Lesbian Rights
1401 21st Street
#11548
Sacramento, CA 95811

Sarah K. Austin
Email: saustin@gladlaw.org
[COR NTC Retained]
GLBTQ Advocates & Defenders
18 Tremont Street
Suite 950
Boston, MA 02108

Ernest Galvan
Direct: 415-433-6830
Email: egalvan@rbgg.com
Fax: 415-433-7104
[COR NTC Retained]
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105

Benjamin Hattem
Direct: 415-433-6830
Email: bhattem@rbgg.com
[COR NTC Retained]
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105

Shannon Minter
Email: SMinter@nclrights.org
[COR NTC Retained]
National Center for Lesbian Rights
1401 21st Street
#11548
Sacramento, CA 95811

Adrienne Spiegel
Email: aspiegel@rbgg.com
[COR NTC Retained]
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105

Amy E. Whelan
Email: awhelan@nclrights.org
[COR NTC Retained]
National Center for Lesbian Rights
1401 21st Street
#11548
Sacramento, CA 95811

Mary Doe

Plaintiff - Appellee

Eve L. Hill
[COR LD NTC Retained]
(see above)

Kara Jane Janssen, Esquire
Direct: 415-433-6830
[COR LD NTC Retained]
(see above)

Jennifer Levi
[COR LD NTC Retained]

App. 002

Case 4:25-cv-00157-D     Document 167     Filed 04/20/26     Page 6 of 169     PageID 2191

(see above)

Christopher Stoll
[COR LD NTC Retained]
(see above)

Sarah K. Austin
[COR NTC Retained]
(see above)

Ernest Galvan
Direct: 415-433-6830
[COR NTC Retained]
(see above)

Benjamin Hattem
Direct: 415-433-6830
[COR NTC Retained]
(see above)

Shannon Minter
[COR NTC Retained]
(see above)

Adrienne Spiegel
[COR NTC Retained]
(see above)

Amy E. Whelan
[COR NTC Retained]
(see above)

Sara Doe

          Plaintiff - Appellee

Eve L. Hill
[COR LD NTC Retained]
(see above)

Kara Jane Janssen, Esquire
Direct: 415-433-6830
[COR LD NTC Retained]
(see above)

Jennifer Levi
[COR LD NTC Retained]
(see above)

Christopher Stoll
[COR LD NTC Retained]
(see above)

Sarah K. Austin
[COR NTC Retained]
(see above)

Ernest Galvan
Direct: 415-433-6830
[COR NTC Retained]
(see above)

Benjamin Hattem
Direct: 415-433-6830
[COR NTC Retained]
(see above)

Shannon Minter
[COR NTC Retained]
(see above)

Adrienne Spiegel
[COR NTC Retained]
(see above)

App. 003

Amy E. Whelan
[COR NTC Retained]
(see above)

                v.

Pamela Bondi, in her official capacity as Attorney General of the
United States
**Terminated:** 04/07/2026
                        Defendant - Appellant

William K. Marshall, III, in his official capacity as Director of the          McKaye Lea Neumeister
Federal Bureau of Prisons                                                      Email: mckaye.l.neumeister@usdoj.gov
                        Defendant - Appellant                                  [COR LD NTC Gvt US DOJ]
                                                                               U.S. Department of Justice
                                                                               (DOJ) Civil Division, Appellate Staff
                                                                               Firm: 202-514-2000
                                                                               950 Pennsylvania Avenue, NW
                                                                               Washington, DC 20530

                                                                               Benjamin Timothy Hayes
                                                                               Email: Benjamin.T.Hayes@usdoj.gov
                                                                               [COR NTC Gvt US DOJ]
                                                                               U.S. Department of Justice
                                                                               (DOJ) Civil Division
                                                                               950 Pennsylvania Avenue, NW
                                                                               Washington, DC 20530

                                                                               Eric Dean McArthur, Esquire, Attorney
                                                                               Email: eric.mcarthur@usdoj.gov
                                                                               [COR NTC Gvt US DOJ]
                                                                               U.S. Department of Justice
                                                                               (DOJ) Civil Division
                                                                               950 Pennsylvania Avenue, NW
                                                                               Washington, DC 20530

                                                                               Charles Wylie Scarborough
                                                                               Email: charles.scarborough@usdoj.gov
                                                                               [COR NTC Gvt US DOJ]
                                                                               U.S. Department of Justice
                                                                               (DOJ) Office of the Attorney General
                                                                               950 Pennsylvania Avenue, NW
                                                                               Washington, DC 20530

William Lothrop, in his official capacity as Acting Director of the
Federal Bureau of Prisons
**Terminated:** 06/06/2025
                        Defendant - Appellant

Todd Blanche, in his official capacity as Acting Attorney General of          McKaye Lea Neumeister
the United States                                                             [COR LD NTC Gvt US DOJ]
                        Defendant - Appellant                                 (see above)

                                                                              Benjamin Timothy Hayes
                                                                              [COR NTC Gvt US DOJ]
                                                                              (see above)

                                                                              Eric Dean McArthur, Esquire, Attorney
                                                                              [COR NTC Gvt US DOJ]
                                                                              (see above)

                                                                              Charles Wylie Scarborough
                                                                              [COR NTC Gvt US DOJ]
                                                                              (see above)

----------------------------

State of Idaho                                                                Michael A. Zarian
                        Amicus Curiae for Appellant                          Direct: 208-947-8779

**App. 004**

Case 4:25-cv-00157-D     Document 167     Filed 04/20/26     Page 8 of 169     PageID 2193

Email: michael.zarian@ag.idaho.gov
[COR LD NTC Gvt Non-Federal]
Office of the Idaho Attorney General
700 W. Jefferson Street
Suite 210
Boise, ID 83720

Alan M. Hurst
Direct: 208-947-8773
Email: alan.hurst@ag.idaho.gov
[COR NTC Gvt Non-Federal]
Office of the Attorney General, State of Idaho
P.O. Box 83720
Boise, ID 83720-0010

Margo Schlanger

        Amicus Curiae for Appellee

Carolyn Frances Corwin, Senior Counsel
Direct: 202-662-5338
Email: ccorwin@cov.com
Fax: 202-778-5338
[COR NTC Retained]
Covington & Burling LLP
Firm: 202-662-6000
One CityCenter
850 10th Street, NW
Washington, DC 20001-4956

State of Indiana

        Amicus Curiae for Appellant

James A. Barta
Direct: 317-232-0709
Email: james.barta@atg.in.gov
[COR LD NTC Gvt Non-Federal]
Office of the Indiana Attorney General
Firm: 317-234-6843
302 West Washington Street
Indiana Government Center South, 5th Floor
Indianapolis, IN 46204

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Jenna Lorence
Direct: 907-269-7938
Email: jenna.lorence@alaska.gov
[COR NTC Gvt Non-Federal]
Deputy Attorney General
Alaska Department of Law
Firm: 907-269-5100
1031 W. 4th Avenue, Suite 200
Anchorage, AL 99502

Commonwealth of Massachusetts

        Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
Email: elizabeth.matos@mass.gov
[COR LD NTC Gvt Non-Federal]
Massachusetts Office of the Attorney General
20th Floor
One Ashburton Place
Boston, MA 02108

Helle Sachse
Direct: 617-963-2361
Email: helle.sachse2@mass.gov
[COR NTC Gvt Non-Federal]
Massachusetts Office of the Attorney General
18th Floor
One Ashburton Place
Boston, MA 02108

App. 005

State of Alabama

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of California

Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
[COR LD NTC Gvt Non-Federal]
(see above)

State of Alaska

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of Illinois

Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
[COR LD NTC Gvt Non-Federal]
(see above)

State of Arkansas

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of New York

Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
[COR LD NTC Gvt Non-Federal]
(see above)

State of Florida

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of Rhode Island

Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
[COR LD NTC Gvt Non-Federal]
(see above)

State of Georgia

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of Vermont

Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
[COR LD NTC Gvt Non-Federal]
(see above)

State of Iowa

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of Maine

Amicus Curiae for Appellee

Elizabeth Matos
Direct: 617-963-2313
[COR LD NTC Gvt Non-Federal]
(see above)

State of Kansas

Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Kris W. Kobach, Esquire
Direct: 913-638-5567
Email: kkobach@gmail.com
Fax: 785-368-8032

[COR NTC Gvt Non-Federal]
Office of the Kansas Secretary of State
120 SW 10th Avenue
Memorial Hall, First Floor
Topeka, KS 66612

| | | |
|---|---|---|
| State of Maryland | | Elizabeth Matos |
| | Amicus Curiae for Appellee | Direct: 617-963-2313 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Kentucky, in his official capacity as Acting Attorney General of the United States | | Michael A. Zarian |
| | Amicus Curiae for Appellant | Direct: 208-947-8779 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Delaware | | Elizabeth Matos |
| | Amicus Curiae for Appellee | Direct: 617-963-2313 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Louisiana | | Michael A. Zarian |
| | Amicus Curiae for Appellant | Direct: 208-947-8779 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Minnesota | | Elizabeth Matos |
| | Amicus Curiae for Appellee | Direct: 617-963-2313 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Mississippi | | Michael A. Zarian |
| | Amicus Curiae for Appellant | Direct: 208-947-8779 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Oregon | | Elizabeth Matos |
| | Amicus Curiae for Appellee | Direct: 617-963-2313 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Missouri | | Michael A. Zarian |
| | Amicus Curiae for Appellant | Direct: 208-947-8779 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Hawaii | | Elizabeth Matos |
| | Amicus Curiae for Appellee | Direct: 617-963-2313 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| State of Montana | | Michael A. Zarian |
| | Amicus Curiae for Appellant | Direct: 208-947-8779 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| District of Columbia | | Elizabeth Matos |
| | Amicus Curiae for Appellee | Direct: 617-963-2313 |
| | | [COR LD NTC Gvt Non-Federal] |
| | | (see above) |
| | | |
| | | Brian L. Schwalb, Esquire |
| | | Email: Brian.Schwalb@dc.gov |
| | | [COR NTC Gvt DC OAG] |
| | | Office of the Attorney General for the District of Columbia |
| | | Firm: 202-727-3400 |
| | | 400 6th Street, NW |
| | | Suite 8100 |
| | | Washington, DC 20001 |

State of Nebraska
    Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Dee Deidre Farmer
    Amicus Curiae for Appellee

Thomas G. Hentoff, Attorney
Direct: 202-434-5804
Email: thentoff@wc.com
Fax: 202-824-4190
[COR LD NTC Retained]
Williams & Connolly LLP
Firm: 202-434-5000
680 Maine Avenue, SW
Washington, DC 20024

State of North Dakota
    Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Lambda Legal Defense and Education Fund
    Amicus Curiae for Appellee

Thomas G. Hentoff, Attorney
Direct: 202-434-5804
[COR LD NTC Retained]
(see above)

State of Ohio
    Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Advocates for Transgender Equality Education Fund
    Amicus Curiae for Appellee

Thomas G. Hentoff, Attorney
Direct: 202-434-5804
[COR LD NTC Retained]
(see above)

State of Oklahoma
    Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Transgender Law Center
    Amicus Curiae for Appellee

Thomas G. Hentoff, Attorney
Direct: 202-434-5804
[COR LD NTC Retained]
(see above)

State of South Carolina
    Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Center for Constitutional Rights
    Amicus Curiae for Appellee

Thomas G. Hentoff, Attorney
Direct: 202-434-5804
[COR LD NTC Retained]
(see above)

State of South Dakota
    Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

James Austin, Ph.D.
    Amicus Curiae for Appellee

Lawrence Lustberg, Esquire
Direct: 973-596-4731
Email: llustberg@fbtgibbons.com
Fax: 973-596-0545
[COR LD NTC Retained]
FBT Gibbons PC
Firm: 973-596-4500
One Gateway Center
Newark, NJ 07102-5310

App. 008

State of Texas

        Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Martin F. Horn

        Amicus Curiae for Appellee

Lawrence Lustberg, Esquire
Direct: 973-596-4731
[COR LD NTC Retained]
(see above)

State of Utah

        Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Steve J. Martin

        Amicus Curiae for Appellee

Lawrence Lustberg, Esquire
Direct: 973-596-4731
[COR LD NTC Retained]
(see above)

State of Virginia

        Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

State of West Virginia

        Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Dan Pacholke

        Amicus Curiae for Appellee

Lawrence Lustberg, Esquire
Direct: 973-596-4731
[COR LD NTC Retained]
(see above)

State of Wyoming

        Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Emmitt Sparkman

        Amicus Curiae for Appellee

Lawrence Lustberg, Esquire
Direct: 973-596-4731
[COR LD NTC Retained]
(see above)

Arizona Legislature

        Amicus Curiae for Appellant

Michael A. Zarian
Direct: 208-947-8779
[COR LD NTC Gvt Non-Federal]
(see above)

Rusty D. Crandell
Direct: 602-926-3137
Email: rcrandell@azleg.gov
[COR NTC Gvt Non-Federal]
Arizona State Senate
1700 W. Washington Street
Phoenix, AZ 85007

Linley Wilson
Direct: 602-388-1262
Email: lwilson@holtzmanvogel.com
[COR NTC Gvt Non-Federal]
Holtzman Vogel Baran Torchinsky & Josefiak
2555 East Camelback Road
Suite 700
Phoenix, AZ 85016

Case 4:25-cv-00157-D    Document 167    Filed 04/20/26    Page 13 of 169    PageID 2198

Richard Morgan                                          Lawrence Lustberg, Esquire
                    Amicus Curiae for Appellee          Direct: 973-596-4731
                                                        [COR LD NTC Retained]
                                                        (see above)


Phil Stanley                                            Lawrence Lustberg, Esquire
                    Amicus Curiae for Appellee          Direct: 973-596-4731
                                                        [COR LD NTC Retained]
                                                        (see above)


Eldon Vail                                              Lawrence Lustberg, Esquire
                    Amicus Curiae for Appellee          Direct: 973-596-4731
                                                        [COR LD NTC Retained]
                                                        (see above)


Rhonda Fleming (Federal Prisoner: 20446-009)
**Terminated:** 09/03/2025
                    Movant-Amicus Curiae for Appellant


Women's Liberation Front
**Terminated:** 09/24/2025
                    Movant-Amicus Curiae for Appellant

**App. 010**

Jane Doe; Mary Doe; Sara Doe,

                    Plaintiffs - Appellees

           v.

William K. Marshall, III, in his official capacity as Director of the Federal Bureau of Prisons; Todd Blanche, in his official capacity as Acting Attorney General of the United States,

                    Defendants - Appellants

----------------------------

State of Idaho,

                    Amicus Curiae for Appellant

Margo Schlanger,

                    Amicus Curiae for Appellee

State of Indiana,

                    Amicus Curiae for Appellant

Commonwealth of Massachusetts,

                    Amicus Curiae for Appellee

State of Alabama,

                    Amicus Curiae for Appellant

State of California,

                    Amicus Curiae for Appellee

State of Alaska,

                    Amicus Curiae for Appellant

State of Illinois,

                    Amicus Curiae for Appellee

State of Arkansas,

                    Amicus Curiae for Appellant

State of New York,

                    Amicus Curiae for Appellee

State of Florida,

                    Amicus Curiae for Appellant

State of Rhode Island,

                    Amicus Curiae for Appellee

State of Georgia,

                    Amicus Curiae for Appellant

State of Vermont,

                    Amicus Curiae for Appellee

App. 011

State of Iowa,

                Amicus Curiae for Appellant

State of Maine,

                Amicus Curiae for Appellee

State of Kansas,

                Amicus Curiae for Appellant

State of Maryland,

                Amicus Curiae for Appellee

State of Kentucky, in his official capacity as Acting Attorney General of the United States,

                Amicus Curiae for Appellant

State of Delaware,

                Amicus Curiae for Appellee

State of Louisiana,

                Amicus Curiae for Appellant

State of Minnesota,

                Amicus Curiae for Appellee

State of Mississippi,

                Amicus Curiae for Appellant

State of Oregon,

                Amicus Curiae for Appellee

State of Missouri,

                Amicus Curiae for Appellant

State of Hawaii,

                Amicus Curiae for Appellee

State of Montana,

                Amicus Curiae for Appellant

District of Columbia,

                Amicus Curiae for Appellee

State of Nebraska,

                Amicus Curiae for Appellant

Dee Deidre Farmer,

                Amicus Curiae for Appellee

State of North Dakota,

                Amicus Curiae for Appellant

Lambda Legal Defense and Education Fund,

Amicus Curiae for Appellee

State of Ohio,

Amicus Curiae for Appellant

Advocates for Transgender Equality Education Fund,

Amicus Curiae for Appellee

State of Oklahoma,

Amicus Curiae for Appellant

Transgender Law Center,

Amicus Curiae for Appellee

State of South Carolina,

Amicus Curiae for Appellant

Center for Constitutional Rights,

Amicus Curiae for Appellee

State of South Dakota,

Amicus Curiae for Appellant

James Austin, Ph.D.,

Amicus Curiae for Appellee

State of Texas,

Amicus Curiae for Appellant

Martin F. Horn,

Amicus Curiae for Appellee

State of Utah,

Amicus Curiae for Appellant

Steve J. Martin,

Amicus Curiae for Appellee

State of Virginia; State of West Virginia,

Amici Curiae for Appellant

Dan Pacholke,

Amicus Curiae for Appellee

State of Wyoming,

Amicus Curiae for Appellant

Emmitt Sparkman,

Amicus Curiae for Appellee

Arizona Legislature,

Amicus Curiae for Appellant

Case 4:25-cv-00157-D     Document 167     Filed 04/20/26     Page 17 of 169     PageID 2202

Richard Morgan; Phil Stanley; Eldon Vail,

Amici Curiae for Appellee

**App. 014**

| Date | | Entry |
|------|---|-------|
| 04/02/2025 | ☐ | US CIVIL CASE docketed. [25-5099] [Entered: 04/02/2025 01:11 PM] |
| 04/02/2025 | ☐ 🖹 26 pg, 748.21 KB | NOTICE OF APPEAL [2109001] seeking review of a decision by the U.S. District Court in 1:25-cv-00286-RCL filed by Pamela Bondi and William Lothrop. Appeal assigned USCA Case Number: 25-5099. [25-5099] [Entered: 04/02/2025 01:20 PM] |
| 04/02/2025 | ☐ 🖹 2 pg, 46.09 KB | CLERK'S ORDER [2109004] filed directing party to file initial submissions: APPELLANT docketing statement due 05/02/2025. APPELLANT certificate as to parties due 05/02/2025. APPELLANT statement of issues due 05/02/2025. APPELLANT underlying decision due 05/02/2025. APPELLANT deferred appendix statement due 05/02/2025. APPELLANT entry of appearance due 05/02/2025. APPELLANT transcript status report due 05/02/2025. APPELLANT procedural motions due 05/02/2025. APPELLANT dispositive motions due 05/19/2025; directing party to file initial submissions: APPELLEE certificate as to parties due 05/02/2025. APPELLEE entry of appearance due 05/02/2025. APPELLEE procedural motions due 05/02/2025. APPELLEE dispositive motions due 05/19/2025 [25-5099] [Entered: 04/02/2025 01:24 PM] |
| 04/03/2025 | ☐ 🖹 1 pg, 68.29 KB | ENTRY OF APPEARANCE [2109264] filed by McKaye L. Neumeister and co-counsel Gerard Sinzdak on behalf of Appellants Pamela Bondi and William Lothrop. [25-5099] (Neumeister, McKaye) [Entered: 04/03/2025 03:53 PM] |
| 04/10/2025 | ☐ 🖹 2 pg, 127.14 KB | TRANSCRIPT STATUS REPORT [2110403] filed by Pamela Bondi and William Lothrop [Service Date: 04/10/2025 ]. Status of Transcripts: Final - All transcripts needed for the appeal have been completed and received. [25-5099] (Neumeister, McKaye) [Entered: 04/10/2025 02:26 PM] |
| 04/10/2025 | ☐ 🖹 3 pg, 83.51 KB | STATEMENT OF INTENT REGARDING APPENDIX DEFERRAL [2110404] filed by Pamela Bondi and William Lothrop [Service Date: 04/10/2025 ] Intent: AppxNotDeferred [25-5099] (Neumeister, McKaye) [Entered: 04/10/2025 02:28 PM] |
| 04/10/2025 | ☐ 🖹 13 pg, 495.58 KB | UNDERLYING DECISION IN CASE [2110407] submitted by Pamela Bondi and William Lothrop [Service Date: 04/10/2025 ] [25-5099] (Neumeister, McKaye) [Entered: 04/10/2025 02:29 PM] |
| 04/10/2025 | ☐ 🖹 3 pg, 82.85 KB | STATEMENT OF ISSUES [2110408] filed by Pamela Bondi and William Lothrop [Service Date: 04/10/2025 ] [25-5099] (Neumeister, McKaye) [Entered: 04/10/2025 02:31 PM] |
| 04/11/2025 | ☐ 🖹 2 pg, 123.96 KB | DOCKETING STATEMENT [2110721] filed by Pamela Bondi and William Lothrop [Service Date: 04/11/2025 ] [25-5099] (Neumeister, McKaye) [Entered: 04/11/2025 08:00 PM] |
| 04/11/2025 | ☐ 🖹 4 pg, 92.61 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2110722] filed by Pamela Bondi and William Lothrop [Service Date: 04/11/2025 ] [25-5099] (Neumeister, McKaye) [Entered: 04/11/2025 08:02 PM] |
| 04/15/2025 | ☐ 🖹 1 pg, 611.09 KB | ENTRY OF APPEARANCE [2111218] filed by Jennifer Levi and co-counsel Sarah Austin on behalf of Appellees Jane Doe, Mary Doe and Sara Doe. [25-5099] (Levi, Jennifer) [Entered: 04/15/2025 02:41 PM] |
| 04/15/2025 | ☐ 🖹 1 pg, 71.77 KB | ENTRY OF APPEARANCE [2111223] filed by Eve L. Hill on behalf of Appellees Jane Doe, Mary Doe and Sara Doe. [25-5099] (Hill, Eve) [Entered: 04/15/2025 03:18 PM] |
| 04/23/2025 | ☐ 🖹 1 pg, 603.38 KB | ENTRY OF APPEARANCE [2112456] filed by Christopher F. Stoll and co-counsel Amy Whelan on behalf of Appellees Jane Doe, Mary Doe and Sara Doe. [25-5099] (Stoll, Christopher) [Entered: 04/23/2025 05:50 PM] |
| 04/25/2025 | ☐ 🖹 2 pg, 697.83 KB | ENTRY OF APPEARANCE [2113058] filed by Kara Janssen and co-counsel Ernest Galvan, Adrienne Spiegel, Benjamin Hattem on behalf of Appellees Jane Doe, Mary Doe and Sara Doe. [25-5099] (Janssen, Kara) [Entered: 04/25/2025 07:49 PM] |
| 04/28/2025 | ☐ 🖹 8 pg, 95.02 KB | UNOPPOSED MOTION [2113145] to consolidate cases filed by Pamela Bondi and William Lothrop [Service Date: 04/28/2025 ] Length Certification: 819 Words. [25-5099] (Neumeister, McKaye) [Entered: 04/28/2025 10:24 AM] |
| 04/28/2025 | ☐ 🖹 6 pg, 85.85 KB | UNOPPOSED MOTION [2113151] to expedite case, to expedite oral argument filed by Pamela Bondi and William Lothrop [Service Date: 04/28/2025 ] Length Certification: 398 Words. [25-5099] (Neumeister, McKaye) [Entered: 04/28/2025 10:35 AM] |
| 04/30/2025 | ☐ 🖹 4 pg, 144.16 KB | CLERK'S ORDER [2113710] filed ORDERED that the motion to consolidate be granted and the above-captioned cases be consolidated. It is FURTHER ORDERED that the following briefing schedule will apply in these consolidated cases: APPELLANTS' Brief and APPENDIX both due 05/09/2025. APPELLEES' Joint Brief due 06/30/2025. APPELLANTS' Reply Brief due 07/21/2025. The Clerk is directed to calendar the consolidated cases for oral argument on the first appropriate date following the completion of briefing (SEE ORDER FOR MORE DETAILS). [25-5099, 25-5101, 25-5108] [Entered: 04/30/2025 03:22 PM] |
| 05/02/2025 | ☐ 🖹 6 pg, 162.39 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2114134] filed by Jane Doe, Mary Doe and Sara Doe [Service Date: 05/02/2025 ] [25-5099] (Janssen, Kara) [Entered: 05/02/2025 07:55 PM] |

**App. 015**

| 05/07/2025 | ☐ 4 pg, 161.19 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2114881] filed by Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101 [Service Date: 05/07/2025 ] [25-5101, 25-5099, 25-5108] (Austin, Sarah) [Entered: 05/07/2025 06:12 PM] |
| 05/09/2025 | ☐ 4 pg, 160.62 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2115251] filed by Maria Moe in 25-5108 [Service Date: 05/09/2025 ] [25-5108, 25-5099, 25-5101] (Austin, Sarah) [Entered: 05/09/2025 05:58 PM] |
| 05/09/2025 | ☐ 85 pg, 294.73 KB | APPELLANT BRIEF [2115266] filed by Pamela Bondi and William Lothrop in 25-5099, 25-5101, Pamela Bondi, William Lothrop and Donald J. Trump in 25-5108 [Service Date: 05/09/2025 ] Length of Brief: 12,538 words. [25-5099, 25-5101, 25-5108] (Neumeister, McKaye) [Entered: 05/09/2025 11:37 PM] |
| 05/09/2025 | ☐ 581 pg, 26.24 MB | *JOINT* APPENDIX [2115267] filed by Pamela Bondi and William Lothrop in 25-5099, 25-5101, Pamela Bondi, William Lothrop and Donald J. Trump in 25-5108 [Volumes: 1] [Service Date: 05/09/2025] [25-5099, 25-5101, 25-5108] (Neumeister, McKaye) [Entered: 05/09/2025 11:46 PM] |
| 05/09/2025 | ☐ | SEALED JOINT APPENDIX [2115393] filed by Pamela Bondi and William Lothrop in 25-5099, 25-5101, Pamela Bondi, William Lothrop and Donald J. Trump in 25-5108 [Volumes: 1] [Service Date: 05/09/2025] [25-5099, 25-5101, 25-5108] [Entered: 05/12/2025 01:19 PM] |
| 05/16/2025 | ☐ 3 pg, 74.26 KB | NOTICE [2116283] of intention to participate as amicus curiae [Disclosure Listing: Not Applicable to this Party] filed by Idaho, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, Wyoming, Ariz. Leg. [Service Date: 05/16/2025 ] [25-5099, 25-5101, 25-5108] [Edited 05/19/2025 by EKC] (Zarian, Michael) [Entered: 05/16/2025 06:54 PM] |
| 05/16/2025 | ☐ 26 pg, 206.41 KB | AMICUS FOR APPELLANT BRIEF [2116284] filed by Idaho, Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, Wyoming, Ariz. Leg. [Service Date: 05/16/2025 ] Length of Brief: 3,566 Words. [25-5099, 25-5101, 25-5108] (Zarian, Michael) [Entered: 05/16/2025 06:57 PM] |
| 05/23/2025 | ☐ 1 pg, 71.73 KB | ENTRY OF APPEARANCE [2117314] filed by Natalie J. Kraner and co-counsel Alexander Shalom on behalf of Appellees Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones. [25-5101] (Kraner, Natalie) [Entered: 05/23/2025 04:58 PM] |
| 05/23/2025 | ☐ 1 pg, 70.42 KB | ENTRY OF APPEARANCE [2117315] filed by Natalie J. Kraner and co-counsel Alexander Shalom on behalf of Appellee Maria Moe. [25-5108] (Kraner, Natalie) [Entered: 05/23/2025 05:03 PM] |
| 06/10/2025 | ☐ 8 pg, 231.03 KB | UNOPPOSED MOTION [2120129] to consolidate cases filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108 [Service Date: 06/10/2025 ] Length Certification: 839 words. [25-5099, 25-5101, 25-5108] (Neumeister, McKaye) [Entered: 06/10/2025 04:47 PM] |
| 06/12/2025 | ☐ 2 pg, 40.58 KB | CLERK'S ORDER [2120551] filed granting appellants' unopposed motion to consolidate [2120129-2] [2120130-2] in 25-5099, et al. with 25-5210, 25-5213, 25-5215 (Consolidation started 06/12/2025). [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 06/12/2025 05:43 PM] |
| 06/13/2025 | ☐ 1 pg, 93.25 KB | NOTICE [2120714] to withdraw attorney Gerard Joseph Sinzdak who represented William K. Marshall III and Pamela Bondi in 25-5099, Pamela Bondi and William K. Marshall III in 25-5101 and Pamela Bondi, Donald J. Trump and William K. Marshall III in 25-5108 filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, Donald J. Trump and William K. Marshall, III in 25-5108, 25-5210, 25-5213, Pamela J. Bondi, Donald J. Trump and William K. Marshall, III in 25-5215 [Service Date: 06/13/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Sinzdak, Gerard) [Entered: 06/13/2025 01:34 PM] |
| 06/25/2025 | ☐ 1 pg, 97.51 KB | *AMENDED* ENTRY OF APPEARANCE [2122234] filed by McKaye L. Neumeister and co-counsel Charles W. Scarborough on behalf of Appellants Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Appellants Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108. [25-5099, 25-5101, 25-5108] (Neumeister, McKaye) [Entered: 06/25/2025 10:43 AM] |
| 06/27/2025 | ☐ 4 pg, 143.04 KB | *JOINT* UNOPPOSED MOTION [2122641] to supplement the appendix filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Mary Doe and Sara Doe in 25-5213 [Service Date: 06/27/2025 ] Length Certification: 210 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Janssen, Kara) [Entered: 06/27/2025 12:58 PM] |
| 06/27/2025 | ☐ 52 pg, 2.73 MB | *REDACTED JOINT* SUPPLEMENTAL APPENDIX [2122646] lodged by Jane Doe, Mary Doe and Sara Doe in 25-5099. [Volumes: 1] [Service Date:06/27/2025] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Janssen, Kara) [Entered: 06/27/2025 01:03 PM] |
| 06/27/2025 | ☐ | SEALED JOINT SUPPLEMENTAL APPENDIX [2122689] lodged by Jane Doe, Mary Doe and Sara Doe in 25-5099. [Volumes: 1] [Service Date:06/27/2025] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 06/27/2025 02:00 PM] |

App. 016

Case 4:25-cv-00157-D   Document 167   Filed 04/20/26   Page 20 of 169   PageID 2205

| | | |
|---|---|---|
| 06/30/2025 | ☐ 1 pg, 39.81 KB | CLERK'S ORDER [2122892] filed granting the joint motion for leave to file a supplemental appendix [2122641-2]; The Clerk is directed to file the lodged supplemental appendices [2122689-2], [2122646-2]. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 06/30/2025 12:26 PM] |
| 06/30/2025 | ☐ | PER ABOVE ORDER lodged appendix [2122689-2], appendix [2122646-2] is filed [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 06/30/2025 12:32 PM] |
| 06/30/2025 | ☐ 84 pg, 620.71 KB | *REDACTED* APPELLEE BRIEF [2123121] lodged by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215 [Service Date: 06/30/2025 ] Length of Brief: 12,525 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215]--[Edited 07/01/2025 by EKC--MODIFIED EVENT FROM FILED TO LODGED] (Janssen, Kara) [Entered: 06/30/2025 08:16 PM] |
| 06/30/2025 | ☐ | SEALED APPELLEE BRIEF [2123305] lodged by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215 [Service Date: 06/30/2025] Length of Brief: 12,525 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 07/01/2025 03:17 PM] |
| 07/01/2025 | ☐ 84 pg, 781.35 KB | *CORRECTED REDACTED* APPELLEE BRIEF [2123283] filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215 [Service Date: 07/01/2025 ] Length of Brief: 12,525 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215]--[Edited 07/01/2025 by EKC] (Janssen, Kara) [Entered: 07/01/2025 02:52 PM] |
| 07/01/2025 | ☐ | SEALED CORRECTED APPELLEE BRIEF [2123307] filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215 [Service Date: 07/01/2025] Length of Brief: 12,525 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 07/01/2025 03:26 PM] |
| 07/01/2025 | ☐ 2 pg, 43.37 KB | CLERK'S ORDER [2123302] filed scheduling oral argument on Friday, 09/05/2025. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 07/01/2025 03:13 PM] |
| 07/03/2025 | ☐ 3 pg, 141.96 KB | NOTICE [2123736] of intention to participate as amicus curiae [Disclosure Listing: Not Applicable to this Party] filed by Professor Margo Schlanger [Service Date: 07/03/2025 ] [25-5099, 25-5101, 25-5108] [Edited 07/03/2025 by EKC] (Corwin, Carolyn) [Entered: 07/03/2025 12:01 PM] |
| 07/03/2025 | ☐ 34 pg, 418.11 KB | AMICUS FOR APPELLEE BRIEF [2123841] lodged by Commonwealth of Massachusetts joined by California, New York, Illinois, Rhode Island, Vermont, Maine, Minnesota, Oregon, Delaware, Maryland and the District of Columbia [Service Date: 07/03/2025 ] Length of Brief: 4,637 words and 23 pages, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Edited 07/07/2025 by EKC--MODIFIED EVENT FROM FILED TO LODGED] (Matos, Elizabeth) [Entered: 07/03/2025 03:32 PM] |
| 07/07/2025 | ☐ 27 pg, 300.28 KB | AMICUS FOR APPELLEE BRIEF [2124034] filed by Margo Schlanger in 25-5099, 25-5101, 25-5108 [Service Date: 07/07/2025 ] Length of Brief: 3715 words. [25-5099, 25-5101, 25-5108] (Corwin, Carolyn) [Entered: 07/07/2025 11:59 AM] |
| 07/07/2025 | ☐ 34 pg, 378.56 KB | *CORRECTED* AMICUS FOR APPELLEE BRIEF [2124152] filed by Commonwealth of Massachusetts in 25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215 Commonwealth of Massachusetts joined by California, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, New York, Oregon, Rhode Island, Vermont and the District of Columbia [Service Date: 07/07/2025 ] Length of Brief: 4,637 words and 23 pages.. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Sachse, Helle) [Entered: 07/07/2025 04:31 PM] |
| 07/07/2025 | ☐ 4 pg, 134.17 KB | NOTICE [2124180] of intention to participate as amicus curiae [Disclosure Listing: Attached] filed by Dee Deidre Farmer, Lambda Legal Defense & Education Fund, Advocates for Transgender Equality Education Fund, the Transgender Law Center, and the Center for Constitutional Rights [Service Date: 07/07/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Edited 07/08/2025 by EKC] (Mestitz, Michael) [Entered: 07/07/2025 07:10 PM] |
| 07/07/2025 | ☐ 28 pg, 274.56 KB | AMICUS FOR APPELLEE BRIEF [2124181] filed by Dee Deidre Farmer, Lambda Legal Defense & Education Fund, Advocates for Transgender Equality Education Fund, the Transgender Law Center, and the Center for Constitutional Rights [Service Date: 07/07/2025 ] Length of Brief: 3,951 words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Mestitz, Michael) [Entered: 07/07/2025 07:16 PM] |
| 07/07/2025 | ☐ 40 pg, 204.11 KB | AMICUS FOR APPELLEE BRIEF [2124186] lodged by Former Corrections Officials James Austin, Ph.D., Martin F. Horn, Steve J. Martin, Richard Morgan, Dan Pacholke, Emmitt Sparkman, Phil Stanley, and Eldon Vail [Service Date: 07/07/2025 ] Length of Brief: 6,490 words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Edited 07/08/2025 by EKC] (Lustberg, Lawrence) [Entered: 07/07/2025 09:20 PM] |

**App. 017**

| | | |
|---|---|---|
| 07/08/2025 | 39 pg, 177.87 KB | *CORRECTED* AMICUS FOR APPELLEE BRIEF [2124288] filed by James Austin, Martin F. Horn, Steve J. Martin, Richard Morgan, Dan Pacholke, Emmitt Sparkman, Phil Stanley and Eldon Vail [Service Date: 07/07/2025 ] Length of Brief: 6,490 words. [25-5099] (Lustberg, Lawrence) [Entered: 07/08/2025 11:13 AM] |
| 07/21/2025 | 39 pg, 156.13 KB | APPELLANT REPLY BRIEF [2126435] filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, Pamela J. Bondi, William K. Marshall, III and Donald J. Trump in 25-5215 [Service Date: 07/21/2025 ] Length of Brief: 6,474 words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Neumeister, McKaye) [Entered: 07/21/2025 02:00 PM] |
| 08/12/2025 | | SEALED MOTION [2130080] for leave to file amicus brief and for other relief filed by Rhonda Fleming in 25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215 (Service Date: 08/14/2025 by Clerk, CM/ECF NDA) Length Certification: 3 pages. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] [Entered: 08/14/2025 11:22 AM] |
| 08/18/2025 | 1 pg, 97.76 KB | *AMENDED* ENTRY OF APPEARANCE [2130530] filed by McKaye L. Neumeister and co-counsel Charles W. Scarborough and Benjamin Hayes on behalf of Appellants Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Appellants Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, Appellants Pamela J. Bondi, William K. Marshall, III and Donald J. Trump in 25-5215. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Hayes, Benjamin) [Entered: 08/18/2025 12:04 PM] |
| 08/26/2025 | 9 pg, 91.16 KB | UNOPPOSED MOTION [2132053] to consolidate cases filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, William K. Marshall, III, Donald J. Trump and Pamela J. Bondi in 25-5215 [Service Date: 08/26/2025 ] Length Certification: 980 words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Neumeister, McKaye) [Entered: 08/26/2025 10:51 AM] |
| 08/28/2025 | 1 pg, 43 KB | PER CURIAM ORDER [2132510] filed allocating oral argument time as follows: Appellants - 15 Minutes, Appellees - 15 Minutes. One counsel per side to argue; directing party to file Form 72 notice of arguing attorney by 08/29/2025 [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 08/28/2025 04:49 PM] |
| 08/29/2025 | | FORM 72 submitted by arguing attorney, Benjamin Hayes, on behalf of Appellants Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Appellants Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, Appellants Pamela J. Bondi, William K. Marshall, III and Donald J. Trump in 25-5215, Appellants Pamela J. Bondi and William K. Marshall, III in 25-5304, 25-5305, 25-5306 *(For Internal Use Only: Form is restricted to protect counsel's personal contact information)*. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Hayes, Benjamin) [Entered: 08/29/2025 08:17 AM] |
| 08/29/2025 | | FORM 72 submitted by arguing attorney, Jennifer Levi, on behalf of Appellees Jane Doe, Mary Doe and Sara Doe in 25-5099, Appellees Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Appellee Maria Moe in 25-5108, Appellees Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Appellees Mary Doe and Sara Doe in 25-5213, 25-5215, Appellees Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5305, 25-5306 *(For Internal Use Only: Form is restricted to protect counsel's personal contact information)*. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Levi, Jennifer) [Entered: 08/29/2025 11:18 AM] |
| 09/03/2025 | 1 pg, 41.26 KB | PER CURIAM ORDER [2133342] filed denying the motion for leave to file an amicus brief [2130080-2] in 25-5099, et al.; granting appellants' unopposed motion to consolidate [2132053-2], [2132054-2], [2132057-2] in 25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215 with 25-5304, 25-5305, 25-5306 (Consolidation started 09/03/2025). Before Judges: Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 09/03/2025 04:26 PM] |
| 09/03/2025 | 34 pg, 600.96 KB | MOTION [2133347] to participate as amicus curiae [Disclosure Listing: Attached] filed by Women's Liberation Front [Service Date: 09/03/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215] (Stade, Nancy) [Entered: 09/03/2025 04:51 PM] |
| 09/04/2025 | 5 pg, 91.2 KB | *CORRECTED* MOTION [2133471] to participate as amicus curiae [Disclosure Listing: Attached] filed by Women's Liberation Front [Service Date: 09/04/2025 ] [25-5099, 25-5215, 25-5213, 25-5210, 25-5108, 25-5101] (Stade, Nancy) [Entered: 09/04/2025 02:19 PM] |
| 09/04/2025 | | [MOTION FOR LEAVE DENIED BY PER CURIAM ORDER ON 9/24/25]--AMICUS FOR APPELLANT BRIEF [2133473] lodged by Women's Liberation Front in 25-5099, 25-5215, 25-5213, 25-5210, 25-5108, 25-5101 [Service Date: 09/04/2025 ] Length of Brief: 2,182. [25-5099, 25-5215, 25-5213, 25-5210, 25-5108, 25-5101]--[Edited 09/04/2025 by EKC--MODIFIED EVENT FROM FILED TO LODGED] (Stade, Nancy) [Entered: 09/04/2025 02:23 PM] |
| 09/04/2025 | 4 pg, 141.03 KB | *JOINT* UNOPPOSED MOTION [2133480] to supplement the appendix filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215, Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, |

**App. 018**

Case 4:25-cv-00157-D    Document 167    Filed 04/20/26    Page 22 of 169    PageID 2207

Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5305, 25-5306 [Service Date: 09/04/2025 ] Length Certification: 180 words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Janssen, Kara) [Entered: 09/04/2025 02:50 PM]

| 09/04/2025 | 10 pg, 1020.02 KB | *JOINT* SUPPLEMENTAL APPENDIX [2133488] lodged by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215, Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5305, 25-5306. [Volumes: 1] [Service Date:09/04/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Edited 09/04/2025 by EKC--MODIFIED EVENT FROM FILED TO LODGED] (Janssen, Kara) [Entered: 09/04/2025 03:08 PM] |
| --- | --- | --- |
| 09/04/2025 | 29 pg, 521.74 KB | *CORRECTED* AMICUS FOR APPELLANT BRIEF [2133527] lodged by Women's Liberation Front in 25-5099, 25-5215, 25-5213, 25-5210, 25-5108, 25-5101 [Service Date: 09/04/2025 ] Length of Brief: 2,215. [25-5099, 25-5215, 25-5213, 25-5210, 25-5108, 25-5101] [Edited 09/05/2025 by EKC--MODIFIED EVENT FROM FILED TO LODGED] (Stade, Nancy) [Entered: 09/04/2025 05:22 PM] |
| 09/05/2025 | 1 pg, 41.71 KB | ORAL ARGUMENT HELD before Judges Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 09/05/2025 02:32 PM] |
| 09/10/2025 | 2 pg, 196.66 KB | PER CURIAM ORDER [2134194] filed, on the court's own motion, that the parties file simultaneous, supplemental briefs addressing the following questions. First, the parties should address whether, under 18 U.S.C. § 3626(a)(2), the district court had power to renew its preliminary injunctions issued on February 18, 2025, February 24, 2025, and March 19, 2025, in 25-cv-286 (RCL); February 24, 2025, and March 3, 2025, in 25-cv-401 (RCL); and March 10, 2025, in 25-cv-653 (RCL). See Georgia Advoc. Off. v. Jackson, 4 F.4th 1200, 1211¬¬¬15 (11th Cir. 2021), vacated, 33 F.4th 1325 (11th Cir. 2022); Mayweathers v. Newland, 258 F.3d 930, 936 (9th Cir. 2001). Second, the parties should address whether, and if so how, the answer to the first question affects this court's jurisdiction over this appeal. The parties' supplemental briefs, not to exceed 3,900 words, are due 14 days from the date of this order. Supplemental reply briefs, not to exceed 1,950 words, may be filed 7 days thereafter. Before Judges: Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 09/10/2025 09:54 AM] |
| 09/12/2025 | 3 pg, 85.85 KB | LETTER [2134729] pursuant to FRAP 28j advising of additional authorities filed by William K. Marshall, III and Pamela Bondi in 25-5099, 25-5101, Donald J. Trump, William K. Marshall, III and Pamela Bondi in 25-5108, 25-5210, 25-5213, Donald J. Trump, William K. Marshall, III and Pamela J. Bondi in 25-5215, William K. Marshall, III and Pamela J. Bondi in 25-5304, 25-5305, 25-5306 [Service Date: 09/12/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Neumeister, McKaye) [Entered: 09/12/2025 04:13 PM] |
| 09/17/2025 | 3 pg, 201.47 KB | LETTER [2135425] pursuant to FRAP 28j advising of additional authorities filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215, Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5305, 25-5306 [Service Date: 09/17/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Levi, Jennifer) [Entered: 09/17/2025 05:42 PM] |
| 09/18/2025 | | TRANSCRIPT [2135463] of oral argument *(For Internal Use Only: Transcript is only available to court staff)*. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 09/18/2025 08:11 AM] |
| 09/24/2025 | 1 pg, 41.58 KB | PER CURIAM ORDER [2136825] filed denying the motion of Women's Liberation Front to participate as amicus curiae in support of appellants [2133471-2] in 25-5099, et al.; granting the joint motion to supplement the appendix [2133480-2]; The Clerk is directed to file the lodged supplemental appendix [2133488-2]. Before Judges: Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 09/24/2025 03:30 PM] |
| 09/24/2025 | | PER ABOVE ORDER lodged supplemental appendix [2133488-2] is filed [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] [Entered: 09/24/2025 03:33 PM] |
| 09/24/2025 | 18 pg, 129.33 KB | APPELLANT SUPPLEMENTAL BRIEF [2136849] filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, Pamela J. Bondi, William K. Marshall, III and Donald J. Trump in 25-5215, Pamela J. Bondi and William K. Marshall, III in 25-5304, 25-5305, 25-5306 [Service Date: 09/24/2025 ] Length of Brief: 2,281 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Neumeister, McKaye) [Entered: 09/24/2025 05:23 PM] |
| 09/24/2025 | 9 pg, 240.92 KB | APPELLEE SUPPLEMENTAL BRIEF [2136852] filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215, Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5305, 25-5306 [Service |

**App. 019**

Case 4:25-cv-00157-D    Document 167    Filed 04/20/26    Page 23 of 169    PageID 2208

Date: 09/24/2025 ] Length of Brief: 7,557 Words. [25-5099, 25-5104, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Hattem, Benjamin) [Entered: 09/24/2025 05:34 PM]

| 12/03/2025 | 9 pg, 91.39 KB | UNOPPOSED MOTION [2148462] to consolidate cases filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, Pamela J. Bondi, William K. Marshall, III and Donald J. Trump in 25-5215, Pamela J. Bondi and William K. Marshall, III in 25-5304, 25-5305, 25-5306 [Service Date: 12/03/2025 ] Length Certification: 1033 words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Neumeister, McKaye) [Entered: 12/03/2025 04:14 PM] |
|---|---|---|
| 12/04/2025 | 6 pg, 446.82 KB | LETTER [2148790] pursuant to FRAP 28j advising of additional authorities filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5101, Maria Moe in 25-5108, Barbara Jones, Carla Jones, Donna Jones and Jane Jones in 25-5210, Mary Doe and Sara Doe in 25-5213, 25-5215, Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5305, 25-5306 [Service Date: 12/04/2025 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306] (Austin, Sarah) [Entered: 12/04/2025 06:27 PM] |
| 12/29/2025 | 2 pg, 104.29 KB | DOCKETING STATEMENT [2152159] filed by Pamela J. Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5419] (Neumeister, McKaye) [Entered: 12/29/2025 06:17 PM] |
| 12/29/2025 | 2 pg, 106.09 KB | TRANSCRIPT STATUS REPORT [2152160] filed by Pamela J. Bondi and William K. Marshall, III [Service Date: 12/29/2025 ]. Status of Transcripts: Final - All transcripts needed for the appeal have been completed and received. [25-5419] (Neumeister, McKaye) [Entered: 12/29/2025 06:18 PM] |
| 12/29/2025 | 4 pg, 96.67 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2152161] filed by Pamela J. Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5419] (Neumeister, McKaye) [Entered: 12/29/2025 06:20 PM] |
| 12/29/2025 | 3 pg, 86.55 KB | STATEMENT OF ISSUES [2152162] filed by Pamela J. Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5419] (Neumeister, McKaye) [Entered: 12/29/2025 06:22 PM] |
| 12/29/2025 | 3 pg, 86.94 KB | STATEMENT OF INTENT REGARDING APPENDIX DEFERRAL [2152164] filed by Pamela J. Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] Intent: AppxNotDeferred [25-5419] (Neumeister, McKaye) [Entered: 12/29/2025 06:25 PM] |
| 12/29/2025 | 6 pg, 230.28 KB | UNDERLYING DECISION IN CASE [2152165] submitted by Pamela J. Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5419] (Neumeister, McKaye) [Entered: 12/29/2025 06:28 PM] |
| 12/29/2025 | 2 pg, 103.83 KB | DOCKETING STATEMENT [2152166] filed by Pamela Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5420] (Neumeister, McKaye) [Entered: 12/29/2025 06:29 PM] |
| 12/29/2025 | 2 pg, 98.21 KB | TRANSCRIPT STATUS REPORT [2152167] filed by Pamela Bondi and William K. Marshall, III [Service Date: 12/29/2025 ]. Status of Transcripts: Final - No transcripts are needed for the appeal. [25-5420] (Neumeister, McKaye) [Entered: 12/29/2025 06:30 PM] |
| 12/29/2025 | 4 pg, 96.89 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2152168] filed by Pamela Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5420] (Neumeister, McKaye) [Entered: 12/29/2025 06:32 PM] |
| 12/29/2025 | 3 pg, 86.54 KB | STATEMENT OF ISSUES [2152169] filed by Pamela Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5420] (Neumeister, McKaye) [Entered: 12/29/2025 06:32 PM] |
| 12/29/2025 | 3 pg, 86.91 KB | STATEMENT OF INTENT REGARDING APPENDIX DEFERRAL [2152170] filed by Pamela Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] Intent: AppxNotDeferred [25-5420] (Neumeister, McKaye) [Entered: 12/29/2025 06:33 PM] |
| 12/29/2025 | 6 pg, 225.53 KB | UNDERLYING DECISION IN CASE [2152171] submitted by Pamela Bondi and William K. Marshall, III [Service Date: 12/29/2025 ] [25-5420] (Neumeister, McKaye) [Entered: 12/29/2025 06:34 PM] |
| 12/29/2025 | 2 pg, 103.58 KB | DOCKETING STATEMENT [2152172] filed by Pamela J. Bondi, William K. Marshall, III and Donald J. Trump [Service Date: 12/29/2025 ] [25-5427] (Neumeister, McKaye) [Entered: 12/29/2025 06:35 PM] |
| 12/29/2025 | 2 pg, 106.36 KB | TRANSCRIPT STATUS REPORT [2152173] filed by Pamela J. Bondi, William K. Marshall, III and Donald J. Trump [Service Date: 12/29/2025 ]. Status of Transcripts: Final - All transcripts needed for the appeal have been completed and received. [25-5427] (Neumeister, McKaye) [Entered: 12/29/2025 06:36 PM] |
| 12/29/2025 | 4 pg, 96.39 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2152174] filed by Pamela J. Bondi, William K. Marshall, III and Donald J. Trump [Service Date: 12/29/2025 ] [25-5427] (Neumeister, McKaye) [Entered: 12/29/2025 06:37 PM] |
| 12/29/2025 | 3 pg, 86.32 KB | STATEMENT OF ISSUES [2152175] filed by Pamela J. Bondi, William K. Marshall, III and Donald J. Trump [Service Date: 12/29/2025 ] [25-5427] (Neumeister, McKaye) [Entered: 12/29/2025 06:38 PM] |
| 12/29/2025 | 3 pg, 86.99 KB | STATEMENT OF INTENT REGARDING APPENDIX DEFERRAL [2152176] filed by Pamela J. Bondi, William K. Marshall, III and Donald J. Trump [Service Date: 12/29/2025 ] Intent: AppxNotDeferred [25- |

App. 020

5427] (Neumeister, McKaye) [Entered: 12/29/2025 06:39 PM]

| | |
|---|---|
| 12/29/2025 6 pg, 217.36 KB | UNDERLYING DECISION IN CASE [2152177] submitted by Pamela J. Bondi, William K. Marshall, III and Donald J. Trump [Service Date: 12/29/2025 ] [25-5427] (Neumeister, McKaye) [Entered: 12/29/2025 06:40 PM] |
| 12/30/2025 2 pg, 141.8 KB | ENTRY OF APPEARANCE [2152358] filed by Jennifer L. Levi and co-counsel Sarah Austin on behalf of Appellees Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones. [25-5420] (Austin, Sarah) [Entered: 12/30/2025 04:45 PM] |
| 12/30/2025 4 pg, 157.73 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2152359] filed by Amy Jones, Barbara Jones, Carla Jones, Donna Jones and Jane Jones [Service Date: 12/30/2025 ] [25-5420] (Austin, Sarah) [Entered: 12/30/2025 04:47 PM] |
| 12/30/2025 2 pg, 141.76 KB | ENTRY OF APPEARANCE [2152360] filed by Jennifer L. Levi and co-counsel Sarah Austin on behalf of Appellee Maria Moe. [25-5427] (Austin, Sarah) [Entered: 12/30/2025 04:50 PM] |
| 12/30/2025 4 pg, 157.58 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2152361] filed by Maria Moe [Service Date: 12/30/2025 ] [25-5427] (Austin, Sarah) [Entered: 12/30/2025 04:58 PM] |
| 12/30/2025 3 pg, 155.57 KB | ENTRY OF APPEARANCE [2152364] filed by Jennifer L. Levi and co-counsel Sarah Austin on behalf of Appellees Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe. [25-5419] (Austin, Sarah) [Entered: 12/30/2025 05:08 PM] |
| 12/30/2025 6 pg, 160.71 KB | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES [2152365] filed by Ellen Doe, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe [Service Date: 12/30/2025 ] [25-5419] (Austin, Sarah) [Entered: 12/30/2025 05:12 PM] |
| 01/07/2026 3 pg, 44.3 KB | PER CURIAM ORDER [2153243] filed granting appellants' unopposed motion to consolidate [2148462-2], [2148471-2], [2148472-2], [2148473-2] Nos. 25-5099, et al. with Nos. 25-5419, 25-5420, and 25-5247 (Consolidation started 01/07/2026). Before Judges: Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427]--[Edited 01/07/2026 by MCM]--[Edited 01/07/2026 by MCM] [Entered: 01/07/2026 01:11 PM] |
| 01/07/2026 1 pg, 96.01 KB | ENTRY OF APPEARANCE [2153247] filed by Thomas G. Hentoff on behalf of Amici Curiae for Appellee Dee Deidre Farmer, Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Lambda Legal Defense and Education Fund and Transgender Law Center in 25-5099, 25-5101, 25-5108. [25-5099, 25-5101, 25-5108] (Hentoff, Thomas) [Entered: 01/07/2026 01:26 PM] |
| 01/07/2026 3 pg, 117.55 KB | NOTICE [2153300] to withdraw attorney Michael Mestitz who represented Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Lambda Legal Defense and Education Fund, Transgender Law Center and Dee Deidre Farmer in 25-5099, Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Dee Deidre Farmer, Lambda Legal Defense and Education Fund and Transgender Law Center in 25-5101, Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Dee Deidre Farmer, Transgender Law Center and Lambda Legal Defense and Education Fund in 25-5108, Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Transgender Law Center, Lambda Legal Defense and Education Fund and Dee Deidre Farmer in 25-5210, Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Lambda Legal Defense and Education Fund, Transgender Law Center and Dee Deidre Farmer in 25-5213 and Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Dee Deidre Farmer, Lambda Legal Defense and Education Fund and Transgender Law Center in 25-5215 filed by Advocates for Transgender Equality Education Fund, Center for Constitutional Rights, Dee Deidre Farmer, Transgender Law Center and Lambda Legal Defense and Education Fund in 25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215 [Service Date: 01/07/2026 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427] (Mestitz, Michael) [Entered: 01/07/2026 06:47 PM] |
| 03/03/2026 10 pg, 92.92 KB | UNOPPOSED MOTION [2161898] to consolidate cases filed by Pamela Bondi and William K. Marshall, III in 25-5099, 25-5101, Pamela Bondi, William K. Marshall, III and Donald J. Trump in 25-5108, 25-5210, 25-5213, Pamela J. Bondi, William K. Marshall, III and Donald J. Trump in 25-5215, Pamela Bondi and William K. Marshall, III in 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427 [Service Date: 03/03/2026 ] Length Certification: 1157 Words. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427] (Neumeister, McKaye) [Entered: 03/03/2026 02:34 PM] |
| 03/10/2026 2 pg, 43.02 KB | PER CURIAM ORDER [2162991] filed granting appellants' unopposed motion to consolidate [2161898-2] [2161900-2] [2161902-2] [2161903-2] Nos. 25-5099, et al. with Nos. 26-5066, 26-5067, and 26-5069 (Consolidation started 03/10/2026). Before Judges: Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069] [Entered: 03/10/2026 03:30 PM] |

**App. 021**

Case 4:25-cv-00157-D    Document 167    Filed 04/20/26    Page 25 of 169    PageID 2210

| | | |
|---|---|---|
| 04/07/2026<br>2 pg, 129.91 KB | | NOTICE [2167503] to terminate party filed by Jane Doe, Mary Doe and Sara Doe in 25-5099, Mary Doe and Sara Doe in 25-5213, Emily Doe, Jane Doe, Lois Doe, Mary Doe, Olivia Doe, Rachel Doe, Sally Doe, Sara Doe, Susan Doe, Tori Doe, Wendy Doe and Zoe Doe in 25-5304, 25-5419, 26-5066 [Service Date: 04/07/2026 ] [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069] (Galvan, Ernest) [Entered: 04/07/2026 04:11 PM] |
| 04/17/2026<br>1 pg, 57.38 KB | | PER CURIAM JUDGMENT [2169118] filed that the preliminary injunctions still in effect be vacated; the cases be remanded for further proceedings; and, as to the preliminary injunctions that everyone agrees have since expired pursuant to section 3626(a)(2)'s ninety-day time limit, the appeals be dismissed as moot insofar as they speak to those superseded injunctions, for the reasons in the accompanying opinion . Before Judges: Srinivasan, Pillard and Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069] [Entered: 04/17/2026 10:15 AM] |
| 04/17/2026<br>52 pg, 374.4 KB | | OPINION [2169119] filed (Pages: 31) for the Court by Judge Pillard, DISSENTING OPINION (Pages: 21) by Judge Randolph. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069] [Entered: 04/17/2026 10:20 AM] |
| 04/17/2026<br>1 pg, 41.21 KB | | CLERK'S ORDER [2169121] filed withholding issuance of the mandate. [25-5099, 25-5101, 25-5108, 25-5210, 25-5213, 25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-5427, 26-5066, 26-5067, 26-5069] [Entered: 04/17/2026 10:22 AM] |

App. 022

Select All    Clear All

⦿ **Documents and Docket Summary**
◯ **Documents Only**

☑ **Include Page Numbers**

**Selected Pages:** 0          **Selected Size:** 0 KB

View Selected

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| DC Circuit (USCA) - 04/20/2026 22:52:12 | | | |
| **PACER Login:** | stoltz3585 | **Client Code:** | |
| **Description:** | Docket Report (full) | **Search Criteria:** | 25-5099 |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

**[ORAL ARGUMENT NOT SCHEDULED]**
**Nos. 25-5099, 25-5101, 25-5108 (consol.)**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

JANE DOE, et al.,
               Plaintiffs-Appellees,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,
               Defendants-Appellants.

JANE JONES, et al.,
               Plaintiffs-Appellees,

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,
               Defendants-Appellants.

MARIA MOE,
               Plaintiff-Appellee,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
               Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## CONSOLIDATED BRIEF FOR APPELLANTS

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

GERARD SINZDAK
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7231*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8100*

**App. 024**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

In *Jones v. Bondi*, plaintiffs in district court, and appellees here, are five inmates in the custody of the Federal Bureau of Prisons (BOP). With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. *Jones*, Dkts. 14, 47. Their pseudonyms are Jane Jones, Amy Jones, Barbara Jones, Carla Jones, and Donna Jones.

In *Doe v. Bondi*, plaintiffs in district court, and appellees here, are 14 inmates in the custody of BOP. With the permission of the district court, those inmates are proceeding pseudonymously in this litigation. *Doe*, Dkt. 7. Their pseudonyms are Jane Doe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sophia Doe, Sally Doe, Wendy Doe, Rachel Doe, and Ellen Doe.

In *Moe v. Trump*, plaintiff in district court, and appellee here, is an inmate in the custody of BOP. With the permission of the district court, plaintiff is proceeding pseudonymously in this litigation. *Moe*, Dkts. 7, 67. The pseudonym being used is Maria Moe.

App. 025

In all three consolidated cases, defendants in district court, and appellants here, are Pamela Bondi, in her official capacity as Attorney General of the United States; and William K. Marshall, III, in his official capacity as Director of BOP.[1]

In *Moe v. Trump*, defendants in district court, and appellants here, also include Donald J. Trump, in his official capacity as President of the United States. In *Jones v. Bondi*, plaintiffs' original complaint also listed Donald J. Trump, in his official capacity as President of the United States, as a defendant. The *Jones* plaintiffs later omitted President Trump as a defendant in filing their Amended Complaint, and the President is thus no longer a party in that case. *See* JA341.

There were no additional parties and no *amici curiae* in district court, and none have entered an appearance before this Court.

## B.    Rulings Under Review

The rulings under review are the February 24, 2025, and March 3, 2025 Orders in *Jones* (Dkts. 28, 46); the March 10, 2025 Order in *Moe* (Dkt.

---

[1] These actions were originally brought against defendant James R. McHenry, III, in his official capacity as Acting Attorney General of the United States, and defendant William Lothrop, in his official capacity as Acting Director of BOP. Attorney General Bondi was automatically substituted as a party under Federal Rule of Civil Procedure 25(d). Director Marshall was automatically substituted as a party under Federal Rule of Appellate Procedure 43(c)(2).

App. 026

62); and the February 18, 2025, February 24, 2025, and March 19, 2025 Orders in *Doe* (Dkts. 44, 55, 68), entered by the Honorable Royce C. Lamberth, granting plaintiffs' motions for preliminary injunctions. Some of the orders are available at *Doe v. Bondi*, No. 1:25-cv-286, 2025 WL 596653 (D.D.C. Feb. 24, 2025); *Doe v. McHenry*, No. 1:25-cv-286, 2025 WL 596651 (D.D.C. Feb. 18, 2025); *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923117 (D.D.C. Feb. 24, 2025); and *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923755 (D.D.C. Mar. 3, 2025). The orders are located in the Joint Appendix at JA168-69 (*Doe* February 18 Order), JA185-88 (*Doe* February 24 Order), JA240-43 (*Doe* March 19 Order), JA333-34 (*Jones* February 24 Order), JA445-49 (*Jones* March 3 Order), and JA569-71 (*Moe* March 10 Order).

## C. Related Cases

This case has not previously been before this Court. Counsel are aware of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.).

/s/ McKaye L. Neumeister
McKaye L. Neumeister

iv

App. 027

# TABLE OF CONTENTS

**Page**

GLOSSARY

TABLE OF AUTHORITIES ................................................................ vii

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION ................................................. 4

STATEMENT OF THE ISSUE.......................................................5

PERTINENT STATUTES AND REGULATIONS ........................... 5

STATEMENT OF THE CASE .......................................................5

    A.    Executive Order 14168 ................................................ 5

    B.    BOP's Designation Authority and Management of Trans-Identifying Inmates ........................................... 7

    C.    Factual Background................................................. 11

    D.    Prior Proceedings .................................................14

SUMMARY OF ARGUMENT .....................................................21

STANDARD OF REVIEW .......................................................... 25

ARGUMENT................................................................................ 25

I.    Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Transfer Claims...................... 25

    A.    The Prison Litigation Reform Act Bars this Challenge............ 26

    B.    The Eighth Amendment Does Not Require BOP to House Plaintiffs, Who Are Male Inmates, in Female Prisons.............. 33

App. 028

II.    Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.................................................................................48

III.   The Preliminary Injunctions At Issue Violate The PLRA. ................. 55

CONCLUSION ........................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**App. 029**

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Abdullah v. Obama,*
 753 F.3d 193 (D.C. Cir. 2014) ........................................................................ 25, 26

*Alexander v. S.C. State Conf. of the NAACP,*
 602 U.S. 1 (2024) .............................................................................................. 25

*Alpine Sec. Corp. v. FINRA,*
 121 F.4th 1314 (D.C. Cir. 2024) ........................................................................ 52

*Baxter v. Wexford Healthcare,* No. 16-cv-291,
 2017 WL 2772333 (W.D. Pa. June 27, 2017) ................................................... 55

*Becker v. Sherman,* No. 16-cv-828,
 2017 WL 6316836 (E.D. Cal. Dec. 11, 2017) ................................................... 49

*Booth v. Churner,*
 532 U.S. 731 (2001) .................................................................................... 30, 32-33

*Bryant v. Johnson,* No. 7:11-cv-75,
 2012 WL 4459930 (W.D. Va. June 15, 2012) ................................................... 55

*Calhoun v. DeTella,*
 319 F.3d 936 (7th Cir. 2003) ............................................................................ 47

*Cason v. Seckinger,*
 231 F.3d 777 (11th Cir. 2000) ........................................................................... 56

*Chaplaincy of Full Gospel Churches v. England,*
 454 F.3d 290 (D.C. Cir. 2006) .......................................................................... 48

*Citizens for Responsibility & Ethics in Washington v. Federal
 Election Comm'n,*
 904 F.3d 1014 (D.C. Cir. 2018) ........................................................................ 50

*City of Los Angeles v. Lyons,*
 461 U.S. 95 (1983) ............................................................................................ 52

*Davis v. District of Columbia,*
 158 F.3d 1342 (D.C. Cir. 1998) ......................................................................... 50

vii

App. 030

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ............................................................ 26

*Doe v. District of Columbia*,
215 F. Supp. 3d 62 (D.D.C. 2016) ........................................................ 45

*Doe v. Georgia Dep't of Corr.*,
730 F. Supp. 3d 1327 (N.D. Ga. 2024) ................................................ 36

*Does 1-26 v. Musk*, No. 25-1273,
2025 WL 1020995 (4th Cir. Mar. 28, 2025) ........................................ 51

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........................................ 21, 22, 34, 41, 42, 44, 57

*Finstuen v. Crutcher*,
496 F.3d 1139 (10th Cir. 2007) ........................................................... 52

*Fisher v. BOP*, No. 4:19-cv-1169,
2022 WL 2648950 (N.D. Ohio July 8, 2022) ...................................... 36

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (TOC), Inc.,
528 U.S. 167 (2000) .............................................................................. 52

*Green v. Hooks*,
798 F. App'x 411 (11th Cir. 2020) ................................................. 39, 44

*Greene v. Bowles*,
361 F.3d 290 (6th Cir. 2004) ............................................................... 49

*Hampton v. Baldwin*, No. 3:18-cv-550,
2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ................................... 36, 49

*Hange v. City of Mansfield*,
257 F. App'x 887 (6th Cir. 2007) ........................................................ 52

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........................................................... 50

*Hatim v. Obama*,
760 F.3d 54 (D.C. Cir. 2014) ............................................................... 54

*Hoffer v. Secretary, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020) ........................................................... 56

viii

*Irving v. Dormire,*
    519 F.3d 441 (8th Cir. 2008) ................................................................ 39

*Jiau v. Tews,*
    812 F. App'x 638 (9th Cir. 2020) ........................................................ 28

*JJS v. Pliler*, No. 19-cv-2020,
    2022 WL 16578124 (S.D.N.Y. Aug. 3, 2022),
    *report and recommendation adopted sub nom.*
    *Shelby v. Petrucci*, No. 19-cv-2020,
    2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022) ........................................ 36

*Jones v. Bock,*
    549 U.S. 199 (2007) .................................................................... 29, 30

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) ............................................................ 33

*Lakin v. Barnhart,*
    758 F.3d 66 (1st Cir. 2014) ................................................................ 34

*Lojan v. Crumbsie*, No. 12-cv-320,
    2013 WL 411356 (S.D.N.Y. Feb. 1, 2013) ....................................... 45, 49

*Matheis v. CDCR*, No. 20-cv-2100,
    2021 WL 718603 (S.D. Cal. Feb. 24, 2021) .......................................... 55

*McBryde v. Committee to Review Circuit Council Conduct*
    *& Disability Orders of the Judicial Conference,*
    264 F.3d 52 (D.C. Cir. 2001) ............................................................. 28

*McKune v. Lile,*
    536 U.S. 24 (2002) ..................................................................... 47, 54

*MediNatura, Inc. v. FDA,*
    998 F.3d 931 (D.C. Cir. 2021) ........................................................ 48, 53

*Miller v. French,*
    530 U.S. 327 (2000) ......................................................................... 26

*Murphy v. United States,*
    653 F.2d 637 (D.C. Cir. 1981) ................................................. 34, 35, 38

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ......................................................... 14

ix

**App. 032**

*Ross v. Blake*,
578 U.S. 632 (2016) ........................................................ 30, 31, 32

*Savage v. U.S. Dep't of Justice*,
91 F.4th 480 (D.C. Cir. 2024) ........................................................ 30

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................ 25

*Shrader v. White*,
761 F.2d 975 (4th Cir. 1985) ........................................................ 35

*Soneeya v. Mici*,
717 F. Supp. 3d 132 (D. Mass. 2024) ........................................................ 36

*Stover v. Corrections Corp. of Am.*, No. 1:12-cv-393,
2015 WL 874288 (D. Idaho Feb. 27, 2015) ........................................................ 45

*Tay v. Dennison*,
457 F. Supp. 3d 657 (S.D. Ill. 2020) ........................................................ 49

*Touizer v. U.S. Attorney Gen.*, No. 21-10761,
2021 WL 3829618 (11th Cir. Aug. 27, 2021) ........................................................ 28

*Turner v. Safley*,
482 U.S. 78 (1987) ........................................................ 53

*Vandevender v. Sass*,
970 F.3d 972 (8th Cir. 2020) ........................................................ 34-35

*Wade v. McDade*,
106 F.4th 1251 (11th Cir. 2024) ........................................................ 34

*Wills v. Barnhardt*, No. 21-1383,
2022 WL 4481492 (10th Cir. Sept. 27, 2022) ........................................................ 28, 29

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................ 25, 26

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
93 F.3d 910 (D.C. Cir. 1996) ........................................................ 33

*Woodford v. Ngo*,
548 U.S. 81 (2006) ........................................................ 30

x

**App. 033**

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ............................................................ 48

*Zollicoffer v. Livingston,*
  169 F. Supp. 3d 687 (S.D. Tex. 2016) ............................................. 45-46

**Statutes:**

18 U.S.C. § 3621(b) ....................................................... 7, 15, 21, 27, 28, 29

18 U.S.C. § 3626(a) ................................................................................. 54

18 U.S.C. § 3626(a)(2) ................................................................. 24, 55, 56

18 U.S.C. § 3626(b)(2) ............................................................................ 56

18 U.S.C. § 3626(g)(2) ............................................................................ 26

28 U.S.C. § 1292(a)(1) ............................................................................. 5

28 U.S.C. § 1331 .................................................................................... 4

28 U.S.C. § 2201 ................................................................................... 4

28 U.S.C. § 2202 .................................................................................. 4

42 U.S.C. § 1997e(a) .......................................................................... 9, 29

**Regulatory Materials:**

28 C.F.R. § 115.41(a) ........................................................................... 7-8

28 C.F.R. § 115.42 ............................................................................... 32

28 C.F.R. § 115.42(a) ............................................................................ 8

28 C.F.R. § 115.42(c) ......................................................................... 8, 43

28 C.F.R. §§ 542.13-.15 ................................................................... 10, 30

Exec. Order No. 14168,
  *Defending Women From Gender Ideology Extremism and
  Restoring Biological Truth to the Federal Government,*
  90 Fed. Reg. 8615 (Jan. 30, 2025) ........................................ 1, 5, 6, 7, 53

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................ 5

Fed. R. App. P. 43(c)(2) ................................................................ 14

Fed. R. Civ. P. 25(d) ................................................................ 14

**Other Authorities:**

BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification* (Mar. 6, 2025), https://perma.cc/G43K-8BD8 ................................................................ 9

Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, and S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* (Feb. 21, 2025), https://perma.cc/J5K2-3NU5 ................................................................ 9

U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* (May 2013), https://perma.cc/RLB3-CY8Q ................. 37, 38, 39

App. 035

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BJS | Bureau of Justice Statistics |
| BOP | Federal Bureau of Prisons |
| EO | Executive Order |
| JA | Joint Appendix |
| PI | Preliminary Injunction |
| PLRA | Prison Litigation Reform Act |
| PREA | Prison Rape Elimination Act |
| TRO | Temporary Restraining Order |

# INTRODUCTION

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025) (EO 14168).  Among other things, EO 14168 directs the Federal Bureau of Prisons (BOP) to ensure that male inmates are not housed in women's prisons, in order to protect female inmates' safety, privacy, and dignity. Consistent with the executive order, BOP informed male trans-identifying inmates who were housed in women's facilities before January 20 that they would be transferred to men's prisons, and BOP began to transfer inmates accordingly.

Plaintiffs, who are 20 such male trans-identifying inmates housed in women's facilities, sued seeking preliminary injunctions to block their transfer to men's prisons.  The district court granted the injunctions, concluding that plaintiffs were likely to succeed in showing that their transfer to male prisons would constitute cruel and unusual punishment, in violation of the Eighth Amendment.  The district court's conclusions find no support in fact or law; and in substituting its policy judgment for that of the Executive Branch, the court forces the government to perpetuate harm to female

**App. 037**

inmates' safety, privacy, and dignity.    Accordingly, the preliminary injunctions should be vacated.

The district court's injunctions fundamentally misunderstand the requirements of the Prison Litigation Reform Act (PLRA) and the Eighth Amendment.   The PLRA requires inmates to raise complaints about the conditions of confinement within BOP's administrative grievance scheme before suing and bars all judicial review of BOP's housing placement and transfer decisions.  Plaintiffs here failed to satisfy this mandatory exhaustion requirement and raise challenges to transfer decisions that Congress left to BOP's discretion and placed outside the jurisdiction of courts.

Even if plaintiffs could circumvent these threshold obstacles, their constitutional claims would fail.  The Eighth Amendment's bar on cruel and unusual punishment prohibits the wanton infliction of pain caused by deliberate indifference to inmates' safety or serious medical needs. Plaintiffs cannot show that their transfer to male facilities would meet that high bar. The district court rested its conclusion that plaintiffs would experience substantially elevated risks of sexual assault in male facilities on statistics showing that trans-identifying inmates experience violence at higher rates, on average, than other inmates.  But those statistics do not establish that plaintiffs' transfer to male prisons would necessarily expose them to a

2

App. 038

uniquely high rate of assault. Ninety-nine percent of male trans-identifying inmates are currently housed in male prisons, a fact that defeats plaintiffs' claim that BOP cannot adequately protect trans-identifying inmates housed in male prisons. Moreover, many male prison facilities in the federal system have very low rates of sexual assault; indeed, several have lower rates than female facilities. And plaintiffs' and the district court's conclusion that transferring plaintiffs to male facilities would necessarily place them at a significantly elevated risk of assault fails to account for measures BOP would undertake to ensure their safety in such facilities—as BOP has done with other trans-identifying inmates and even some of the plaintiffs here. For these reasons, plaintiffs cannot show that merely housing them in male prisons would expose them to objectively intolerable levels of risk or that BOP will not take reasonable measures to abate any such risks.

Fundamentally, plaintiffs' theory proves too much. Many male inmates face an above-average risk of sexual and other assault based on identifiable characteristics, such as, for example, their offense of conviction, their sexual orientation, their status as government informants, and their mental health. Under plaintiffs' and the district court's reasoning, BOP would violate the Eighth Amendment any time it assigned such individuals to a men's prison rather than a theoretically lower-risk female prison. That

3

is patently wrong. Put simply, the Eighth Amendment does not prevent BOP from treating males as males and females as females; nor does the Constitution force BOP to house men with women, endangering female inmates' safety, invading their privacy, or causing them significant distress—especially female inmates who have experienced domestic abuse and sexual assault from men.

In addition to being legally erroneous, the district court's orders harm the government and the public interest, particularly given the importance of the policies in the executive order at issue and the complexities of managing the federal prison system. By requiring all inmates to reside in facilities that align with their sex, EO 14168 reflects the federal government's compelling interest in ensuring the safety, privacy, and dignity of prisoners in federal custody. Against such harms, plaintiffs identify only a speculative possibility of future harm from the executive order's implementation. Accordingly, this Court should vacate the preliminary injunctions.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 2201, and 2202. JA201-02; JA340; JA461. On February 18, 2025, February 24, 2025, March 3, 2025, March 10, 2025, and March 19, 2025, the district court issued orders granting plaintiffs' motions for preliminary

4

**App. 040**

injunctions.    JA168-69;  JA185-88;  JA240-43;  JA333-34;  JA445-49; JA569-71.  The federal government filed timely notices of appeal of those preliminary-injunction orders on April 2, 2025.    JA244-45; JA450-51; JA572-73; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting preliminary injunctions blocking the transfer of male trans-identifying inmates to male facilities, on the ground that any such transfer violates the Eighth Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Executive Order 14168

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*.  EO 14168, 90 Fed. Reg. 8615. The order proclaims that, as a result of "deny[ing] the biological reality of sex," "legal and other socially coercive means" have increasingly been used "to permit men to self-identify as women and gain access to intimate single-

5

**App. 041**

sex spaces and activities designed for women." *Id.* § 1, 90 Fed. Reg. at 8615. "Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being." *Id.* The executive order's purpose is thus to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.* The order directs that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2, 90 Fed. Reg. at 8615. Further, "the Executive Branch will enforce all sex-protective laws to promote this reality." *Id.* The order also directs that it "shall be implemented consistent with applicable law." *Id.* § 8(b), 90 Fed. Reg. at 8618.

As to "privacy in intimate spaces" in particular, EO 14168, § 4, 90 Fed. Reg. at 8616 (formatting altered), the order contains specific directives regarding the Federal Bureau of Prisons. As relevant here, Section 4(a) requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal

6

**App. 042**

Regulations and interpretation guidance regarding the Americans with Disabilities Act." *Id.* § 4(a), 90 Fed. Reg. at 8616.[2]

## B.     BOP's Designation Authority and Management of Trans-Identifying Inmates

**1.**     Decisions on classification and designation of inmates to a particular prison facility are vested in BOP. *See* 18 U.S.C. § 3621(b). In making decisions regarding "the place of [a] prisoner's imprisonment," BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau … that the Bureau determines to be appropriate and suitable." *Id.* Additionally, "[t]he Bureau may at any time … direct the transfer of a prisoner from one penal or correctional facility to another." *Id.* And the statute expressly provides that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.*

In designating inmates to a facility, BOP follows the applicable regulations under the Prison Rape Elimination Act (PREA). During intake and upon transfer, BOP screens inmates for "their risk of being sexually abused by other inmates or sexually abusive toward other inmates." 28

---

[2] The other directive to BOP—Section 4(c), which pertains to medical care for inmates—is implicated in the district court litigation in these cases but is not at issue in this appeal.

7

C.F.R. § 115.41(a). This information is used to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Regarding the assignment of trans-identifying inmates in particular, BOP "considers on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." JA177-78 (Stover Second *Doe* Decl. ¶ 26); *see* 28 C.F.R. § 115.42(c).

**2.** Previously, BOP used a specialized decisionmaking body to handle the placements of the trans-identifying inmate population. As BOP has explained in former guidance documents, this body—called the "Transgender Executive Council"—oversaw the initial facility designations of trans-identifying inmates, and "review[ed] all transfers" of trans-identifying inmates "for approval." JA123, 124-25. From May 2018 to January 2022, the guidance provided that in deciding the facility assignment for a trans-identifying inmate, BOP would "use biological sex as the initial determination for designation." JA103. The guidance further provided that "designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the [identified] factors." JA103. In January 2022, BOP revised the guidance to state that in

8

App. 044

deciding the facility assignment for a trans-identifying inmate, the Transgender Executive Council would consider as one factor, among other things, the inmate's "current gender expression." *See* JA125. Pursuant to EO 14168, BOP has rescinded this guidance and disbanded the Transgender Executive Council.[3]

Now, the Designation and Sentence Computation Center makes the initial placement and transfer decisions for all trans-identifying inmates, just as it does for the rest of BOP's inmate population. BOP, Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch. 1, at 1-3 (Mar. 6, 2025), https://perma.cc/G43K-8BD8.

**3.** When trans-identifying inmates wish to raise concerns about their treatment in BOP custody, like all other inmates they must pursue BOP's Administrative Remedy Program before bringing any legal action. *See* 42 U.S.C. § 1997e(a) (PLRA exhaustion requirement). The program has four levels: aggrieved inmates must first attempt an informal resolution with unit

---

[3] The responsibility for trans-identifying inmate housing decisions was then briefly taken over by the Special Populations Oversight Committee, which has also since disbanded. *See* Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, and S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, *Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* 2 (Feb. 21, 2025), https://perma.cc/J5K2-3NU5.

App. 045

staff, then submit an administrative remedy request to the Warden, then appeal to BOP's Regional Director, and then, if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. After fully exhausting this administrative review process, if the inmate's concerns have not been resolved, the inmate can pursue legal action.

For complaints regarding sexual assault and harassment, in particular, there are numerous ways for inmates to report incidents. "An inmate can write directly to the Warden, Regional Director or Director" of BOP; "file a Request for Administrative Remedy"; or contact the U.S. Department of Justice Office of Inspector General directly. JA310 (Stover First *Jones* Decl. ¶ 16).

4.    BOP, however, does not merely wait to react to any such complaints. Rather, staff are trained to "monitor" and proactively "intervene when they observe problematic interactions between inmates." JA178 (Stover Second *Doe* Decl. ¶ 28). BOP implements a "zero tolerance" policy toward "sexual abuse and sexual harassment," and provides "[r]outine training" to all staff "to help detect incidents, perpetrators, and inmate victims of sexually abusive behavior," and instruction on how to properly and timely intervene. JA178 (Stover Second *Doe* Decl. ¶ 27). If staff ever have reason to "believe that an inmate's safety may be jeopardized by placement

10

**App. 046**

in the general population," staff can temporarily move the inmate to "more restrictive conditions as a protective custody case in the Special Housing Unit," to ensure inmate safety while determining how to properly protect the inmate going forward.  JA394 (Stover Second *Jones* Decl. ¶ 25); *see* JA179 (Stover Second *Doe* Decl. ¶ 30).

Staff at each institution also regularly review a file regarding certain inmates, including those who "present a threat to staff or institutional security," or "pose a significant threat to inmate ... safety."  JA178 (Stover Second *Doe* Decl. ¶ 28).  Staff review the file "for the purpose of determining inmates with a history of assaultive behavior or a history of sexual offenses, for the purpose of keeping the institution safe and secure."  *Id.*

### C.    Factual Background

**1.**    There are approximately 2,198 trans-identifying inmates housed in BOP facilities and halfway houses.  JA174 (Stover *Second Doe* Decl. ¶ 5) (describing trans-identifying inmate population as of February 20, 2025). Of those, 1,488 are male inmates who trans-identify as female, and 710 are female inmates trans-identifying as male.  *Id.*  Of the 1,488 male trans-identifying inmates, 22 were housed in female institutions as of February 20, 2025.  *Id.*

11

**App. 047**

**2.**     Plaintiffs are 20 male trans-identifying inmates in BOP custody who were housed in female facilities at the time EO 14168 was issued.  They are proceeding in this litigation under the pseudonyms Jane, Mary, Sara, Emily, Zoe, Tori, Olivia, Susan, Lois, Sophia, Sally, Wendy, Rachel, and Ellen Doe; Jane, Amy, Barbara, Carla, and Donna Jones; and Maria Moe.  *See* Doe, Dkt. 7; *Jones*, Dkts. 14, 47; *Moe*, Dkts. 7, 67.  Plaintiffs allege that, although their "birth sex" is male, they identify as female, take cross-sex hormones, and have been housed in female prison facilities.  Some of the plaintiffs have had cross-sex surgeries.  *See* JA190-200, 211; JA336-39, 344; JA460, 465.

Following the issuance of EO 14168, BOP officials informed plaintiffs that they would be transferred to men's facilities.  JA205-06; JA342-43; JA463.  BOP individually reviewed the housing placements for the plaintiffs, taking "into consideration the inmates' assigned security level, disciplinary record, medical record, and psychology record."  JA174 (Stover Second *Doe* Decl. ¶ 10); *see* JA390 (Stover Second *Jones* Decl. ¶ 11); JA239 (Associate Warden *Doe* Decl. ¶ 6); JA307 (Stover First *Jones* Decl. ¶ 7); JA100 (Stover First *Doe* Decl. ¶ 11); JA513, 910 (Stover *Moe* Decl. ¶ 10).

Through that review, BOP determined that plaintiffs should be assigned to low-security male facilities.  JA307, 747 (Stover First *Jones* Decl. ¶ 8); JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12); JA513, 910 (Stover *Moe*

12

**App. 048**

Decl. ¶ 11); JA390, 824 (Stover Second *Jones* Decl. ¶ 12); JA175-76, 657-58 (Stover Second *Doe* Decl. ¶¶ 12-16); JA239, 710 (Associate Warden *Doe* Decl. ¶ 5). The particular facilities selected house "a large number of nonviolent offenders" whose crimes of incarceration did "not involve a threat of harm or an actual attack upon a victim," and who "tend to have minor infractions in their disciplinary history with [BOP]." JA307, 747 (Stover First *Jones* Decl. ¶ 8). "Based on the [BOP decisionmakers'] experience and range of expertise, placing [plaintiffs] at a low security institution with non-violent offenders would minimize the likelihood that they would be victimized." JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12); *see* JA390, 824 (Stover *Second* Jones Decl. ¶ 13); JA307-08, 747-48 (Stover First *Jones* Decl. ¶¶ 8-9); JA176-77, 658-59 (Stover Second *Doe* Decl. ¶¶ 18, 25); JA513, 910 (Stover *Moe* Decl. ¶ 11).

Specifically, BOP observed that the rates of sexual assault at the chosen facilities were low, and that the overall rates of assault are often lower than at the female facilities where plaintiffs are currently housed. *See* JA176-77, 658-59 (Stover Second *Doe* Decl. ¶¶ 19-23); JA308, 748 (Stover First *Jones* Decl. ¶ 9); JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 13-16); *see also* JA391, 825 (Stover Second *Jones* Decl. ¶ 16) ("In the seven facilities that the *Jones* and *Doe* plaintiffs may be transferred, there was only one guilty

13

**App. 049**

finding ... of sexual assault ... in 2024."). And BOP noted that various facilities it has selected for plaintiffs' new housing assignments already house "other inmates who identify as female, thereby ensuring that the staff members at the facilities are experienced in managing and providing care to this special population." JA177, 659 (Stover Second *Doe* Decl. ¶ 24); *see* JA308, 748 (Stover First *Jones* Decl. ¶ 9); JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 12-15).

### D. Prior Proceedings

Plaintiffs brought three lawsuits against the Attorney General and the Director of BOP,[4] challenging the transfer of plaintiffs to male facilities and the alleged imminent cessation of certain medical treatment for their gender dysphoria. Plaintiffs collectively assert that the relevant provisions of EO 14168, BOP's implementation of those provisions, and the resulting anticipated transfer of plaintiffs to male facilities and alleged termination of hormone interventions would violate Equal Protection principles, the Eighth Amendment, the Rehabilitation Act, the Administrative Procedure Act

---

[4] The complaints originally named the Acting Attorney General and Acting Director of BOP; upon taking office, the Attorney General and Director were automatically substituted as defendants. *See* Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c)(2). Although President Trump is also currently named as a defendant in one of these actions, no relief is available against the President. *See Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[C]ourts do not have jurisdiction to enjoin [the President], and have never submitted the President to declaratory relief[.]" (citation omitted)).

14

App. 050

(APA), and the separation of powers. *See* JA213-23; JA356-67; JA472-81. Plaintiffs seek a declaratory judgment that Section 4(a) and 4(c) of EO 14168 violate plaintiffs' legal and constitutional rights, damages and costs, and injunctive relief prohibiting the government "from implementing Sectio[n] 4(a) and 4(c) of Executive Order 14168, and requiring Defendants to maintain Plaintiffs' housing and medical treatment consistent with the status quo before January 20, 2025." JA223; *see* JA367; JA481.

1.      Plaintiffs Jane, Mary, and Sara Doe filed their action on January 30, 2025, simultaneously moving for a temporary restraining order (TRO) and preliminary injunction (PI). *See Doe*, Dkt. 5. The government filed an opposition to the TRO motion on February 3. *Doe*, Dkt. 11. On February 4, the district court held a hearing and issued a nationwide TRO barring BOP from transferring any inmates pursuant to EO 14168. *See* JA157-67 (TRO Order).

a.      The district court determined that it had jurisdiction to entertain the motion, explaining that the exclusion of review over BOP placement decisions in 18 U.S.C. § 3621(b) did not foreclose review of constitutional claims, and that plaintiffs did not need to first pursue their claims through BOP's administrative grievance process under the PLRA's exhaustion requirements, because no relief was available through that process.

App. 051

JA159-63 (TRO Order 3-7).  On the merits, the court concluded that plaintiffs were likely to succeed on their Eighth Amendment claims.[5]  As relevant here, the court observed that the claims were ripe because EO 14168 afforded BOP "no discretion to keep the plaintiffs in a female penitentiary, nor to continue providing hormonal therapy."  JA165 (TRO Order 9).[6]  And the court concluded that plaintiffs had established objectively intolerable risks of harm—of which BOP was aware—with respect to transfer and termination of hormones.  JA164-65 (TRO Order 8-9).  Finally, the court concluded that the remaining TRO factors favored plaintiffs.  JA166-67 (TRO Order 10-11).

The district court ordered "that the defendants are temporarily enjoined and restrained from implementing Sectio[n] 4(a) and 4(c) of Executive Order 14168, pending further Order of this Court," and that "defendants shall maintain and continue the plaintiffs' housing status and medical care as they existed immediately prior to January 20, 2025."  JA167 (TRO Order 11).

---

[5] The court has declined to reach plaintiffs' other claims.  *See* JA158 (TRO Order 2); JA187.

[6] The government maintains that the district court's understanding of EO 14168 with respect to hormone medication is incorrect.  *See Doe*, Dkt. 11, at 3; *Doe*, Dkt. 63; Defendants' Response to Plaintiffs' Motion for a PI at 1, 13, *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C. Mar. 28, 2025), Dkt. 36.  In any event, plaintiffs' medical-treatment claims are not at issue in this appeal.

16

**b.** On February 18, 2025, the district court converted the TRO to a preliminary injunction and narrowed the scope of that injunction to cover only the plaintiffs. JA168-69. The court enjoined the government "from implementing Sectio[n] 4(a) and 4(c) of Executive Order 14168 against plaintiffs Jane, Mary and Sara Doe, pending further Order of this Court," and again ordered that the government "shall maintain and continue the plaintiffs' housing status and medical care as they existed immediately prior to January 20, 2025," pending further court order. JA169.

**c.** On February 21, the Doe plaintiffs filed an amended complaint, adding nine new individuals as plaintiffs: Emily, Zoe, Tori, Olivia, Susan, Lois, Sophia, Sally, and Wendy Doe. *Doe*, Dkt. 47. At the same time, the Doe plaintiffs moved for a TRO and expanded PI to cover the new plaintiffs. *Doe*, Dkt. 50.

On February 24, the district court granted the motion, determining that "the same reasoning from the Court's original TRO Order … still applies, with nothing in the record to compel a different outcome." JA186. In opposition to this new motion, the government had provided a declaration explaining that BOP individually reevaluated the plaintiffs' placements and identified specific low-security men's facilities at which to place plaintiffs, where the risk of victimization would be minimized. JA174, 176, 656, 658

17

**App. 053**

(Stover Second *Doe* Decl. ¶¶ 10-11, 18); *see* JA186. But according to the court, the fact that BOP had previously deemed "a women's facility [as] the appropriate facility for each named plaintiff"—and only reassessed their housing due to EO 14168—was alone sufficient to establish likely success on the merits of the Eighth Amendment claim. JA186-87. The court thus enjoined the government from implementing EO 14168 as to the original three plaintiffs and nine new plaintiffs, and required BOP to continue the same "housing status and medical care [for plaintiffs] as they existed immediately prior to January 20, 2025." JA187-88.

**d.** On March 14, the Doe plaintiffs moved to file a second amended complaint to add two additional individual plaintiffs—Rachel and Ellen Doe—and moved for additional emergency relief that same day. *Doe*, Dkts. 58, 61. The district court granted the motion on March 19, issuing a preliminary injunction covering just those two new plaintiffs. JA240-43.

The district court determined that the two new plaintiffs were similarly situated to the other 12, with the caveat that they had already been transferred to male facilities. JA240-41. The court noted that the new plaintiffs presented new factual allegations, but "even supposing that ... each of the plaintiffs' new arguments is either factually or legally defunct, the new plaintiffs are at least as strongly situated, in terms of the merits of their

18

App. 054

Eighth Amendment claims, as the existing plaintiffs," and, if anything, the balance of the equities and irreparable harm prongs were more favorable to these new plaintiffs. JA241. Accordingly, the court concluded that a preliminary injunction was appropriate "for the same reasons that it was appropriate for the existing [plaintiffs]." JA242. The court thus enjoined the government from implementing EO 14168 against the two new plaintiffs, and ordered BOP to "immediately transfer plaintiffs Rachel Doe and Ellen Doe back to women's penitentiaries." JA243.

> **2.** Plaintiff Jane Jones filed a second action on February 10, 2025, listing the case as related to *Doe*, and moved for a TRO and PI on February 21. *See Jones*, Dkts. 1, 2, 21. The district court granted the motion on February 24, determining that "the same reasoning from the Court's TRO Order in *Doe v. McHenry* applies here," and "also appl[ying] the reasoning from the Court's most recent [February 24] Order in *Doe v. Bondi*, granting the plaintiffs' renewed Motion for TRO and Preliminary Injunction in that case." JA333. The court thus enjoined the government from implementing EO 14168 against Jones, and directed BOP to "maintain and continue [Jones's] housing status and medical care as they existed immediately prior to January 20, 2025." JA334.

App. 055

On February 28, an amended complaint was filed in the *Jones* action, adding four new individual plaintiffs—Amy, Barbara, Carla, and Donna Jones—and a second motion for a TRO and PI was filed.  JA335-68; *Jones*, Dkt. 37.  On March 3, the district court granted the motion, determining again that "the same reasoning from the Court's TRO Order in the related case, *Doe v. McHenry*, applies here."  JA445.  The court also reiterated its conclusion that the fact that BOP had previously "determined that women's facilities are the *appropriate* facilities for Plaintiffs," and now seeks a "blanket removal of the plaintiffs from their appropriate housing placement with no discretion to place them in any women's facility" due only to the executive order, "suggests ... a likelihood of success on the merits."  JA446-47.  The court thus issued the same preliminary injunction as to the four additional *Jones* plaintiffs.  JA449.

**3.**     Plaintiff Moe brought the third action on January 26, 2025, in the District of Massachusetts, simultaneously moving for a TRO and PI.  *See* JA459-82; *Moe*, Dkt. 3.  The district court there entered an ex parte TRO with no reasoning that same day.  JA485.  The case was then transferred to the district where Moe is incarcerated, *Moe*, Dkt. 41, before being transferred to the District Court for the District of Columbia, *see Moe*, Dkt. 60, and assigned to the same district judge as the other two actions.  The district

App. 056

court granted Moe's motion for a preliminary injunction on March 10, explaining that Moe "is similarly situated to the plaintiffs in" *Doe* and *Jones*, and determining "that the same reasoning from the Court's TRO and PI Orders in those cases applies here." JA569-70.

**4.**     The government filed timely notices of appeal in all three actions, and moved to consolidate the cases on appeal for purposes of briefing, argument, and disposition.  The government further moved to expedite the appeals.  The Court granted those motions on April 30, 2025.

## SUMMARY OF ARGUMENT

**I.**     The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on criminal inmates in federal custody.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks omitted).  Plaintiffs contend that transferring them to male prison facilities and housing them alongside other male inmates would categorically violate that prohibition by subjecting plaintiffs to the threat of harm from their fellow inmates.  This challenge is unlikely to succeed on the merits both because it is barred by the PLRA and because it fails to establish the substantive elements of an Eighth Amendment claim.

**A.**     The PLRA provides that BOP's "designation of a place of imprisonment ... is not reviewable by any court."  18 U.S.C. § 3621(b).

App. 057

Congress has thus expressly precluded judicial review of BOP's decisions to house these particular inmates in certain low-security male facilities. And even if judicial review of those decisions were permissible, plaintiffs have not satisfied the PLRA's mandatory exhaustion requirement by pursuing complaints regarding their transfer to male facilities through BOP's Administrative Remedy Program before bringing suit.

**B.** Plaintiffs' Eighth Amendment claims fail in any event. To state a claim that prison officials violated the Eighth Amendment when they made the decision to transfer plaintiffs to male facilities, plaintiffs must show that the conditions in the chosen male facilities pose "a substantial risk of serious harm" and that the officials acted with "'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834. Plaintiffs cannot establish either of those elements here.

Housing male trans-identifying inmates in male prison facilities does not expose those inmates to objectively intolerable risks of harm. Over 1,400 male trans-identifying inmates in BOP custody are housed in male facilities. Plaintiffs have not established that those inmates face a pervasive threat of violence and sexual assault in any male facility, much less the low-security facilities to which plaintiffs have been designated. To the contrary, BOP's assault data confirms the low rate of assaults in those facilities, including

22

App. 058

only one guilty finding of sexual assault in the seven facilities at issue in all of 2024. JA391, 825 (Stover Second *Jones* Decl. ¶ 16).

And even assuming that plaintiffs would face an objectively substantial risk of harm in male facilities, BOP has not been deliberately indifferent to any such risks; rather, it has procedures designed to handle any specific risk of assault to an inmate and officials trained to reasonably respond to any known risk. And it considered and responded reasonably to possible safety concerns here by selecting particular male facilities with low rates of violence and existing trans-identifying inmate population as destination facilities for plaintiffs. The mere fact that BOP knows that these 20 plaintiffs are trans-identifying and is choosing to house them with other male inmates alone does not evidence deliberate indifference to those inmates' safety, just as it does not establish deliberate indifference to the safety of the hundreds of other male trans-identifying inmates in male BOP facilities.

Plaintiffs' theory essentially posits that anytime a male inmate would face an elevated risk of assault in men's prisons, it would constitute cruel and unusual punishment not to transfer that inmate to a women's prison. But there are any number of reasons that individuals might face above-average risks of assault from their fellow male inmates, such as their underlying offense of conviction or mental health issues. The Constitution clearly does

not require BOP to jeopardize the safety, bodily privacy, and well-being of the female inmates in its custody by assigning all such male inmates to women's prisons. Plaintiffs' understanding of the Eighth Amendment is thus fatally overbroad.

**II.** Nor have plaintiffs demonstrated that the remaining PI factors are satisfied. Although plaintiffs fear becoming possible victims of violence in male facilities, the record does not establish that any such victimization is certain or imminent at the particular low-security facilities to which they will be transferred. Moreover, the preliminary injunctions disrupt important Executive Branch policy judgments, disregard BOP's exercise of its expertise in the difficult and sensitive task of managing the federal prison system, and ignore the harm to female inmates' safety, privacy, and dignity from male inmates being housed in a female prison. The district court thus abused its discretion in concluding that the irreparable harm prong or the public interest and balance of the equities support blocking these transfers.

**III.** Finally, the preliminary injunctions do not comport with the PLRA's stringent procedural and scope requirements for preliminary-injunctive relief. In issuing such relief, courts must determine that it is narrowly drawn and the least intrusive means necessary to remedy the identified harm. 18 U.S.C. § 3626(a)(2). The district court neglected to make

that finding for the first five PI orders, and improperly summarily addressed the PLRA in the sixth order; regardless, there are less intrusive ways of ensuring plaintiffs' safety than entirely barring any transfer to male facilities.

## STANDARD OF REVIEW

This Court "review[s] the district court's balancing of the preliminary injunction factors for abuse of discretion and review[s] questions of law underlying the district court's decision *de novo*." *Abdullah v. Obama*, 753 F.3d 193, 197-98 (D.C. Cir. 2014). Although "factual findings" are generally reviewed "for clear error," where findings are based "upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18 (2024) (quotation marks omitted).

## ARGUMENT

I.     **Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Eighth Amendment Transfer Claims.**

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

25

App. 061

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (alterations in original) (quotation marks omitted). "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Id.* (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). A preliminary injunction cannot issue if plaintiffs fail to satisfy any of these factors. *See Winter*, 555 U.S. at 32. Plaintiffs have not done so here.

### A. The Prison Litigation Reform Act Bars this Challenge.

Because plaintiffs' Eighth Amendment claims regarding their transfer to male facilities challenge the conditions of their confinement, this suit is squarely foreclosed by the Prison Litigation Reform Act. The PLRA creates a carefully reticulated scheme for "the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331 (2000). The statute applies to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2). The PLRA renders the district court's PI orders invalid for two independent reasons.

26

**App. 062**

**1.** The PLRA bars judicial review of BOP decisions regarding where to house a particular inmate. In general, the PLRA grants BOP broad discretion to determine an inmate's "[p]lace of imprisonment." 18 U.S.C. § 3621(b) (emphasis omitted). The relevant provision directs that BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau," taking into account certain factors. *Id.* The statute further provides that BOP "may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another." *Id.* And at the conclusion of this provision, Congress shielded all such decisions from judicial interference, providing that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.* The district court improperly disregarded this restriction in reviewing whether plaintiffs should remain at the female facilities where they are currently incarcerated and blocking plaintiffs' transfer to low-security male facilities, as BOP has determined would be appropriate.

The district court acknowledged that the PLRA may "foreclose any APA challenges to facility designations and transfer decisions," but held that it does not "divest the Court of jurisdiction to entertain constitutional claims

27

**App. 063**

arising from BOP facility designations." JA159-60 (TRO Order 3-4). This is incorrect. Congress used clear, categorical language to establish that such decisions were entirely exempt from "review[] by any court." 18 U.S.C. § 3621(b). This Court has determined that similar language precluded review of as-applied constitutional claims. *See McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of the Judicial Conference*, 264 F.3d 52, 58, 60 (D.C. Cir. 2001) (holding that statute providing that actions "'shall not be judicially reviewable on appeal or otherwise'" had the "the requisite clarity of preclusive intent"). The same is true here as to plaintiffs' Eighth Amendment transfer claims.

Accordingly, other circuits have recognized that § 3621(b) precludes review of challenges to BOP's placement decisions where the plaintiffs raise constitutional claims challenging their individual placements. *See Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *4 (10th Cir. Sept. 27, 2022) (no "jurisdiction to review" due process challenge to "the BOP's decision on [the plaintiff's] transfer request"); *Touizer v. U.S. Attorney Gen.*, No. 21-10761, 2021 WL 3829618, at *2 (11th Cir. Aug. 27, 2021) (per curiam) (no jurisdiction to order transfer to home confinement, citing § 3621(b), where inmate raised First, Fifth, and Eighth Amendment claims); *Jiau v. Tews*, 812 F. App'x 638, 639 (9th Cir. 2020) (no jurisdiction over due process

28

claim challenging length of placement in residential reentry center under § 3621(b)).  The Tenth Circuit expressly rejected the argument that the text of § 3621(b) did not apply to constitutional challenges, explaining that "§ 3621(b) contains no such limiting language." *Wills*, 2022 WL 4481492, at *4.  Plaintiffs here similarly challenge BOP's placement determinations, asserting that their individual transfers to male facilities will violate their Eighth Amendment rights given the conditions at those facilities.  *See* JA165 (TRO Order 9) ("[P]laintiffs' alleged constitutional harms would arise entirely and narrowly out of their placement in a male penitentiary … .").  Such challenges are "not reviewable by any court."  18 U.S.C. § 3621(b).

**2.**	Further, the PLRA requires plaintiffs to exhaust their claims within prison remedial schemes before seeking judicial relief.  *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  So long as administrative remedies are "available," "a court may not excuse a failure to exhaust" under the PLRA, "even to take

[special] circumstances into account." *Ross v. Blake*, 578 U.S. 632, 638-39 (2016).

Plaintiffs do not claim to have satisfied the PLRA's requirement to "complete the administrative review process in accordance with the applicable procedural rules." *Bock*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). BOP's Administrative Remedy Program has four levels: aggrieved individuals must first attempt an informal resolution with unit staff, then submit an administrative remedy request to the Warden, then appeal to BOP's Regional Director, and then, if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. This process was "available" to plaintiffs. *Ross*, 578 U.S. at 638-39; *see Savage v. U.S. Dep't of Justice*, 91 F.4th 480, 484 (D.C. Cir. 2024) ("[A] grievance procedure is 'available' to a prisoner if it is 'capable of use to obtain some relief for the action complained of.'").[7]

The district court nonetheless determined that exhaustion was not required because plaintiffs satisfied "a narrow exception to the administrative exhaustion requirement" whereby exhaustion would

---

[7] A procedure is "available" under the PLRA even if it cannot provide "the remedial action an inmate demands"; prison officials need only have "authority to take *some* action in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001) (emphasis added).

"'operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" JA161 (TRO Order 5) (quoting *Ross*, 578 U.S. at 643). The court explained that EO 14168 "plainly requires the BOP to perform the allegedly unlawful facility transfer" and BOP thus lacks "discretion to provide" any relief "that would remedy the plaintiffs' supposed constitutional violations." JA161 (TRO Order 5). That conclusion misconstrues the nature of plaintiffs' claims, and conflates the failure to provide the precise relief that plaintiffs seek with the ability to take any action on plaintiffs' complaints at all.

The district court stated that "the alleged constitutional violation arises from the forthcoming transfer to a male penitentiary," an "actio[n] which the BOP has no discretion not to take." JA163 (TRO Order 7). But the alleged constitutional violation at issue involves the Eighth Amendment right to be free from cruel and unusual punishment, and specifically the knowing failure to protect plaintiffs from violence at the hands of their fellow inmates. Contrary to the court's suggestion, it is not the transfer alone that would be deemed to violate the Eighth Amendment; rather, plaintiffs must show that the risk of harm to plaintiffs in a male facility *following transfer* is constitutionally impermissible, and BOP's efforts to address that risk are constitutionally inadequate. This requires a fact-specific evaluation of the

31

circumstances of plaintiffs' confinement. Although BOP lacks discretion to continue housing plaintiffs in female facilities under EO 14168, there are any number of actions that BOP can take to protect their safety in a male facility, including changes to housing and programming assignments, and protective custody. *See* 28 C.F.R. § 115.42; JA308-10 (Stover First *Jones* Decl. ¶¶ 11-15). If plaintiffs raised concerns about their safety in a male facility through the Administrative Remedy Program, BOP could thus take action to pursue additional safety measures.

The district court effectively concluded that because BOP's administrative scheme cannot give plaintiffs the *precise relief* they seek in this litigation—a halt to the transfer—it can provide no remedy at all. But the specific "exception" to exhaustion under which the court exercised review does not stretch so broadly; it only covers circumstances where there is truly "no … potential" for "'any relief.'" *Ross*, 578 U.S. at 642-43 (contemplating circumstances where the office at issue "disclaims the capacity to consider" grievances and "'lacks authority to provide any relief,'" or as a factual matter "decline[s] ever to exercise" its authority). Remedies are "available" under the PLRA where officials have "authority to take *some* responsive action with respect to the type of allegations" raised, even if they cannot provide "the specific relief the prisoner demands." *Booth v. Churner*, 532 U.S. 731, 737

32

App. 068

n.4, 738 (2001) (emphasis added); *cf. Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) (holding that exhaustion was not required where "BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to" the inmate's complaint).

BOP has discretion to take a variety of actions (other than continuing to house them in female facilities) to address plaintiffs' concerns regarding safety, should plaintiffs properly raise such grievances. Accordingly, the PLRA requires plaintiffs to exhaust their Eighth Amendment claims through BOP's administrative complaint scheme.

## B. The Eighth Amendment Does Not Require BOP to House Plaintiffs, Who Are Male Inmates, in Female Prisons.

"[T]he segregation of inmates by sex is unquestionably constitutional." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996). The district court abused its discretion in nonetheless concluding that BOP's decision to transfer the all-male plaintiffs to male prisons likely violated the Eighth Amendment. Under the Eighth Amendment's prohibition of "cruel and unusual punishments," prison officials must "take reasonable measures to guarantee the safety of the inmates," which includes "protect[ing] prisoners from violence at the hands

33

**App. 069**

of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quotation marks omitted). To establish a failure-to-protect claim, an "inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" to his health or safety and that prison officials acted with "'deliberate indifference'" to that risk. *Id.* at 834; *accord Wade v. McDade*, 106 F.4th 1251, 1261-62 (11th Cir. 2024) (en banc). Neither prong of that inquiry has been satisfied here.

**1.a.** Plaintiffs have not demonstrated that merely placing them in a male facility will inherently subject them to an objectively substantial risk of serious harm. For the level of risk to satisfy the first prong of this inquiry, it must be "'sufficiently serious'" and "objectively intolerable." *Farmer*, 511 U.S. at 834, 846. "[N]ot every risk carries an inherent threat at a substantial level, or of severity beyond the norms ... ." *Lakin v. Barnhart*, 758 F.3d 66, 72 (1st Cir. 2014) (Souter, J.); *see Murphy v. United States*, 653 F.2d 637, 644 (D.C. Cir. 1981) ("[A] prisoner has no right to demand the level of protection necessary to render an institution assault-free ... ."). To qualify as "substantial," the risk must be "pervasive": "violence and sexual assaults [must] occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures." *Vandevender v. Sass*,

34

**App. 070**

970 F.3d 972, 977 (8th Cir. 2020) (quotation marks omitted); *see Shrader v. White*, 761 F.2d 975, 978 (4th Cir. 1985) (similar); *Murphy*, 653 F.2d at 644-45 (similar).

Having initiated these actions before being transferred to specific male facilities,[8] plaintiffs' argument is not that a specific housing assignment carries an objectively intolerable risk of harm. Instead, plaintiffs assert categorically that there are no possible housing conditions at any male facility under which plaintiffs would not be subject to an objectively intolerable threat of abuse. There is no support for that assertion, and no support for the necessary implication that BOP is categorically unable to adequately manage the risk of assault for the approximately 1,466 male trans-identifying inmates (representing 99% of all such inmates) who are housed in male facilities. *See* JA174 (Stover Second *Doe* Decl. ¶ 5).

As far as the undersigned counsel are aware, no federal court has ever held that the Eighth Amendment requires BOP to house trans-identifying inmates in opposite-sex facilities as a means of protecting them from the risk

---

[8] Although two plaintiffs—Rachel and Ellen Doe—were transferred prior to joining this action, JA240-41, they "incorporate[d] by reference the arguments made in [plaintiffs'] prior motions" that transfer to any male facility was constitutionally impermissible, *Doe*, Dkt. 61-1, at 7.

35

**App. 071**

of assault.[9] *See Doe v. Georgia Dep't of Corr.*, 730 F. Supp. 3d 1327, 1344 (N.D. Ga. 2024) (observing that even if court found "some specific and immediate threat of harm" to male trans-identifying inmate in male facility, court would deny request for transfer to women's prison at PI stage); *Hampton v. Baldwin*, No. 3:18-cv-550, 2018 WL 5830730, at *13, *16-17 (S.D. Ill. Nov. 7, 2018) (finding likelihood of success on merits of failure-to-protect claim, but declining to order transfer to women's prison at PI stage).

**b.** The district court nonetheless found that the plaintiffs had satisfied this prong by citing "various government reports and regulations recognizing that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex." JA164-65 (TRO Order 8-9). But the government "reports and regulations" relied on by the district court do not come close to establishing that plaintiffs face a significantly elevated

---

[9] And counsel are aware of only two federal district courts that have held that a trans-identifying inmate must be moved to an opposite-sex facility as relief under a deliberate indifference to medical needs claim. *See JJS v. Pliler*, No. 19-cv-2020, 2022 WL 16578124, at *16-19 (S.D.N.Y. Aug. 3, 2022), *report and recommendation adopted sub nom. Shelby v. Petrucci*, No. 19-cv-2020, 2022 WL 16575766 (S.D.N.Y. Nov. 1, 2022); *Soneeya v. Mici*, 717 F. Supp. 3d 132, 134-35 (D. Mass. 2024). *But see Fisher v. BOP*, No. 4:19-cv-1169, 2022 WL 2648950, at *15-16 (N.D. Ohio July 8, 2022) (no Eighth Amendment violation where BOP had not transferred male trans-identifying inmate to female facility).

36

risk of physical and sexual assault if they are transferred to a male prison facility. Those materials indicate merely that trans-identifying inmates are generally more likely to be the victims of sexual violence than non-trans-identifying inmates. *See* JA209 (*Doe*, Second Am. Compl. ¶ 105). But that fact alone does not support the conclusion that transferring a trans-identifying inmate to a male prison significantly increases the risk of assault. Indeed, the government report on which plaintiffs rely indicates that the rate of sexual victimization is almost two-and-a-half times *higher* at female prisons (8.5%) than at male prisons (3.7%). U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, at 15 (May 2013) (Table 5), https://perma.cc/RLB3-CY8Q (BJS Report); *see id*. at 54 (Appendix Table 2) (showing overall lower rates at federal facilities, with similar disparity between male and female facilities).

Moreover, even if plaintiffs could show that male prisons have, on average, higher rates of sexual assault than do female prisons, that showing would not mean that plaintiffs necessarily face a higher risk of assault in the facilities that BOP designated for their transfers. As the cited government report found, many male facilities in the federal prison system have very low rates of sexual victimization, BJS Report 48 (Appendix Table 1), including a

37

number that "had no reported incidents of sexual victimization of any kind" when surveyed, BJS Report 15. Indeed, BOP's declarant explained that, in "the seven facilities that the *Jones* and *Doe* plaintiffs may be transferred [to], there was only one guilty finding … of sexual assault … in 2024." JA391, 825 (Stover Second *Jones* Decl. ¶ 16). And the rates of assault generally at the male facilities to which plaintiffs will be transferred are often lower than the rates in the facilities where plaintiffs are currently housed. JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 13-15).

The district court discounted the government's statistics because they "do not disaggregate assaults against transgender inmates from overall rates of assault." JA187 n.2. But that objection is inapposite; the overall rate of assaults in these male facilities—which already house trans-identifying inmates—is so low that merely being housed there cannot constitute being subject to a substantial risk of serious harm. *See* JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 13-16); JA176-77, 658-59 (Stover Second *Doe* Decl. ¶¶ 19-24); JA396-443.

Plaintiffs thus have not and cannot show that their transfer to a male prison will expose them to a "pervasive" and "objectively intolerable" risk of assault. *See Murphy*, 653 F.2d at 645 (concluding that showing was insufficient where 20 assaults occurred within calendar year and the plaintiff

**App. 074**

made "no attempt to show that the rate of assaults in this facility exceeded the norm for like institutions"); *Green v. Hooks*, 798 F. App'x 411, 426-27 (11th Cir. 2020) ("28 reported incidents of sexual assault … over five years" did not demonstrate "substantial risk of serious harm").

Under plaintiffs' reasoning, moreover, BOP would violate the Constitution any time it assigned to a male prison a male inmate who, statistically speaking, faced an elevated risk of sexual assault. The absurd results produced by plaintiffs' theory reveal the fundamental flaw in their Eighth Amendment claims. Many male inmates face an elevated risk of sexual or other assault in men's prisons based on their individual characteristics, such as their offense of conviction, sexual orientation, mental health, or status as a government informant. *See* BJS Report 18 (higher rates of inmate-on-inmate sexual victimization among non-heterosexual inmates than heterosexual inmates); BJS Report 19-20 (higher rates among violent sex offenders than other offenders); BJS Report 24-26 (higher rates among inmates with severe psychological distress than inmates without mental health problems); *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (observing that "an inmate who is considered to be a snitch is in danger of being assaulted or killed by other inmates" and collecting relevant Eighth Amendment cases). And the risks to such inmates would likely decrease, in

39

App. 075

some case likely dramatically, if those men were transferred to women's prisons.  But even if there was no other way to eliminate the risk of violence to such inmates in men's prisons, no one would assert that it would violate the Eighth Amendment not to house them in women's prisons.  The same is true for the male inmates at issue here: the Constitution does not force BOP to privilege their interests by compromising the safety and infringing upon the privacy of female inmates in its custody.  Plaintiffs' sweeping understanding of the Eighth Amendment is thus plainly incorrect.

      **c.**    The district court also suggested, citing only to the initial *Doe* complaint, that plaintiffs face a sufficiently serious risk of harm from being housed in a male facility because such housing "*by itself* will exacerbate the symptoms of their gender dysphoria."  JA165 (TRO Order 9) ("[T]he mere homogenous presence of men will cause uncomfortable dissonance."); *see* JA187 n.2.  Plaintiffs' transfer claim is not a medical-treatment claim but rather a failure-to-protect claim, so the district court's point is irrelevant.  Doubly so because the *Doe* plaintiffs did not even rely on any such harm in their original PI motion.  *See Doe*, Dkt. 13-1, at 14-18.  And for good reason. The court cited no case law, secondary source, or expert testimony to suggest that merely living in a male facility as a trans-identifying inmate with a

40

**App. 076**

diagnosis of gender dysphoria[10] constitutes an "objectively intolerable risk" to the inmate's health as to amount to cruel and unusual punishment and require placement in a female facility.

Plaintiffs attempted to supply this missing support in a subsequent declaration. *See* JA182-83 (Meade *Doe* Supp. Decl. ¶ 8). But even assuming "resid[ing] in a men's facility" would "worsen [plaintiffs'] gender dysphoria," *id.*, that does not show that any change in the severity of symptoms would rise to the level of an Eighth Amendment violation, particularly considering the ways in which BOP could treat those symptoms. Nor can plaintiffs make that showing, in light of the vast number of inmates with gender dysphoria that can be adequately managed by BOP in male facilities.

**2.**     Nor have plaintiffs shown that BOP is deliberately indifferent to the potential risks of transferring plaintiffs to male facilities. This prong of the inquiry requires that prison officials "kno[w] that inmates face a substantial risk of serious harm and disregar[d] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials

---

[10] As noted, there are approximately 1,466 male trans-identifying inmates in BOP custody who live in male facilities, JA174 (Stover Second *Doe* Decl. ¶ 5), though not all trans-identifying individuals have gender dysphoria. And as of March 27, 2025, there were 1,028 inmates in BOP custody being treated for gender dysphoria or incongruence. Declaration of Chris A. Bina ¶ 7, *Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C. Mar. 28, 2025), Dkt. 36-1.

41

**App. 077**

are not deliberately indifferent "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. The requirement that officials ensure "reasonable safety" for inmates "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844-45 (quotation marks omitted).

    **a.** Here, BOP specifically considered the risks to plaintiffs of being housed in male facilities. *See* JA307-08, 747-48 (Stover First *Jones* Decl. ¶¶ 8-9); JA390-91, 824-25 (Stover Second *Jones* Decl. ¶¶ 12-16); JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12); JA175-77, 657-59 (Stover Second *Doe* Decl. ¶¶ 12-25); JA237, 710 (Associate Warden *Doe* Decl. ¶¶ 5-7); JA513, 910 (Stover *Moe* Decl. ¶ 11). "In determining the most appropriate placement for transgender inmates," BOP "takes into consideration the inmates' assigned security level, disciplinary record, medical record and psychology record." JA100, 653 (Stover First *Doe* Decl. ¶ 11). "Based on the [BOP decisionmakers'] experience and range of expertise," it determined that "placing [plaintiffs] at a low security institution with non-violent offenders would minimize the likelihood that they would be victimized." JA100-01, 653-54 (Stover First *Doe* Decl. ¶ 12). And once plaintiffs are in particular male facilities, BOP will further consider safety concerns and how to

42

**App. 078**

minimize the risk of victimization "in making ... housing and programming assignments." 28 C.F.R. § 115.42(c).

Indeed, the record already contains an example of how BOP reasonably responds to concerns raised by trans-identifying inmates in male facilities. Plaintiffs Rachel and Ellen Doe were transferred to a male facility before being added to this litigation. *See* JA240-41. While there, "Rachel Doe reported receiving a note that was sexual in nature from an unknown inmate." JA239, 710 (Associate Warden *Doe* Decl. ¶ 10). As a result, BOP Special Investigative Services began an investigation into the incident. *Id*. The investigation found "that Rachel did not feel threatened or concerned," and subsequently was "living in general population and attending recreation without issue," JA239, 710 (Associate Warden *Doe* Decl. ¶¶ 11-12), but if the investigation had revealed a serious threat, BOP would have taken appropriate steps to protect Doe from harm, such as by separating Doe from the aggressor or otherwise initiating protective custody.

BOP officials thus have responded reasonably to the risk at issue (even assuming it is an objectively substantial one), and plaintiffs provide no reason to doubt that BOP officials will continue to do so. The requirement to ensure "reasonable safety" for male trans-identifying inmates—reflecting "due regard for prison officials' 'unenviable task of keeping dangerous men

43

in safe custody,'" *Farmer*, 511 U.S. at 844—does not force BOP to attempt to eliminate the risks to such inmates entirely by harming the security, dignity, and well-being of female inmates. Accordingly, plaintiffs cannot establish that BOP officials were subjectively aware of a substantial risk of harm to plaintiffs and failed to take reasonable steps to abate that risk.

**b.** The district court nonetheless concluded that BOP was deliberately indifferent to the purportedly serious risk of harm that plaintiffs would face from the transfer merely because BOP was aware of the cited "government resources and regulations." JA165 (TRO Order 9). But as discussed, those sources do not support that these plaintiffs would face an objectively intolerable risk in the specific male facilities to which they would be transferred. Nor is the mere knowledge that an inmate is trans-identifying and will be housed among males sufficient to show deliberate indifference. *See, e.g.*, *Farmer*, 511 U.S. at 848-49 (acknowledging the defendants' admission that the plaintiff was a "transsexual" in a high-security male facility, but remanding without suggesting that those facts alone established deliberate indifference); *Green*, 798 F. App'x at 423.

Plaintiffs assert to the contrary that "[c]ourts have consistently found this element satisfied when officials knowingly house transgender women"—*i.e.*, males—"in men's prisons." *Doe*, Dkt. 13-1, at 16 (citing cases); *Jones*,

44

**App. 080**

Dkt. 21-1, at 17 (same); *Moe*, Dkt. 31-1, at 15 (same). That misstates the law, as even a cursory review of the cases cited by plaintiffs shows. In none of the cases cited by plaintiffs did a court find that the decision to house a male trans-identifying inmate in a men's prison was alone sufficient to establish that prison officials deliberately disregarded a substantial risk of harm to the inmate. In each case, the court found that additional, case-specific factors heightened the risk of assault, and that it was the officials' disregard of these additional factors that demonstrated their failure to take reasonable steps to protect the plaintiff from harm. *See, e.g.*, *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77-80 (D.D.C. 2016) (knowledge that the plaintiff was supposed to be housed alone, but unnecessarily placed male inmate in cell with plaintiff "unsupervised overnight" without performing security checks or following transfer protocols); *Stover v. Corrections Corp. of Am.*, No. 1:12-cv-393, 2015 WL 874288, at *6-10 (D. Idaho Feb. 27, 2015) (prior reporting of "generalized information about assaults by" gang-member assailants, plaintiff's requests to move for safety reasons, and open-dorm setting housing exclusively sex offenders); *Lojan v. Crumbsie*, No. 12-cv-320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (knowledge of vulnerability and allowing individual with history of violence "access to [the plaintiff] as a trustee"); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 689-92, 696 (S.D.

**App. 081**

Tex. 2016) (the plaintiff reported over a dozen incidents of assault to prison officials in facilities with documented issues involving sexual abuse of gay and trans-identifying inmates). Plaintiffs point to no such factors here.

3.     The district court also concluded that BOP was likely deliberately indifferent to the risks to plaintiffs of being housed in male facilities because BOP had previously "determined that women's facilities are the *appropriate* facilities for Plaintiffs under the prevailing legal regime," but now seeks to "remov[e] Plaintiffs from their appropriate housing assignment" due "sole[ly]" to the implementation of EO 14168. JA446-47; *see* JA186-87. This fundamentally misunderstands the nature of BOP's designation authority and its exercise with respect to trans-identifying inmates.

Contrary to the district court's supposition, BOP's prior decisions to house plaintiffs in opposite-sex facilities were not based solely on safety considerations. Rather, BOP considered a number of factors, including: "an inmate's security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse," as well as "facility-specific factors, including inmate populations, staffing patterns, and physical layouts." JA125. In some circumstances, inmates were "placed in a women's facility due to court

46

**App. 082**

orders," as part "of a settlement agreement," or "because they were already being housed with women prior to coming into [BOP] custody." JA393 (Stover Second *Jones* Decl. ¶ 24). And some inmates were transferred to an opposite-sex facility to "progres[s] the individual inmate's transition" to the opposite sex as required under the prior BOP policy for cross-sex surgeries. JA126; JA393 (Stover Second *Jones* Decl. ¶ 24) (noting that Zoe and Mary Doe fall into this category). There is no reason to think that BOP's previous determinations to house plaintiffs in female facilities reflected a judgment on the part of BOP that it would be categorically, unconstitutionally unsafe to house them in any male facility.

In any event, even if plaintiffs had been housed in female facilities based purely on safety concerns, the Eighth Amendment does not bar BOP from revisiting those assignments and determining that different housing designations are appropriate. "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). In making such decisions, the Constitution does not require prison administrators to prioritize the safety of an individual prisoner over all other considerations. *See, e.g.*, *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (The Eighth Amendment is not violated where the action challenged was taken for "a legitimate penological purpose.").

47

**App. 083**

BOP has a legitimate penological interest in the privacy, well-being, and security of female inmates. That BOP is now placing more weight on those interests when making housing assignments than it did in the recent past does not violate the Constitution.

## II. Plaintiffs Have Not Satisfied The Remaining Preliminary-Injunction Factors.

In seeking a preliminary injunction, plaintiffs also have "the burden to show ... that they are likely to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities, including the public interest, tips in their favor." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017) (alterations and quotation marks omitted); *see MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) ("If the government is the party sought to be enjoined, the public interest and balance of equities factors merge."). Plaintiffs have failed to establish those factors here.

**A.** Plaintiffs have not demonstrated that they will likely suffer irreparable harm from the transfer to male facilities. This Court has "set a high standard for irreparable injury": to qualify, an injury must be "both certain and great," "actual and not theoretical," "imminen[t]," and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (emphasis and quotation marks omitted)

48

**App. 084**

(holding that "tangible injury" was too "hypothetical" where challenged practice merely "reduce[d the] Appellants' *opportunities* for promotion").

Here, plaintiffs fear that they will be the victims of violence and sexual abuse if transferred to male facilities. *See Doe*, Dkt. 13-1, at 22-23; *Doe*, Dkt. 50-1, at 23; *Jones*, Dkt. 38, at 9; *Jones*, Dkt. 21-1, at 21-22; *Moe*, Dkt. 4, at 19-20. But they have not shown that any such physical harm is likely, much less certain. Rather, plaintiffs allege only that the risk of such violence is increased in male facilities generally. *See supra* pp. 36-37. And the cases plaintiffs cite do not stand for the proposition that merely being housed in male facilities and exposed to the possibility of violence therein is *per se* an irreparable injury for preliminary injunction purposes.[11]

Nor can plaintiffs succeed in demonstrating that the tangible injury they fear is sufficiently imminent and certain, given that the vast majority of male trans-identifying inmates are currently housed in male facilities and BOP will take steps to minimize any risk to plaintiffs by, among other things,

---

[11] *Tay v. Dennison*, 457 F. Supp. 3d 657, 687 (S.D. Ill. 2020) (finding irreparable injury where the plaintiff was "forced to endure constant sexual abuse" and "sexually assaulted, harassed, and threatened" by "multiple prisoners"); *Hampton*, 2018 WL 5830730, at *15 (finding irreparable harm where the plaintiff "continues to be sexually assaulted and prison officials refuse to do anything to protect her"); *Greene v. Bowles*, 361 F.3d 290, 292 (6th Cir. 2004) (not involving PI motion or irreparable injury); *Becker v. Sherman*, No. 16-cv-828, 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (same); *Lojan*, 2013 WL 411356, at *4 (same).

49

transferring them to low-security institutions with non-violent offenders.[12] The possibility that these specific plaintiffs will be victimized in the low-security facilities that BOP has identified for their housing thus "fail[s] to rise beyond the speculative level." *Citizens for Responsibility & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam); *see Hanson v. District of Columbia*, 120 F.4th 223, 245 (D.C. Cir. 2024) (per curiam) ("'[S]imply showing some *possibility* of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief.").

The district court nonetheless concluded that plaintiffs had demonstrated irreparable harm related to transfer based on the "prospective violation of a constitutional right." JA166 (TRO Order 10) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). As discussed, *supra* Part I, plaintiffs are not likely to succeed in showing any such violation. Moreover, this Court has clarified that it does not "'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights." *Hanson*, 120 F.4th at 244.

---

[12] Indeed, the two newest *Doe* plaintiffs—who were transferred to and briefly housed in a low-security male facility before joining this action—made no allegations that they had been subjected to any physical harm during that period. *See* JA229-30, 700-01 (Ellen Doe Decl.); JA232-34, 703-05 (Rachel Doe Decl.).

As to Rachel and Ellen Doe only, the district court also stated that "the fact that they have already been transferred and, allegedly, have been abused at their new facilities can only strengthen their claims of irreparable harm." JA241-42.  The record, however, reveals only that the two allegedly had been subjected to unwanted attention and propositioned for sex at the new male facilities.  *See* JA230, 701 (Ellen Doe Decl. ¶ 8); JA233-34, 704-05 (Rachel Doe Decl. ¶¶ 11-12).  Those plaintiffs asserted that they were in "fear of sexual assault and other violence," *Doe,* Dkt. 61-1, at 9—not that they had actually experienced any since their recent transfer to low-security male facilities.[13] Although plaintiffs seem to suggest that experiencing fear of potential victimization alone is an irreparable injury, *id.,* such intangible and subjective allegations of harm are insufficient, *see Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *5 (4th Cir. Mar. 28, 2025) ("[S]ubjective fear that is remote and speculative is insufficient to show the required actual and imminent harm to establish irreparability.").

As the Supreme Court has explained with respect to the analogous standing inquiry, "[i]t is the *reality* of the threat of repeated injury that is

---

[13] Moreover, as a government declarant explained, one of these plaintiffs had "not made any complaints of sexual harassment," and the other indicated to BOP Special Investigative Services that the inmate "did not feel threatened or concerned" despite receiving a note "that was sexual in nature." JA239, 710 (Associate Warden *Doe* Decl. ¶¶ 9-12).

51

App. 087

relevant ... not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury ... ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983); *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) ("'subjective apprehensions' that ... recurrence [of feared conduct] would even *take place* were not enough to support standing" in *Lyons*); *see also Hange v. City of Mansfield*, 257 F. App'x 887, 893 (6th Cir. 2007); *Finstuen v. Crutcher*, 496 F.3d 1139, 1144 (10th Cir. 2007). Although plaintiffs might worry about violence if housed in male facilities, that subjective concern alone does not constitute irreparable injury.

Plaintiffs' failure to adequately establish that they will likely suffer irreparable injury is sufficient to require vacatur of the preliminary injunctions in these cases. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) ("[A] movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction ... ." (alteration and quotation marks omitted)).

**B.** The district court further erred in concluding that the balance of the equities and public interest favor the issuance of these injunctions. JA166-67 (TRO Order 10-11).

**App. 088**

The President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has deemed it important to protect the safety, well-being, and privacy of female inmates in intimate spaces when they are in federal custody. EO 14168, §§ 1, 4, 90 Fed. Reg. at 8615-16. And that determination is consistent with BOP's expert policy judgment. *See* JA392-93, 826-27 (Stover Second *Jones* Decl. ¶¶ 20, 23) ("It is [B]OP's correctional judgment that housing inmates with inmates of their own biological sex ensures bodily privacy and safety and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships."). Regardless of the public debate over these issues, there is a public interest in deferring to the Executive Branch's determination as to the operations of the federal prisons. By contrast, forcing BOP to effectively "keep in place a [former housing policy] that no longer reflects its current … thinking … is not in the public interest." *MediNatura*, 998 F.3d at 945.

The preliminary injunctions impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy. "[P]rison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." *Turner v. Safley*, 482 U.S. 78, 89 (1987) (alterations and quotation marks omitted). And "[i]t is well settled that the decision where to house inmates," in

53

**App. 089**

particular, "is at the core of prison administrators' expertise." *McKune*, 536 U.S. at 39. This Court has accordingly recognized the need to "accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (alterations, emphasis, and quotation marks omitted). The district court failed to do so here.

Instead, the court second-guessed the strength of Executive Branch policy interests, suggesting that any "deleterious effect on privacy and security" for female inmates was irrelevant because "there are only about sixteen" male trans-identifying inmates "housed in female penitentiaries," and that BOP could "manage[]" the "threat to the female inmates housed with them" "locally by prison staff." JA166-67 (TRO Order 10-11). It is not the prerogative of the district court to dictate the management of federal prisons or countermand the President's express judgment that the implementation of this housing policy is necessary to serve the public interest in protecting female inmates. To the contrary, such policy judgments and governmental interests merit particularly strong consideration under the PLRA, which requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal

54

App. 090

justice system" that would be caused by the requested preliminary-injunctive relief. 18 U.S.C. §3626(a)(2).[14]

The Executive Branch interests at stake thus clearly outweigh plaintiffs' speculative assertions regarding the possible risks of being housed in low-security male facilities. In nevertheless granting these broad preliminary injunctions, the district court abused its discretion.

## III. The Preliminary Injunctions At Issue Violate The PLRA.

At a minimum, this Court should vacate the preliminary injunctions for failure to comply with the PLRA's relief provisions. The PLRA contains specific restrictions on the grant of "preliminary injunctive relief" "with respect to prison conditions." 18 U.S.C. § 3626(a)(2). Any such relief must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means

---

[14] *See, e.g.*, *Baxter v. Wexford Healthcare*, No. 16-cv-291, 2017 WL 2772333, at *3 (W.D. Pa. June 27, 2017) (observing that "harm to the nonmoving party" and "public interest" factors are "especially important" in the correctional context given 18 U.S.C. § 3626(a)); *Bryant v. Johnson*, No. 7:11-cv-75, 2012 WL 4459930, at *3 (W.D. Va. June 15, 2012) ("Efficient and effective penal administration furthers the public's interest, and involving a federal court in the day-to-day administration of a prison is a course the judiciary generally disapproves of taking." (citing 18 U.S.C. § 3626(a)(2)); *Matheis v. CDCR*, No. 20-cv-2100, 2021 WL 718603, at *4 (S.D. Cal. Feb. 24, 2021) ("The Court cannot substitute CDCR's own judgment on what would best serve the public interest, such as calculating whether transferring an inmate during times of COVID-19 would be net beneficial." (citing 18 U.S.C. § 3626(a)(2)).

55

necessary to correct that harm." *Id.* The district court did not make any such findings in the first five PI orders that these requirements were satisfied. *Compare* JA242-43 (PLRA findings), *with* JA157-67 (TRO Order 1-11) (no findings); JA168-69 (same); JA185-88 (same); JA333-34 (same); JA445-49 (same); JA569-71 (same). That failure alone requires "immediate termination" of all but the final *Doe* PI order. 18 U.S.C. § 3626(b)(2).

And for the final *Doe* PI order, the district court engaged in only a brief and cursory analysis. JA242-43. But the PLRA requires much more. *See Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278-79 (11th Cir. 2020) (holding that a "one-sentence, boilerplate paragraph … regarding PLRA compliance"—akin to "just append[ing] a rote, catch-all assertion that 'the permanent injunction satisfies the [PLRA]'"—was 'seriously deficient'"); *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000) (explaining that analogous provision of PLRA requires not just a "summary conclusion," but rather "particularized findings, on a provision-by-provision basis, that each requirement imposed … satisfies the need-narrowness-intrusiveness criteria, given the nature of the current and ongoing violation").

Moreover, with respect to all 20 plaintiffs, the district court determined that to remedy the risk of harm they might face in a male facility, plaintiffs must be kept in female facilities. It should be self-evident, however,

56

**App. 092**

that there are better-tailored and less-intrusive means through which BOP can address the risk of harm to male trans-identifying inmates in male facilities. *See Farmer,* 511 U.S. at 831 (seeking injunction against confinement in *higher-security* male facility as relief for failure-to-protect claim). Indeed, the record reflects that BOP intends to pursue such means with respect to these plaintiffs, both regarding their initial transfer to and their experience in the new male facilities. *See, e.g.,* JA307-10, 747-50 (Stover First *Jones* Decl. ¶¶ 8-16); JA390-91, 94, 824-25, 828 (Stover Second *Jones* Decl. ¶¶ 11-16, 25-26). Vacatur of the preliminary-injunction orders as to the transfer of plaintiffs to male facilities is thus further warranted on this basis.

## CONCLUSION

For the foregoing reasons, the preliminary-injunction orders of the district court should be vacated insofar as they enjoin BOP from implementing Section 4(a) of EO 14168 and transferring plaintiffs to male facilities.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

GERARD SINZDAK

*/s/McKaye L. Neumeister*

MCKAYE L. NEUMEISTER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7231*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-8100*
   *McKaye.L.Neumeister@gmail.com*

May 2025

**App. 094**

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,538 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.


                */s/ McKaye L. Neumeister*
                McKaye L. Neumeister

**App. 096**

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 3621(b) ...................................................................... A1

18 U.S.C. § 3626(a)-(b) ...............................................................A2

42 U.S.C. § 1997e(a) ....................................................................A5

28 C.F.R. § 115.41.........................................................................A5

28 C.F.R. § 115.42 ........................................................................A7

28 C.F.R. § 542.13.........................................................................A7

28 C.F.R. § 542.14......................................................................... A8

28 C.F.R. § 542.15.......................................................................A10

**18 U.S.C. § 3621**

**§ 3621. Imprisonment of a convicted person**

* * *

**(b) Place of imprisonment.**--The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

**(1)** the resources of the facility contemplated;

**(2)** the nature and circumstances of the offense;

**(3)** the history and characteristics of the prisoner;

**(4)** any statement by the court that imposed the sentence--

**(A)** concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

**(B)** recommending a type of penal or correctional facility as appropriate; and

**(5)** any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same

A1

**App. 099**

matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

\* \* \* \*

## 18 U.S.C. § 3626

### § 3626. Appropriate remedies with respect to prison conditions

**(a) Requirements for relief.--**

**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--

**(i)** Federal law requires such relief to be ordered in violation of State or local law;

**(ii)** the relief is necessary to correct the violation of a Federal right; and

**(iii)** no other relief will correct the violation of the Federal right.

**(C)** Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of

A2

**App. 100**

prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

**(2) Preliminary injunctive relief.**--In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

**(3) Prisoner release order.**--**(A)** In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless--

    **(i)** a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

    **(ii)** the defendant has had a reasonable amount of time to comply with the previous court orders.

**(B)** In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

**(C)** A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.

**(D)** If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered.

A3

**App. 101**

**(E)** The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that--

**(i)** crowding is the primary cause of the violation of a Federal right; and

**(ii)** no other relief will remedy the violation of the Federal right.

**(F)** Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

**(b) Termination of relief.--**

**(1) Termination of prospective relief.--(A)** In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener--

**(i)** 2 years after the date the court granted or approved the prospective relief;

**(ii)** 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or

**(iii)** in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

**(B)** Nothing in this section shall prevent the parties from agreeing to terminate or modify relief before the relief is terminated under subparagraph (A).

**(2) Immediate termination of prospective relief.--**In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

A4

App. 102

**(3) Limitation.--**Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

**(4) Termination or modification of relief.--**Nothing in this section shall prevent any party or intervener from seeking modification or termination before the relief is terminable under paragraph (1) or (2), to the extent that modification or termination would otherwise be legally permissible.

* * * *

## 42 U.S.C. § 1997e

### § 1997e. Suits by prisoners

#### (a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

* * * *

## 28 C.F.R. § 115.41

### § 115.41. Screening for risk of victimization and abusiveness

**(a)** All inmates shall be assessed during an intake screening and upon transfer to another facility for their risk of being sexually abused by other inmates or sexually abusive toward other inmates.

**(b)** Intake screening shall ordinarily take place within 72 hours of arrival at the facility.

**(c)** Such assessments shall be conducted using an objective screening instrument.

**(d)** The intake screening shall consider, at a minimum, the following criteria to assess inmates for risk of sexual victimization:

A5

**App. 103**

**(1)** Whether the inmate has a mental, physical, or developmental disability;

**(2)** The age of the inmate;

**(3)** The physical build of the inmate;

**(4)** Whether the inmate has previously been incarcerated;

**(5)** Whether the inmate's criminal history is exclusively nonviolent;

**(6)** Whether the inmate has prior convictions for sex offenses against an adult or child;

**(7)** Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

**(8)** Whether the inmate has previously experienced sexual victimization;

**(9)** The inmate's own perception of vulnerability; and

**(10)** Whether the inmate is detained solely for civil immigration purposes.

**(e)** The initial screening shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse, as known to the agency, in assessing inmates for risk of being sexually abusive.

**(f)** Within a set time period, not to exceed 30 days from the inmate's arrival at the facility, the facility will reassess the inmate's risk of victimization or abusiveness based upon any additional, relevant information received by the facility since the intake screening.

**(g)** An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness.

**(h)** Inmates may not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to paragraphs (d)(1), (d)(7), (d)(8), or (d)(9) of this section.

**(i)** The agency shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this standard in order to ensure that sensitive information is not exploited to the inmate's detriment by staff or other inmates.

A6

**App. 104**

## 28 C.F.R. § 115.42

### § 115.42. Use of screening information

**(a)** The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.

**(b)** The agency shall make individualized determinations about how to ensure the safety of each inmate.

**(c)** In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

**(d)** Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

**(e)** A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.

**(f)** Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

**(g)** The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

## 28 C.F.R. § 542.13

### § 542.13. Informal resolution

**(a) Informal resolution.** Except as provided in § 542.13(b), an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each Warden shall establish procedures to allow for the informal resolution of inmate complaints.

**(b) Exceptions.** Inmates in CCCs are not required to attempt informal resolution. An informal resolution attempt is not required prior to

A7

**App. 105**

submission to the Regional or Central Office as provided for in § 542.14(d) of this part. An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution.

## 28 C.F.R. § 542.14

### § 542.14. Initial filing

**(a) Submission.** The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP–9), is 20 calendar days following the date on which the basis for the Request occurred.

**(b) Extension.** Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

**(c) Form.**

**(1)** The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).

**(2)** The inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue. For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.

**(3)** The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 ½ " by 11") continuation page. The inmate must provide an additional

A8

copy of any continuation page. The inmate must submit one copy of supporting exhibits. Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.

**(4)** The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional counselor). CCC inmates may mail their Requests to the CCM.

**(d) Exceptions to initial filing at institution—**

**(1) Sensitive issues.** If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

**(2) DHO appeals.** DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.

**(3) Control Unit appeals.** Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.

**(4) Controlled housing status appeals.** Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.

**(5) Other requests for formal review of decisions not originating from the Warden.** Other than the exceptions listed above, formal administrative remedy requests regarding initial decisions that did not originate with the Warden, or his/her staff, may be initially filed with the Bureau office which made the original decision, and appealed directly to the General Counsel.

A9

**App. 107**

**28 C.F.R. § 542.15**

**§ 542.15. Appeals**

**(a) Submission.** An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP–10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP–11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response. When the inmate demonstrates a valid reason for delay, these time limits may be extended. Valid reasons for delay include those situations described in § 542.14(b) of this part. Appeal to the General Counsel is the final administrative appeal.

**(b) Form.**

(1) Appeals to the Regional Director shall be submitted on the form designed for regional Appeals (BP–10) and accompanied by one complete copy or duplicate original of the institution Request and response. Appeals to the General Counsel shall be submitted on the form designed for Central Office Appeals (BP–11) and accompanied by one complete copy or duplicate original of the institution and regional filings and their responses. Appeals shall state specifically the reason for appeal.

(2) An inmate may not raise in an Appeal issues not raised in the lower level filings. An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal.

(3) An inmate shall complete the appropriate form with all requested identifying information and shall state the reasons for the Appeal in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 ½ ” x 11”) continuation page. The inmate shall provide two additional copies of any continuation page and exhibits with the regional Appeal, and three additional copies with an Appeal to the Central Office (the inmate is also to provide copies of exhibits used at the prior level(s) of appeal). The inmate shall date and sign the Appeal and mail it to the appropriate Regional Director, if a Regional Appeal, or to the National Inmate Appeals Administrator, Office of General Counsel, if a Central Office Appeal (see 28 CFR part 503 for information on locating Bureau addresses).

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JANE DOE, *et al.*,

            Plaintiffs,

v.                                                    Case No.: **1:25-cv-00286-RCL**

PAMELA BONDI, in her official capacity as
Attorney General of the United States, *et al.*,

            Defendants.

## [PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

This Court entered a preliminary injunction in this dispute on August 20, 2025 [ECF No. 89]. The injunction began on August 23, 2025, and will expire on November 21, 2025.

On November 13, 2025, the plaintiffs moved for the Court to enter a new preliminary injunction, providing the same relief as in the August 20 injunction, to begin on November 21, 2025, and end on February 19, 2026. The defendants do not oppose the plaintiffs' motion for a new preliminary injunction. There are no newly discovered factual circumstances that necessitate a reassessment of the Court's prior holdings that the plaintiffs have met their burden for preliminary injunctive relief or a reevaluation of the terms of that relief. Plaintiffs continue to meet their burden to prove preliminary injunctive relief is warranted.

Therefore, upon consideration of Plaintiffs' Motion for New Preliminary Injunction and the entire record herein, it is hereby

ORDERED that the plaintiffs' Motion is **GRANTED**; and it is further

ORDERED that the defendants are hereby enjoined from implementing Sections 4(a) and 4(c) of Executive Order 14168 against any plaintiff in this action for the period of November 21, 2025 to February 19, 2026; and it is further

[4777945.1]

**App. 109**

**ORDERED** that, for the period of November 21, 2025 to February 19, 2026, the defendants shall maintain and continue plaintiffs Jane Doe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Olivia Doe, Susan Doe, Lois Doe, Sally Doe, Wendy Doe, Rachel Doe, and Ellen Doe's housing status in women's facilities and shall continue to provide their gender dysphoria treatment as it existed immediately prior to January 20, 2025.

In accordance with the Prison Litigation Reform Act, the Court finds that this preliminary injunction is narrowly drawn, extends no further than necessary to correct the harm that the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm. 18 U.S.C. § 3626(a)(2). Plaintiffs have shown a substantial likelihood of success on their claims that implementation of sections 4(a) and 4(c) is or would be unlawful and is causing or would cause them immediate, irreparable harm. Because any application of Sections 4(a) and 4(c) to Plaintiffs would cause this serious and irreparable harm, a preliminary injunction preventing the implementation of those sections is necessary to correct the harm and is the least intrusive means necessary to do so. Furthermore, because this preliminary injunction prevents the implementation of only those sections of the Order for which Plaintiffs have demonstrated a likelihood of success on the merits and immediate, irreparable harm if a preliminary injunction is not entered, this order extends no further than necessary to correct the harm that requires this preliminary relief.

Finally, this Court has considered any adverse impact on public safety or on the operation of the criminal justice system caused by this relief and has given substantial weight to such impacts. *Id.* After this consideration, the Court has concluded and so finds that no adverse

/ / /

/ / /

[4777945.1]

2

**App. 110**

impacts on public safety or the operation of the criminal justice system will result from

maintaining the status quo of Plaintiffs' medical care and housing status while this

litigation proceeds.

Dated: _____ , 2025   _____
                               United States District Judge

**App. 111**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 5, 2025        Decided April 17, 2026

No. 25-5099

JANE DOE, ET AL.,
APPELLEES

v.

TODD BLANCHE, IN HIS OFFICIAL CAPACITY AS ACTING
ATTORNEY GENERAL OF THE UNITED STATES AND WILLIAM K.
MARSHALL, III, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE FEDERAL BUREAU OF PRISONS,
APPELLANTS

———

Consolidated with 25-5101, 25-5108, 25-5210, 25-5213,
25-5215, 25-5304, 25-5305, 25-5306, 25-5419, 25-5420, 25-
5427, 26-5066, 26-5067, 26-5069

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-00286)
(No. 1:25-cv-00401)
(No. 1:25-cv-00653)

———

*Benjamin Hayes*, Attorney, U.S. Department of Justice,
argued the cause for appellants. On the briefs were *Brett A.*

**App. 112**

2

*Shumate*, Assistant Attorney General, *Yaakov M. Roth*, Acting Assistant Attorney General, at the time the brief was filed, *Eric D. McArthur*, Deputy Assistant Attorney General, and *Gerard Sinzdak*, *Charles W. Scarborough*, and *McKaye L. Neumeister*, Attorneys.

    *Theodore E. Rokita*, Attorney General, Office of the Attorney General for the State of Indiana, *James A. Barta*, Solicitor General, *Jenna M. Lorence*, Deputy Solicitor General, *Raul R. Labrador*, Attorney General, Office of the Attorney General for the State of Idaho, *Alan M. Hurst*, Solicitor General, *Michael A. Zarian*, Deputy Solicitor General, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Treg Taylor*, Attorney General, Office of the Attorney General for the State of Alaska, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Chris Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Brenna Bird*, Attorney General, Office of the Attorney General for the State of Iowa, *Kris Kobach*, Attorney General, Office of the Attorney General for the State of Kansas, *Russell Coleman*, Attorney General, Office of the Attorney General for the Commonwealth of Kentucky, *Liz Murrill*, Attorney General, Office of the Attorney General for the State of Louisiana, *Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Andrew Bailey*, Attorney General, Office of the Attorney General for the State of Missouri, *Austin Knudsen*, Attorney General, Office of the Attorney General for the State of Montana, *Michael T. Hilgers*, Attorney General, Office of the Attorney General for the State of Nebraska, *Drew Wrigley*, Attorney General, Office of the Attorney General for the State of North Dakota, *Dave Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *Gentner Drummund*, Attorney General, Office of the

App. 113

3

Attorney General for the State of Oklahoma, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Marty Jackley*, Attorney General, Office of the Attorney General for the State of South Dakota, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *Derek Brown*, Attorney General, Office of the Attorney General for the State of Utah, *Jason S. Miyares*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, *John B. McCuskey,* Attorney General, Office of the Attorney General for the State of West Virginia*, Bridget Hill*, Attorney General, Office of the Attorney General for the State of Wyoming, *Rusty D. Crandell*, and *Linley Wilson* were on the brief for *amici curiae* Idaho, Indiana, 23 Other States, and the Arizona Legislature, in support of appellants.

*Jennifer L. Levi* argued the cause for appellees. With her on the brief were *Ernest Galvan*, *Kara J. Janssen*, *Adrienne Spiegel*, *Ben Hattem*, *Alexander Shalom*, *Natalie J. Kraner*, *Shannon Minter*, *Amy Whelan*, *Sarah Austin*, and *Eve L. Hill*. *Christopher Stoll* entered an appearance.

*Carolyn F. Corwin* was on the brief for *amici curiae* Law Professors in support of appellees.

*Andrew Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Elizabeth Matos*, Chief, Civil Rights Division, *Helle Sachse*, Deputy Director, Police Accountability Unit, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawai'i, *Kwame Raoul*,

4

Attorney General, Office of the Attorney General for the State of Illinois, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Leticia James,* Attorney General, Office of the Attorney General for the State of New York, *Dan Reyfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, and *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, were on the brief for *amici curiae* Massachusetts and 12 Other States in support of appellees.

*Richard Saenz* and *Michael J. Mestitz* was on the brief *amici curiae* Dee Deidre Farmer, et al., in support of appellees.

*Lawrence S. Lustberg* was on the brief for *amici curiae* Former Corrections Officials in support of appellees.

Before: SRINIVASAN, *Chief Judge*, PILLARD, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting Opinion filed by *Senior Circuit Judge* RANDOLPH.

PILLARD, *Circuit Judge*:

On January 20, 2025, the President issued an Executive Order directing the Attorney General to "ensure that males"—defined as "person[s] belonging, at conception, to the sex that produces the small reproductive cell"—"are not detained in

5

women's prisons or housed in women's detention centers." Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615, 8615-16 (Jan. 30, 2025).  Pursuant to the Executive Order, the Federal Bureau of Prisons prepared to transfer the eighteen transgender women who are plaintiffs in this case to men's facilities.  Plaintiffs are a very small subset of the thousands of transgender women in the Bureau's custody: those few who the Bureau itself had previously decided should be housed in women's facilities.

Plaintiffs sued to block their transfers, claiming in relevant part that incarceration in men's facilities will expose them to substantial risk of grave harm in violation of the Eighth Amendment to the U.S. Constitution.  The district court granted plaintiffs preliminary injunctive relief on the ground that transgender women face an unconstitutional risk of harm in men's prisons.  To the extent the court's reasoning categorically forbids placing any transgender woman in a men's prison, plaintiffs do not defend it on appeal.  They instead urge us to sustain the preliminary injunctions on the narrower ground that the individual plaintiffs before the court all have characteristics that make them particularly vulnerable to violence, abuse, and psychiatric harm in men's prisons.

The existing record does not include findings of fact about the individual plaintiffs' vulnerabilities, or about the reasons on which the Bureau relied in placing plaintiffs in women's facilities in the first place, to enable us to sustain the district court's preliminary injunctions on either of the narrower, plaintiff-specific grounds urged on appeal.  We thus vacate the operative preliminary injunctions and remand for further proceedings.  The district court remains free to consider, as it deems appropriate, whether plaintiffs may be entitled to relief

6

on those or other available grounds that may be supported by further findings of fact and analysis.

**I.**

**A.**

The Eighth Amendment's prohibition on cruel and unusual punishment imposes constraints on "the treatment a prisoner receives in prison and the conditions under which he is confined." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). In particular, the Supreme Court has long held that "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828 (internal quotation marks omitted). To prove an Eighth Amendment violation based on "deliberate indifference," a prisoner must establish that (1) the conditions in which the prisoner is incarcerated "pos[ed] a substantial risk of serious harm"; and (2) prison officials "kn[ew] of and disregard[ed] an excessive risk" to the prisoner's health or safety. *Id.* at 834, 837. A prison official may violate the Eighth Amendment by, *inter alia*, failing to "protect prisoners from violence at the hands of other prisoners" or "ensure that inmates receive adequate . . . medical care." *Id.* at 832-33 (internal quotation marks omitted).

The Prison Litigation Reform Act of 1995 (PLRA) imposes various requirements on claims challenging prison conditions. *See Jones v. Bock*, 549 U.S. 199, 203-04 (2007). As relevant here, the PLRA requires prisoners to exhaust prison grievance procedures before filing suit. *Id.* at 204. It provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are

App. 117

7

exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," which means "unexhausted claims cannot be brought in court," *Jones*, 549 U.S. at 211, and "a court may not excuse a failure to exhaust, even to take [special] circumstances into account," *Ross v. Blake*, 578 U.S. 632, 639 (2016). But the statute has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 635-36 (quoting 42 U.S.C. § 1997e(a)). Because "failure to exhaust is an affirmative defense under the PLRA," *Jones*, 549 U.S. at 216, the defendant bears the burden of showing that an administrative remedy was available for the plaintiff to exhaust, *see Kaemmerling v. Lapin*, 553 F.3d 669, 675-76 (D.C. Cir. 2008).

The PLRA also cabins courts' power to grant remedies with respect to prison conditions. *See* 18 U.S.C. § 3626 ("Appropriate remedies with respect to prison conditions"). Specifically, the PLRA instructs courts not to "grant or approve any prospective relief" in "any civil action with respect to prison conditions" unless "the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* § 3626(a)(1)(A). The PLRA further provides that "[p]reliminary injunctive relief" with respect to prison conditions "shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.* § 3626(a)(2).

When a person is sentenced to a term of imprisonment in federal prison, the Federal Bureau of Prisons (BOP or Bureau) designates the place of imprisonment. The governing statute directs the Bureau to designate for each prisoner "any available

App. 118

8

penal or correctional facility . . . that [BOP] determines to be appropriate and suitable" after it considers a list of factors, including "the resources of the facility contemplated," "the nature and circumstances of the offense," and "the history and characteristics of the prisoner." 18 U.S.C. § 3621(b). The same provision states that, "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.* It further authorizes BOP, "at any time, having regard for the same matters, [to] direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

In making designation and transfer decisions, the Bureau is required to follow applicable regulations under the Prison Rape Elimination Act (PREA). 34 U.S.C. § 30301 *et seq*. As relevant here, those regulations require BOP to screen inmates for "their risk of being sexually abused by other inmates," considering, among other things, "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming." 28 C.F.R. § 115.41(a), (d)(7). The regulations further require BOP to use that information to "inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." *Id.* § 115.42(a). Regarding the housing assignment of transgender inmates in particular, the regulations require BOP to "consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.* § 115.42(c).

**B.**

Plaintiffs are eighteen transgender women in BOP custody. *See* Appellees' Br. i & n.1; Appellees' Notice of

9

Death of Appellee Susan Doe, Doc. No. 2167503. Each plaintiff has been diagnosed with gender dysphoria, "a condition marked by significant distress and a host of physiological and psychological symptoms when a person lives in a manner conforming to their biological sex." *Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025). To treat their gender dysphoria, all plaintiffs have received long-term hormone therapy, *id.*, which has led some plaintiffs to "grow breasts" or develop "more feminine" features, Zoe Doe Decl. ¶ 5 (J.A. 915-16); *see, e.g.*, Mary Doe Decl. ¶ 5 (J.A. 942-43). Several plaintiffs have also had surgeries such as vaginoplasty, breast augmentation, and facial feminization. *See, e.g.*, [Name Redacted] Decl. ¶ 5 (J.A. 286); *Doe* Second Am. Compl. ¶ 10 (J.A. 192).

On January 20, 2025, President Trump issued Executive Order No. 14,168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. at 8615. Section 4(a) of the Executive Order directs the Attorney General and the Secretary of the Department of Homeland Security to "ensure that males are not detained in women's prisons or housed in women's detention centers." *Id.* at 8616.[1]

When the Executive Order issued, each plaintiff was in the Bureau's custody at a women's facility. Plaintiffs represented a very small subset—about one percent—of transgender women in BOP custody, the remainder of whom were in men's facilities. *Doe v. Bondi*, 2025 WL 596653, at *1 (D.D.C.

---

[1] Section 4(c) of the Executive Order separately directs the Attorney General to "ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." 90 Fed. Reg. at 8617. Section 4(c), and BOP's actions implementing that directive, are not before us. *See* Appellants' Br. 7 n.2.

10

Feb. 24, 2025); *see* Rick Stover Second *Jones* Decl. ¶ 22-2 (J.A. 393). BOP had decided, after an individualized assessment of various statutory and regulatory factors, to house each plaintiff in a women's facility. *See Jones v. Bondi*, 2025 WL 923755, at \*1 (D.D.C. Mar. 3, 2025); Stover Second *Jones* Decl. ¶ 24 (J.A. 393). Five plaintiffs had never been housed in a men's facility. *See* Rachel Doe Decl. ¶ 7 (J.A. 233); Jane Jones Decl. ¶ 8 (J.A. 286), *Moe* Compl. (J.A. 466), Sara Doe Decl. ¶ 3 (J.A. 951), Wendy Doe Decl. ¶ 6 (J.A. 946-47). Other plaintiffs had previously been housed in men's facilities while in BOP or state custody. *See, e.g.*, Zoe Doe Decl. ¶ 6 (J.A. 916); Olivia Doe Decl. ¶ 3 (J.A. 920). Those plaintiffs who had been housed in men's facilities reported that they were sexually harassed, threatened, raped, and assaulted by male inmates in those facilities. *See, e.g.*, Emily Doe Decl. ¶ 4 (J.A. 924) (rape); Zoe Doe Decl. ¶ 5 (J.A. 916) (stalking); Sally Doe Decl. ¶ 6 (J.A. 930) (threats); Donna Jones Decl. ¶ 6 (J.A. 385) (sexual assault). Others had attempted suicide, engaged in self-harm, or experienced suicidal ideation while housed in men's facilities. *See, e.g.*, Olivia Doe Decl. ¶ 5 (J.A. 921) (attempted suicide).

In response to the Executive Order, however, BOP officials began taking steps to transfer plaintiffs to men's facilities. *See Doe*, 763 F. Supp. 3d at 84. Three plaintiffs—Ellen Doe, Rachel Doe, and Jane Jones—were transferred before joining this litigation. *See* Ellen Doe Decl. ¶ 7 (J.A. 230); Rachel Doe Decl. ¶ 11 (J.A. 233); Jane Jones Decl. ¶ 14 (J.A. 287). The district court's March 19 preliminary injunction rescinded the transfers and enjoined any other such transfers pending final judgment. *See Doe* March 19 PI Order (J.A. 240); *Jones* February 24 PI Order (J.A. 334).

**App. 121**

11

## C.

Plaintiffs brought three separate actions challenging their transfers (or impending transfers) from women's to men's facilities pursuant to the Executive Order. *See Doe*, 763 F. Supp. 3d at 84; *Jones v. Bondi*, 2025 WL 923117, at *1 (D.D.C. Feb. 24, 2025); *Moe* March 10 PI Order (J.A. 569-71). As the district court noted, each complaint contained "substantially similar" allegations. *Jones*, 2025 WL 923117, at *1. For simplicity, we cite to the *Doe* complaint. Naming as defendants the Attorney General and the Director of BOP in their official capacities, plaintiffs sued for declaratory, injunctive, and compensatory relief. They claimed that Section 4(a) of the Executive Order, as applied to them, violated the Eighth Amendment to the United States Constitution, the equal protection component of the Due Process Clause of the Fifth Amendment, the Rehabilitation Act, and the Administrative Procedure Act (APA). *Doe v. Bondi*, No. 25-286, ECF No. 1 (Compl.) ¶ 14 (D.D.C. filed Feb. 3, 2025). Plaintiffs sought preliminary injunctive relief to prohibit defendants from implementing Section 4(a) of the Executive Order against them and require defendants to maintain plaintiffs' housing as it was before January 20, 2025. *Doe v. Bondi*, No. 25-286, ECF No. 13-1 (Mot. for TRO & PI) at 26 (D.D.C. filed Feb. 3, 2025).

In a February 4 Temporary Restraining Order and in six ensuing preliminary-injunction orders, the district court granted preliminary relief to all eighteen plaintiffs. *Doe* February 4 TRO (J.A. 157); *Doe* February 18 PI Order (J.A. 168); *Doe* February 24 PI Order (J.A. 185); *Doe* March 19 PI Order (J.A. 240); *Jones* February 24 PI Order (J.A. 333); *Jones* March 3 PI Order (J.A. 445); *Moe* March 10 PI Order (J.A. 569). The court incorporated the reasoning of its February 4 TRO in its subsequent preliminary injunction

12

orders, *see, e.g.*, *Doe* February 24 PI Order at 2 (J.A. 186); *Jones* February 24 PI Order at 1 (J.A. 333); *Moe* March 10 PI Order at 1 (J.A. 569), and both parties treat the February 4 TRO as containing the court's reasoning for purposes of the preliminary injunctions on appeal. *See* Reply Br. 11; Appellees' Br. 20. So again, for simplicity, we describe the rationales as set forth in the February 4 TRO.

The district court first rejected defendants' threshold defenses that (1) the PLRA forecloses judicial review of plaintiffs' challenge to defendants' decision to transfer them to men's facilities and (2) plaintiffs failed to exhaust available administrative remedies as required by the PLRA. *Doe*, 763 F. Supp. 3d at 85-87. As to jurisdiction stripping, the court declined to address whether the PLRA prohibits judicial review of "*APA* challenges to facility designations and transfer decisions," because, in any event, the PLRA was "not sufficiently explicit to bar consideration of [plaintiffs'] *constitutional* claims." *Id.* (emphases added) (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)). As to exhaustion, the district court reasoned that the PLRA requires exhaustion of only "available" remedies, 42 U.S.C. § 1997e(a), and that no remedy was "available" to plaintiffs because "there [was] no form of relief that is within BOP's discretion to provide and that would remedy [plaintiffs'] supposed constitutional violations." *Doe*, 763 F. Supp. 3d at 87 (citing *Kaemmerling*, 553 F.3d at 675-76, and *Ross*, 578 U.S. at 643). Thus, the court concluded that the PLRA does not bar consideration of plaintiffs' request for relief insofar as plaintiffs allege a violation of their constitutional rights. *Id.*

The district court then turned to the likelihood of success on the merits and concluded that plaintiffs had established such a likelihood on their Eighth Amendment claim. Plaintiffs had shown a likelihood of proving an "objectively intolerable risk

13

of harm" on the basis of two distinct harms: (1) transgender women's "significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex"; and (2) the risk that "placement in a male penitentiary *by itself* will exacerbate the symptoms of [plaintiffs'] gender dysphoria," regardless of whether plaintiffs face a substantial risk of violence in the new facility. *Id.* at 88.

The court further concluded that plaintiffs likely could prove that BOP knowingly or recklessly subjected them to such risks because "the government resources and regulations to which plaintiffs gesture in their complaint strongly suggest" that "BOP is subjectively aware that transferring the plaintiffs to a male penitentiary would substantially increase the likelihood of them experiencing this parade of harms." *Id.* at 89; *see* 28 C.F.R. § 115.41(d)(7) (listing whether an inmate is or is perceived to be transgender as a risk factor for "sexual victimization"); *Doe v. Bondi*, No. 25-286, ECF No. 1 (Compl.) ¶ 43 (D.D.C. filed Feb. 3, 2025) (citing a 2013 U.S. Department of Justice report that estimated nearly 35% of transgender people in state and federal prisons were sexually assaulted between 2007 and 2012).

For those reasons, the court concluded that plaintiffs had met their burden to show a likelihood of success on the merits of their Eighth Amendment claim. The court did not consider the merits of plaintiffs' other claims for relief, including their APA claims. *See Doe*, 763 F. Supp. 3d at 87-89.

Importantly, however, the court's analysis of plaintiffs' Eighth Amendment claims did not make individualized findings that characteristics the court generally identified as likely posing substantial risks of serious harm were applicable to each plaintiff. In particular, the court did not identify

**App. 124**

14

characteristics of each individual, such as effects of sex reassignment medical treatment or prior experience of assault or self-harm in men's prisons, and make a corresponding finding that the plaintiff therefore likely faces a risk of harm rising to the level of an Eighth Amendment violation. *See id.* at 88-89.

In evaluating the remaining factors for preliminary injunctive relief, the district court reasoned that plaintiffs had "straightforwardly" demonstrated irreparable harm because "a prospective violation of a constitutional right constitutes irreparable injury." *Id.* at 89 (quoting *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). The court concluded that the harms it had identified in its Eighth Amendment analysis were irreparable. *See id.* As to the balance of equities and the public interest, the court rejected defendants' representation that housing these few "biological males" in women's facilities had deleterious effects on the privacy and security of other "female inmates," because "defendants have not so much as alleged that the plaintiffs in this particular suit present any threat to the female inmates housed with them." *Id.* at 89-90. The district court thus concluded that the balance of equities and the public interest favored plaintiffs. *Id.* at 90-91.

For those reasons, the court preliminarily "enjoined and restrained" defendants from "implementing Section[] 4(a) . . . of [the Executive Order]" and further ordered defendants to "maintain and continue . . . plaintiffs' housing status . . . as [it] existed immediately prior to January 20, 2025." *Id.* at 90.

Within ninety days of each preliminary injunction, plaintiffs filed in the district court motions for "renewed preliminary injunction[s]." *Doe v. Bondi*, No. 25-286, ECF

15

No. 81-1 (*Doe* Renewed PI Mot.) at 1 (D.D.C. filed May 12, 2025). Plaintiffs explained that, pursuant to 18 U.S.C. § 3626(a)(1)(A) and (a)(2), the preliminary injunctions would expire after ninety days. Preliminary relief remained necessary, plaintiffs argued, and "[n]othing in the statute limits the number of times a court may enter preliminary relief" upon such a showing. *Doe* Renewed PI Mot. 5 (quoting *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001)). Plaintiffs accordingly asked the district court to "enter a new preliminary injunction renewing the relief in the current injunctions for an additional ninety (90) days." *Id.* at 10. Defendants did not oppose plaintiffs' motions, *id.* at 1, and the district court renewed each of the preliminary injunctions as requested. *See, e.g.*, *Doe* May 15 PI Order (J.A. 954-56).

Defendants timely appealed the preliminary injunctions (both original and renewed). We consolidated the appeals for briefing and argument.

## II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "We review the district court's decision whether to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (internal quotation marks omitted).

Defendants contend that the district court erred in granting preliminary injunctive relief based on plaintiffs' Eighth Amendment claim. They first argue that the district court

**App. 126**

16

should not have considered plaintiffs' Eighth Amendment claim because 18 U.S.C. § 3621(b) prohibits judicial review of BOP's designation of a place of imprisonment and because plaintiffs failed to exhaust available administrative remedies. Defendants separately argue that, even if the district court could consider plaintiffs' Eighth Amendment claim, plaintiffs have failed to show a likelihood of success on the merits of that claim because they do not face an "objectively intolerable" risk of harm from their transfer to men's facilities and because the Bureau did not exhibit deliberate indifference to any such risk. Lastly, defendants contend that the preliminary injunctions should be vacated because plaintiffs failed to establish the remaining *Winter* factors and the district court failed to make the requisite findings under the PLRA before granting injunctive relief. *See* 18 U.S.C. § 3626(a)(2).

We hold that 18 U.S.C. § 3621(b) does not bar judicial review of constitutional claims challenging BOP's designation of a place of imprisonment. We also hold that defendants have failed to carry their burden to show plaintiffs' failure to exhaust available administrative remedies. Turning to the merits, we conclude that we cannot sustain the preliminary injunctions because plaintiffs expressly disclaim the district court's rationale for granting relief and instead advance a narrower ground for upholding the injunctions—namely, that they are entitled to relief based on their specific characteristics—that we cannot adopt on the existing record. We thus vacate the preliminary injunctions and remand for further proceedings.

**A.**

**1.**

Before turning to the parties' arguments, we address a threshold issue raised by our dissenting colleague. We have before us a set of preliminary injunctions, some of which were

App. 127

17

entered more than ninety days ago and have accordingly since expired under 8 U.S.C. § 3626(a)(2) and others newly entered in the last ninety days and thus still in effect. Our colleague argues that the injunctions should be vacated because the PLRA provides that civil orders granting preliminary relief from unlawful prison conditions "shall automatically expire" within ninety days. 18 U.S.C. § 3626(a)(2). In his view, that means the preliminary injunctions on appeal are either moot (because they are no longer in effect) or invalid (because the district court lacked authority to issue them once the original injunction in each case expired).

We agree that the challenges to preliminary injunctions that have expired are moot. *See Banks v. Booth*, 3 F.4th 445, 447-49 (D.C. Cir. 2021) (dismissing as moot appeal from preliminary injunction that expired after ninety-day window). But we do not resolve whether section 3626(a)(2) prohibited the district court from entering the new injunctions. Even assuming section 3626(a)(2) limits a district court's ability to issue a new preliminary injunction at the end of the ninety-day period set forth in that statute, *but see Mayweathers*, 258 F.3d at 936, we conclude that any implicit restriction to that effect can be and has been waived by the defendants.

"In our adversarial system of adjudication, we follow the principle of party presentation." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). As the "neutral arbiter of matters the parties present," we "rely on the parties to frame the issues for decision." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Here, both parties agree that section 3626(a)(2) does not limit a district court's ability to issue a new preliminary injunction at the end of the ninety-day period set forth in that statute. *See* Appellants' Supp. Br. 3-8; Appellees' Supp. Br. 1-6. The Bureau explains that the parties' shared reading of

18

section 3626(a)(2) "avoids the heightened litigation burdens that would be imposed on the parties and the courts if prison-condition disputes regularly had to be litigated on a highly expedited basis in order to achieve final judgment before the initial [preliminary injunction] expired." Appellants' Supp. Br. 4. And plaintiffs note that "every court of appeals that has reached the issue" agrees. Appellees' Supp. Br. 3 (citing cases).

The party-presentation principle does not apply to questions of subject-matter jurisdiction, which federal courts have an "independent obligation" to raise and decide even when "the parties either overlook or elect not to press" them. *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). But no one contends that any implicit limitation section 3626(a)(2) imposes on a district court's ability to issue a successive preliminary injunction is jurisdictional. Appellants' Supp. Br. 9-11; Appellees' Supp. Br. 6-7; Dissenting Op. at 21. After all, we only "brand[] a rule as going to a court's subject matter jurisdiction" if Congress has clearly stated as much. *Henderson*, 562 U.S. at 434; *see Sebelius v. Auburn Reg. Med. Ctr.*, 568 U.S. 145, 153 (2013). Section 3626(a)(2) is silent on this point.

Seeing no justification for departing from the principle of party presentation, we do not address whether the injunctions before us would be subject to vacatur under section 3626(a)(2) if the point had been preserved and pressed.

Next, we address the two threshold obstacles that the Bureau asserts prevent us from reaching the merits of plaintiffs' Eighth Amendment claim. We hold that neither applies to bar our review.

19

**2.**

Defendants first contend that 8 U.S.C. § 3621(b) prevents this court from hearing plaintiffs' Eighth Amendment claim challenging their transfer to men's facilities. In relevant part, section 3621(b) states: "Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." *Id.*

"[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Supreme Court "require[s] this heightened showing . . . to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (internal quotation marks omitted). Thus, we have held that a statute precludes judicial review of constitutional challenges "only if the evidence of congressional intent to preclude is 'clear and convincing.'" *McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.*, 264 F.3d 52, 59 (D.C. Cir. 2001) (collecting cases).

Even assuming that what plaintiffs challenge is "a designation of a place of imprisonment under this subsection," 8 U.S.C. § 3621(b), defendants fail to identify "clear and convincing" evidence that Congress intended to preclude judicial review of constitutional challenges to such a designation. Defendants hang their hat on statutory text that they say uses "clear, categorical language" demonstrating preclusive intent. Appellants' Br. 28. But our cases treat even such "broad and seemingly comprehensive statutory language" as alone insufficient to "supply[] the necessary clarity to bar as applied constitutional claims." *McBryde*, 264 F.3d at 59; *see Griffith v. FLRA*, 842 F.2d 487, 494-95 (D.C. Cir. 1988); *Ungar*

20

*v. Smith*, 667 F.2d 188, 193 (D.C. Cir. 1981); *Ralpho v. Bell*, 569 F.2d 607, 620-21 (D.C. Cir. 1977). In *McBryde*, we confronted a statute stating that certain decisions of entities of the federal courts—a regional Circuit Judicial Council and the nationwide Judicial Conference Review Committee—"shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* at 58 (quoting 28 U.S.C. § 372(c)(10)). That text fell short of "clear and convincing" evidence of preclusive intent. *Id.* at 59. We found the requisite clarity only after examining legislative history that emphasized the quasi-judicial nature of the form of "agency" review that the statute left available to aggrieved persons. *Id.* at 62; *see also id.* at 58-63. The statutory text here is quite like that of the statute at issue in *McBryde*, as defendants themselves acknowledge. Appellants' Br. 28. But defendants fail to point to any further indicia of "clear and convincing" preclusive intent, which *McBryde* deemed necessary. And none of the non-precedential, out-of-circuit cases defendants cite in support of section 3621(b) preclusion for constitutional claims addresses *Webster v. Doe*—let alone our precedent described above. *See* Appellants' Br. 28-29 (citing *Wills v. Barnhardt*, 2022 WL 4481492, at *1-*2, *4 (10th Cir. Sept. 27, 2022); *Touizer v. U.S. Att'y Gen.*, 2021 WL 3829618, at *1-*2 (11th Cir. Aug. 27, 2021) (per curiam); *Jiau v. Tews*, 812 F. App'x 638, 639 (9th Cir. 2020)).

We are thus unpersuaded that section 3621(b) precludes judicial review of plaintiffs' Eighth Amendment claim.

**3.**

We turn next to defendants' argument that plaintiffs' challenge is barred by their failure to exhaust administrative remedies. Plaintiffs do not deny that they sought no administrative relief before filing suit. Rather, they note that

21

the PLRA requires the exhaustion of only "available" remedies, 42 U.S.C. § 1997e(a), *see Ross*, 578 U.S. at 635-36, and contend that there were no administrative remedies available to them, Appellees' Br. 42-45. The point thus turns on whether plaintiffs are right about that.

An administrative remedy is "available" if it is "capable of use to obtain some relief for the action complained of." *Ross*, 578 U.S. at 642 (internal quotation marks omitted). Conversely, an administrative remedy is not available "where the relevant administrative procedure lacks authority to provide any relief" such that it operates as "a simple dead end." *Id.* at 643 (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)).

Defendants have failed to carry their burden to show that administrative remedies were available to plaintiffs. *See Kaemmerling*, 553 F.3d at 675 (citing *Jones*, 549 U.S. at 215-16). No one disputes that BOP has a grievance procedure open to inmates. *See* 28 C.F.R. §§ 542.13-.15. But defendants have failed to show that, for plaintiffs, the grievance procedure is "capable of use to obtain some relief for the action complained of." *Ross*, 578 U.S. at 642 (internal quotation marks omitted). Part of the injury plaintiffs claim is that the mere fact of their transfer to a men's facility would subject them to an intolerable risk of harm by exacerbating their gender dysphoria. And defendants acknowledge that BOP's grievance procedure cannot stop or reverse the challenged transfers because they are mandated by the Executive Order. Appellants' Br. 32. The "action complained of" is not an Eighth Amendment violation in the abstract, but the concrete action the plaintiffs challenge—here, the transfers and their attendant risks. And *Ross* asks whether the grievance process can provide "some relief for the action complained of." 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).

**App. 132**

22

In that respect, this case is on all fours with *Kaemmerling*, where an inmate challenged BOP's collection of his DNA information as contrary to his sincerely held religious beliefs. 553 F.3d at 675. In assessing the availability of an administrative remedy, we accepted the plaintiff's claim that the collection of his DNA would complete the asserted religious injury. *Id.* We held that he had "no administrative process to exhaust" because "BOP ha[d] no discretion not to collect his DNA, as the [DNA Act's] mandatory language indicates and as BOP conceded." *Id.*

Plaintiffs also claim Eighth Amendment injury from the substantially elevated risk of physical or sexual violence they would face in men's facilities. With respect to that asserted injury, too, defendants have failed to carry their burden to identify an administrative remedy "capable" of providing plaintiffs "some relief." *Ross*, 578 U.S. at 642 (internal quotation marks omitted). In support of their assertion that BOP can take "additional safety measures" in response to any personal safety concerns plaintiffs may raise through BOP's grievance procedure, defendants point to a single declaration from a BOP official. *See* Appellants' Br. 32 (citing Rick Stover First *Jones* Decl. ¶¶ 11-15 (J.A. 308-10)). That declaration discusses general BOP policies and procedures designed to ensure the safety of inmates, and the only form of administrative relief it identifies as an additional safety measure is the possibility of housing an inmate "as a protective custody case in the Special Housing Unit." Stover First *Jones* Decl. ¶ 15 (J.A. 309-10).

As the Bureau acknowledges, transferring plaintiffs into segregated housing in men's prisons is no solution. The same BOP official who identified placement in the Special Housing Unit (SHU) as a possible administrative remedy explained it would involve "more restrictive conditions" than being housed

App. 133

23

in the general prison population. *Id.* *See* BOP Program Statement 5270.12 § 541.21 (noting "inability to leave the room or cell for the majority of the day" as "element" of "[r]estrictive housing"). He clarified in a further declaration that the Bureau planned to use segregated housing only as a short-term measure. *See* Stover Second *Jones* Decl. ¶ 25 (J.A. 394) ("BOP does not intend to house any plaintiff in the SHU . . . for an extended period of time."). Thus, defendants' only proffered administrative relief is by their own lights not an appropriate, sustainable form of relief from plaintiffs' claimed harms. A temporary, stop-gap measure that lacks any capacity to relieve plaintiffs from the ongoing risk of harm in men's prisons that plaintiffs allege is not "capable of use to obtain some relief for the action complained of." *Ross,* 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).

The dissent posits that exhausting administrative remedies —even through a process incapable of reducing objective risk—can still provide plaintiffs "some relief" from Eighth Amendment injury by mitigating prison officials' deliberate indifference. *See* Dissenting Op. at 5-6. We are not persuaded.

First, the suggestion cannot be squared with *Ross*. It would mean no plaintiff with a failure-to-protect claim could benefit from *Ross*'s rule that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable . . . to provide any relief to aggrieved inmates." 578 U.S. at 643. But *Ross* itself (and *Booth*, from which *Ross* derived this rule) involved a failure-to-protect claim. *See Ross*, 578 U.S. at 636, 643; *Booth*, 532 U.S. at 734.

Second, the suggestion that grievance procedures inherently mitigate deliberate indifference fails as a practical matter. The bare fact of prompting prison officials to consider

App. 134

24

an inmate's grievance does not somehow mitigate the officials' indifference if they have no response to the inmate's plight. *Cf. Farmer*, 511 U.S. at 844 (explaining that prison officials do not act with deliberate indifference "if they responded reasonably to the risk, even if the harm ultimately was not averted"). If anything, requiring an inmate to exhaust an administrative procedure incapable of providing any identified, concrete relief from a substantial risk of serious harm makes official indifference more deliberate, not less. The burden is on the Bureau. With no evidence in the record even suggesting that there is any sustainable way in which BOP's grievance procedure could provide plaintiffs' "some relief" from the severe risks they claim they will face if housed in men's prisons, defendants have failed to carry their burden to show an "available" administrative remedy for plaintiffs to exhaust.

With defendants' threshold objections cleared, we turn to the merits of plaintiffs' Eighth Amendment claim.

**B.**

The district court concluded that plaintiffs were entitled to preliminary injunctive relief because they are likely to succeed on the merits of their claim that their transfer to men's facilities would violate the Eighth Amendment. As noted above, the district court set forth its rationale for so concluding in the February 4 TRO in *Doe*. There, the district court found that plaintiffs had shown that "transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex." 763 F. Supp. 3d at 88. The district court also credited plaintiffs' claim that "placement in a male penitentiary *by itself* will exacerbate the symptoms of their gender dysphoria, *even if* they [plaintiffs] are not subject to physical or sexual violence in their new facility." *Id.*

App. 135

25

Notably, in making those findings, the district court did not identify each individual plaintiffs' risk-elevating characteristics, such as their having undergone sex reassignment treatment or their experiences of assault or self-harm in men's prisons. *Id.* Rather, the court cited to "various government reports and regulations" that recognized the generally heightened risks faced by transgender women housed in men's facilities. *Id.*

On the basis of those findings, the district court concluded that plaintiffs were likely to succeed in showing (1) that they faced an "objectively intolerable" risk of violence (as transgender women housed in men's facilities) and of exacerbated gender dysphoria (as transgender women with gender dysphoria housed in men's facilities); and (2) that BOP was actually aware of those risks. *Id.* at 88-89. The district court thus concluded that plaintiffs had shown a likelihood of success on their Eighth Amendment claim, *id.* at 88 (citing *Farmer*, 511 U.S. at 839-40), and further concluded that plaintiffs would be irreparably harmed absent preliminary injunctive relief, *id.* at 89.

Plaintiffs, however, expressly disclaim the categorical argument "that the Eighth Amendment requires every transgender woman to be housed in a women's prison." Appellees' Br. 19-20. They also make clear that they do not contend that every transgender woman diagnosed with gender dysphoria has an Eighth Amendment entitlement to be housed in a women's prison. *See* Appellees' Br. 25 (arguing that worsening gender dysphoria will put these plaintiffs at "significant risk of harm" because they have lived as women for extended periods, transitioned through use of medications and surgeries, and because they have histories of self-injury and suicidal ideation). We generally do not consider arguments that parties do not make—or, as here, arguments that they

App. 136

26

disclaim. *See Greenlaw v. United States,* 554 U.S. 237, 243-44 (2008). Thus, we cannot sustain the district court's preliminary injunctions on the ground that every transgender woman (or every transgender woman diagnosed with gender dysphoria) in BOP custody has an Eighth Amendment entitlement to not be housed in men's facilities.

Plaintiffs urge us to affirm the district court's preliminary injunctions on a different—narrower—ground. They contend that they all have "particular vulnerabilities" that expose them to a greater risk of harm than transgender women in BOP custody generally. Appellees' Br. 19-25. Plaintiffs argue that their characteristics make them "an especially at-risk group" even among transgender women inmates, which is why plaintiffs "are part of the small, unique group of transgender women whom BOP placed in women's facilities." *Id*. at 20. In explaining what distinguishes them, plaintiffs point to long-term hormone therapy and surgeries effecting gendered physical alterations, prior history of sexual assault or self-harm in men's facilities, or a combination of such factors. *See id.* at 20-21. They further contend that BOP is aware of their individual characteristics—an awareness that defendants do not dispute. Appellees' Br. 26; *see* Appellants' Br. 42-44. According to plaintiffs, such characteristics render their housing in men's facilities unconstitutional under the Eighth Amendment regardless of whether other transgender women could constitutionally be housed in men's facilities. *See* Appellees' Br. 28-29.

The record indeed contains ample, uncontested evidence of plaintiffs' characteristics that, according to plaintiffs, make them distinctively vulnerable to harm in men's facilities. *See, e.g.,* [Name Redacted] Decl. ¶ 5 (J.A. 286) (facial reconstructive surgery, breast augmentation surgery, and vaginoplasty); Donna Jones Decl. ¶ 6 (J.A. 385) (prior history

App. 137

27

of sexual assault in men's prison); Olivia Doe Decl. ¶ 5 (J.A. 921) (prior history of attempting suicide in men's prison). But the district court did not make findings that each of the plaintiffs would be subject to a "significantly elevated risk" of harm in men's facilities, *Doe*, 763 F. Supp. 3d at 88, and we cannot "take [its] place" to make such factual findings ourselves, *United States v. Hill*, 131 F.3d 1056, 1061 (D.C. Cir. 1997) (internal quotation marks omitted). Instead, it is the province of the district court to elicit and assess evidence and find facts. We accordingly remand to allow the district court to exercise its judgment whether to make the factual determinations needed to hold, as plaintiffs urge, that the distinctive characteristics of these individuals in particular render their transfer to men's facilities unconstitutional under the Eighth Amendment.

In two of its preliminary injunction orders, the district court relied on a different ground that is particularized to the specific group of plaintiffs in this case: Before the President issued his Executive Order barring any such assignments, "BOP determined that women's facilities are the *appropriate* facilities for plaintiffs under the prevailing legal regime considering all statutorily and constitutionally required factors." *Doe*, 2025 WL 596653, at *1; *Jones*, 2025 WL 923755, at *1 (internal quotation marks omitted); *see also* Appellees' Br. 20 (emphasizing BOP's initial placement of plaintiffs in women's facilities). Specifically, the district court relied on the Bureau's initial determinations that women's facilities were the appropriate facilities for plaintiffs and the fact that "housing inmates with inmates of the opposite biological sex is a statistical anomaly" to infer that plaintiffs faced risks cognizable under the Eighth Amendment. *Id.* at *1 (internal quotation marks omitted). Simply put, the Bureau itself decided that, among the thousands of transgender women

28

in its custody, this small subgroup should be placed in women's facilities, not men's.

But the referenced "statutorily and constitutionally required factors" applicable to such assignments encompass considerations outside the concerns of the Eighth Amendment. *See, e.g.*, 18 U.S.C. § 3621(b) (requiring BOP to place inmates "as close as practicable to the prisoner's primary residence" and to consider many factors in designating a place of imprisonment, *inter alia*, "the resources of the facility contemplated," "the nature and circumstances of the offense," any "faith-based" or health needs, and available special services such as substance abuse treatment). The Bureau, relying on an affidavit from a BOP official, asserted that the "decision to place each Plaintiff in a women's facility was made for a 'variety of reasons,' and not simply because of a finding that the plaintiffs could not be safely housed in a men's facility"—*i.e.*, for reasons "beyond just safety concerns." *Jones*, 2025 WL 923755, at *1. BOP's supporting affidavit stated that plaintiffs were initially placed in women's facilities because of court orders or settlement agreements, because they were waiting for sex reassignment surgery, or because they were "already being housed with women prior to coming into [BOP] custody." Stover Second *Jones* Decl. ¶ 24 (J.A. 393).

Given the rarity of such placements within the federal system, it is reasonable to infer that BOP's decisions to house plaintiffs in women's facilities are the product of deliberate, individualized determinations rather than happenstance. And the Bureau denies only that its placements of transgender women in women's institutions were "all" made based on risks they would face if housed in men's facilities. *Id.*

App. 139

29

That said, the record does not definitively establish whether safety concerns motivated each plaintiff's placement. The district court made no findings that the Bureau's prior assignments of plaintiffs rested on the Bureau's assessment that they would face constitutionally germane risks of harm if housed with men. Without such findings, we cannot confirm the district court's inference that BOP previously placed plaintiffs in women's facilities because they could not be safely housed in men's facilities.

Because the district court did not otherwise explain why these individual plaintiffs—as opposed to transgender women in BOP custody more broadly—are likely to succeed on an Eighth Amendment challenge to their placement in men's facilities, and because plaintiffs disclaim broader theories that the Eighth Amendment requires all transgender women—or all those with gender dysphoria—to be housed in women's facilities, plaintiffs have not shown a likelihood of success on their Eighth Amendment claim.

**C.**

Our conclusion that plaintiffs have not shown a likelihood of success on their Eighth Amendment claim means that we cannot sustain the district court's preliminary injunctions. For largely the same reasons that plaintiffs have failed to show a likelihood of success, we lack grounds to hold that they "will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). The district court reasoned that plaintiffs demonstrated irreparable harm from their transfer because "a prospective violation of a constitutional right constitutes irreparable injury." *Doe*, 763 F. Supp. 3d at 89 (quoting *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). But, as explained above, plaintiffs have disclaimed the basis on

**App. 140**

30

which the district court rested its likelihood-of-success conclusion and advanced only their more individuated claim as to which the district court has not made the necessary findings. We cannot affirm a finding of irreparable harm to all plaintiffs that was predicated on a categorial, since-disclaimed theory of constitutional injury.

We recognize that plaintiffs separately contend that they each face a substantial risk of irreparable harm from physical and sexual violence as well as the worsening of their gender dysphoria. But, again, that argument expressly relies on plaintiff-specific characteristics that plaintiffs say make them particularly at risk of harm. *See* Appellees' Br. 47-48. The district court did not rely on plaintiff-specific factfinding in concluding that plaintiffs would be irreparably harmed absent an injunction, leaving unexpressed the specific factual support for a holding that plaintiffs' distinct characteristics would subject them to irreparable harm. For these reasons, we cannot conclude that plaintiffs "will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th at 95. That conclusion obviates the need for us to consider the other *Winter* factors. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (even under sliding-scale approach to preliminary injunction factors, failure to establish first two obviates need to consider other two). Because we cannot affirm the district court's conclusion that plaintiffs have shown a likelihood of success on the merits of their Eighth Amendment claim and irreparable harm, we must vacate the preliminary injunctions and remand for further consideration. *Id.*

Apart from their Eighth Amendment claim, plaintiffs seek to defend the preliminary injunctions based on their claims under the Administrative Procedure Act. Appellees' Br. 29-38. But the district court did not reach those claims. *See Doe*, 763

App. 141

31

F. Supp. 3d at 87-90. And "we are a court of review, not of first view, so where the merits went unaddressed below, it is our general practice to remand to the district court." *Bauer v. FDIC*, 38 F.4th 1114, 1126 (D.C. Cir. 2022) (formatting modified). We thus decline to reach plaintiffs' APA claims in the first instance and remand to the district court to consider those claims as appropriate.

Because we vacate the preliminary injunctions on the merits, we need not address defendants' contention that the preliminary injunctions fail to comply with the PLRA's provisions limiting relief to that which the district court finds is "narrowly drawn" and extends "no further than necessary to correct the harm" supporting preliminary relief. 18 U.S.C. § 3626(a)(2).

## III.

For the foregoing reasons, we vacate the preliminary injunctions still in effect and remand for further proceedings. As to the preliminary injunctions that everyone agrees have since expired pursuant to section 3626(a)(2)'s ninety-day time limit, we dismiss the appeals as moot insofar as they speak to those superseded injunctions. *See Banks*, 3 F.4th at 447-49. Nothing in this opinion limits the district court's ability on remand to elicit further information, make additional findings of fact, or consider additional or alternative legal bases for relief, as it deems appropriate.

*So ordered*.

**App. 142**

RANDOLPH, *Senior Circuit Judge*, dissenting:

Thirty years ago Congress addressed the burgeoning number of lawsuits dealing with prison conditions and the regulatory injunctions federal judges were issuing in response. In order to identify and channel those prisoner cases worthy of concern and to cabin the injunctive authority of federal judges, Congress passed the Prison Litigation Reform Act of 1995. Two of the major reforms of that legislation are at issue in this case. The majority opinion defies both.

## I

### A

Although I agree that the outstanding preliminary injunctions must be vacated, I dissent because the Prison Litigation Reform Act compels an end to these consolidated cases, not a remand that encourages the district court to repackage relief under alternative theories. The PLRA speaks in unmistakable terms: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Requiring exhaustion "afford[s] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 525 (2002). It is, at its core, a rule grounded in respect for the institutional competence of those who daily contend with the complex realities of incarceration. *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001).

That respect is absent from the majority's opinion. None of the plaintiffs took advantage of the administrative remedies available to them. Under the PLRA's unambiguous command,

App. 143

2

that failure should have ended these consolidated cases. As the Supreme Court has cautioned, "a court may not excuse a failure to exhaust, even to take [special] circumstances into account." *Ross v. Blake*, 578 U.S. 632, 639 (2016).

The majority does precisely what the Supreme Court has forbidden, masking its departure from the statute by distending the "unavailability" exception articulated in *Ross* beyond its limits. *See* Maj. Op. at 20-21. They assert that the administrative process here was a "dead end" because officers purportedly lacked power to grant any form of relief, and so administrative procedures are unavailable and need not be exhausted. *Id.* at 21 (quoting *Ross*, 578 U.S. at 643). That conclusion cannot survive even cursory examination. Prison officials retained broad discretion to ameliorate plaintiffs' alleged harms through an array of ordinary interventions, including modified housing assignments, accommodations, or alternative treatment measures. *See* 28 C.F.R. § 115.42(c); JA308-10 (Stover First *Jones* Decl. ¶ 11-15).

To prop up its contrary conclusion, the majority leans heavily—indeed, nearly exclusively—on *Kaemmerling v. Lapin*, 553 F.3d 669 (D.C. Cir. 2008). *See* Maj. Op. at 22. But *Kaemmerling* cannot bear the load they place upon it. The plaintiff there sought to enjoin the statutorily mandated collection of his DNA, asserting that the procedure violated his religious beliefs and thus infringed upon his rights under the Religious Freedom Restoration Act and the Constitution. *Kaemmerling*, 553 F.3d at 674. This court concluded that, because the prison officials had no discretion over the DNA collection and no grievance procedure could offer any relief, no administrative remedy remained "available." *Id.* at 675-76. Only striking down a federal statute—which the Bureau of Prisons could not do—would provide any relief. *Id.* at 676.

**App. 144**

3

To transform that limited holding—rendered outside the context of any Eighth Amendment claim—into an endorsement of the majority's position is irreconcilable with the Supreme Court's unequivocal instruction that a remedy need not be "effective" to be "available." *Booth v. Churner*, 532 U.S. 731, 740-41 (2001). "Even when the prisoner seeks relief not available in grievance proceedings . . . exhaustion is a prerequisite to suit." *Porter*, 534 U.S. at 524. *Kaemmerling*, by its own terms, did nothing more than acknowledge the unremarkable proposition that a remedy is not "available" when it is incapable of altering the contours of the dispute before the court: "This case is the rare one in which there is no administrative process to exhaust because the BOP lacks authority to provide Kaemmerling *any relief or to take any action whatsoever* in response to his complaint challenging enforcement of the DNA Act." 553 F.3d at 675 (emphasis added).

Not so here. These cases do not give rise to a purely legal question, insulated from factual development and agency judgment. As already noted, prison officials retained broad discretion to ameliorate the plaintiffs' alleged harms. The majority attempts to manufacture parity with *Kaemmerling* by asserting a tight nexus between the plaintiffs' transfer to male facilities and the exacerbation of their gender dysphoria—the implication being that, because exacerbation is inevitable, no factual development or application of agency expertise could meaningfully inform the court's analysis. *See* Maj. Op. at 22. They contend that this nexus "is on all fours with" the connection identified in *Kaemmerling* between the statutorily mandated DNA collection and the asserted religious injury. *Id.*

But that analogy falters at the threshold. Unlike *Kaemmerling*, this case does not involve an alleged legal injury flowing inexorably from a mandatory government act. Plaintiffs

4

assert that their transfer to male facilities will inevitably intensify their feeling of gender dysphoria. But such distress, without more, is *damnum absque injuria*, for which federal courts themselves afford no relief. The relevant inquiry is not whether administrative remedies are available to address such non-cognizable harm, but whether remedies are available to address the alleged legal injury—here, an Eighth Amendment violation. *See Alabama Power Co. v. Ickes*, 302 U.S. 464, 478-79 (1938) (noting that remedies attach only to legal injuries; harm alone does not suffice); *Abdelfattah v. Dep't of Homeland Sec.*, 787 F.3d 524, 536 (D.C. Cir. 2015) (recognizing that remedies are defined as relief intended to redress "a violation of *an established legal right* [that] has occurred or is imminent" (emphasis added)).

Once framed correctly, the analogy to *Kaemmerling* collapses. The PLRA demands exhaustion whenever grievance mechanisms "are 'capable of use' to obtain '*some* relief for the action complained of.'" *Ross*, 578 U.S. at 642 (emphasis added) (quoting *Booth*, 532 U.S. at 738). "Some relief" is a modest threshold—and a fatal obstacle to the majority's reasoning. That principle had no purchase in *Kaemmerling*, where the claim admitted no possibility of any mitigation whatsoever and therefore no prospect of "some relief." Either the Bureau of Prisons would collect the plaintiff's DNA and thereby fully consummate the asserted religious injury, or it would refrain and cause no injury at all.

Unlike the alleged harm in *Kaemmerling*, the Eighth Amendment injury the plaintiffs here assert is necessarily one of degree. Failure-to-protect claims comprise two inquiries: whether the inmate "is incarcerated under conditions posing a substantial risk of serious harm," and whether the authorities are deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Both concepts operate along a

5

continuum. Risk presents gradations. So does indifference. Accordingly, the possibility of "some relief" carries significance here that it lacked in *Kaemmerling*. If grievance procedures could diminish the level of risk or mitigate official indifference even marginally, then administrative remedies remain available and the PLRA demands that they be pursued before judicial intervention may be sought.

With respect to deliberate indifference, it borders on paradoxical to conclude that there is no possibility of "some relief" here. Grievance procedures exist precisely to confront alleged indifference and, when warranted, to secure institutional response. *Cf. Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 130 n.6 (1977). Short of circumstances in which prison officials categorically refuse to act upon grievances or obstruct access to grievance procedures, it is difficult to conceive how a failure-to-protect claim could ever admit of no possible relief on this element. Administrative consideration of an inmate's grievance is the antithesis of disregarding it. And given the range of interventions ordinarily available in correctional settings, it is not apparent how officials willing to engage with an inmate could ever be incapable of "respond[ing] reasonably" in a failure-to-protect context.[1] *Farmer*, 511 U.S. at 844. One plaintiff's experience before joining this litigation makes the point. After transferring to a male facility, Rachel Doe reported receiving a sexually explicit note from an unidentified inmate, and prison officials promptly opened an

---

[1] Contrary to the majority's suggestion, this does not foreclose application of *Ross*'s "dead end" exception to all failure-to-protect claims. *See* Maj. Op. at 23. The examples *Ross* itself offers—where grievances must be directed to an office that "disclaims the capacity" to consider them or officials with apparent authority "decline ever to exercise it"—reflect circumstances of categorical refusal in which the exception remains available. *Ross*, 578 U.S. at 643.

6

investigation to address the matter. Nothing in the record supports the conclusion that prison officials would abandon the vigilance reflected in Rachel Doe's experience or prove indifferent to the risks the plaintiffs assert.

Accordingly, because deliberate indifference is an indispensable element of failure-to-protect claims, plaintiffs cannot establish that administrative remedies are unavailable irrespective of the asserted risks attendant to their transfers. *See id.* ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). But even if plaintiffs' claims depended solely on their asserted risks following transfer, that would not excuse their failure to exhaust.[2] Intensified gender dysphoria does not inevitably ripen into a substantial risk of serious harm. The condition exists along a continuum with its severity neither fixed nor immutable, but contingent on a range of influences—some aggravating, others ameliorating. Transfer to male facilities may push the trajectory of plaintiffs' dysphoria in an unfavorable direction. It does not, however, dictate the ultimate severity of their condition, particularly in light of the range of treatment measures prison officials could implement. Administrative relief therefore remains available

---

[2] The majority's contention that mitigation of officials' deliberate indifference does not constitute "some relief" is incorrect for the reasons already explained. *See* Maj. Op. at 23. Tellingly absent, however, is any response to the separate and sufficient point that remedies would also have mitigated the substantial risk of serious harm plaintiffs allege. Because a failure-to-protect claim requires both deliberate indifference and substantial risk of serious harm, plaintiffs must demonstrate that relief was unavailable with respect to both elements in order to establish the absence of any possibility of "some relief."

7

with respect to the risks plaintiffs attribute to their gender dysphoria after transfer.

That conclusion follows even more self-evidently with respect to the portion of plaintiffs' claims alleging a heightened risk of physical and sexual violence. Managing and reducing such risks is among the most fundamental responsibilities of prison administration. *See Hewitt v. Helms*, 459 U.S. 460, 473 (1983) ("The safety of the institution's . . . inmates is perhaps the most fundamental responsibility of the prison administration."); *Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."). It would be a remarkable proposition to conclude that prison officials are categorically incapable of reducing, to any extent, the risk of physical or sexual assault within their institutions.

Nor is it a sufficient rejoinder to assert that any available administrative remedy would fail to mitigate the harms associated with transfer to male facilities to an adequate degree. It may ultimately prove that transfer to male facilities gravely intensifies certain plaintiffs' risks of serious harm, and that no action by prison officials can meaningfully alleviate those risks. But it is wholly speculative to conclude, at this juncture, that no relief whatsoever could conceivably be available through established grievance channels. And it is precisely such speculation that the PLRA's exhaustion requirement is designed to forestall. Prisoners must pursue "the possibility of *some* relief," *Booth*, 532 U.S. at 738 (emphasis added)—even if there is no "effective" remedy, *id.* at 740—because it is not for courts to preemptively adjudicate the adequacy of such relief. Exhaustion serves to "afford[] corrections officials time and opportunity to address complaints internally," thereby generating an administrative record that "clarifies the contours

8

of the controversy." *Porter*, 534 U.S. at 525. Some measure of relief is plainly available here. Whether it would prove inadequate is a question that cries out for factual development. Yet the majority indulges plaintiffs' request to proceed in the absence of any such administrative record.

The majority objects that the "action complained of" is not an Eighth Amendment violation "in the abstract," but rather "the concrete action the plaintiffs challenge—here, the transfers and their attendant risks." Maj. Op. at 21. The charge is puzzling. This dissent nowhere disputes that the action complained of is the transfer. But the availability of "some relief" for that action can only be assessed by reference to the elements of the constitutional claim the plaintiffs raise. If measuring facts against legal standards is "abstract," the majority's quarrel lies not with my dissent but with the enterprise of judging. Whatever abstraction burdens this case is a consequence of the majority's own making. It has proceeded without the factual record that exhaustion exists to produce, condemned relief as unavailable before the record could show otherwise, and substituted its own anticipatory conclusions for the evidence it declined to await.

At bottom, this case is far simpler than the majority tries to make it appear. The plaintiffs ask us to excuse exhaustion not because no remedies were available, but because none could deliver their preferred remedy—namely, insulation from being transferred to male facilities. But the PLRA demands exhaustion whenever grievance mechanisms "are 'capable of use' to obtain 'some relief *for* the action complained of.'" *Ross*, 578 U.S. at 642 (emphasis added) (quoting *Booth*, 532 U.S. at 738). *For* the action complained of, not *from* the action complained of, as the majority implicitly contends. Courts may not excuse exhaustion simply because the available remedies do not include a plaintiff's preferred choice. *See Porter*, 534 U.S.

9

at 524 ("All 'available' remedies must . . . be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' Even when the prisoner seeks relief not available in grievance proceedings . . . exhaustion is a prerequisite to suit." (quoting *Booth*, 532 U.S. at 739)); *Kaemmerling*, 553 F.3d at 675 ("Even if an inmate believes that seeking administrative relief from the prison would be futile and even if the grievance system cannot offer the particular form of relief sought, the prisoner nevertheless must exhaust the available administrative process."). A prisoner "may not circumvent the requirement of exhaustion by picking out a remedy that the prison happens not to offer and contending that its absence entitles him to bypass the administrative grievance procedure." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1174 (7th Cir. 2010). Yet that is precisely what the majority's opinion endorses.

## B

The majority's sole refuge from the inescapable conclusion that the plaintiffs failed to exhaust available remedies is the assertion that the government did not satisfy its burden of showing those remedies were available. *See* Maj. Op. at 21-22, 24. To sustain that proposition, the majority once again stretches *Kaemmerling* past its breaking point. They aggrandize a fleeting statement—that the government there "failed to carry its burden of showing an administrative remedy available . . . to exhaust," *Kaemmerling*, 553 F.3d at 675—into a holding that under the PLRA "the defendant bears the burden of showing that an administrative remedy was available for the plaintiff to exhaust." Maj. Op. at 7.

But that maneuver can succeed only by unmooring the statement from its context. The government's briefing in *Kaemmerling* was silent about whether administrative remedies

10

could offer even the possibility of some relief. *See* Brief for Appellees at 10-12, *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) (No. 07-5065). Indeed, as the court observed immediately before the statement the majority now seizes upon, "counsel for the BOP could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to Kaemmerling's claim that collecting his DNA would violate his statutory and constitutional rights." *Kaemmerling*, 553 F.3d at 675.

Against this backdrop, *Kaemmerling*'s reference to the government's "burden" was not a pronouncement on burden allocation at all. It was instead a recognition that the choreography of burdens was immaterial because the government had conceded the ultimate question—that administrative remedies were unavailable. *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (recognizing that "the ultimate purpose" of burden allocation "is typically achieved from the outset" when a party concedes the dispositive issue); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (observing that "[a] burden-shifting protocol is . . . unnecessary" when "[t]he fact to be uncovered by such a protocol . . . is not in dispute"); *Preston v. Texas Dep't of Fam. & Protective Servs.*, 222 F. App'x 353, 359 (5th Cir. 2007) (explaining that the court "need not make [a] determination" regarding the first two prongs of a burden-shifting inquiry because the plaintiff "failed to create a fact issue at the third step of the burden shifting analysis").

When the parties contest whether administrative remedies were available, *Kaemmerling* offers no guidance. Other circuits, however, have charted a clear course. The majority to consider the issue have uniformly adopted a three-step framework. The government bears only a modest initial burden to establish a generally available grievance procedure, after which the burden

11

shifts to the plaintiff to undertake the more demanding task of demonstrating that the procedure was, in reality, unavailable.[3] Only then does the burden return to the government, which may attempt to rebut the plaintiff's showing of unavailability. *Fordley v. Lizarraga*, 18 F.4th 344, 351 (9th Cir. 2021).

While the convergence of other circuits is not itself determinative, *see infra* at 14-15, the alignment here is the natural product of the PLRA's design. The statute itself is "silent on the allocation of the burden of persuasion," and so one must "begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005)). Exhaustion is, of course, styled an "affirmative defense," *Jones v. Bock*, 549 U.S. 199, 216 (2007), and the burden of proof often rests with the defendant who asserts such a defense, *see, e.g.*, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). But that convention derives from "the general rule of statutory construction that the burden of proving justification or

---

[3] *See Fordley v. Lizarraga*, 18 F.4th 344, 351 (9th Cir. 2021) ("Once the defendant shows that such a remedy was generally available, the burden shifts to the inmate to show that something in his particular case made the generally available administrative remedies effectively unavailable to him. Because the failure to exhaust is an affirmative defense that defendants must plead and prove, the ultimate burden of proving that the inmate has not exhausted his claims remains with the defendants."); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) ("[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Geter v. Baldwin State Prison*, 974 F.3d 1348, 1356 n.14 (11th Cir. 2020); *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

12

exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948). Typically, it is the defendant who claims the benefit of an exception when raising an affirmative defense. Exhaustion under the PLRA, however, reverses that posture. Though styled as an affirmative defense, exhaustion is not an exception to the statutory scheme but its default rule. *See Porter*, 534 U.S. at 525 n.4. Once exhaustion is raised, it is the plaintiff—not the defendant—who seeks departure from the ordinary rule. And "absent some reason to believe that Congress intended otherwise, . . . we should conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 92 (2008) (quoting *Schaffer*, 546 U.S. at 57-58).

The prevailing burden-shifting framework for determining the availability of remedies under the PLRA faithfully reflects this principle.[4] After the defendant identifies a nominally

---

[4] The Sixth and Seventh Circuits have declined to adopt the prevailing burden-shifting framework, holding instead that the government bears the burden of demonstrating the availability of administrative remedies. *See Lamb v. Kendrick*, 52 F.4th 286, 295 (6th Cir. 2022); *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022). But those decisions arose in a materially distinct context: disputes over whether prison officials obstructed prisoners' access to the grievance process itself, not whether an otherwise accessible process was capable of affording relief. *See Lamb*, 52 F.4th at 295; *Gooch*, 24 F.4th at 627-28; *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018); *Hill v. Snyder*, 817 F.3d 1037, 1040-41 (7th Cir. 2016). In cases involving impeded access, allocating the burden in this manner may be sensible, given the practical difficulty prisoners face in proving facts uniquely within the knowledge and control of prison officials. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005) ("[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the

13

available administrative process—a showing that may be made simply by "pointing to legally sufficient sources such as statutes, regulations, or grievance procedures," *Hubbs*, 788 F.3d at 59 (cleaned up)—the substantial burden lies with the plaintiff to establish why that procedure was, in reality, unavailable.

The majority's contrary approach thus inverts the PLRA's design. It relieves plaintiffs of their obligation to demonstrate unavailability and imposes on the government a burden the statute nowhere assigns. Neither *Kaemmerling* nor any other authority supports that result. Under the consensus burden-shifting framework, the government undisputedly carried its threshold obligation by identifying a nominally available grievance procedure. The burden thus rested with the plaintiffs to demonstrate that administrative remedies were unavailable to them in fact. They did not satisfy that burden and that failure should have resulted in the dismissal of their complaints.

## II

The preliminary injunctions should be vacated for an additional reason antecedent to the merits: following its issuance of the initial round of injunctions, the district court lacked authority to issue further preliminary relief.

---

knowledge of his adversary." (quoting *United States v. New York, New Haven & Hartford R.R. Co.*, 355 U.S. 253, 256 n.5 (1957))). Whatever force that allocation may have in such circumstances, however, does not extend to a case like this one. Here, the question is not whether grievance procedures were accessible, but whether they could provide meaningful relief in light of the plaintiffs' particular characteristics and situation—considerations that do not implicate the same evidentiary imbalance and therefore do not justify the same departure from the consensus approach.

14

Congress spoke plainly in the PLRA. Preliminary injunctive relief "shall automatically expire" ninety days after entry unless—before that deadline—the court both makes the findings required for prospective relief under § 3626(a)(1) and "makes the order final." 18 U.S.C. § 3626(a)(2). The district court entered its original preliminary injunction orders on February 18, February 24, March 3, March 10, and March 19, 2025. It did not, however, convert any of those orders into final prospective relief. As a result, each expired by operation of law ninety days after entry.

At that juncture, the statute afforded the district court a single lawful avenue to continue injunctive relief. The court could proceed to a trial on the merits and, if appropriate, enter final, prospective relief. The district court did not do so. Instead, it has repeatedly reissued successive preliminary injunctions, attempting to reset the ninety-day clock each time. Having failed to issue final relief, the district court was without power to continue preliminarily enjoining defendants. The latest orders are therefore invalid and we lack appellate jurisdiction over these interlocutory appeals.

I acknowledge that this practice of issuing rolling injunctions has become familiar in PLRA litigation, and that every circuit to confront the issue—save one, *see Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1207-15 (11th Cir. 2021), vacated as moot, 33 F.4th 1325 (11th Cir. 2022) (per curiam)—has acquiesced in that understanding. But "we have no warrant to ignore clear statutory language on the ground that other courts have done so." *Milner v. Department of Navy*, 562 U.S. 562, 576 (2011).

A broad consensus may, of course, reflect sound reasoning and thus merit respectful consideration. But here the consensus rests on little more than inertia. Uncritical adherence to the

15

decisions of other circuits risks ossifying error, undermining the process of percolation through which divergent views sharpen the law. *See Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900). Should uniformity ultimately prove indispensable, the task of reconciling any ensuing conflict properly belongs to our superiors. *See Cruz v. Am. Airlines, Inc.*, 193 F.3d 526, 530 (D.C. Cir. 1999).

This is precisely such an instance in which consensus should not command assent. Only the Ninth Circuit has attempted anything resembling a textual analysis, and its effort falls well short. *See Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001). That opinion summarily declared that "[n]othing in the statute limits the number of times a court may enter preliminary relief," and suggested that "[i]f anything, the [expiration] provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted." *Id.* Other circuits have dispensed with even that minimal effort, asserting the conclusion without any independent analysis. *See, e.g.*, *Smith v. Edwards*, 88 F.4th 1119, 1125-26 (5th Cir. 2023) (asserting, without explanation, that a preliminary injunction under the PLRA "may be extended by the district court if it makes the requisite findings"); *Alloway v. Hodge*, 72 F. App'x 812, 817 (10th Cir. 2003) (adopting *Mayweathers*'s conclusion with no independent reasoning); *Monroe v. Bowman*, 122 F.4th 688, 697 (7th Cir. 2024) (same).

If Congress intended merely to impose on plaintiffs a continuing burden to demonstrate that preliminary relief remains warranted, § 3626(a)(2) would be an oddly circuitous way of doing so. Congress could instead have permitted preliminary relief to persist unless the district court failed to renew findings at ninety-day intervals, rather than compelling automatic dissolution of relief followed by reissuance upon the same showing. Congress's handiwork elsewhere in the same

16

section exposes the implausibility of a reading that would require such a convoluted approach to maintaining preliminary relief for some indefinite period. In a neighboring provision, Congress authorized termination of final "prospective relief" after specified time periods unless the court makes written findings that the relief remains necessary. *See* 18 U.S.C. § 3626(b). That provision imposes precisely the continuing burden the Ninth Circuit attributes to § 3626(a)(2), but without the peculiar requirement that relief expire regardless of its continued justification. It strains credulity to conclude Congress adopted a more tortuous framework for preliminary injunctions without any discernible justification. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (explaining that courts should not rely on "the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012))).

Properly construed, § 3626(a)(2) operates exactly as the Eleventh Circuit has explained: it recasts preliminary injunctions in prison-conditions litigation into a form of short-lived relief that is far closer in function to a temporary restraining order. *Georgia Advocacy Office*, 4 F.4th at 1209-10. Ordinarily, a preliminary injunction remains "effective until a decision has been reached at a trial on the merits." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2941 (3d ed. 2025) (Wright & Miller). A TRO, by contrast, is sharply constrained—fourteen days, with at most a single fourteen-day extension—designed to preserve the status quo only long enough for a court to conduct a prompt hearing on whether more enduring relief is warranted. *See* Fed. R. Civ. P. 65(b)(2); 11A Wright & Miller § 2951. Often, it does not endure even that long. This brevity of TROs is intentional, reflecting the deliberate "design[] to restrict the possible adverse effect of an

17

order that is granted without a hearing and to ensure a prompt hearing on the application for a preliminary injunction." 11A Wright & Miller § 2953. The caselaw reveals no effort to evade those time limits through serial reissuance, and the PLRA's ninety-day ceiling on preliminary injunctions reflects the same settled understanding. By imposing a firm temporal boundary on preliminary relief, Congress curtailed the harms of potentially unjustified or overbroad injunctions and expedited final judgments in prison cases.

This constraint of the remedial power of the federal district courts accords precisely with a statutory scheme crafted to curtail the intrusive, open-ended judicial supervision that had come to characterize prison-conditions litigation. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006).[5] As Judge Calabresi aptly observed, "Congress meant to get the federal courts out of the business of running jails." *Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (en banc) (Calabresi, J., concurring). Permitting district courts to perpetually reissue preliminary injunctions is wholly "inconsistent" and "out of step" with that design. *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227-28 (2012). The consolidated cases before us illustrate the point starkly. They have languished. The district court has taken no meaningful steps toward final resolution, despite having jurisdiction to do so during the pendency of this appeal. *See* 11A Wright & Miller § 2962 ("An appeal from the grant or denial of a preliminary injunction does not divest the trial court

---

[5] "As a result of prisoner litigation, by 1995" when the PLRA was enacted, "thirty-nine states were under [federal] court order or consent decree to improve prison conditions and control population in their entire state system or at least in their major facilities." Thomas Julian Butler, Commentary, *The Prison Litigation Reform Act: A Separation of Powers Dilemma*, 50 ALA. L. REV. 585, 589 (1999).

18

of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending.").

To accept the notion that district courts may perpetually reissue preliminary injunctions is therefore to disregard the very reform on which "Congress trained its attention." *Yates v. United States*, 574 U.S. 528, 532 (2015). It would require one to assume that Congress enacted a strict temporal limitation as part of a broader scheme to curb courts' intrusive oversight of prisons, only to invite routine circumvention through a *sub silentio* loophole, invoked by nothing more than a perfunctory order every ninety days. That reading cannot be reconciled with settled principles of statutory construction. *See Rake v. Wade*, 508 U.S. 464, 471 (1993) ("To avoid denying effect to a part of a statute, we accord significance and effect to every word." (cleaned up)). Congress specified one—and only one—path by which a preliminary injunction may persist: conversion to final prospective relief supported by the requisite findings. *See Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021).

This conclusion is confirmed by other features of the statute. Section 3626(a)(2) opens by providing that "[i]n any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief." The singular phrasing—"*an* order for preliminary injunctive relief"—conveys authorization to issue one such order, not a renewable succession of them. *See Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021). A contrary reading strips this sentence of any operative force, reducing it to a superfluous restatement of existing equitable authority. *SW General, Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence,

**App. 160**

19

or word shall be superfluous, void, or insignificant." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001))).

True, "[t]he canon against surplusage is not an absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). But it carries particular force here, where Congress departed from an otherwise parallel structure. Section 3626(a)(1)(A), governing prospective relief, begins immediately with substantive limitations, requiring that such relief "extend no further than necessary," be "narrowly drawn," and be "the least intrusive means necessary to correct" the violation. Section 3626(a)(2) ultimately adopts those same limitations for preliminary relief, but only after it opens by authorizing the entry of "*an* order for preliminary injunctive relief." If that initial authorization were merely ornamental, its inclusion in § 3626(a)(2)—and its omission from § 3626(a)(1)(A), where Congress could equally have restated courts' authority to grant prospective relief—would be inexplicable. *See Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—[the reviewing court] presumes that Congress intended a difference in meaning."); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices.").

The statutory text resolves the issue, and the inquiry can end there. But looking beyond the text only reinforces the conclusion. The legislative history confirms that Congress understood—and accepted—the precise consequence of the provision it enacted. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring) (observing that it is "entirely appropriate to consult . . . the legislative history" to determine whether a particular result was

20

unconsidered by the legislature). When the PLRA, then contained in H.R. 2076, first passed both Houses of Congress, it contained the very same automatic-expiration provision at issue here. *See* H.R. 2076, 104th Cong. § 801(a) (1995). During floor debate, Representative Conyers, then the ranking member of the House Judiciary Committee, expressly acknowledged the effect of that design:

> [T]he provisions would render emergency relief ineffective. Preliminary injunctions would mandatorily terminate 90 days after entry unless the court made the injunction final within the 90-day period. It is virtually impossible for the parties to complete discovery and for the court to complete a trial and issue a decision within 90 days. . . . Termination of a preliminary injunction, without attention to whether there is good cause for the injunction to remain in effect, and without allowing adequate time for the parties to conduct discovery and the court to hold a trial would deprive a court of the power to prevent a defendant from returning to life threatening practices. Federal courts would be prevented from issuing any relief in prison or jail conditions cases without a finding of a violation of law, effectively prohibiting court-enforceable settlement agreements.

141 Cong. Rec. H14106 (1995). The debate reflects no disagreement that the provision would operate in exactly this manner. Although President Clinton ultimately vetoed that version of the PLRA for reasons unrelated to its prison-litigation provisions, *see* 141 Cong. Rec. H15166-67 (1995), Congress returned to the matter only months later. In enacting the PLRA in its final form, Congress retained the preliminary-injunction provision verbatim, notwithstanding the concerns Representative Conyers had articulated, and without any further discussion suggesting a retreat from its acknowledged effect. *See* Act of April 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321; *see also Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 946 (D.C.

21

Cir. 2024) (noting that legislative history demonstrating legislative awareness of a given interpretation supports an inference of affirmative ratification upon enactment).

When the text, structure, and contemporaneous legislative understanding align so completely, § 3626 admits of only one meaning.

One final point bears emphasis. The majority suggests that this issue—whether the district court lacked authority to renew the preliminary injunctions—has been forfeited because the government did not raise it. That is mistaken. The restriction on successive preliminary injunctions reflects congressional concerns regarding judicial efficiency and the appropriate limits of judicial authority in litigation concerning conditions in both state and federal prisons—matters that "implicat[e] values beyond the concerns of the parties." *Day v. McDonough*, 547 U.S. 198, 205 (2006) (alteration in original) (quoting *Acosta v. Artuz*, 221 F.3d 117, 123 (2d Cir. 2000)); *see also Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 149 (7th Cir. 1990) (Posner, J.) ("An injunction imposes burdens on the court that issues it and potentially affects the rights of third parties; on both grounds the court has a duty independent of the desires of the parties to assure that the injunction is proper."). Thus, "[i]t is of no moment that the government has not made this argument." *United States v. Rashad*, 396 F.3d 398, 404 (D.C. Cir. 2005) (Randolph, J., dissenting). The restriction "is meant to conserve judicial resources, not to confer some right on the government that it may waive by not arguing the point." *Id.*

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5099**                    **September Term, 2025**

**1:25-cv-00286-RCL**
**1:25-cv-00401-RCL**
**1:25-cv-00653-RCL**

**Filed On: April 17, 2026** [2169121]

Jane Doe, et al.,

        Appellees

     v.

William K. Marshall, III, in his official
capacity as Director of the Federal Bureau
of Prisons and Todd Blanche, in his official
capacity as Acting Attorney General of the
United States,

        Appellants

------------------------------

Consolidated with 25-5101, 25-5108,
25-5210, 25-5213, 25-5215, 25-5304,
25-5305, 25-5306, 25-5419, 25-5420,
25-5427, 26-5066, 26-5067, 26-5069

## O R D E R

It is **ORDERED**, on the court's own motion, that the Clerk withhold issuance of
the mandate herein until seven days after disposition of any timely petition for rehearing
or petition for rehearing en banc. See Fed. R. App. P. 41(b); D.C. Cir. Rule 41. This
instruction to the Clerk is without prejudice to the right of any party to move for
expedited issuance of the mandate for good cause shown.

                  **FOR THE COURT:**
                  Clifton B. Cislak, Clerk

        BY:   /s/
                  Daniel J. Reidy
                  Deputy Clerk

**App. 164**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| RHONDA FLEMING, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 4:25-CV-00157-D |
| | § | |
| WARDEN T. RULE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF MALISSA MARK

I, Malissa Mark, submit this declaration in support of the Respondent's response to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. I hereby declare the following under penalty of perjury pursuant to 28 U.S.C. § 1746.

1. I am the Executive Assistant at the Federal Medical Center Carswell, located in Fort Worth, Texas. I also serve as the institution's Camp Administrator. As part of my official duties, I have access to records maintained in the ordinary course of business by the BOP, including information regarding inmate housing assignments.

2. I have reviewed relevant files pertaining to these Intervenors and I provide the following statements concerning their current housing status within the BOP. Intervenors in this matter are Ms. Elizabeth Hardin (Reg. 20280-078), Ms. Brenda Kirk (Reg. 09978-180), Ms. Jasmine Meabon (Reg. 31206-076), Ms. Clemencio Morais (Reg. 04292-511), and Ms. Keisha Williams (Reg. 91940-083).

3. On February 2, 2026, this Court entered a Permanent Injunction with the consent of the parties. Pursuant to that Injunction, FMC Carswell is prohibited from permitting any male inmate to enter or remain in any privacy area (including showers, restrooms, changing areas, and dormitory spaces) to which either Plaintiff, that is Ms. Rhonda Fleming (Reg. 20446-009) or Ms. Miriam Herrera (Reg. 56791-177), has access. While Ms. Fleming has since transferred away from FMC Carswell, Ms. Herrera remains at this institution. And to implement this injunction FMC Carswell has permanently sex-segregated its common-area group restrooms such that biologically male inmates may not use them (regardless of whether Fleming or Herrera is present at the time).

4. Accordingly, no Intervenor will encounter a biologically male inmate in any privacy area outside the housing units, including all common area restrooms.

5. Ms. Hardin transferred to the Federal Correctional Institution Waseca in Waseca, Minnesota on March 12, 2026. She departed FMC Carswell on February 18, 2026.

6. Ms. Kirk is currently housed on Unit 2North where she has been assigned since September 18, 2025. There are no biologically male inmates assigned to Unit 2North and, in accordance with the Permanent Injunction entered by this Court regarding Ms. Herrera, no biologically male inmates will be assigned to Unit 2North in the foreseeable future.

7. Ms. Williams is currently designated to FMC Carswell's satellite minimum security camp. There are no biologically male inmates currently assigned to the FMC Carswell Camp.

**App. 165**

8. Ms. Meabon and Ms. Clemencio Morais are both currently assigned to Unit 2South. They share this unit with one biologically male inmate. While both Intervenors are on the same housing unit, neither share a cell with the biological male inmate.

Under 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Executed on this 20th day of April 2026, in Fort Worth, Texas.

Malissa Mark

Executive Assistant

F.M.C. Carswell, Federal Bureau of Prisons

App. 166