# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **RHONDA FLEMING and**<br>**MIRIAM CRYSTAL HERRERA,** | §<br>§<br>§ | |
| **Plaintiffs,** | §<br>§ | |
| **v.** | §<br>§ | **Civil Action No. 4:25-cv-0157-D**<br>**(Consolidated with** |
| **WARDEN T. RULE, WILLIAM K.**<br>**MARSHALL, III, PAMELA J. BONDI,**<br>**UNITED STATES OF AMERICA,** | §<br>§<br>§<br>§ | **Civil Action No. 4:25-cv-0438-D)** |
| **Defendants.** | §<br>§ | |

## BRIEF IN SUPPORT OF PLAINTIFFS' AFFIRMATIVE
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

BROWN FOX PLLC

Cortney C. Thomas
 Texas Bar No. 24075153
 cort@brownfoxlaw.com
C. Alan Carrillo
 Texas Bar No. 24109693
 alan@brownfoxlaw.com
Andrew C. Debter
 Texas Bar No. 24133954
 andrew@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, TX 75225
T: 214.327.5000
F: 214.327.5001

*Attorneys for Plaintiffs Rhonda Fleming*
*and Miriam Crystal Herrera*

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   BACKGROUND .................................................................................................... 4

      A.    Historically, American correctional systems have separated inmates by
            biological sex. ............................................................................................ 4

      B.    PREA authorizes rulemaking only for standards addressing prison rape
            prevention. ................................................................................................. 7

      C.    The PREA regulation authorizes and encourages cross-sex prison housing. ......... 8

      D.    The policy has resulted in the placement of biological males in women's
            facilities. ................................................................................................... 14

III.  PROCEDURAL HISTORY ................................................................................... 17

IV.   LEGAL STANDARD ............................................................................................ 19

V.    ARGUMENT ......................................................................................................... 21

      A.    Plaintiffs have standing to challenge Section 115.42. ......................................... 21

      B.    Section 115.42(c)–(g) Exceeds Statutory Authority under PREA ........................ 22

            1.    PREA does not authorize cross-sex prison housing based on
                  gender ideology. ............................................................................... 23

            2.    The Challenged Regulation contradicts PREA's text and purpose
                  because it puts women at greater risk of prison rape and other
                  related harms. ................................................................................... 24

            3.    The major questions doctrine confirms that Congress did not grant
                  BOP the sweeping authority it now claims. ......................................... 26

      C.    The regulation is contrary to law and the Constitution because it conflicts
            with statutory and constitutional principles protecting inmate safety and
            privacy ....................................................................................................... 35

            1.    The regulation conflicts with BOP's statutory duty to protect
                  inmate safety. .................................................................................. 36

            2.    The regulation is contrary to constitutional protections for bodily
                  privacy ............................................................................................ 37

3.    The regulation is contrary to the Eighth Amendment's requirement that prison officials protect inmates from substantial risks of serious harm. ............................................................................... 38

D.    Universal vacatur of the unlawful regulation is the appropriate remedy. .............. 39

1.    Vacatur is the default remedy under § 706. ............................................... 40

2.    Vacatur under § 706 is universal in scope. ............................................... 40

3.    Vacatur may be limited to the unlawful portions of the regulation. ......... 41

VI.  CONCLUSION .................................................................................................................. 42

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ala. Assn. of Realtors v. HHS*,
  594 U.S. 758 (2021) ............................................................................................... 27

*All. for Fair Bd. Recruitment v. SEC*,
  125 F.4th 159 (5th Cir. 2024) ................................................................................. 30

*All. for Nat. Health, USA v. United States*,
  No. 24-CV-2989 (CRC), 2025 WL 1938165 (D.D.C. July 15, 2025) ...................... 20

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  271 F.3d 262 (D.C. Cir. 2001) ................................................................................ 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................... 18, 20

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ................................................................... 27, 28, 31, 35

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ............................................................................ 40, 41

*Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ................................................................................... 41

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................ 20

*Cornwell v. Dahlberg*,
  963 F.2d 912 (6th Cir. 1992) .................................................................................. 37

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) ............................................................................. 40, 41

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ................................................................................................ 22

*De Veloz v. Miami-Dade Cnty.*,
  756 F. App'x 869 (11th Cir. 2018) .......................................................................... 39

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................................................ 38

*Doe v. Blanche*,
  No. 25-5099, 2026 WL 1042002 (D.C. Cir. Apr. 17, 2026) ............................... 19, 22

*Doe v. Luzerne Cnty.*,
  660 F.3d 169 (3d Cir. 2011) ................................................................................. 37

*Dothard v. Rawlinson*,
  433 U.S. 321 (1977) .............................................................................................. 6

*Electro-Catheter Corp. v. Surgical Specialties Instrument Co., Inc.*,
  587 F. Supp. 1446 (D.N.J. 1984)......................................................................... 18

*Farmer v. Brennan*,
  511 U.S. 825 (1994) .......................................................................................... 5, 39

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .......................................................................... 23, 27, 31, 35

*Fortner v. Thomas*,
  983 F.2d 1024 (11th Cir. 1993) ........................................................................... 37

*Franciscan Alliance, Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ............................................................................... 40

*Girling Health Care, Inc. v. Shalala*,
  85 F.3d 211 (5th Cir. 1996) ................................................................................. 20

*In re Clarke*,
  94 F.4th 502 (5th Cir. 2024) ............................................................................... 40

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
  448 U.S. 607 (1980) ............................................................................................ 27

*INS v. Cardoza–Fonseca*,
  480 U.S. 421 (1987) ............................................................................................ 20

*Kansas v. U.S. Dep't of Educ.*,
  739 F. Supp. 3d 902 (D. Kan. 2024)..................................................................... 30

*Klinger v. Dep't of Corr.*,
  31 F.3d 727 (8th Cir. 1994) .............................................................................. 6, 25

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ............................................................................................ 23

*Learning Res., Inc. v. Trump*,
  146 S. Ct. 628 (2026)........................................................................................... 26

*Lee v. Downs*,
  641 F.2d 1117 (4th Cir. 1981) ............................................................................. 37

iv

*Louisiana v. U.S. Dep't of Educ.*,
  737 F. Supp. 3d 377 (W.D. La. 2024) ........................................................................ 30

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................ 21, 22

*Matthews v. Hardy*,
  420 F.2d 607 (D.C. Cir. 1969) .................................................................................. 36

*Mayfield v. United States Dep't of Labor*,
  117 F.4th 611 (5th Cir. 2024) ............................................................................. 27, 30

*Michenfelder v. Sumner*,
  860 F.2d 328 (9th Cir. 1988) ...................................................................................... 6

*Moore v. Carwell*,
  168 F.3d 234 (5th Cir. 1999) ..................................................................................... 37

*NAACP v. Tindell*,
  95 F.4th 212 (5th Cir. 2024) ..................................................................................... 21

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
  595 U.S. 109 (2022) ..................................................................................... 22, 27, 28

*Newton v. Joseph*,
  718 F. App'x 256 (5th Cir. 2018) ............................................................................. 37

*Pitts v. Thornburgh*,
  866 F.2d 1450 (D.C. Cir. 1989) ............................................................................. 5, 38

*Purl v. HHS*,
  787 F. Supp. 3d 284 (N.D. Tex. 2025) ........................................... 28, 30, 32, 41, 42

*Ragas v. Tenn. Gas Pipeline Co.*,
  136 F.3d 455 (5th Cir. 1998) ..................................................................................... 20

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
  245 F.3d 434 (5th Cir. 2001) ..................................................................................... 20

*Tex. v. Nuclear Regulatory Comm'n*,
  78 F.4th 827 (5th Cir. 2023) ................................................................................. 27, 30

*Texas v. Cardona*,
  743 F. Supp. 3d 824 (N.D. Tex. 2024) ...................................................................... 30

*Texas v. EEOC*,
  785 F. Supp. 3d 170 (N.D. Tex. 2025) ......................................................... 40, 41, 42

*Texas v. HHS*,
  770 F. Supp. 3d 940 (E.D. Tex. 2025) ................................................................ 30

*Texas v. United States*,
  126 F.4th 392 (5th Cir. 2025) ........................................................................... 41

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) .......................................................................................... 41

*Utility Air Regulatory Group v. EPA*,
  573 U.S. 302 (2014) ..................................................................................... 27, 28

*Veney v. Wyche*,
  293 F.3d 726 (4th Cir. 2002) ......................................................................... 6, 25

*Walker v. Sears, Roebuck & Co.*,
  853 F.2d 355 (5th Cir. 1988) ............................................................................ 20

*Washington v. Glucksberg*,
  521 U.S. 702, 721 (1997) .................................................................................. 38

*West v. Radtke*,
  48 F.4th 836 (7th Cir. 2022) ............................................................................... 6

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ................................................................................... Passim

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .......................................................................................... 28

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
  93 F.3d 910 (D.C. Cir. 1996) .............................................................................. 5

*York v. Story*,
  324 F.2d 450 (9th Cir. 1963) ............................................................................. 37

## <u>Statutes</u>

5 U.S.C. § 706 ............................................................... 20, 21, 35, 37, 39, 40, 43

18 U.S.C. § 4042(a) ............................................................................................ 36

34 U.S.C. § 30301 ........................................................................................ 7, 24, 25

34 U.S.C. § 30302 ............................................................................................ 7, 8

34 U.S.C. § 30306 ............................................................................................... 9

34 U.S.C. § 30307 ................................................................................................. 8, 9, 23, 32

CAL. PENAL CODE §§ 2605–06 ................................................................................ 33

CONN. GEN. STAT. § 18-81ii ................................................................................... 33

LA. STAT. §§ 9:58, 9:63, 9:65 ............................................................................... 34

N.Y. ASSEMB. B A709A (2023) ............................................................................. 33

UTAH CODE § 64-13-7 ........................................................................................... 34

**Rules**

FED. R. CIV. P. 56(a) .............................................................................................. 19

FED. R. CIV. P. 56(b) .............................................................................................. 18

**Regulations**

28 C.F.R. § 115.42 .........................................................................................Passim

**Other Authorities**

10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2713
    (4th ed.) ............................................................................................................. 18

*National Standards to Prevent, Detect, and Respond to Prison Rape*,
    77 Fed. Reg. 37,106 (June 20, 2012) ............................................................... 9

*Prisons for Women*, *1790–1980*,
    5 Crime & Just. 129 (1983) .............................................................................. 5

*The History of Prisons in the United States from 1777 to 1877*,
    51 Stan. L. Rev. 839 (1999) .............................................................................. 5

*The Writ-of-Erasure Fallacy*,
    104 Va. L. Rev. 933 (2018) ............................................................................. 41

# I.  INTRODUCTION

This case presents a straightforward question of administrative law: whether the federal government may use a statute directed at preventing prison rape to authorize a regulatory regime that departs from the longstanding practice of sex-separated incarceration and permits the placement of biological males in women's prisons. The answer is no. The challenged provisions of 28 C.F.R. § 115.42(c)–(g) cannot be reconciled with the text, structure, or purpose of the Prison Rape Elimination Act ("PREA"), and they exceed the authority Congress conferred.

Recent statements by the government underscore that conclusion. On March 26, 2026, the Department of Justice announced federal civil rights investigations into the States of California and Maine for housing biological males in women's prisons.[1] In its press release, the Attorney General declared that "[k]eeping men out of women's prisons is not only common sense" but "a matter of safety and constitutional rights." The Assistant Attorney General for Civil Rights stated that the Civil Rights Division "will not allow women incarcerated in jails or prisons to be subject to unconstitutional risks of harm from male inmates." And the First Assistant United States Attorney for the Central District of California warned that the "Constitution protects women from having their civil rights violated by harmful state legislation wrapped in the language of 'equity' and 'progress.'"

Those statements accurately describe the constitutional interests at stake. They also describe the consequences of the federal government's *own* regulation. The regulation challenged in this case, 28 C.F.R. § 115.42(c)–(g) (the "Challenged Regulation"), is the legal framework that authorized and encouraged the very practice the government now condemns. It was this regulation

---

[1] Press Release, U.S. Dep't of Justice, *Justice Department Notifies California and Maine of Investigations into Whether Housing Biological Men in Women's Prisons Violates Constitution* (Mar. 26, 2026), https://www.justice.gov/opa/pr/justice-department-notifies-california-and-maine-investigations-whether-housing-biological [https://perma.cc/4HQA-JZW9].

that directed prison officials to consider gender identity in housing decisions. It was this regulation that required officials to give "serious consideration" to an inmate's own views of safety. And it was this regulation under which the Bureau of Prisons placed biological males, including convicted sex offenders, in the general population of FMC Carswell, a federal women's prison, where they shared cells, showers, and restrooms with female inmates. The Department of Justice cannot credibly threaten states with federal civil rights investigations for maintaining the same cross-sex housing policies that its own regulation created and that remain codified in the Code of Federal Regulations.

Defendants have acknowledged as much. At no point in this litigation have Defendants defended the merits of the Challenged Regulation. They have conceded that they "have no objection to those provisions being vacated, held unlawful, and set aside as to Plaintiffs." Dkt. No. 133. And on December 2, 2025, the Department instructed all PREA auditors to "immediately pause from making compliance determinations" for the challenged subsections, recognizing that portions of the PREA Standards "are in conflict with the requirements" of Executive Order 14168. Yet the regulation remains on the books. It has not been amended through notice-and-comment rulemaking. And its continued existence has produced precisely the incoherence this motion seeks to resolve: a federal government that publicly investigates states for constitutional violations arising from cross-sex prison housing while preserving the federal regulation that pioneered the practice and still financially penalizes states that fail to comply with its standards.

Vacatur is necessary now, not at some indeterminate future date and not as applied only to these Plaintiffs. The Department has stated that it "is currently updating the PREA Standards" to align with the Executive Order, but no proposed rule has been published in the over fifteen months since the Executive Order was signed. Administrative commitments to future rulemaking do not

make an unlawful regulation lawful, particularly where it exceeded congressional authorization from the start. So long as the Challenged Regulation remains in force, it provides a ready-made regulatory vehicle for any future administration to reinstate cross-sex housing policies without new legislation and without meaningful democratic deliberation. A subsequent administration would need only to resume enforcement of the existing rule and withdraw the current auditing pause. The regulatory infrastructure would remain intact, the compliance obligations would snap back into place, and the federal prisons would again be operating under a framework that this Court has already found produces constitutional violations. Vacatur forecloses that possibility. It removes the unlawful provisions from the regulatory code entirely. Any future policy permitting the housing of biological males in women's prisons would then have to come from Congress—through legislation enacted by the people's elected representatives—not from an unelected agency acting beyond its delegated authority.

The Department of Justice's delay and selective enforcement underscore why this Court should act now. It has been over fifteen months since President Trump signed Executive Order 14168. And in that time Judge Lamberth enjoined the EO's execution with respect to cross-sex housing in the related *Doe v. Bondi* (now *Doe v. Blanche*) litigation, even though that preliminary injunction has since been vacated on appeal. Yet DOJ has not even published a Notice of Proposed Rulemaking to commence amending the Challenged Regulation. Nor is this the first time the Department has failed to act: during the first Trump Administration (2017–2021), the Department of Justice under Attorney General Barr likewise never initiated rulemaking to amend the Challenged Regulation. Meanwhile, the Department has opened federal civil rights investigations into state prison systems for maintaining the very cross-sex housing policies that its own regulation pioneered and continues to authorize. The Challenged Regulation also operates in only one

3

direction: by its terms it contemplates placing transgender-identifying males[2] in women's facilities based on asserted gender identity, yet it offers no similar protections or preference to women fearing sexual violence or harassment by those biological males. The regime thus privileges the housing preferences of male, transgender-identifying inmates over the safety and privacy of the women incarcerated alongside them. This Court should not wait for formal rulemaking that the Department has had fourteen months to begin, has not begun as of the date of this filing, and cannot guarantee will succeed, if and when a rulemaking is eventually started. Vacatur is the remedy Congress prescribed for precisely this situation.

The undisputed record establishes that Section 115.42(c) through (g) exceeds the statutory authority conferred by the Prison Rape Elimination Act, is contrary to constitutional protections for inmate safety and bodily privacy, and has produced the precise harms that PREA was enacted to prevent. Defendants do not contest these conclusions. Plaintiffs are entitled to summary judgment on their APA claim and to universal vacatur of the challenged provisions.

## II.    BACKGROUND[3]

**A.    Historically, American correctional systems have separated inmates by biological sex.**

1.    For centuries, American prisons and jails have classified and housed inmates based on biological sex. That practice is rooted in the most elementary penological concerns: inmate

---

[2] For obvious reasons, the Department has generally not opted to house biological females in men's facilities. *Second Declaration of Rick Stover, Senior Deputy Designation and Sentence Computation Center*, filed in *Jones v. Trump, et al.*, 1:25-cv-00401-RCL, (D.D.C. Mar. 1, 2025), ¶ 22 [Dkt. 42-1] (BOP official testifying as of March 1, 2025 in related litigation that "[o]ut of 10,009 biological female inmates in FBOP custody, only 1 biological female is housed in a male institution.").

[3] Plaintiffs' summary judgment record draws from several categories of evidence. The new appendix filed with this motion includes the materials most directly relevant to the present motion and any new or key materials not previously submitted, including BOP memoranda, prior declarations, and hearing transcripts. Plaintiffs have not refiled in the appendix every background source, publicly available document, or item already included in prior appendices or otherwise already before the Court. To avoid unnecessary duplication, Plaintiffs cite those materials by reference where appropriate.

safety, institutional security, and the preservation of bodily privacy. It predates the founding of the federal prison system[4] and has persisted without interruption since.

2.      Historical sources confirm that sex-segregated incarceration has been the norm since the earliest development of the American prison system. On April 5, 1790, the Pennsylvania legislature passed the law establishing the legal foundation for America's first prison system, a law that "ordered that jailers segregate the sexes." Matthew W. Meskell, *The History of Prisons in the United States from 1777 to 1877*, 51 Stan. L. Rev. 839, 847 (1999). Thus, the separation of men and women became a foundational principle of American penology. *See generally* Nicole Hahn Rafter, *Prisons for Women, 1790–1980*, 5 Crime & Just. 129 (1983).[5] As the D.C. Circuit recognized, sex-based separation is "a pervasive characteristic of American prisons." *Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989).

3.      Courts have uniformly concluded that this practice is not merely permissible but constitutionally sound. *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) ("The segregation of inmates by sex is unquestionably constitutional."). That conclusion reflects the convergence of several constitutional imperatives. Prison officials have a duty to "protect prisoners from violence at the hands of other prisoners." *Farmer v.*

---

[4] Historical Information, Fed. Bureau of Prisons, https://www.bop.gov/about/history/ [https://perma.cc/J756-PAQU] ("Pursuant to Pub. L. No. 71-218, 46 Stat. 325 (May 14, 1930), Congress established the Federal Bureau of Prisons (FBOP) within the Department of Justice (DOJ) and charged the agency with the 'management and regulation of all Federal penal and correctional institutions.' The federal prison system had already existed for nearly 40 years under the Three Prisons Act (1891)[.]"); Timeline, Fed. Bureau of Prisons, https://www.bop.gov/about/history/timeline.jsp ("1891 - Federal Prison System Established . . . 1930 - Federal Bureau of Prisons is Established").

[5] While the earliest state prisons isolated female prisoners in designated rooms within otherwise male institutions, over the nineteenth century, women were progressively moved into more distinct quarters, separate annexes, and eventually independent facilities, driven by concerns over discipline, safety, and the prevention of sexual contact. *See* Rafter, *supra*, at 134–39. In 1835, New York founded the Mount Pleasant Female Prison, the first independent penal institution for women. *Id.* at 138. Beginning around 1870, twenty women's reformatories were established, physically separate from men's prisons, run entirely by women, and designed around beliefs about inherent differences between the sexes. *Id.* at 147–48, 159. Throughout all regions and time periods, women's prisons have remained physically distinct from men's institutions, whether as annexed units or as fully independent facilities. *Id.* at 132, 166–72.

*Brennan*, 511 U.S. 825, 833 (1994). "Courts have long recognized that sex is a trait relevant to inmate privacy." *West v. Radtke*, 48 F.4th 836, 850 (7th Cir. 2022); *see also Michenfelder v. Sumner*, 860 F.2d 328, 333–34 (9th Cir. 1988) (recognizing that sex-separated spaces serve important privacy interests). Sex-separated housing has long served as a structural safeguard that preserves privacy, safety, and dignity within custodial settings. *See Dothard v. Rawlinson*, 433 U.S. 321, 335–36 (1977).

4.      This separation reflects real differences between the male and female incarcerated populations. "[F]emale inmates as a class have special characteristics distinguishing them from male inmates, ranging from the fact that they are more likely to be single parents with primary responsibility for child rearing to the fact that they are more likely to be sexual or physical abuse victims." *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731–32 (8th Cir. 1994). "Male inmates, in contrast, are more likely to be violent and predatory than female inmates." *Id.* at 732; *see also Veney v. Wyche*, 293 F.3d 726, 734 (4th Cir. 2002) ("[F]emales and males are housed separately, and each gender faces unique safety and security concerns of various degrees. Indeed, it is a well-documented reality that institutions for females generally are much less violent than those for males.").

5.      These sex-based differences have shaped the physical design, staffing, and operational policies of women's facilities for generations. Women's prisons are often physically separate from facilities housing male inmates, operate at lower security levels, feature more communal dormitory-style living, provide more private bathroom facilities, and are staffed predominantly by women. *See* Rafter, *supra*, at 131–33, 137, 142–44, 146–47, 156–60, 165–72. The safety and privacy considerations motivating these distinctions are obvious and have been credited by courts. *See, e.g.*, *Veney*, 293 F.3d at 734; *Klinger*, 31 F.3d at 732.

6

6.    The BOP's own recent sworn declarations confirm that this baseline persists. In related litigation, the BOP attested: "The [Federal Bureau of Prisons] believes that housing inmates according to their biological sex helps to ensure prisoner safety, security, and privacy. That is why the FBOP has always housed the vast majority of inmates with other individuals of their own biological sex." Second Decl. of Rick Stover, filed in *Jones v. Trump*, No. 1:25-cv-00401-RCL (D.D.C.), ¶ 20 (Dkt. 42-1). That testimony by the government also states: "It is FBOP's correctional judgment that housing inmates with inmates of their own biological sex ensures bodily privacy and safety and limits the risk of sexual abuse, disciplinary problems, and illicit intimate relationships. No FBOP housing unit is co-ed. Rather, female inmates are housed separate and apart from male inmates in 29 facilities." *Id.* at ¶ 23. Moreover, a recent BOP legal policy guide states: "Inmates are housed separate from the alternative sex. At various sites, female inmate units are co-located with male units. However, all housing units and activities are separate."[6] This centuries-old practice of sex-separated incarceration is the baseline against which the BOP's claimed regulatory authority must be assessed.

**B.    PREA authorizes rulemaking only for standards addressing prison rape prevention.**

7.    Against that backdrop, Congress enacted the Prison Rape Elimination Act ("PREA") in 2003 to address a specific and serious problem: sexual abuse in custodial settings. Pub. L. No. 108-79, 117 Stat. 972 (codified at 34 U.S.C. § 30301 *et seq.*). Consistent with that aim, the statute defines its purposes as ninefold, all directed at preventing and punishing prison rape and protecting inmates from sexual violence. 34 U.S.C. § 30302. Section 30302 provides that the principal purposes of PREA are to "establish a zero-tolerance standard for the incidence of prison

---

[6] U.S. Dep't of Just., Fed. Bureau of Prisons, *Legal Resource Guide to the Federal Bureau of Prisons 2025* at 23 (Apr. 2025), [https://perma.cc/QJB3-L5KQ].

rape in prisons in the United States," to "make the prevention of prison rape a top priority in each prison system," and to "develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape." *Id.* at § 30302(1)–(3). Other purposes include increasing data collection, standardizing definitions, increasing accountability of prison officials, "protect[ing] the Eighth Amendment rights of Federal, State, and local prisoners," and reducing the costs of prison rape. *Id.* § 30302(4)–(9).

8.      The rulemaking provision, Section 30307(a), is correspondingly narrow. It directs the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30307(a)(1). Those standards must be "based upon the independent judgment of the Attorney General," who must give "due consideration" to recommended standards from the National Prison Rape Elimination Commission. *Id.* § 30307(a)(2). Section 30307(a)(3) further provides that the Attorney General "shall not establish a national standard under this section that would impose substantial additional costs compared to the costs presently expended by Federal, State, and local prison authorities." *Id.* § 30307(a)(3).

9.      The statutory text is notable for what it does not say. PREA does not reference transgender inmates. It does not reference intersex inmates. It does not reference gender identity or gender expression. It does not address prison housing placement methodology or authorize the Attorney General to alter the criteria governing sex-segregated housing. It does not purport to redefine "sex" or to substitute gender identity for biological sex in any context. The statute addresses one subject: the prevention of sexual violence in correctional settings.

**C.      The PREA regulation authorizes and encourages cross-sex prison housing.**

10.      Among other things, PREA established a National Prison Rape Reduction Commission charged with creating a report recommending national standards for reducing prison

rape. *See* 34 U.S.C. § 30306. The Commission finalized its report in 2009 and transmitted it to then Attorney General Eric Holder.[7] PREA mandated that the Attorney General publish a final rule within one year of receiving the Commission's report. 34 U.S.C. § 30307(a)(1). However, the Obama Administration's Department of Justice did not publish its final rule until May 17, 2012. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37,106 (June 20, 2012) (codified at 28 C.F.R. pt. 115).[8]

11.     The Challenged Regulation departs from that historical baseline of sex-separated prisons. It directs prison officials to make housing decisions for transgender-identifying inmates on a case-by-case basis, considering factors such as gender identity and the inmate's own views regarding safety. *See* 28 C.F.R. § 115.42(c),(e). As implemented by BOP policy, this framework permits the placement of biological male inmates—including convicted sex offenders—in facilities designated for female offenders based on self-reported gender identity.

12.     Subsections (a) and (b) are unobjectionable. Subsection (a) directs agencies to use risk-screening information "with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a). Subsection (b) requires "individualized determinations about how to ensure the safety of each inmate." *Id.* § 115.42(b). Subsections (c) through (g) diverge from that framework. They introduce a separate regime for housing "transgender or intersex" inmates. Subsection (c) provides: "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-

---

[7] Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (2009), https://www.prearesourcecenter.org/resource/national-prison-rape-elimination-commission-report [https://perma.cc/W47L-Q3EM].

[8]     https://www.federalregister.gov/documents/2012/06/20/2012-12427/national-standards-to-prevent-detect-and-respond-to-prison-rape [https://perma.cc/4CXS-T4CN].

by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." *Id.* § 115.42(c). Subsection (d) requires that "[p]lacement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year." *Id.* § 115.42(d). Subsection (e) directs that "[a] transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration." *Id.* § 115.42(e). Subsection (f) requires that transgender and intersex inmates "shall be given the opportunity to shower separately from other inmates." *Id.* § 115.42(f). And subsection (g) provides that agencies "shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status." *Id.* § 115.42(g).

13.    The Department of Justice made clear through official guidance that this regulation prohibits strictly sex-based housing policies for transgender inmates. On March 24, 2016, the PREA Resource Center, which operates under the authority of the Bureau of Justice Assistance within the Department of Justice, published a Frequently Asked Questions guidance addressing Standard 115.42(c) and (e). PREA Resource Center, Frequently Asked Questions, Standard 115.42 (Mar. 24, 2016).[9] The guidance posed the question: "Does a policy that houses transgender or intersex inmates based exclusively on external genital anatomy violate Standard 115.42(c) & (e)?" *Id.* The Department answered: "Yes." *Id.* The guidance stated that "[a]ny written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the standard." *Id.* It further required that a compliant policy "must allow for housing by gender identity when appropriate."

---

[9]    Frequently Asked Questions, PREA Res. Ctr., https://www.prearesourcecenter.org/frequently-asked-questions?page=4. [https://perma.cc/G7PD-EGX8]. *See* Ex. A-3 (APP014-017).

*Id.* The guidance specified that individualized assessments "must consider the transgender or intersex inmate's gender identity," and warned that a PREA audit revealing that all transgender inmates in a facility were housed according to their biological sex "raises the possibility of non-compliance." *Id.* The guidance also instructed that "a facility should not make a determination about housing for a transgender or intersex inmate based primarily on the complaints of other inmates or staff when those complaints are based on gender identity." *Id.* Thus, according to DOJ, the government is not free to make "case by case" housing determinations under this regulation in any manner it chooses; it must take gender ideology into account.

14.    Later, the BOP issued a series of policy manuals implementing the regulatory framework. On January 18, 2017, the BOP issued Program Statement 5200.04, the Transgender Offender Manual, to ensure that the BOP "properly identifies, tracks, and provides services to the transgender population." Dkt. 59, pp. 8–22 (APP5–19). The 2017 Manual expressly authorized the housing of inmates based on self-reported gender identity. Dkt. 59, p. 13 (APP10). Classification could turn on subjective factors such as an inmate's "sense of their own gender" and "gender expression," including "mannerisms, clothing, hair style, and choice of activities," rather than any objective biological characteristic. Dkt. 59, p. 9 (APP6). The 2017 Manual elevated the concerns of male, transgender-identifying inmates over and above the concerns and protection of the entire female inmate population. On May 11, 2018, the BOP issued a revised Manual, No. 5200.04 CN-1, which modified the policy to "use biological sex as the initial determination" of placement but ultimately permitted gender identity-based placement "in rare cases." Dkt. 59, pp. 26–40 (APP23–37). On January 13, 2022, under the Biden administration, the BOP issued a further revision, Program Statement 5200.08, which eliminated biological sex as the initial determinant of facility placement. Dkt. 59, pp. 41–54 (APP38–51). Under the 2022 Manual, a "Transgender Executive

11

Council" considered factors including the male inmate's security level, criminal history, "current gender expression," and "vulnerability to sexual victimization," but women's safety was not a central factor. Dkt. 59, p. 46 (APP43). The 2022 Manual thus authorized a shift away from sex-based housing toward a framework that permitted cross-sex placement in women's facilities based on gender identity.

15.    On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*.[10] Section 2 of the Order states that "[i]t is the policy of the United States to recognize two sexes, male and female," and that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* Section 3 directs that "[e]ach agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* Among other directives, the Order instructed the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers." *Id.* The Order acknowledged, however, that doing so could require "amendment . . . of Part 115.41 of title 28, Code of Federal Regulations," i.e., the exact regulation now at issue. *Id.*

16.    Moreover, the BOP's own response to Executive Order 14168 reveals that the agency views the PREA regulations as not merely authorizing but *requiring* its cross-sex housing policy. On February 21, 2025, BOP issued a memo to all Chief Executive Officers addressing compliance with the Executive Order.[11] The memo acknowledged the issuance of Executive Order

---

[10] Exec. Order 14168, 90 F.R. 8615 (2025), https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ [https://perma.cc/ZS9L-LF56]. *See* Ex. A-1 (APP004-008).

[11] Memorandum from Dana R. DiGiacomo, Acting Assistant Dir., Reentry Servs. Div., BOP, and S. Salem, Assistant Dir., Corr. Programs Div., BOP, to All Chief Exec. Officers, Compliance with Executive Order "Defending Women

12

14168 on January 20, 2025, but stated that the Executive Order "does not supersede or change BOP's obligation to comply with Federal laws and regulations, including Prison Rape Elimination Act (PREA) and corresponding regulations." *Id.* The memo committed BOP to comply with the Executive Order only "[e]xcept as described above" (that is, only insofar as consistent with existing federal laws and regulations, including 28 C.F.R. § 115.42). *Id.* The memo renamed the Transgender Executive Council as the "Special Populations Oversight Committee" and stated that this body "will review designations and conduct case-by-case assessments, in consideration of and adherence to PREA." *Id.* The February 21, 2025 memo thus confirms the BOP's position that the PREA regulations operate as an independent legal constraint on the agency's ability to implement sex-based housing, notwithstanding a direct presidential directive to the contrary.

17.     The Department of Justice has taken minor steps to bring PREA auditing and BOP policy into alignment with Executive Order 14168. On December 2, 2025, DOJ issued a memorandum to all PREA auditors, acknowledging that "[p]ortions of the PREA Standards are in conflict with the requirements in E.O. 14168." *See* Ex. A-2 (APP009-013). The memorandum identified specific subsections of the PREA Standards at issue, including 28 C.F.R. § 115.42(c) through (g), which address the housing of transgender inmates. The memorandum instructed all PREA auditors to "immediately pause from making compliance determinations" for those subsections and stated that the Department "is currently updating the PREA Standards to align with the requirements of E.O. 14168." Effective immediately, the memorandum provided that "applicable federal and non-federal correctional facilities shall not be held to subsections of the PREA Standards that may conflict with E.O. 14168."

---

from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Feb. 21, 2025), *available at* [https://perma.cc/J5K2-3NU5]. *See* Ex. A-4 (APP018-020).

18.     Despite these recent executive and administrative actions, the Challenged Regulation has not been formally amended through notice-and-comment rulemaking and remains on the books. Moreover, the policy framework established under the PREA regulations and various guidance resulted in the placement of numerous biological male inmates in federal women's prisons, including FMC Carswell. As the Second Amended Complaint details, male inmates housed in women's facilities under these policies remain present in those facilities, and the regulation continues to provide the legal basis upon which such placements were made and may be made in the future by a court or a new administration.

**D.     The policy has resulted in the placement of biological males in women's facilities.**

19.     The consequences of that regulatory framework are not theoretical. The record demonstrates that BOP still houses biological male inmates within the general population of FMC Carswell, a federal medical center designated for female offenders. Dkt. No. 149 ¶¶ 13, 49–52. Under the framework established by 28 C.F.R. § 115.42(c)–(g), defendants housed biologically male inmates in FMC Carswell's general population on the basis of male inmates' asserted gender identity. Dkt. No. 149 ¶¶ 10, 12–14, 20–21. These inmates include individuals convicted of violent and sexual offenses, including rape, armed bank robbery, child sexual exploitation, and sexual assault. Dkt. No. 149 ¶ 53; Ex. D, Exhaustion Hearing Transcript of December 18, 2025 ("Dec. 18, 2025 Hr'g Tr.") at 135:24–136:8 (APP062-063). Many retain male genitalia and possess the physical characteristics of men, including greater height, weight, and muscle mass. Dkt. No. 149 ¶¶ 42, 54; Ex. B, Declaration of Rhonda Fleming dated November 3, 2025 ("Fleming Decl.") ¶ 5 (APP023); Dec. 18, 2025 Hr'g Tr. at 95:4–24 (APP052).

20.     These placements occur in environments that offer limited privacy. FMC Carswell's layout and design is consistent with a historically single-sex prison, with communal areas that offer ample opportunity for observation of female inmates even as they engage in

14

intimate activities. Fleming Decl. ¶ 3 (APP022); Ex. C, Declaration of Miriam Herrera dated November 3, 2025 ("Herrera Decl.") ¶ 3 (APP031). Housing units contain doorless cells that sleep four prisoners at a time. Dkt. No. 149 ¶ 4; Fleming Decl. ¶¶ 3–4 (APP022-023); Herrera Decl. ¶ 3 (APP031). There are no meaningful visual barriers inside the cells; an officer standing at the door can clearly observe any inmate inside, and so can other inmates. Fleming Decl. ¶¶ 3–4 (APP022-023); Dec. 18, 2025 Hr'g Tr. at 95:15–24 (APP052). The shower stalls utilize lockless swing doors with approximately four-inch gaps between the doors and their frames, a feature designed to enable female officers to observe inmates while they shower, but which also allows male inmates to observe female inmates as they bathe. Dkt. No. 149 ¶ 5, 46, 67–68; Fleming Decl. ¶¶ 3, 4, 6 (APP022-023); Herrera Decl. ¶¶ 3–4 (APP031-032). A mirror area sits perpendicular to the showers with a direct line of sight into the stalls. Dkt. No. 149 ¶ 46. Common area restrooms, including restrooms in the recreation area, are accessible to biologically male inmates and expose female inmates to male presence while using toilet stalls. Dec. 18, 2025 Hr'g Tr. at 117:15–23 (APP058); Dkt. No. 149 ¶¶ 45, 68, 71. The Special Housing Unit consists of small lockdown cells (approximately twelve feet by eight feet) in which prisoners eat, sleep, shower, and use the toilet in a single space with no partition or privacy. Dkt. No. 149 ¶ 47; Fleming Decl. ¶ 12 (APP024). Defendants have threatened to place male inmates alongside female inmates in the SHU. Fleming Decl. ¶ 13 (APP024-025).

21.    Although against FMC Carswell policy, inmates often move unfettered throughout their housing units, including from cell to cell. Fleming Decl. ¶ 4 (APP022-023); Herrera Decl. ¶ 3 (APP031); Dkt. No. 149 ¶¶ 71–72. Because the cells lack any door or meaningful visual barrier, male inmates could walk by or enter a cell while a female inmate is asleep or changing clothes at essentially any time.  Fleming Decl. ¶¶ 3–4, 6–7 (APP022-023); Herrera Decl. ¶¶ 3–5 (APP031-

15

032). Prior to entry of the TRO, biologically male inmates were present in multiple housing units designated for female inmates, including the unit in which both Plaintiffs were housed. Dec. 18, 2025 Hr'g Tr. at 101:9–14, 117:2–5 (APP055, 058); Fleming Decl. ¶¶ 12–13 (APP024-025); Dkt. No. 149 ¶¶ 49–52. Accordingly, female inmates housed in the same unit as male inmates were exposed to the presence and gaze of those male inmates, even when they were not assigned to the same cell.  Fleming Decl. ¶¶ 3, 15 (APP022, 025);  Herrera Decl. ¶¶ 4–6 (APP031-032); Dkt. No. 149 ¶¶ 66-67.

22.    The record further reflects that these conditions have resulted in concrete harms. Female inmates have been subjected to voyeurism, harassment, and physical assault by male inmates.[12] Female inmates have altered their daily routines in an effort to avoid exposure, often without meaningful success given the design of the facility. Dkt. No. 149 ¶¶ 73, 80; Dec. 18, 2025 Hr'g Tr. at 117:15–23 (APP058). Plaintiffs inevitably observed male inmates undress and shower in the nude alongside female inmates. Dec. 18, 2025 Hr'g Tr. at 76:4–6 (APP049); Fleming Decl.¶¶ 3–4, 6 (APP022-023). These are not isolated incidents but predictable consequences of a policy that places biological males in women's housing units.

23.    Data obtained through a Freedom of Information Act request confirms the heightened risk. Approximately 51 percent of male, transgender-identifying inmates in BOP custody were incarcerated for sex offenses, nearly four times the rate in the general BOP male

---

[12] Herrera was subjected to voyeurism and stalking by a male inmate who positioned himself in front of a nearby bathroom mirror and stared at her through the large gaps in the shower stall as she bathed. Herrera Decl. ¶ 4 (APP031-032); Dec. 18, 2025 Hr'g Tr. at 73:15–74:4 (APP046-047). That inmate later deliberately opened the door on Herrera as she bathed, laughed, and threatened that he would be waiting for her in the bathroom after lights out. Herrera Decl. ¶ 4 (APP031-032); Dkt. No. 149 ¶ 68. Male inmates made obscene comments, including one who remarked from a wheelchair that his position gave him "a better view of women's private parts." Herrera Decl. ¶ 5 (APP032); Dkt. No. 149 ¶ 69. Plaintiffs observed male inmates engaging in sexual intercourse with female inmates in cells and showers. Herrera Decl. ¶ 5 (APP032); Dec. 18, 2025 Hr'g Tr. at 118:11–22 (APP059); Dkt. No. 149 ¶¶ 55–56, 59–60. In July 2025, a male inmate entered the unlocked room of a female inmate at approximately 2 a.m. and sexually assaulted her, declaring, "I'm not trans, I'm bisexual and everything works." Fleming Decl. ¶ 7 (APP023); Dkt. No. 149 ¶ 62.

16

population.[13] Dkt. No. 149 ¶¶ 27, 44; Dkt. No. 59 (Thomas Decl.) ¶ 4 (PRIORAPP002)[14]. Despite these conditions, BOP took no meaningful corrective action prior to this litigation.

24.     In short, the challenged regulation has resulted in a material departure from the historical baseline of sex-segregated incarceration. It has authorized and produced cross-sex housing in women's facilities, with significant implications for inmate safety and privacy.

### III.    PROCEDURAL HISTORY

This case comprises consolidated actions filed by Plaintiffs Rhonda Fleming and Miriam Herrera challenging the Bureau of Prisons' cross-sex housing policy and its implementing regulation, 28 C.F.R. § 115.42. On February 19, 2025, Plaintiff Fleming commenced this action by filing a pro se complaint. Dkt. No. 1. On April 22, 2025, Plaintiff Herrera filed a separate pro se action. *Herrera v. Rule*, No. 4:25-cv-00438-D (N.D. Tex.). Both actions were later reassigned and consolidated before this Court.

On November 4, 2025, Plaintiffs filed their Verified Amended Complaint, asserting that Defendants' cross-sex housing policy violates the Fourth, Fifth, and Eighth Amendments, the Religious Freedom Restoration Act, and the Administrative Procedure Act. Dkt. No. 61. Plaintiffs contemporaneously moved for a temporary restraining order, preliminary injunction, and permanent injunction. Dkt. No. 58. Defendants opposed the requested relief solely on exhaustion grounds. Dkt. No. 72. Defendants did not address the merits of Plaintiffs' constitutional or APA claims.

---

[13] *See* Brief of *Amicus Curiae* Women's Liberation Front in Support of Appellants at 5, *Doe v. Bondi*, No. 25-5099 (D.C. Cir. filed Sept. 3, 2025); Keep Prisons Single Sex, "News: Federal BOP Transgender Inmate Report (Jan. 2025)," available at https://usa.kpssinfo.org/federal-bop-transgender-inmate-report-january-2025/ [https://perma.cc/79UQ-GYZF].

[14] Citations to prior appendices in this matter are referred to herein as ("PRIORAPP###") for ease of reference.

The Court held a hearing on Plaintiffs' motion for temporary restraining order on November 17, 2025. Dkt. No. 79. Following that hearing, the Court entered a temporary restraining order enjoining Defendants from housing biological male inmates in the same housing unit as Plaintiffs and from permitting such inmates to enter privacy areas accessible to Plaintiffs. Dkt. No. 83 ¶¶ 1, 3–4. On December 18, 2025, the Court conducted an evidentiary hearing on Defendants' exhaustion defense. Dkt. No. 114. Both Plaintiffs testified, and the parties presented evidence and argument. On December 30, 2025, the Court rejected Defendants' exhaustion defense. Dkt. No. 117. Following those proceedings, the parties filed a Joint Status Report on January 29, 2026, along with a proposed stipulated order providing for permanent injunctive relief on Plaintiffs' constitutional and APA claims. Dkt. No. 133. Defendants later withdrew their consent as to the APA claim on January 30, 2026. Dkt. No. 136. The Court then entered a stipulated order of permanent injunction and final judgment, permanently extending the Court's prior TRO. Dkt. No. 137.

Plaintiffs' APA claim,[15] asserted as the Fifth Cause of Action in the Second Amended Complaint, has already been presented to the Court throughout these proceedings. That claim

---

[15] Defendants have never filed an answer to Plaintiffs' APA claim. The absence of an answer does not preclude summary judgment. Rule 56 permits a party to move for summary judgment "at any time until 30 days after the close of all discovery," FED. R. CIV. P. 56(b), and neither the text of Rule 56 nor the standard governing summary judgment requires a responsive pleading as a prerequisite. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (explaining that summary judgment turns on whether "there is no genuine issue as to any material fact" and the movant is "entitled to a judgment as a matter of law"); 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2713 (4th ed.) ("The defendant may make a Rule 56 motion or a Rule 12(b)(6) motion before answering. . . . Further, under certain circumstances, a Rule 56 motion may be made by plaintiff before the responsive pleading is interposed."); *see also Electro-Catheter Corp. v. Surgical Specialties Instrument Co., Inc.*, 587 F. Supp. 1446, 1456 (D.N.J. 1984) (holding that the plaintiff's motion for summary judgment was timely even though the defendant had not yet filed an answer). In any event, Defendants have repeatedly declined to defend the merits of the Challenged Regulation. *See* Dkt. No. 72 (opposing TRO solely on exhaustion grounds); Dkt. No. 130 (moving to dismiss only retaliation and FTCA claims without addressing APA claim); Dkt. No. 133 (stating Defendants "have no objection to those provisions being vacated, held unlawful, and set aside as to Plaintiffs"); *see also* Dkt. No. 139, pp. 8–9 (addressing in detail Defendants' lack of response and statements of non-opposition regarding APA claim); Dkt. No. 163 (moving to dismiss APA claim on justiciability grounds only without addressing the merits). Plaintiffs' APA claim is therefore properly before the Court for summary disposition.

challenges the lawfulness of 28 C.F.R. § 115.42 and has been briefed in connection with Plaintiffs'

motion for injunctive relief, their proposed findings of fact and conclusions of law, and the

evidentiary hearings conducted by the Court. Defendants did not substantively respond to

Plaintiffs' APA arguments in their response to the TRO motion and have repeatedly confirmed in

subsequent proceedings that they do not oppose the merits of Plaintiffs' APA claim. *See* Dkt. No.

72; Dkt. No. 133 (stating with respect to Plaintiffs' APA claim that "Defendants have no objection

to those provisions being vacated, held unlawful, and set aside as to Plaintiffs."). Defendants have,

however, taken the position that any vacatur of the challenged regulation should be limited to

Plaintiffs and should not extend more broadly. *See* Dkt. Nos. 133, 136. And, more recently,

Defendants have taken the position that Plaintiffs lack standing to pursue their APA claim. This

motion seeks summary judgment on Count Four and entry of vacatur consistent with the relief

previously requested.[16]

## IV.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of

---

[16] Following the Court's entry of the stipulated permanent injunction and final judgment, Dkt. No. 137, the only claims that remain pending in this consolidated action are Plaintiffs' APA claim, their RFRA claim, and Plaintiff Herrera's retaliation claim. With their APA claim, Plaintiffs seek vacatur of the Challenged Regulation, as detailed herein. Additionally, Plaintiffs still seek broader injunctive relief under both the APA and RFRA, than the Stipulated Injunction on Plaintiffs' constitutional claims. Plaintiffs have been holding that injunctive request in abeyance pending resolution of *Doe v. Blanche*, D.C. Cir. Nos. 25-5099, in which the Government appealed preliminary injunctions issued by Judge Lamberth preventing BOP from transferring transgender-identifying inmates from women's facilities to men's facilities pursuant to Executive Order 14168. The consolidated appeal was argued on September 5, 2025, and on April 17, 2026, the D.C. Circuit issued its opinion vacating the injunction as failing to show a likelihood of success on the merits and remanded to the D.C. district court for further factual findings. *Doe v. Blanche*, No. 25-5099, 2026 WL 1042002 (D.C. Cir. Apr. 17, 2026). Following that decision (once the appellate mandate issues), depending on whether further development materially alters the status quo, Plaintiffs will consider moving this Court for APA and RFRA injunctive relief in addition to the vacatur sought herein. Finally, Plaintiffs' claims for damages under RFRA and Plaintiff Herrera's retaliation claim remain pending as well.

19

the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of the motion and show from the record that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When reviewing summary judgment evidence, the court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). If enough evidence supports a disputed allegation that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Anderson*, 477 U.S. at 250.

Summary judgment is the appropriate mechanism for review of agency action[17] under the Administrative Procedure Act. *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996). And the court must grant summary judgment to the challenger, and "set aside [the] agency

---

[17] Although "[t]ypically, a court cannot reach the merits of a § 706 claim without having the entire administrative record before it," *All. for Nat. Health, USA v. United States*, No. 24-CV-2989 (CRC), 2025 WL 1938165, at *6 (D.D.C. July 15, 2025), no administrative record is required here. Plaintiffs' Motion challenges the Challenged Regulation as exceeding the statutory authority Congress conferred in PREA and as contrary to constitutional and statutory law— pure questions of law that do not turn on the agency's contemporaneous reasoning or any record of adjudicative fact. *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 441 n.37 (5th Cir. 2001) ("Although the administrative record for the regulation is not before this Court, that is of no moment. Our review is limited to interpreting the extent to which the regulation is consistent with the statute—a task which we are competent to perform without the administrative record." (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447 (1987))); *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001) (concluding that legal questions such as whether "the challenged [regulatory] provisions violate" statutory authority "can be resolved with nothing more than the statute and its legislative history" and are reviewable without the administrative record). Although not raised in this Motion, Plaintiffs reserve all rights with respect to whether the Challenged Regulation is "arbitrary and capricious" under 5 U.S.C. § 706(2)(A).

action," if it determines that the action was "in excess of statutory . . . authority," "contrary to constitutional right," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)–(C).

## V. ARGUMENT

This argument proceeds in four parts. First, Plaintiffs have standing to challenge the Challenged Regulation. Second, the Challenged Regulation must be vacated because it exceeds the statutory authority conferred by PREA in three independent respects: (1) PREA does not authorize cross-sex prison housing; (2) the Challenged Regulation contradicts PREA's text and purpose by increasing rather than reducing the risk of sexual violence; and (3) the major questions doctrine confirms that Congress did not silently delegate a policy choice of this magnitude to the agency. Third, the Challenged Regulation must be vacated because it is contrary to law and the Constitution because it conflicts with BOP's statutory duty to protect inmate safety and produces conditions that this Court has already found violate the Fourth and Eighth Amendments. The fact that the Challenged Regulation exceeds statutory authority and that it is contrary to the law and the Constitution present independent grounds to vacate the Challenged Regulation under 5 U.S.C. § 706(2). Plaintiffs need only demonstrate one or the other; here, they have satisfied both. Fourth, under Fifth Circuit law, APA vacatur operates beyond the parties and may be limited to set aside only the specific unlawful provisions.

## A.    Plaintiffs have standing to challenge Section 115.42.

Plaintiffs bear the burden of establishing standing. *NAACP v. Tindell*, 95 F.4th 212, 216 (5th Cir. 2024). And at the summary judgment stage, Plaintiffs must set forth "specific facts" to support standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff "must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (citing *Lujan*, 504 U.S. at 560–61).

21

Standing is plainly met on the facts presented at the time this action commenced. When Plaintiffs filed their Complaint, both were incarcerated at FMC Carswell and were being required, on a daily basis, to share living quarters, bathrooms, and showers with biological males who had been placed in their housing units pursuant to the framework established by the Challenged Regulation. Dkt. No. 149 ¶¶ 45–75, 130–37. Those facts establish a concrete, particularized, and actual injury that was directly traceable to the Challenged Regulation and that this Court could redress by vacatur. *See Lujan*, 504 U.S. at 560–61; *Davis*, 554 U.S. at 733. This Court has already determined that Plaintiffs satisfy the requirements for standing by entering its stipulated order of permanent injunction and final judgment on Plaintiffs' constitutional claims arising out of the same facts. Dkt. No. 137. Although Defendants challenge Plaintiffs' standing based on the *Doe v. Blanche* preliminary injunction [Dkt. No. 163 pp. 8–11], the D.C. Circuit has now vacated that injunction as failing to show a likelihood of success on the merits and remanded to the D.C. district court for further factual findings. *Doe v. Blanche*, No. 25-5099, 2026 WL 1042002 (D.C. Cir. Apr. 17, 2026). Even if the D.C. district court were to reissue the injunction after further factual development, it would still be only temporary and once again subject to appeal and potential vacatur. The *Doe* case therefore does not impede Plaintiffs' standing.[18]

**B.      Section 115.42(c)–(g) Exceeds Statutory Authority under PREA.**

Like all administrative agencies, BOP is a "creature[] of statute" and "accordingly possess[es] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022); *see also, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power

---

[18] Defendants' other standing and mootness arguments also fail for the reasons articulated in Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint [Dkt. No. 173], which Plaintiffs hereby incorporate by reference.

upon it."). An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). The challenged provisions fail this test because they impose obligations that cannot be traced to any grant of authority in PREA.

### 1.     PREA does not authorize cross-sex prison housing based on gender ideology.

PREA's operative grant of authority is narrow. Congress directed the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30307(a)(1). That directive authorizes the promulgation of standards aimed at reducing sexual abuse in correctional facilities. It does not authorize the Attorney General or BOP to redefine the criteria governing sex-segregated prison housing or to replace biological sex with gender identity as a basis for housing assignments.

The text of § 30307 confirms that Congress focused on institutional safeguards against sexual abuse, not on restructuring the foundational organization of correctional facilities. The statute speaks in terms of "detection," "prevention," "reduction," and "punishment" of prison rape. *Id.* It says nothing at all about "transgender" or "intersex" inmates, "gender identity," or cross-sex housing. Those words appear nowhere in PREA's text. Nor does it confer authority to displace the longstanding practice of housing inmates according to biological sex.

The Challenged Regulation by contrast, requires agencies to make housing decisions for "transgender or intersex" inmates on a case-by-case basis, to give "serious consideration" to the inmate's own views of safety, and to reassess those decisions periodically. 28 C.F.R. § 115.42(c)–(e). These provisions operate as a substantive directive that housing placement may turn on gender identity rather than biological sex. In other words, it enables and presumably in at least some cases *requires* the federal government to place male inmates in female facilities, thereby altering the basic structure of sex-segregated incarceration.

23

Nothing in PREA authorizes that shift. Congress knows how to legislate with respect to sensitive classifications when it intends to do so. Its silence here is dispositive. An agency may not use a general grant of rulemaking authority to supply a policy judgment that Congress itself did not make. Because § 115.42(c)–(g) implements a housing regime untethered to any statutory command, those provisions exceed PREA's limited delegation.

> **2.      The Challenged Regulation contradicts PREA's text and purpose because it puts women at greater risk of prison rape and other related harms.**

The challenged provisions are not only unsupported by the statutory text; they are also inconsistent with PREA's stated purpose. Congress enacted PREA to "establish a zero-tolerance standard for the incidence of prison rape" and to make "the prevention of prison rape a top priority in each prison system." 34 U.S.C. § 30302(1)–(2). The statute further directs the development of standards to "detect[], prevent[], reduce[], and punish[]" such abuse. *Id.* § 30302(3). And another of PREA's enumerated purposes is to "protect the Eighth Amendment rights of Federal, State, and local prisoners." *Id.* § 30302(7).

Section 115.42(c)–(g) operates in tension with those objectives. By requiring prison officials to consider placing biological males in female facilities based on asserted gender identity, the regulation introduces precisely the type of risk that PREA was enacted to mitigate. That disconnect is evident in the structure of § 115.42 itself. Subsection (a) directs agencies to use screening information "with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a). Subsections (c)–(g) depart from that separation principle in at least two ways. First, those portions of the regulation create a framework under which BOP must consider and prioritize an inmate's gender identity and subjective safety preferences in making housing decisions. *Id.* at § 115.42(c)–(e). This has the effect of enabling and making it more likely that transgender-identifying male

24

inmates (including sex offenders) will be placed in women's facilities—even though it is well recognized by both data[19] and common sense that women are more likely to be sexually abused and males are more likely to be sexually abusive. *See Klinger v. Dep't of Corr.*, 31 F.3d 727, 731–32 (8th Cir. 1994) ("[F]emale inmates . . . are more likely to be sexual or physical abuse victims. Male inmates, in contrast, are more likely to be violent and predatory than female inmates."); *see also Veney v. Wyche*, 293 F.3d 726, 734 (4th Cir. 2002). Even accepting the regulation's purported premise that male, transgender-identifying inmates are at higher risk of sexual victimization relative to other male inmates, moving them to women's facilities merely redistributes the heightened risk of victimization onto sexually vulnerable women. PREA's textual statutory mandate was to "establish a *zero*-tolerance standard for the incidence of prison rape," not to prioritize gender ideology over women's safety or simply shift risk of sexual violence onto women. 34 U.S.C. § 30302(1) (emphasis added). Second, to the extent the regulation seeks to protect male, transgender-identifying inmates from harm in male facilities, the regulation actually *prohibits* the logical accommodation—i.e., dedicated units within the male facilities that separate those inmates from the broader male inmate populations. 28 C.F.R. § 115.42(g). Instead, the regulation integrates those inmates with women, putting the women at greater risk. The regulation thus displaces the separation-based approach that the statute's purpose would suggest. In so doing, it favors gender ideology over PREA's stated purpose of reducing sexual violence.

---

[19] *See* U.S. Dep't of Just., Bureau of Just. Stat., *Sexual Victimization Reported by Adult Correctional Authorities, 2019–2020 – Statistical Tables*, p. 11 (Emily D. Buehler & Shelby Kottke-Weaver eds., July 2024) (NCJ 308553) https://bjs.ojp.gov/document/svraca1920st.pdf [https://perma.cc/3MUT-JGXX] ("In substantiated inmate-perpetrated incidents, males accounted for 81% of nonconsensual sexual acts perpetrators, 78% of sexual harassment perpetrators, and 67% of abusive sexual contact perpetrators."); *86 Percent of Women in Jail Are Sexual-Violence Survivors*, Nat'l PREA Res. Ctr. (Nov. 11, 2017), https://tinyurl.com/yz4be7yv [https://perma.cc/9G4E-LQB8] (reporting that up to 86% of female inmates have been victims of sexual violence, most at the hands of men).

The record in this case confirms that the regulation has produced the very harms Congress sought to prevent. Under the framework established by § 115.42(c)–(g), BOP placed biological males in the general population of FMC Carswell, a facility designated for female offenders, where they shared cells, restrooms, and showers with female inmates. Dkt. No. 149 ¶¶ 49–52; Fleming Decl. ¶ 4 (APP022-023);  Herrera Decl. ¶ 3 (APP031). Multiple male inmates at FMC Carswell have prior criminal histories of sexual assault and abuse, including rape and molestation of women, the elderly, and children. Dkt. No. 149 ¶¶ 53–54; Dec. 18, 2025 Hr'g Tr. at 135:24–136:8 (APP062-063). The predictable consequences followed. Plaintiffs observed male inmates having sexual intercourse with female inmates in cells and showers.  Herrera Decl. ¶ 5 (APP032); Dec. 18, 2025 Hr'g Tr. at 118:11–22 (APP059). Male inmates engaged in voyeurism, sexual harassment, and physical assault of female inmates.  Herrera Decl. ¶¶ 4–5 (APP031-032); Fleming Decl. ¶¶ 6–7 (APP023), Dkt. No. 149 ¶¶ 56, 58–60, 62–63.

PREA's purpose is to reduce sexual abuse in correctional facilities, not to authorize policies that increase the risk of such abuse in the most sensitive environments within those facilities. Because the Challenged Regulation conflicts with both the text and purpose of PREA, those provisions cannot be sustained as a valid exercise of delegated authority.

**3.    The major questions doctrine confirms that Congress did not grant BOP the sweeping authority it now claims.**

To the extent there was any doubt about whether BOP has the authority it claims, the major questions doctrine eliminates it. "The major questions doctrine teaches that, to sustain a claim that Congress has granted them an extraordinary power, executive officials must identify clear authority for that power." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 650 (2026) (Gorsuch, J., concurring). This important canon of statutory interpretation has been applied for over four

decades[20] and has been reaffirmed many times by the Supreme Court in recent years. *See, e.g.*, *Ala. Assn. of Realtors v. HHS*, 594 U.S. 758, 764 (2021); *National Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022); *Biden v. Nebraska*, 600 U.S. 477, 507 (2023). As articulated by Justice Scalia in his canonical formulation: "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

When (as here) a court interprets a statute "that confers authority upon an administrative agency," the court's analysis "must be shaped, at least in some measure," by whether there are "reason[s] to hesitate before concluding that Congress meant to confer [the] authority" the agency seeks to wield. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Those principles are given effect through the major questions doctrine, which "counsels skepticism" toward expansive assertions of agency power. *West Virginia*, 597 U.S. at 732; *see id.* at 723–24. As the Fifth Circuit recently held, that doctrine comes into play whenever an agency "claims the power to resolve a matter of great political significance," "seeks to . . . require billions of dollars in spending by private persons or entities," or "seeks to intrude into an area that is the particular domain of state law." *Mayfield v. United States Dep't of Labor*, 117 F.4th 611, 616 (5th Cir. 2024) (quoting *West Virginia*, 597 U.S. at 743–44 (Gorsuch, J., concurring)). Any one of those three indicators "independently trigger[s] the doctrine." *Id.*; *see also Tex. v. Nuclear Regulatory Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023), *rev'd on other grounds*, 605 U.S. 665 (2025) (applying the major questions doctrine because of the political significance of the issue). Separately, the doctrine is implicated when, as here, the

---

[20] *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) ("In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view of §§ 3(8) and 6(b)(5), coupled with OSHA's cancer policy.").

agency claims to "discover" in the statute "an unheralded power representing a transformative expansion in [its] regulatory authority," and "locate[s] that newfound power" in "vague" statutory language. *West Virginia*, 597 U.S. at 724 (internal quotation marks omitted) (first quoting *Utility Air*, 573 U.S. at 324; and then quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). The challenged regulation in this case asserts an unheralded power of staggering political significance.

> **i.     The challenged regulation addresses a question of great political significance.**

The major questions doctrine applies where an agency attempts "to make major policy decisions itself," particularly those involving issues of "vast economic and political significance." *West Virginia*, 597 U.S. at 716, 723; *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. One indicator of such a question is whether the issue has been the subject of "earnest and profound debate across the country," especially where that debate is "personal and emotionally charged." *Biden v. Nebraska*, 600 U.S. 477, 503–04 (2023).

The regulation at issue falls squarely within that category. "Indeed, few issues command as much political controversy as . . . gender-identity-related procedures." *Purl v. HHS*, 787 F. Supp. 3d 284, 324 (N.D. Tex. 2025). Whether transgender-identifying males may be housed in women's prisons is a question that implicates issues over gender identity, as well as fundamental concerns of bodily privacy and institutional safety. "People of good faith vehemently disagree on both these issues." *Purl*, 787 F. Supp. 3d at 324 ("They lie at the center of what it means to be human, the relationship between biology and psychology, and how the human person interfaces with the world. These issues transcend politics, implicating anthropology, philosophy, and

concepts of self.").[21] It is also a subject of substantial public and political debate. It was one of the major policy issues of the 2024 presidential election cycle.[22] It was debated in national presidential debates, congressional hearings, and state legislative sessions.[23] The policy of housing men in women's prisons is one that "raise[s] an eyebrow"[24] by any measure. *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 182 (5th Cir. 2024) (quoting *West Virginia*, 597 U.S. at 730).

---

[21] *See also* Ryan T. Anderson, *Anthropological Fallacies* PUB. DISCOURSE (June 16, 2022), https://www.thepublicdiscourse.com/2022/06/82881/ [https://perma.cc/WY8M-F4GB]; O. CARTER SNEAD, WHAT IT MEANS TO BE HUMAN: THE CASE FOR THE BODY IN PUBLIC BIOETHICS (2020) (arguing, in part, that expressive individualism has created atomized wills separated from the body and resetting that mindset has enormous implications for public policy and bioethics).

[22] Issues concerning transgender policies, including those affecting incarcerated individuals, were widely recognized as salient topics in the 2024 presidential election cycle and national political discourse. *See, e.g.*, Brett Baier Interview with Vice President Kamala Harris, Fox News (Oct. 16, 2024), https://www.youtube.com/watch?v=80DaR2CVNNk [https://perma.cc/J62H-7V2H] (questioning Harris on transgender prisoner policies); Bill Barrow & Marc Levy, *Trump Hammered Democrats on Transgender Issues. Now the Party Is at Odds on a Response*, Associated Press (Nov. 14, 2024), https://www.ap.org/news-highlights/spotlights/2024/trump-hammered-democrats-on-transgender-issues-now-the-party-is-at-odds-on-a-response/ [https://perma.cc/GZ94-5PU6] (political advertising by President Trump and Republican candidates included approximately $215 million in anti-transgender advertisements during the 2024 cycle, according to media tracking firm AdImpact); Geoff Mulvihill, *Most LGBTQ+ Adults Feel Americans Don't Accept Transgender People, Pew Poll Finds*, Associated Press (May 29, 2025), https://www.ap.org/news-highlights/spotlights/2025/most-lgbtq-adults-feel-americans-dont-accept-transgender-people-pew-poll-finds/ [https://perma.cc/XMA3-FNLU] (in the run-up to the November 5 election, 55% of voters said support for transgender rights had gone too far, according to an Associated Press VoteCast survey); *see also* Ross Douthat & Chase Strangio, *The Shifting Politics of Transgender Rights*, N.Y. Times (Dec. 4, 2025) (describing transgender-related policies as a central and contested issue in national electoral politics).

[23] *See, e.g.*, Presidential Debate Between Former President Donald J. Trump and Vice President Kamala Harris (ABC News broadcast Sept. 10, 2024), https://abcnews.com/Politics/trumps-transgender-operations-illegal-aliens-debate-claim/story?id=113584635 [https://perma.cc/U72E-GPKQ] (Trump stated during the debate that Harris "wants to do transgender operations on illegal aliens that are in prison"); *Sexual Assault in U.S. Prisons: Two Decades After the Prison Rape Elimination Act*: Hearing Before the Subcomm. on Criminal Justice & Counterterrorism of the S. Comm. on the Judiciary, 118th Cong. (Sept. 25, 2024) (testimony of Kelsey Bolar, Dir., IW Features, Independent Women's Forum), https://www.independentwomen.com/2024/09/24/hearing-sexual-assault-in-us-prisons/ [https://perma.cc/VSW9-BHN6] (testifying about the consequences of housing biological males in women's prisons); Confirmation Hearing on the Nomination of Sarah Netburn: Hearing Before the S. Comm. on the Judiciary, 118th Cong. (May 22, 2024), https://www.youtube.com/watch?v=O5dv4GKAUOI [https://perma.cc/DC58-WYUS] (Sen. Ted Cruz questioned the nominee about her recommendation to transfer a biologically male inmate convicted of sexual offenses to a women's federal prison); Minnesota H.F. 435 (2025), https://www.house.mn.gov/sessiondaily/Story/18522 [https://perma.cc/W4L2-ZZHD] (bill requiring that only inmates born female be housed at the state's women's correctional facility); Miss. H.B. 585, (Dignity and Safety for Incarcerated Women Act), https://trackbill.com/bill/mississippi-house-bill-585-dignity-and-safety-for-incarcerated-women-act-enact/2497048/ [https://perma.cc/S8RP-5SBQ] (proposed legislation requiring inmate sleeping quarters and restrooms in correctional facilities to be designated by sex and authorizing prisoners to sue if housed with members of the opposite sex). *See also infra*, pp. 33–34 (surveying various state statutes addressing cross-sex housing in state prisons).

[24] Americans broadly agree that housing trans-identifying male inmates in women's prisons is bad policy. In one national poll, 77% of American voters opposed allowing male criminals to serve their sentences in women's

As courts have recognized in analogous contexts, policies concerning gender identity in sex-separated spaces present questions of "enormous social and political significance." *See, e.g.*, *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 401 (W.D. La. 2024) (holding a final rule modifying Title IX regulations was "one of vast political significance" because it "will ultimately determine whether biological males that identify as female are allowed in female bathrooms and locker rooms and vice versa" and "will affect every public elementary school, middle school, high school, and college in the United States that receive federal funding"); *Texas v. HHS*, 770 F. Supp. 3d 940, 950 (E.D. Tex. 2025) (holding a final rule related to gender identity and foster care "addresses both a matter of great political significance and intrudes into an area that is the domain of state law"); *Texas v. Cardona*, 743 F. Supp. 3d 824, 879 (N.D. Tex. 2024) (holding a final rule related to gender identity a major question because of "the enormous social and political significance associated with transgenderism and gender-identity issues"); *Purl*, 787 F. Supp. 3d at 324 (holding that a final rule "[h]arnessing HIPAA to create special protections for politically favored medical procedures [i.e., abortions and gender transition surgeries] is a matter of 'great political significance'"); *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 924 (D. Kan. 2024) (holding a final rule relating to gender identity acceptance "clearly decide[d] major questions")

For this reason alone, the regulation implicates the major questions doctrine. *See Mayfield*, 117 F.4th at 616; *Nuclear Regulatory Comm'n*, 78 F.4th at 844.

### ii.    The regulation represents a fundamental departure from what Congress enacted.

The doctrine also applies where an agency claims authority that reflects a mismatch between "the history and breadth of the authority" previously exercised and the "newfound power"

---

correctional facilities. Press Release, Women's Liberation Front, *National Poll Reveals Majority of Voters Support Protecting Single-Sex Spaces* (Oct. 27, 2020), https://www.womensliberationfront.org/news/national-poll-support-for-womens-spaces [https://perma.cc/5B4N-34TX].

the agency asserts. *West Virginia*, 597 U.S. at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). That mismatch is present here.

PREA authorizes the Attorney General to promulgate standards to detect, prevent, reduce, and punish prison rape. 34 U.S.C. § 30307. It does not address how prison systems should classify inmates by sex or authorize the redefinition of sex-based housing practices. For centuries, correctional systems have relied on sex-separated housing as a baseline measure to protect inmate safety and privacy. *See infra*, Part II(A). Nothing in PREA suggests that Congress intended to displace that framework.

Yet the Challenged Regulation effects precisely such a departure. By directing prison officials to consider gender identity in housing decisions and to give weight to an inmate's own views of safety, the regulation alters the criteria governing placement in sex-segregated facilities. In practical terms, it authorizes the placement of biological males in women's prisons based on gender identity. That is a fundamental change in how correctional institutions may assign inmates to facilities.

The Supreme Court has cautioned that an agency may not "effect a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind," absent clear congressional authorization. *Nebraska*, 600 U.S. at 502 (quoting *West Virginia*, 597 U.S. at 728). That is what the regulation does here: it transforms a statute focused on preventing sexual abuse into a vehicle for reorganizing the structure of sex-separated incarceration.

### iii. PREA contains no clear statement authorizing cross-sex prison housing.

Once the major questions doctrine is triggered, the agency must identify a "clear congressional authorization" for the power it asserts. *West Virginia*, 597 U.S. at 723. A "merely

plausible textual basis" is not enough. *Id.* Nor may an agency rely on "modest words," "vague terms," or "subtle devices" to support an extraordinary assertion of authority. *Id.*

BOP cannot meet that standard. PREA's text contains no reference to gender identity, no authorization for cross-sex housing, and no indication that Congress intended to alter the longstanding, foundational practice of sex-segregated incarceration. The statute's focus is on preventing prison rape, not on redefining the criteria for inmate placement. At most, PREA provides a general directive to promulgate "national standards" addressing sexual abuse in confinement. 34 U.S.C. § 30307(a). That kind of general delegation to promulgate "standards" is precisely the sort of "cryptic," "implicit," and "oblique or elliptical" textual hook the Supreme Court has held insufficient under the major questions doctrine. *West Virginia*, 597 U.S. at 721–23; *see Purl*, 787 F. Supp. 3d at 325–26.

If PREA's general directive to promulgate "national standards" for preventing prison rape were read to confer the vast authority the Government now claims, the consequences would extend far beyond the regulation at issue. On the Government's logic, the same statutory hook that supports § 115.42(c)–(g) would equally support a regulation prohibiting sex-separated housing altogether, on the theory that integration reduces opportunities for abuse by same-sex inmates. It would likewise support a regulation requiring continuous audiovisual surveillance in cells, showers, and other private spaces to prevent sex abuse (despite any resulting invasion of privacy). It would support federal displacement of other state prison policies regarding gender identity— including classification systems, staffing ratios, and disciplinary procedures—so long as the agency invoked the preventive rationale PREA supplies. And it would support conditioning the full measure of federal corrections funding on state compliance with whichever of these regimes the agency preferred in any given administration. Each of these measures could be defended under

the same textual premise the Government advances here: that a directive to issue "standards" addressing prison sexual abuse carries with it the authority to restructure the conditions of confinement nationwide. These are quintessentially legislative judgments. Nothing in PREA's text suggests that Congress silently transferred to an agency the authority to resolve such questions of vast economic and political significance. Under the major questions doctrine, that silence forecloses the sweeping interpretation the Government advances.

State legislatures have repeatedly demonstrated that clear statutory language is readily available when a legislature intends to resolve the question of cross-sex prison housing, whether to permit or to prohibit it. *Compare* CAL. PENAL CODE §§ 2605–06 (requiring that a "transgender, nonbinary, or intersex" inmate be "housed at a correctional facility for men or women based on the individual's preference," "regardless of anatomy," and directing staff to honor chosen pronouns and honorifics), *and* CONN. GEN. STAT. § 18-81ii (permitting housing "consistent with the inmate's gender identity" upon a diagnosis of gender dysphoria and presentation of a birth certificate, passport, or driver's license reflecting that identity), *and* N.Y. ASSEMB. B. A709A (2023)[25] (proposing that inmates "shall be presumptively placed in a correctional facility or other institution with persons of the gender that most closely aligns with such person's self-attested gender identity," and expressly barring any condition based on "history of, consent to, intention to seek, or refusal to undergo any treatment or intervention regarding their sex characteristics or gender identity"), *with* La. Stat. §§ 9:58, 9:63, 9:65 (defining "sex," "male," and "female" in biological terms; requiring that "[a] correctional facility or juvenile detention facility shall designate each multi-occupancy restroom, changing room, and sleeping quarters for the exclusive

---

[25] N.Y. ASSEMB. B. A709A (2023), https://www.nysenate.gov/legislation/bills/2023/A709/amendment/A [https://perma.cc/5E7F-29KE].

33

use of either females, males, or members of the same family;" providing that spaces "designated for females or males shall be used only by members of that sex;" and creating a "rebuttable presumption" that cross-sex housing "is inherently discriminatory and is a cognizable harm for biological women" and a commensurate cause of action), *and* UTAH CODE § 64-13-7 (prohibiting the Department of Corrections and county jails from assigning inmates whose biological sex at birth is male to living areas housing inmates whose biological sex at birth is female, subject only to a narrow individualized exception).[26]

Legislation currently pending in Congress confirms the point: the Preventing Violence Against Female Inmates Act of 2025, introduced by Senator Tom Cotton, would require BOP to "use the biological sex" (defined in biological terms) of federal prisoners "in making determinations regarding housing"; would bar overnight co-location of prisoners who are not of the same biological sex; and would condition state eligibility for federal funds on a certification of comparable state policies.[27] These enactments share a common feature: when a legislature intends to depart from, or to reaffirm, the longstanding practice of sex-based prison housing, it does so through direct and unambiguous language that defines the relevant terms, specifies the governing criterion, and prescribes the procedures for implementation. Congress did nothing of the kind in PREA. The contrast between PREA's silence and the precise legislative treatment the subject has

---

[26] Other states have addressed the issue through state regulations. *See* Me. Dep't of Corr. Policy 23.8 (Jan. 23, 2023), https://www.maine.gov/corrections/sites/maine.gov.corrections/files/inline-files/Policy%2023.8%20%28AF%29_2.pdf [https://perma.cc/9RYJ-4XWB] (departmental policy directing that transgender, gender nonbinary, and intersex adult residents be housed consistent with gender identity, adopted by the Maine Department of Corrections after the legislature declined to enact comparable legislation); N.J. Dep't of Corr., Internal Management Procedure, Gender Identity Housing (Oct. 11, 2022), https://newjerseymonitor.com/wp-content/uploads/2023/05/trans-Gender-Identity-Housing.pdf [https://perma.cc/LE8P-N3FT] (departmental policy establishing a rebuttable presumption of gender identity-based housing, subject to override by the department's PREA committee following a hearing).

[27] *See* Preventing Violence Against Female Inmates Act of 2025, S. 2985, 119th Cong. § 2 (2025), https://www.congress.gov/bill/119th-congress/senate-bill/2985/text [https://perma.cc/U6SJ-F3M2].

received in the States reinforces the conclusion that Congress did not, through a general directive to promulgate standards preventing sexual abuse, quietly authorize the regulatory cross-sex housing regime the Government now defends.

The absence of a clear statement is dispositive. Where, as here, an agency claims the authority to resolve a matter of significant political and social importance and to effect a fundamental change in the statutory scheme, courts "hesitate before concluding that Congress has intended such an implicit delegation." *Brown & Williamson*, 529 U.S. at 159. That hesitation cannot be overcome without a clear expression of congressional intent. No such expression exists in PREA. The government must "point to clear congressional authorization" to justify its extraordinary assertion of power. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). It cannot.

In these circumstances, the major questions doctrine confirms what the statutory text already shows. Congress did not grant BOP the sweeping authority it now claims. Section 115.42(c)–(g) therefore cannot be sustained as a lawful exercise of delegated power.

**C.    The regulation is contrary to law and the Constitution because it conflicts with statutory and constitutional principles protecting inmate safety and privacy.**

Separate and apart from the Challenged Regulation's overreach beyond PREA, the Court must vacate the regulation because it conflicts with statutory and constitutional principles protecting inmate safety and privacy. The Administrative Procedure Act requires courts to "hold unlawful and set aside" agency action that is "contrary to constitutional right" or "not in accordance with law." 5 U.S.C. § 706(2)(A)–(B). The challenged provisions of 28 C.F.R. § 115.42(c)–(g) fail both requirements. They conflict with governing statutory obligations imposed on the Bureau of Prisons and produce conditions that violate well-established constitutional protections for inmate safety and bodily privacy.

**1.      The regulation conflicts with BOP's statutory duty to protect inmate safety.**

Congress has imposed an affirmative duty on BOP to ensure the safekeeping and protection of federal inmates. Under 18 U.S.C. § 4042(a), BOP must "have charge of the management and regulation of all Federal penal and correctional institutions," "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," and "provide for the protection, instruction, and discipline" of all such persons. 18 U.S.C. § 4042(a)(1)–(3). Those mandatory obligations reflect Congress's judgment that the federal government bears responsibility for maintaining conditions that protect inmates from harm, and "prison regulations must conform to them." *Matthews v. Hardy*, 420 F.2d 607, 610 (D.C. Cir. 1969) (stating that although "prison authorities have wide discretion" regarding inmate handling and administration "such discretion is not unlimited" and that prison regulation "must conform" to "paramount federal constitutional or statutory rights").

The Challenged Regulation is inconsistent with that statutory mandate. By directing prison officials to consider gender identity in housing decisions and to give weight to an inmate's own views regarding placement, the Challenged Regulation authorizes placements that expose female inmates to increased risks of physical and sexual harm. The record demonstrates that, under this framework, biological males have been housed in women's facilities, including in communal living spaces that lack meaningful privacy protections. Dkt. No. 149 ¶¶ 49–52; Fleming Decl. ¶¶ 3–4 (APP022-023); Herrera Decl. ¶ 3 (APP031). Female inmates are required to sleep, dress, shower, and use restroom facilities in environments where they may be observed by male inmates and where those inmates may enter at will.  Fleming Decl. ¶¶ 3, 6–7 (APP022-023); Herrera Decl. ¶¶ 3–5 (APP031-032); Dkt. No. 149 ¶¶ 55, 66–67, 72–74; Dec. 18, 2025 Hr'g Tr. at 117:15–23 (APP058).

36

Those conditions are incompatible with BOP's statutory duty to provide for inmate safety. The obligation to protect inmates necessarily requires prison officials to mitigate known risks of harm, particularly in environments involving close quarters and limited supervision. A regulatory framework that contemplates placing biological males, including individuals with histories of violence or sexual misconduct, into women's housing units increases those risks rather than reducing them. It therefore conflicts with the statutory command that BOP provide for the protection and safekeeping of inmates in its custody. *See* 5 U.S.C. § 706(2)(A) (requiring courts to hold unlawful and set aside agency action "not in accordance with law").

### 2. The regulation is contrary to constitutional protections for bodily privacy.

The Constitution protects inmates from unnecessary and unjustified exposure to members of the opposite sex in intimate settings. Under the Fourth Amendment, "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *see also Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999) (recognizing that non-emergent, cross-sex strip searches raise a valid privacy claim); *Newton v. Joseph*, 718 F. App'x 256, 258 (5th Cir. 2018). Moreover, the Fifth Amendment's Due Process Clause protects the fundamental right to bodily privacy and personal security. *See York v. Story*, 324 F.2d 450, 456 (9th Cir. 1963); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *Doe v. Luzerne Cnty.*, 660 F.3d 169, 176–77 (3d Cir. 2011) (recognizing that an individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex").

The right to bodily privacy in intimate spaces is one that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Washington v. Glucksberg*,

37

521 U.S. 702, 721 (1997); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (stating that the Due Process Clause "has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition'' and 'implicit in the concept of ordered liberty.'") (quoting *Glucksberg*, 521 U.S. at 721); *Pitts v. Thornburgh*, 866 F.2d 1450, 1458 (D.C. Cir. 1989) (noting "a pervasive characteristic of American prisons, namely, the separation of inmates on the basis of gender").

The record establishes that the challenged regulation produces precisely the type of exposure that the Constitution prohibits. Female inmates housed under BOP's cross-sex housing framework are routinely exposed to the presence and observation of biological males in showers, restrooms, and sleeping quarters.  Fleming Decl. ¶¶ 3–4, 6 (APP022-023); Herrera Decl. ¶¶ 3–5 (APP031-032); Dkt. No. 149 ¶¶ 72–74; Dec. 18, 2025 Hr'g Tr. at 117:15–23 (APP058). These are the predictable consequences of a housing policy that places male inmates within the general population of a women's facility and allows access to shared privacy areas. These conditions, which are directly traceable to the regulation at issue, subject female inmates to ongoing and involuntary exposure that is incompatible with constitutional protections for bodily privacy.

This Court has already entered permanent injunctive relief on Plaintiffs' constitutional claims, necessarily finding that the challenged conditions violated these protections. Dkt. No. 137. Because it inevitably produces constitutional injuries this Court has already identified and enjoined, the regulation is contrary to the Constitution.

**3.      The regulation is contrary to the Eighth Amendment's requirement that prison officials protect inmates from substantial risks of serious harm.**

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee inmate safety and to protect prisoners from violence at the hands of other inmates. *Farmer*, 511 U.S. at 832–33. That duty is violated when officials are deliberately indifferent to

conditions posing a substantial risk of serious harm. *Id.* "Housing a biological female alongside . . . male inmates poses an outrageous risk that she will be harassed, assaulted, raped, or even murdered." *De Veloz v. Miami-Dade Cnty.*, 756 F. App'x 869, 877 (11th Cir. 2018).

The Challenged Regulation authorizes and perpetuates such conditions. The record demonstrates that the presence of biological male inmates in women's housing units has resulted in incidents of assault, threats of violence, and pervasive sexual harassment. Fleming Decl. ¶¶ 6–7 (APP023); Herrera Decl. ¶¶ 4–5 (APP031-032); Dkt. No. 149 ¶¶ 55–62, 66–69; Dec. 18, 2025 Hr'g Tr. at 118:11–22 (APP059). Female inmates are exposed to individuals who are, on average, physically stronger and who may have histories of violent or sexual offenses. Dkt. No. 149 ¶¶ 42–44, 53–54; Fleming Decl. ¶ 5 (APP023); Dec. 18, 2025 Hr'g Tr. at 95:4–24, 135:24–136:8 (APP052, 062-063). As this Court has already determined, these circumstances create a substantial risk of serious harm and violate the Eighth Amendment. Dkt. No. 137.

The Challenged Regulation is therefore contrary to constitutional requirements. An agency may not promulgate or enforce a rule that necessarily produces conditions violating the Eighth Amendment's prohibition on cruel and unusual punishment. *See* 5 U.S.C. § 706(2)(B) (requiring courts to hold unlawful and set aside agency action "contrary to constitutional right, power, privilege, or immunity"). Because the Challenged Regulation authorizes and sustains conditions that violate the Eighth Amendment, it is independently unlawful under § 706(2)(B).

**D.    Universal vacatur of the unlawful regulation is the appropriate remedy.**

The Administrative Procedure Act provides a clear, default remedy when an agency acts unlawfully. Where, as here, a regulation exceeds statutory authority and is contrary to constitutional right, the Court should set it aside. That directive resolves both the availability and scope of relief.

### 1.    Vacatur is the default remedy under § 706.

Section 706 directs reviewing courts to "hold unlawful and set aside" agency action that is not in accordance with law, exceeds statutory authority, or is contrary to constitutional right. 5 U.S.C. § 706(2). "The default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). "Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022). That rule applies with full force here. Plaintiffs have shown that § 115.42(c)–(g) exceeds statutory authority and is contrary to constitutional and statutory protections for inmate safety and privacy. Because the regulation is unlawful, it should be vacated under § 706. *Texas v. EEOC*, 785 F. Supp. 3d 170, 192 (N.D. Tex. 2025) (finding that "vacatur is the correct remedy" under the APA for gender-identity related guidance that was contrary to law).

### 2.    Vacatur under § 706 is universal in scope.

Vacatur under the APA operates on the regulation itself, not merely on its application to the parties before the Court. The Fifth Circuit has consistently held that "vacatur under [Section] 706(2) [is] a remedy that affects individuals beyond those who are parties to the immediate dispute." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951 (5th Cir. 2024). "[S]etting aside agency action under § 706 has 'nationwide effect,' is 'not party-restricted,' and 'affects persons in all judicial districts equally.'" *Id.* (first quoting *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024); and then quoting *Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)). That understanding follows from the nature of vacatur, which "empowers courts to set aside—i.e., formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 859 (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018)). And it operates nationwide because it "operates on the status of agency action in the

40

abstract." *Braidwood*, 104 F.4th at 951. Moreover, that principle remains intact after the Supreme Court limited universal injunctions in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), as that decision expressly carved out APA vacatur: "Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10.

Accordingly, once a regulation is vacated, it no longer has legal force against anyone. Under Fifth Circuit precedent, universal vacatur of the Challenged Regulation is appropriate. *Texas*, 785 F. Supp. 3d at 192 (concluding based on Fifth Circuit precedent that "universal vacatur . . . is appropriate"); *see also Purl*, 787 F. Supp. 3d at 328.

### 3.    Vacatur may be limited to the unlawful portions of the regulation.

Although vacatur operates universally, it may be limited in scope to the portions of a rule that are unlawful, so long as those provisions are severable. A two-prong test governs: (1) the "intent of the agency" and (2) "whether the remainder of the regulation could function sensibly without the stricken provision[s]." *Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025). Courts should "adhere to the text of a severability clause in the absence of extraordinary circumstances." *Id.* Here, although the PREA regulations do not contain any severability clause reflecting the agency's intent,[28] severability is warranted because Subsections (c) through (g) address a discrete subject and are textually and operationally separable from the rest of the regulation. *See Texas*, 785 F. Supp. 3d at 192 (severing gender-identity related provisions that "form a fraction of the overall Guidance" and "are easily identified"); *see also Purl*, 787 F. Supp.

---

[28] *See Texas*, 785 F. Supp. 3d at 192 (noting the absence of a severability provision in the Enforcement Guidance but finding that severability was nevertheless warranted under the second prong).

3d at 331. Vacating only § 115.42(c)–(g) would leave the BOP free to house inmates based on biological sex, leave PREA intact, and preserve every other protective standard.

## VI.    <u>CONCLUSION</u>

The undisputed record establishes that 28 C.F.R. § 115.42(c) through (g) exceeds the rulemaking authority conferred by Congress in PREA. The challenged provisions find no support in PREA's text, they contradict PREA's stated purpose of reducing sexual violence, and they fail the clear-statement requirement imposed by the major questions doctrine. They are also contrary to the Constitution, producing conditions that this Court has already found violate the Fourth and Eighth Amendments.

Defendants have never contested these conclusions on the merits. They have conceded that the Challenged Regulation should be vacated as to Plaintiffs and have taken no position defending the lawfulness of the regulation. The government has acknowledged that the provisions conflict with Executive Order 14168 and has directed its auditors to suspend compliance determinations for the very subsections at issue. And yet DOJ has simultaneously opened federal civil rights investigations into state prison systems for maintaining the cross-sex housing policies that its own regulation authorized. The government's actions confirm what the statutory text and the record independently establish: the Challenged Regulation is unlawful and cannot be sustained.

The only question that remains is the scope of relief. Under the APA, the ordinary remedy is vacatur, which operates on the regulation itself. 5 U.S.C. § 706(2). The Fifth Circuit has consistently reaffirmed that vacatur under Section 706 is universal in scope, affecting the legal status of the agency action rather than merely the rights of the parties before the court. Limiting vacatur to Plaintiffs alone would leave in place a regulation that the government concedes is unlawful and that this Court has found produces constitutional violations. As long as the Challenged Regulation remains in force, it continues to operate as a source of legal authority for

42

the very practices at issue and creates the risk that those practices will be reinstated or expanded by a future administration without further action by Congress.

For the foregoing reasons, Plaintiffs respectfully request that this Court grant summary judgment on their APA claim, hold 28 C.F.R. § 115.42(c) through (g) unlawful, and vacate those provisions in their entirety.

Respectfully submitted,

BROWN FOX PLLC

By: */s/ Cortney C. Thomas*
    Cortney C. Thomas
    Texas Bar No. 24075153
    cort@brownfoxlaw.com
    C. Alan Carrillo
    Texas Bar No. 24109693
    alan@brownfoxlaw.com
    Andrew C. Debter
    Texas Bar No. 24133954
    andrew@brownfoxlaw.com

    8111 Preston Road, Suite 300
    Dallas, TX 75225
    T: 214.327.5000
    F: 214.327.5001

    *Attorneys for Plaintiffs Rhonda Fleming*
    *and Miriam Crystal Herrera*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.

43