**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| RHONDA FLEMING, et al.,<br>    Plaintiffs,<br><br>v.<br><br>WARDEN T. RULE, et al.<br>    Defendants.<br><br>ELIZABETH ANN HARDIN, et al.,<br>    Intervenor-Plaintiffs,<br><br>v.<br><br>WARDEN T. RULE, et al.,<br>    Defendants. | Civil Action No. 4:25-cv-00157-D<br>(Consolidated with<br>Civil Action No. 4:25-cv-00438-D) |

**BRIEF OF MARGO SCHLANGER AND SAMUEL R. BAGENSTOS**
**AS *AMICI CURIAE* IN OPPOSITION TO VACATUR OF PREA REGULATIONS**

Margo Schlanger (*pro hac vice* motion forthcoming)
Michigan Bar No. P82345
625 S State St.
Ann Arbor, MI 48109
(734) 615-2618
margo.schlanger@gmail.com

Samuel R. Bagenstos (*pro hac vice* motion forthcoming)
Michigan Bar No. P73971
625 S State St.
Ann Arbor, MI 48109
857-231-1663
sbagen@gmail.com

Holt Major Lackey
Texas Bar No. 24047763
Holt Major Lackey, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, Texas 78752
512-949-9598
holt@holtmajorlackey.com

Callie Caldwell Butcher
Texas Bar No. 24092203
Butcher Legal Group, PLLC
10228 E. Northwest Hwy, #432
Dallas, Texas 75238
(214) 367-6813
callie@butcherlegalgroup.com

**TABLE OF CONTENTS**

Table of Authorities...........................................................................................................ii

Use of Generative Artificial Intelligence ...................................................................... 1

Interest of Amici Curiae................................................................................................. 1

Summary of Argument................................................................................................... 2

Argument ....................................................................................................................... 4

    I.   PREA Authorizes the Challenged Regulations Because They Directly Address Prison Rape Prevention and Prison Safety........................................................................ 4

        A.  PREA Grants Broad Rulemaking Authority to Prevent Sexual Abuse in Prisons and Jails.............................................................................................................. 6

        B.  The Regulations Emerged from Comprehensive Study and Careful Rulemaking......... 8

        C.  The Regulations Require Individualized Assessment .................................. 15

        D.  The Prison-Administration Rule Does Not Raise a "Major Question"........................ 16

    II.  The Regulations Are Not Arbitrary and Capricious Because DOJ Considered the Relevant Problem and Adopted an Individualized Safety Framework ........................................... 17

    III. Plaintiffs' Constitutional Theories Do Not Justify Facial Vacatur of the PREA Regulations ....................................................................................................... 20

        A. The Regulations Safeguard Bodily Privacy by Requiring Individualized Assessments and Preserving Facility-Level Privacy Accommodations............................................. 21

        B. The Regulations Satisfy the Eighth Amendment by Mandating Individualized Risk Assessment and Protective Measures.......................................................... 22

        C. An Individualized Safety Assessment Framework Does Not Discriminate Against Women .......................................................................................................... 23

    IV. Vacatur Is Inappropriate Without a Meaningful Substantive Defense and Adversarial Testing............................................................................................................... 24

Conclusion ................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Bauer v. Texas*, 341 F.3d 352 (5th Cir. 2003)..................................................................... 24

*Biden v. Nebraska*, 600 U.S. 477 (2023)............................................................................ 17

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ......................... 24

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........................................ 23

*Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026) .............................................................. 16

*Env't Integrity Proj. v. EPA*, 425 F.3d 992 (D.C. Cir. 2005) ........................................... 15

*Farmer v. Brennan*, 511 U.S. 825 (1994)...................................................................... 4, 22

*FCC v. Prometheus Radio Project,* 592 U.S. 414 (2021) .................................................. 17

*Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993)............................................... 21

*Johnson v. California*, 543 U.S. 499 (2005) ..................................................................... 23

*Lewis v. Casey*, 518 U.S. 343 (1996) ................................................................................ 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020)......7-8

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) ........................................ 17

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) .............................................. 17

*Princeton Univ. v. Schmid*, 455 U.S. 100 (1982) ............................................................. 24

*Turner v. Safley*, 482 U.S. 78 (1987)................................................................................ 21

*United States v. Virginia*, 518 U.S. 515 (1996)................................................................ 23

*Utility Air Regul. Grp. v. EPA,* 573 U.S. 302 (2014) ...................................................... 16

*West Virginia v. EPA*, 597 U.S. 697 (2022) ..................................................................... 17

**Statutes & Regulations**

75 Fed. Reg. 11077 ................................................................................................ 9

75 Fed. Reg. 11078 ................................................................................................11

76 Fed. Reg. 6257 ................................................................................................ 12

77 Fed. Reg. 37106, 37112. .................................................................................. 9

77 Fed. Reg. 37150 .............................................................................................. 17

77 Fed. Reg. 37152–53 .................................................................................. 15, 18

90 Fed. Reg. 8615, 8616 ...................................................................................... 16

6 C.F.R. pt. 115 ...................................................................................................... 4

28 C.F.R. § 115 ...................................................................................................... 9

28 C.F.R. § 115.14 ................................................................................................ 7

28 C.F.R. § 115.16 ................................................................................................ 7

28 C.F.R. § 115.41(d) ............................................................................................ 5

28 C.F.R. § 115.41(d)(7) ...................................................................................... 17

28 C.F.R. § 115.41(g) ............................................................................................ 5

28 C.F.R. § 115.42(a) ............................................................................................ 5

28 C.F.R. § 115.42(b), ........................................................................................... 5

28 C.F.R. § 115.42(c)–(g) ............................................................................ 2, 4, 25

28 C.F.R. § 115.42(g) ...................................................................................... 18, 20

28 C.F.R. § 115.41(a) ............................................................................................ 5

28 C.F.R. § 115.41(e) ............................................................................................ 5

28 C.F.R. § 115.42 ................................................................................................ 6

28 C.F.R. § 115.42(c) ................................................................ 2, 12, 15, 18, 20, 24

28 C.F.R. § 115.42(d) ................................................................................................ 2, 12

28 C.F.R. § 115.42(g) ................................................................................................... 2

28 C.F.R. § 115.42(f) .................................................................................................... 2

28 C.F.R. § 115.43 ...................................................................................................... 19

28 C.F.R. § 115.51 ...................................................................................................... 19

28 C.F.R. § 115.52(f) .................................................................................................. 19

28 C.F.R. § 115.53 ...................................................................................................... 19

28 C.F.R. § 115.61 ...................................................................................................... 19

28 C.F.R. § 115.62 ...................................................................................................... 19

28 C.F.R. § 115.68 ...................................................................................................... 19

28 C.F.R. § 115.86(a), ................................................................................................ 19

28 C.F.R. § 115.86(d)(1). ........................................................................................... 19

28 C.F.R. § 115.86(e) ................................................................................................. 19

28 U.S.C. §§ 115.111–115.193 .................................................................................... 4

28 U.S.C. §§ 115.211–115.293 .................................................................................... 4

28 U.S.C. §§ 115.311–115.399 .................................................................................... 4

34 U.S.C. §§ 30301–30309 ........................................................................................... 2

34 U.S.C. § 30302(1) .................................................................................................... 4

34 U.S.C. § 30302(2) .................................................................................................... 5

34 U.S.C. § 30302(3) .................................................................................................... 5

34 U.S.C. § 30306(a) .................................................................................................... 8

34 U.S.C. §§ 30306(d)(2)(E) ....................................................................................... 8

34 U.S.C. §§ 30306(d)(2)(F) ....................................................................................... 8

iv

34 U.S.C. § 30306(d)(3)(A). ........................................................................................... 8

34 U.S.C. § 30306(e)(2)(A) ............................................................................................ 8

34 U.S.C. § 30307(a) ...................................................................................................... 9

34 U.S.C. § 30307(a)(1) ............................................................................................ 3, 6

34 U.S.C. § 30307(b) .................................................................................................... 25

34 U.S.C. § 30307(e) ..................................................................................................... 25

5 U.S.C. §§ 551-559 ....................................................................................................... 9

**Other Authorities**

American Civil Liberties Union, Lambda Legal, National Center for Lesbian Rights, National
    Center for Transgender Equality, & Transgender Law Center, ANPRM Comment, DOJ-
    OAG-2010-0001-0425 (May 11, 2010) ..................................................................11

American Civil Liberties Union, the Equity Project, Lambda Legal, National Center for Lesbian
    Rights, National Center for Transgender Equality, National Juvenile Defender Center,
    Sylvia Rivera Law Project & Transgender Law Center, NPRM Comment, DOJ-OAG-
    2011-0002-1121 (Apr. 4, 2011)............................................................................... 14

American Jail Association, ANPRM Comment, DOJ-OAG-2010-0001-0252 (May 6, 2010) .... 12

D.C. Trans Coalition, ANPRM Comment, DOJ-OAG-2010-0001-0042 (Apr. 7, 2010) ............ 18

*Fleming v. Pistro*, No. 4:21-cv-325, Order Following Bench Trial (N.D. Fla. Jan. 17, 2025),
    ECF No. 176 ........................................................................................................... 21

*Fleming v. Rule*, No. 4:25-cv-00157-D, Br. in Supp. of Pls.' Affirmative Mot. for Partial
    Summ. J. (N.D. Tex. Apr. 30, 2026), ECF No. 175 ................................................... 7

*Fleming v. Rule,* No. 4:25-cv-00157-D, Intervenor-Pl's Mot. for Prelim. and Permanent Inj. and
    Br. in Supp. (N.D. Tex. Mar. 30, 2026), ECF No. 152 .............................................. 7

Human Rights Watch, NPRM Comment, DOJ-OAG-2010-0002-1209 (Apr. 4, 2011) ............... 13

Just Detention International, NPRM Comment, DOJ-OAG-2010-0002-1107 (Apr. 4, 2011) ..... 13

Michigan Department of Corrections, NPRM Comment, DOJ-OAG-2010-0002-0605 (Mar. 29,
    2011) ...................................................................................................................... 13

Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (June 2009)....................................................................................................... 8, 10, 17

Sharon Dolovich, UCLA Law School, NPRM Comment, DOJ-OAG-2010-0002-0732 (Mar. 30, 2011) ................................................................................................................... 14

Sylvia Rivera Law Project, ANPRM Comment, DOJ-OAG-2010-0001-0390 (May 11, 2010) ...11

**USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

Pursuant to Local Rule 7.2(f), *Amici* disclose that generative artificial intelligence was used to assist in categorizing public comments made in response to the Advanced Notice of Proposed Rulemaking and Notice of Proposed Rulemaking that preceded the promulgation of the regulations challenged in this action, as described *infra* at pp. 11-12 & n.4.

**INTEREST OF AMICI CURIAE**

*Amici*[1] have a scholarly interest in ensuring that courts evaluate prison regulations affecting vulnerable populations through a careful application of statutory text, administrative law principles, constitutional doctrine, and the realities of custodial administration. *Amici* urge that this court decline to invalidate national rules protecting a highly vulnerable population without full adversarial testing, a complete administrative record, and careful attention to the reliance interests and safety interests of affected nonparties.

*Amicus* Margo Schlanger is the Wade H. and Dores M. McCree Collegiate Professor of Law at the University of Michigan Law School. She is a scholar of civil rights and of the law of incarceration. Schlanger formerly served as the Department of Homeland Security's Officer for Civil Rights and Civil Liberties, and in that capacity advised the Secretary of Homeland Security on matters including drafting of the Department's Prison Rape Elimination Act regulations. She was a witness and member of an expert advisory committee for the Prison Rape Elimination Act Commission. As a Trial Attorney and Senior Trial Attorney at the U.S. Department of Justice, she investigated and litigated cases involving unlawful incarceration conditions.

*Amicus* Samuel R. Bagenstos is the Frank G. Millard Professor of Law at the University of Michigan Law School and the Arlene Susan Kohn Professor of Social Policy at the University

---

[1] *Amici* file this brief in their individual capacities. Institutional affiliations are provided for identification purposes only.

1

of Michigan Gerald R. Ford School of Public Policy. He is a scholar of constitutional law, administrative law, and civil rights. Bagenstos formerly served as General Counsel to the U.S. Department of Health and Human Services and the Office of Management and Budget, where he worked extensively with administrative law and the drafting and promulgation of regulations, and as Principal Deputy Assistant Attorney General for Civil Rights at the U.S. Department of Justice where, among other things, he supervised investigations and litigation regarding unlawful conditions of incarceration.

## SUMMARY OF ARGUMENT

Plaintiffs and Intervenor-Plaintiffs (hereinafter "Plaintiffs") seek extraordinary relief: facial invalidation and vacatur of regulations duly promulgated under the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301–30309. The challenged provisions, 28 C.F.R. § 115.42(c)–(g), require individualized, case-by-case assessment of whether the placement of a transgender or intersex person in a male or female prison or jail would ensure health and safety and whether it would present management or security problems, *id*. § 115.42(c); periodic reassessments to review new safety threats, *id*. § 115.42(d); and serious consideration of an individual's own views with respect to their safety, *id*. § 115.42(e). They also require transgender and intersex prisoners to have the opportunity to shower separate from others, regardless of their housing placement, *id*. § 115.42(f); and prohibit the use of segregated housing units except in narrow circumstances not applicable here, *id*. § 115.42(g).

Plaintiffs primarily focus on the requirement of case-by-case assessment of housing classifications for transgender and intersex individuals, *id*. § 115.42(c). They object to *any* transgender woman being housed in a female facility, in any circumstances; instead, they say, any transgender woman in need of special protection from sexual abuse should be housed in a segregated unit. Any regulations to the contrary are, they argue, unauthorized by statute. But

2

Section 115.42(c) and (g) directly serve PREA's command to prevent, detect, reduce, and punish sexual abuse in custody. The challenged regulations are authorized by statute, are not arbitrary and capricious, and do not violate the Constitution.

When it enacted PREA (by unanimous vote), Congress expressly granted the Attorney General rulemaking authority, directing that the Attorney General "shall publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30307(a)(1). Congress also created the bipartisan National Prison Rape Elimination Commission, which found that transgender people face an acute risk of sexual abuse in custody and that transgender women in men's facilities are at "extremely high risk." *See infra*, pp. 8–9. Exercising its authority under 34 U.S.C. § 30307(a)(1), the U.S. Department of Justice ("DOJ") promulgated regulations that require individualized assessment rather than categorical placement or categorical segregation—precisely the kind of standard Congress authorized.

The regulations are not arbitrary or capricious. DOJ promulgated the PREA standards after first receiving the Commission's recommendations and then undergoing a thorough, multi-year rulemaking process: issuing an advance notice of proposed rulemaking; receiving over 650 comments on that advance notice; issuing a notice of proposed rulemaking; receiving more than 1,300 public comments on that notice; carefully reviewing those comments; and adopting final national standards. The regulations address concrete safety risks to both transgender and other inmates, while preserving institutional discretion to consider management and security concerns in each case. Indeed, what would have been arbitrary and capricious is the Plaintiffs' proposed non-individuated approach, which received *zero* support in PREA's administrative record.

Plaintiffs' constitutional arguments also do not justify facial vacatur. The regulations do not require prison officials to disregard the privacy or safety of women in custody. To the

3

contrary, they specifically require in-advance individualized assessment of classification/housing needs of *all* prisoners, with attention to health, safety, security, and other prison management concerns, as well as a comprehensive response system to any emerging potential threats of sexual abuse. These regulations help prison systems comply with their Eighth Amendment obligation to take reasonable measures to protect incarcerated people from substantial risks of serious harms. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). If a particular housing or supervision situation creates a privacy or safety concern for a specific individual or in a specific facility, the correct response is for the affected prisoner to use the reporting and protective procedures the PREA regulations require the prison to offer. If that yields insufficient relief, the next step is an injunctive action to enforce constitutional rights.

Finally, vacatur would be especially inappropriate on the present record. The Government has not substantively defended the regulations. Judicial review of a regulatory scheme that covers federal, state, and local facilities nationwide requires careful consideration after a full adversarial process—not the circumstances here.

## ARGUMENT

### I. PREA AUTHORIZES THE CHALLENGED REGULATIONS BECAUSE THEY DIRECTLY ADDRESS PRISON RAPE PREVENTION AND PRISON SAFETY.

Plaintiffs seek nationwide vacatur of several regulatory provisions governing housing and related assignments for transgender and intersex people, 28 C.F.R. § 115.42(c)–(g). These provisions form a crucial part of the Prison Rape Elimination Act's (PREA's) regulatory scheme, which covers both general and specific risks to prisoners in American jails and prisons.[2]

---

[2] Separate, though largely similar, provisions govern lockups, community confinement, and juvenile detention. *See* 28 U.S.C. §§ 115.111–115.193 (lockups); 28 U.S.C. §§ 115.211–115.293 (community confinement); 28 U.S.C. §§ 115.311–115.399 (juvenile detention). A separate (though again, largely similar) rule, 6 C.F.R. pt. 115, governs immigration detention.

PREA's purposes include "establish[ing] a zero-tolerance standard for the incidence of prison rape in prisons in the United States," 34 U.S.C. § 30302(1); "mak[ing] the prevention of prison rape a top priority in each prison system," *id.* § 30302(2); and "develop[ing] and implement[ing] national standards for the detection, prevention, reduction, and punishment of prison rape," *id.* § 30302(3).

Furthering these purposes, 28 C.F.R. §§ 115.41(a) requires facilities to screen all people for characteristics that make them more likely to be "sexually abused by other inmates or sexually abusive toward other inmates." And 28 C.F.R. § 115.41(d) sets the minimum parameters of the potential victimization screening:

(1) Whether the inmate has a mental, physical, or developmental disability;
(2) The age of the inmate;
(3) The physical build of the inmate;
(4) Whether the inmate has previously been incarcerated;
(5) Whether the inmate's criminal history is exclusively nonviolent;
(6) Whether the inmate has prior convictions for sex offenses against an adult or child;
(7) Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;
(8) Whether the inmate has previously experienced sexual victimization;
(9) The inmate's own perception of vulnerability; and
(10) Whether the inmate is detained solely for civil immigration purposes.

Section 115.41(e) adds risks of sexual abusiveness: "prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse."

Crucially, 28 C.F.R. § 115.41(g) requires *re*assessment "when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness."

Then, under 28 C.F.R. § 115.42(a), facilities "shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually

5

victimized from those at high risk of being sexually abusive." And the general principle of individuation is set by 28 C.F.R. § 115.42(b), which requires "individualized determinations about how to ensure the safety of each inmate."

The remainder of Section 115.42—the part of the regulations that Plaintiffs challenge—applies these general principles to the particular needs of transgender or intersex prisoners:

> (c) In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

> (d) Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

> (e) A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.

> (f) Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

> (g) The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

The challenged provisions merely apply the general principle of individualized treatment to the particular context of gay, lesbian, bisexual, transgender, and intersex individuals. As we will show, they responded to numerous specific comments in the rulemaking record. They are a valid exercise of the Attorney General's authority under PREA and are not arbitrary and capricious.

### A.  PREA Grants Broad Rulemaking Authority to Prevent Sexual Abuse in Prisons and Jails.

PREA's statutory command is unambiguous: the operative rulemaking provision directs the Attorney General to "publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30307(a)(1). Plaintiffs argue

6

that the statutory delegation is too narrow to permit standards requiring individualized housing assessments for transgender and intersex people. That argument fails. The challenged regulations are directly tied to PREA's core subject: preventing sexual abuse in the nation's prisons and jails.

The resulting regulations combine a carefully developed and comprehensively supported general approach—one that leans heavily on individualized risk assessment to inform custody classification, housing, and supervision—with population-by-population specifics addressing, for example, "youthful inmates" (§ 115.14); inmates with disabilities and with limited English proficiency (§ 115.16) and other groups predictably in need of particular attention. Among these groups are incarcerated people who are gay or lesbian, and those who are transgender or intersex.

Plaintiffs suggest the regulations could pass muster only if the statutory text specifically referenced transgender and/or intersex inmates, or gender identity or gender expression. Br. in Supp. of Pls.' Affirmative Mot. for Partial Summ. J., ECF No. 175 at 23–24; Intervenor-Pls.' Mot. for Prelim. and Permanent Inj. and Br. in Supp., ECF No. 152 at 21–22. But there is no requirement that Congress enumerate every topic to be covered when it enacts a broad rulemaking delegation such as PREA's. The Supreme Court drove this point home in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020), when it emphasized that a statutory provision requiring a federal agency to "craft a set of standards" was "completely silent" on the substance of those standards: "the statute does not, as Congress has done in other statutes, provide an exhaustive or illustrative list." *Id*. Far from treating this silence as a barrier to agency rulemaking, the Court understood it to confer "virtually unbridled discretion" on the outcome of the agency's rule. *Id*. It generalized:

> It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.' *Rotkiske v. Klemm*, 589 U.S. 8, 13-14 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012)); *Nichols v. United States*, 578 U.S. 104, 110 (2016). This principle applies

7

not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text. See *Watt v. Energy Action Ed. Foundation*, 454 U.S. 151, 168 (1981). By introducing a limitation not found in the statute, respondents ask us to alter, rather than to interpret, the ACA. See *Nichols*, 578 U. S., at 104.

*Id*. at 677.

As detailed below, the provisions applying the regulations' general individuation principle to the specific context of housing assignments of transgender prisoners were based on administrative record evidence about sexual violence and abuse against, in particular, transgender women in men's prisons, and the best ways to eliminate such abuses. The regulations took a careful approach, empowering the sound discretion of correctional officials to prevent future abuse. Plaintiffs are simply wrong to say that the regulations exceed statutory authority.

### B. The Regulations Emerged from Comprehensive Study and Careful Rulemaking.

PREA's regulatory process was notably thorough and deliberate. It began with PREA's statutorily chartered body, the bipartisan National Prison Rape Elimination Commission (NPREC), 34 U.S.C. § 30306(a). The statute required the NPREC to produce a report that included, among other topics, "an assessment of the characteristics of inmates most likely to commit prison rape and the effectiveness of various types of treatment or programs to reduce such likelihood"; and "an assessment of the characteristics of inmates most likely to be victims of prison rape and the effectiveness of various types of treatment or programs to reduce such likelihood." 34 U.S.C. §§ 30306(d)(2)(E), (F). And Congress required the Commission to recommend national standards—and specified that those standards should cover "classification and assignment of prisoners." 34 U.S.C. § 30306(e)(2)(A).

Congress expected the Commission's work to be extremely substantial, allotting it five years to complete its work. 34 U.S.C. § 30306(d)(3)(A). And that expectation was borne out:

8

NPREC produced a 259-page report. Nat'l Prison Rape Elimination Comm'n, *National Prison Rape Elimination Commission Report* (June 2009) ("Commission Report"), https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF. It detailed a comprehensive fact gathering and consultative process, including many public meetings, hearings, site visits, and roundtable consultations with "key stakeholders, including representatives of the Federal Bureau of Prisons, associations of corrections professionals, diverse advocacy groups, law enforcement associations, large and small correctional facilities, community corrections agencies, and survivors of sexual abuse." *Id.* at 26. The Commission released its recommended national standards in draft and received two 60-day rounds of written comments from "more than 225 institutions, entities, and individuals." *Id.* at 25–29.

Once the report issued, the Attorney General was required to publish a final rule adopting national standards based on his "independent judgment," after "due consideration" of the Commission's recommendations and other appropriate data. 34 U.S.C. § 30307(a).

DOJ began with an Advance Notice of Proposed Rulemaking ("ANPRM") titled "National Standards to Prevent, Detect, and Respond to Prison Rape," soliciting public input on the Commission's proposed standards. 75 Fed. Reg. 11077 (Mar. 10, 2010). A two-month public comment period followed, producing over 650 comments. Approximately a year later, DOJ published a Notice of Proposed Rulemaking ("NPRM") proposing national standards under PREA for public review and comment, including multiple proposed provisions designed to identify and protect transgender people from sexual abuse. 76 Fed. Reg. 6248 (Feb. 3, 2011). DOJ thoroughly reviewed and considered the more than 1,300 public comments filed, in revising the proposed standards. 77 Fed. Reg. 37106, 37112 (June 20, 2012). In 2012, DOJ promulgated the final rule, which set national standards under PREA. *Id.* at 37106; 28 C.F.R. pt. 115. Thus the

9

rule was developed using precisely the kind of transparent, participatory rulemaking that the APA contemplates. It has been in place for 14 years. 5 U.S.C. §§ 551-559.

Each of the requirements to which Plaintiffs now object has appropriate support in the administrative record. The Commission pointed to numerous sources to conclude that transgender individuals face significant risk of sexual abuse in prison, with transgender women housed in men's facilities facing "extremely high risk for abuse." Commission Report at 73–74. And it cited testimony suggesting that special housing units in men's facilities did not suffice to solve the problem. *Id.* at 74. Based on these findings, the Commission called for "decisive steps" to protect transgender people from prison rape and proposed national standards specific to this population. *Id.* at 7–9, 73–74, 215–35. Its general approach prioritized screening—both during intake and subsequently, cautioning that "to be effective, the results of these screenings must then drive decisions about housing and programming." *Id*. at 8. Based substantially on testimony by corrections officials, its proposed standard "specifically prohibits housing assignments based solely on a person's sexual orientation, gender identity, or genital status because this practice can lead to labeling that is both demoralizing and dangerous." *Id*. at 80 & n.81 (citing, inter alia, hearing testimony of Richard Stalder, Secretary, La. Dep't of Public Safety and Corrections; President, Ass'n of State Correctional Administrators; and testimony of Michael Hennessey, Sheriff, City and County of San Francisco, California).

The DOJ rulemaking process built on the Commission Report and relied on substantial additional evidence. The ANPRM explained that DOJ had established a working group of staff from across the Department and had obtained "preliminary input" via "listening sessions," whose participants included "representatives of state and local prisons and jails, juvenile facilities, community corrections programs, lockups, state and local sexual abuse associations and service

10

providers, national advocacy groups, survivors of prison rape, and members of the Commission."
*National Standards to Prevent, Detect, and Respond to Prison Rape*, 75 Fed. Reg. at 11078.

The ANPRM solicited further, written, feedback: over 650 comments were received. Over 100 of them referenced transgender prisoners, many sharing accounts of sexual abuse in jails and prisons across the country.[3] Nearly all of this group of comments devoted some of their space to housing and classification. Of these, most supported the Commission's proposals, suggesting that, sometimes, placement of a transgender woman in a women's facility was needed to keep her safe. See, e.g., Sylvia Rivera Law Project, ANPRM Comment, DOJ-OAG-2010-0001-0390, at 28–29 (May 11, 2010), https://downloads.regulations.gov/DOJ-OAG-2010-0001-0390/attachment_1.doc, App. at 4 ("Though not all transgender, gender non-conforming and intersex individuals held in confinement feel safest in female facilities, for many individuals it could greatly increase both physical and emotional safety and reduce the overall incidence of sexual abuse."); *see also* American Civil Liberties Union, Lambda Legal, National Center for Lesbian Rights, National Center for Transgender Equality, & Transgender Law Center, ANPRM Comment, DOJ-OAG-2010-0001-0425, at 14 (May 11, 2010), https://downloads.regulations.gov/DOJ-OAG-2010-0001-0425/attachment_1.pdf , App. at 5 ("We strongly support the requirement in SC-2 of individualized classification decisions and especially the prohibition on placement in particular facilities, units or wings solely on the basis of sexual orientation, genital status, or gender identity. Individualized determinations are

---

[3] See Appendix: Search Methodology and Inventory of PREA Public Comments Referencing Transgender Issues (May 19, 2026) [hereinafter App.]. The search methodology employed case-insensitive substring matching of the terms "transgender," "intersex," "gender identity," and "gender nonconforming" against the full text of every comment in both the ANPRM and NPRM dockets. Then we used further word searches and an AI tool to assist in categorizing each tagged comment. The final tally was 106 comments in the ANPRM docket and 133 comments in the NPRM docket. *Id*. at 1–2.

11

particularly important for transgender and intersex inmates.")

A few ANPRM comments opposed the Commission's approach, emphasizing the importance of facility discretion. For example, the American Jail Association opposed regulation of housing decisions because "[h]ousing placements are determined in each agency based upon their physical plant, classification system and supervision methodologies." American Jail Association, ANPRM Comment, DOJ-OAG-2010-0001-0252, at 13 (May 6, 2010), https://downloads.regulations.gov/DOJ-OAG-2010-0001-0252/attachment_1.pdf, App. at 3. But as best as we can determine, not even one ANPRM comment supported Plaintiffs' current assertion that housing *any* transgender woman in a women's facility violates the rights or threatens the safety of other prisoners. *See* App. at 1–2 (reporting zero hits across both dockets for search terms indicating this position).

When DOJ promulgated the proposed rule, its proposal largely agreed with the Commission. As in the Commission proposal, the basic approach was case-by-case determination; the NPRM's version of 28 C.F.R. § 115.42(c) was identical to the final rule: "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." Like the final rule, the NPRM required semi-annual reassessment. 28 C.F.R. § 115.42(d). However, the proposed standard did not include the Commission's recommended ban on segregated housing for LGBTI individuals, citing the example of a dedicated gay/trans Los Angeles jail unit believed by some to be safer than general population for those housed there. *See* 76 Fed. Reg. at 6257.

At that stage, DOJ received over 1300 comments; about 130 discussed transgender

12

prisoners (see App. at 8–15)—the large majority devoting some portion of the comment to the housing assignment issue. Again, most such comments agreed with the case-by-case approach. *See, e.g.*, Just Detention International, NPRM Comment, DOJ-OAG-2011-0002-1107, at 58 (Apr. 4, 2011), App. at 12_ ("[F]or many transgender and intersex individuals, housing in a facility aligned with their gender identity may be the safest and most appropriate option."); Human Rights Watch, NPRM Comment, DOJ-OAG-2011-0002-1209, at 34 (Apr. 4, 2011), ttps://downloads.regulations.gov/DOJ-OAG-2011-0002-1209/attachment_1.pdf, App. at 14 ("We strongly support the requirements in §115.42(c), (d), and (e) regarding assignment and screening of transgender and intersex inmates. The standard helps to guide agencies who all too often, as documented in the Commission's report, have failed to acknowledge the unique vulnerabilities of those inmates to abuse. Automatic assignment of transgender inmates . . . based solely on birth gender . . . has been a common practice that has needlessly subjected them to sexual assaults.").

Some state commenters sought still more discretion. For example, the Michigan Department of Corrections commented that semi-annual reassessment was too onerous a mandate, and that requiring "serious consideration" of an "inmate's own views with respect to his or her own safety" was unnecessary, because "[e]ach agency has a duty to monitor the safety of inmates regardless of the source of the information and should adjust living and programming accordingly without being mandated to do so. To put such a mandate into writing opens this up to the potential for manipulation by inmates." Michigan Department of Corrections, NPRM Comment, DOJ-OAG-2011-0002-0605, at 10 (Mar. 29, 2011), https://downloads.regulations.gov/DOJ-OAG-2011-0002-0605/attachment_1.doc, App. at 9. But again, *not one* commenter asserted that housing a transgender prisoner in a facility aligned with her gender identity would endanger other prisoners or threaten their privacy. *See* App. at 1–2.

13

The comments did push back significantly on the NPRM's failure to adopt the Commission's bar on special LGBT units. See, e.g., Sharon Dolovich, UCLA School of Law, NPRM Comment, DOJ-OAG-2011-0002-0732, at 9 (Mar. 30, 2011), https://downloads.regulations.gov/DOJ-OAG-2011-0002-0732/attachment_1.doc, App. at 10 (proposing the language later adopted: "The agency shall not place lesbian, gay, bisexual, transgender, or other intersex inmates in particular facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement or legal judgment for the purpose of protecting such inmates."); American Civil Liberties Union, the Equity Project, Lambda Legal, National Center for Lesbian Rights, National Center for Transgender Equality, National Juvenile Defender Center, Sylvia Rivera Law Project, & Transgender Law Center, NPRM Comment, DOJ-OAG-2011-0002-1121, at 28 (Apr. 4, 2011), https://downloads.regulations.gov/DOJ-OAG-2011-0002-1121/attachment_1.pdf, App. at 12 (same); Just Detention International, NPRM Comment, DOJ-OAG-2011-0002-1107, at 60 (Apr. 4, 2011), https://downloads.regulations.gov/DOJ-OAG-2011-0002-1107/attachment_1.pdf, App. at 12  ("JDI recommends that placing adult inmates in particular beds, wings or units solely on the basis of sexual orientation, gender identity, genital status or birth gender be permitted only when, as in Los Angeles County, such placement is based on a finding, made by a judge or outside expert, that these inmate groups cannot be housed safely by other means.").

The final rule held to the NPRM provisions we described above, except that the Attorney General decided that special units risked isolation and punitive conditions without sufficient justification.  The final rule's preamble explained: "Because it would not be feasible for the Department to anticipate every case or circumstance that might warrant such placements, the

14

Department has chosen to adopt a final standard that allows use of this practice only where the dedicated facility, unit, or wing is established in connection with a consent decree, legal settlement, or legal judgment." 77 Fed. Reg. at 37153.

In short, a comprehensive process guided the PREA regulations through successive iterations of standard-setting—each one involving careful consideration of significant public input that supported the eventual result of case-by-case decisionmaking about transgender housing assignments. To the extent there was dissensus, it was that prison and jail officials sought more discretion, not less. Plaintiffs' current position—that under no circumstances should a transgender woman be housed in a women's facility—made no appearance. *See* App. at 1–15 (inventorying all 239 comments referencing transgender people across both dockets and finding no support for that categorical position). Had DOJ taken that position, it might well have violated the APA's ban on arbitrary and capricious rulemaking. And such a position would certainly have been an impermissible "surprise switcheroo," *Env't Integrity Proj. v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005), given that neither the agency nor any commentor had put it in issue.

### C.  The Regulations Require Individualized Assessment.

For transgender and other prisoners alike, PREA emphasizes individualized assessment and review, and discretionary judgments by correctional officials. Contrary to the challengers' assertions, the regulations do not impose a categorical placement rule; they require a structured individualized assessment. In fact, it's worth quoting Section 115.42(c) again:

> (c) In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

28 C.F.R. § 115.42(c). The regulations do not define sex. They do not say that every transgender woman must be placed in a women's facility, or that the preferences of a transgender person

15

control the outcome. They do not say that prison officials should ignore the safety or privacy of others. Indeed, the fair reading of Section 115.42(c) is that it expressly *requires* consideration of the safety and privacy of others—that's encompassed by "management and security" concerns.

The individualized structure of the challenged provisions is precisely what aligns them with PREA's core objectives. A categorical rule either forbidding or requiring placement based on gender identity would undermine PREA's safety-centered purpose by substituting rigid mandates for case-by-case analysis that effective prison-rape prevention requires.

The current Administration is, of course, hostile to the approach of these regulations. See Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* § 4(a), 90 Fed. Reg. 8615, 8616 (Jan. 30, 2025) ("The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations."). But even in the last administration, the case-by-case approach meant that gender-identity-based BOP housing was exceedingly rare—only about 1% of trans women prisoners were housed in women's prisons. *Doe v. Blanche*, 172 F.4th 901, 908 (D.C. Cir. 2026). That fact underscores the individualized, and non-categorical, approach of the regulations.

### D.  This Prison-Administration Rule Does Not Raise a "Major Question."

Finally, these regulations do not implicate the "major questions doctrine." The regulations at issue do not assert vast economic or political power. *See Utility Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014) (explaining that Congress is expected to "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance'") (quoting *FDA v. Brown & Williamson Tobacco Grp.*, 529 U.S. 120, 160). They do not restructure the national economy, impose a sweeping new regulatory program, or discover a transformative power in

16

ancillary statutory language. *Cf. West Virginia v. EPA*, 597 U.S. 697 (2022); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) (per curiam); *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023). Rather, they employ conventional tools of prison administration and sexual-abuse prevention to address the precise subject Congress assigned to DOJ: preventing sexual abuse in confinement.

## II. THE REGULATIONS ARE NOT ARBITRARY AND CAPRICIOUS BECAUSE DOJ CONSIDERED THE RELEVANT PROBLEM AND ADOPTED AN INDIVIDUALIZED SAFETY FRAMEWORK.

As described above, the rulemaking record documents a thorough and careful process. The result cannot be characterized as arbitrary and capricious. To the contrary, DOJ quite plainly "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (cleaned up); *see also FCC v. Prometheus Radio Project,* 592 U.S. 414, 424–28 (2021) (holding that agency need only act reasonably on the record).

Why is it necessary that prison officials conducting intake screening consider "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming?" 28 C.F.R. § 115.41(d)(7). Because—as the administrative record supports— those characteristics render prisoners more vulnerable to sexual abuse. See Commission Report 7–8 (Finding 3 on vulnerable populations); *id.* at 73–74 ("Gender Rules": vulnerability of LGB and transgender/intersex prisoners; male-to-female transgender individuals at "special risk" in men's facilities); 77 Fed. Reg. at 37150 (tracing the same risk to "gender nonconformance").

In "deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments," why "consider," even "on a case-by-case basis," "whether a placement would ensure the inmate's health and safety"? 28 C.F.R. § 115.42(c). Because—as the administrative record supports—sometimes

17

placement of a transgender woman in a women's prison is necessary to prevent sexual predation. *See* supra pp. 12–13 (citing NPRM comments). Why consider "whether the placement would present management or security problems"?  28 C.F.R. § 115.42(c). To ensure the safety of all incarcerated people and give due consideration to the day-to-day needs of prison administration.

Why give "serious consideration" to a "transgender or intersex inmate's own views with respect to his or her own safety"?  28 C.F.R. § 115.42(e). Because—as the administrative record supports—transgender prisoners, like everyone else, are likely to have helpful insight into their own needs and vulnerabilities. *See, e.g.*, D.C. Trans Coalition, ANPRM Comment, DOJ-OAG-2010-0001-0042, at 3 (Apr. 7, 2010), https://downloads.regulations.gov/DOJ-OAG-2010-0001-0042/attachment_1.pdf, App. at 2 ("we know where we are safest, and thus housing assignments should reflect the individual situation of every trans person who is incarcerated").

And finally, why bar placement of "lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates"? 28 C.F.R. § 115.42(g). Because—as the administrative record supports—special units are fraught with risks, aren't necessarily safer than general population units, and have often been used punitively, separating their residents from the opportunities for jobs, education, and other programs and services received by others. 77 Fed. Reg. at 37152–53.

Rarer even than a transgender woman housed in a BOP women's facility is the situation in which another prisoner therefore faces a safety threat.  But if that does occur, PREA provides protective mechanisms. Facilities must provide multiple internal and at least one external, anonymous channel to report sexual abuse, harassment, retaliation, or staff neglect, and staff

18

must accept verbal, written, anonymous, and third-party reports. See 28 C.F.R. §§ 115.51, 115.54. When a person is in imminent danger, corrections officials must take immediate protective action upon learning of a substantial risk, *id.* § 115.62; process an "emergency grievance" with an initial response within 48 hours and a final decision within five days, *id.* § 115.52(f); and use protective custody only as a last resort, with documentation and 30-day reviews, *id.* §§ 115.43, 115.68. The PREA regulations guarantee access to outside confidential support services, *id.* § 115.53, require staff and medical/mental-health practitioners to report incidents and limit disclosures appropriately, *id.* § 115.61, obligate first responders to separate parties and preserve evidence, *id.* § 115.64, and protect reporters and victims against retaliation, *id.* § 115.67. In addition, there's a requirement of follow-up: The facility generally must conduct sexual abuse incident reviews after concluding investigations, *id.* § 115.86(a), and must, among other things, "[c]onsider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse," *id.* § 115.86(d)(1). "The facility shall implement the recommendations for improvement, or shall document its reasons for not doing so." *Id.* § 115.86(e). In short, the PREA regulations establish a framework to allow any person in custody—including Plaintiffs—to report danger and obtain protection.

At its core, challengers' disagreement is not with the absence of reasoned decision-making, but with DOJ's choice not to adopt the categorical rule that they prefer. DOJ reasonably determined that PREA's purpose is not best served by categorical rules, but by identifying and mitigating sexual-abuse risks in actual custodial settings through individualized risk assessment. Tellingly, challengers point to no evidence in the administrative record rendering it unreasonable for DOJ to require the framework it adopted: screening for risk factors, individualized placement assessment, periodic reassessment, separate-shower access for transgender and intersex people,

19

staff training, and audit enforcement. Nor do challengers identify evidence that it was unreasonable for DOJ to reject categorical segregation of transgender people solely based on their status, while preserving an exception for dedicated placements established by consent decree, legal settlement, or legal judgment for the protective purposes. 28 C.F.R. § 115.42(g). Allegations of harms and risks at a specific facility may, if proven, support individual- or facility-specific relief under the Constitution, but they do not establish that DOJ acted irrationally in adopting national standards requiring individualized assessment of transgender and intersex people's safety.

### III. PLAINTIFFS' CONSTITUTIONAL THEORIES DO NOT JUSTIFY FACIAL VACATUR OF THE PREA REGULATIONS.

Plaintiffs invoke bodily privacy, the Eighth Amendment, and equal protection principles to attack the constitutionality of the regulations. The challenged provisions do not command prison officials to expose any person to sexual abuse, voyeurism, harassment, or assault. They do not eliminate privacy protections. They do not forbid sex-separated showers or other operational safeguards. They do not place unequal burdens on women. To the contrary, the regulations require case-by-case placement decisions that consider health, safety, management, and security. 28 C.F.R. § 115.42(c). A regulation with those features cannot be facially unconstitutional simply because Plaintiffs contend that they have experienced harms in a particular facility.

If the Court concludes that Plaintiffs have shown particular privacy or safety problems at FMC Carswell that violate their rights and satisfy a cause of action, it can order appropriate particular remedies. *See Lewis v. Casey*, 518 U.S. 343, 360 (1996) ("The constitutional violation has not been shown to be systemwide, and granting a remedy beyond what was necessary to provide relief to [individual plaintiffs] was therefore improper."). Such relief could preserve privacy-space protections, require additional individualized review, or address supervision and

20

facility-design concerns without invalidating the national standard. Vacatur of § 115.42(c)–(g), by contrast, would deprive people in jails and prisons nationwide of the individualized framework Congress authorized DOJ to create under PREA.

### A. The Regulations Safeguard Bodily Privacy by Requiring Individualized Assessments and Preserving Facility-Level Privacy Accommodations.

The governing prison-law framework requires deference to prison regulations that are reasonably related to legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). While incarcerated people retain certain constitutional rights to bodily privacy, those rights are limited by the realities of prison administration. *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing "a prisoner's constitutional right to bodily privacy" and explaining that such claims are evaluated under *Turner*). An incarcerated person's "right to bodily privacy is invaded only when she is coerced or compelled to expose intimate parts of her nude body by a government policy or practice"—not when incidental or accidental exposure occurs despite policies designed to prevent it. *See Fleming v. Pistro*, No. 4:21-cv-325, Order Following Bench Trial (N.D. Fla. Jan. 17, 2025), ECF No. 176 at 3 (concluding that Plaintiff Fleming did not satisfy her burden to prove that she was coerced or compelled to expose herself in shared showers or toilets).

The challenged regulations do not require any incarcerated person to be viewed unclothed by another incarcerated person and do not compel any facility to deny privacy accommodations. The regulations leave room for measures including privacy screens, separate shower schedules, single-user spaces, individualized housing decisions, movement protocols, staff training, and disciplinary measures to protect privacy. The fallacy of the challengers' privacy claim is that it attacks implementation and facility conditions, which does not justify facial relief. Plaintiffs allege that FMC Carswell has shower-door gaps, unlocked bathrooms, mirror sightlines, and

21

allegedly insufficient supervision. Those allegations, even if accepted, identify problems caused by the facility's practices—not by the regulations.

### B. The Regulations Satisfy the Eighth Amendment by Mandating Individualized Risk Assessment and Protective Measures.

The Eighth Amendment requires prison officials to take reasonable measures to protect incarcerated people from substantial risks of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994). A prison official violates the Eighth Amendment only when (1) the alleged deprivation is objectively and sufficiently serious; and (2) the prison official has a "sufficiently culpable state of mind"—specifically, "deliberate indifference to inmate health or safety." *Id.* at 834 (internal citations omitted). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. Whether an official had the requisite knowledge is a "question of fact," *id.* at 842, and "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted," *id.* at 844. The inquiry thus necessarily focuses on what particular officials knew about particular risks.

Regulations mandating case-by-case consideration of health, safety, and management concerns cannot themselves constitute deliberate indifference; they are one mechanism through which officials satisfy their constitutional duty to take reasonable measures to protect incarcerated people from substantial risks of serious harm. Far from exhibiting deliberate indifference, PREA's regulatory scheme is designed to ensure that prison officials identify and respond to individualized risks—the very conduct the Eighth Amendment requires.

Plaintiffs' allegations instead concern facility-specific conditions at FMC Carswell: shower-door gaps, unlocked bathrooms, mirror sightlines, alleged incidents of harassment, and

22

claimed insufficient supervision. These are textbook as-applied claims about how a particular facility implemented its policies—not facial Eighth Amendment challenges to nationwide regulations. If particular officials at a particular facility ignored known threats, failed to conduct required assessments, or tolerated harassment, those facts may support an Eighth Amendment conditions claim. They do not establish that § 115.42(c)–(g) is facially unconstitutional.

## C. An Individualized Safety Assessment Framework Does Not Discriminate Against Women.

The Equal Protection Clause requires that similarly situated persons be treated alike but permits differential treatment when justified by constitutionally sufficient governmental interests. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (rational-basis review for classifications that are not constitutionally suspect); *United States v. Virginia*, 518 U.S. 515 (1996) (heightened scrutiny for sex-based classifications); *Johnson v. California*, 543 U.S. 499 (2005) (strict scrutiny for racial classifications in prisons).

Plaintiffs' equal protection theory appears to be that the challenged regulations subordinate women's interests to the interests of transgender people. They point to alleged facility conditions at FMC Carswell—shared restrooms, showers, dormitory spaces, and common areas—as evidence that the framework imposes unequal burdens on women. That argument fails at the threshold because the challenged provisions do not constitute a sex classification. They do not create a sex-based entitlement for transgender people and do not impose a blanket burden on women. A regulatory framework that requires officials to address individual risks of sexual abuse while considering management or security concerns, 28 C.F.R. § 115.42(c), unquestionably satisfies constitutional scrutiny.

The regulations do not require officials to ignore the safety of women or to house any particular transgender woman in a women's facility. Instead, they require attention to health,

23

safety, management, and security concerns in each placement decision, which gives officials room to account for risks to all people in the specific institutional setting. 28 C.F.R. § 115.42(c). Equal protection principles therefore reinforce, rather than undermine, the individualized approach of the challenged regulations.

## IV. VACATUR IS INAPPROPRIATE WITHOUT A MEANINGFUL SUBSTANTIVE DEFENSE AND ADVERSARIAL TESTING.

Vacatur in this case's current posture would be especially inappropriate. Plaintiffs represent that the Government has repeatedly declined to defend the merits of the challenged regulations and has not yet answered the APA claim. Pls.' MSJ Br. at 18–19, ECF No. 175 ("Defendants did not substantively respond to Plaintiffs' APA arguments in their response to the TRO motion and have repeatedly confirmed in subsequent proceedings that they do not oppose the merits of Plaintiffs' APA claim").

Federal courts do not decide the validity of national regulations by default. *See Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) (per curiam) ("We do not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before us"). Courts review agency action based on law, record, and reasoned adversarial presentation. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–21 (1971) (explaining that judicial review under the Administrative Procedure Act turns on the "full administrative record"). Article III requires genuine adversity between the parties; without it, injunctive relief is improper. *See Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) ("[T]o demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief. . . . there must be a substantial and continuing controversy between two adverse parties.").

Setting aside notice-and-comment regulations on a nationwide basis would be an

24

exceptional step, particularly when the factual record reflects only one party's presentation, the Government has offered no substantive defense, and affected nonparties have had no opportunity to be heard. The requested relief would affect people who are not before the Court and who have relied on the regulatory protections at issue. The effects of vacatur would extend far beyond Plaintiffs, and far beyond transgender women in women's prisons. The challenged regulation govern not only facility placement, but also risk screenings, housing and programming assignments, and shower access, and they apply directly to every federal prison and regulate state facilities as well. 34 U.S.C. § 30307(b), (e).

The Court should therefore decline to vacate the challenged regulations. At minimum, if the Court is inclined to consider facial invalidation, it should require full merits briefing, examine the administrative record underlying the 2012 rule, and allow meaningful participation by parties or amici who will defend the regulations and represent the interests of affected transgender people and others. Such a process is necessary before a court sets aside national sexual-abuse-prevention standards adopted after years of study, public comment, and administrative deliberation.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' and Intervenor-Plaintiffs' requests to vacate 28 C.F.R. § 115.42(c)–(g) and related PREA regulations.

Respectfully submitted this 19th day of May 2026.

/s/ *Holt Major Lackey*
Margo Schlanger
Michigan Bar No. P82345
625 S State St.
Ann Arbor, MI 48109
(734) 615-2618
margo.schlanger@gmail.com

Samuel R. Bagenstos
Michigan Bar No. P73971
625 S State St.
Ann Arbor, MI 48109
857-231-1663
sbagen@gmail.com

Holt Major Lackey
Texas Bar No. 24047763
Holt Major Lackey, PLLC
111 W. Anderson Ln., Ste. D-211
Austin, Texas 78752
512-949-9598
holt@holtmajorlackey.com

Callie Caldwell Butcher
Texas Bar No. 24092203
Butcher Legal Group, PLLC
10228 E. Northwest Hwy, #432
Dallas, Texas 75238
(214) 367-6813
callie@butcherlegalgroup.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Brief was served on all counsel of record through the Court's CM/ECF system on May 19, 2026, as Exhibit A to Margo Schlanger & Sameul R. Bagenstos Motion for Leave to File Brief as *Amici Curiae* in Opposition to Vacatur of PREA Regulations.

/s/ *Holt Major Lackey*
Holt Major Lackey

26